UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MARK SHAPIRO,

                       Plaintiff,                           Case No. 14-cv-10119 (NRB)

      -v-

                                                          **AMENDED**
DANIEL SACHS GOLDMAN, NICHOLAS MCQUAID,    **COMPLAINT**
PREET BHARARA,DONALD G. ANSPACHER,
JANICE K. FEDARCYK,
THE OFFICE OF THE UNITED STATES ATTORNEY:
SOUTHERN DISTRICT OF NEW YORK,
THE FEDERAL BUREAUOF INVESTIGATION,
THE UNITED STATES DEPARTMENT OF JUSTICE,
THE UNITED STATES OF AMERICA, ANTHONY TARDALO,
THE NATIONAL INSURANCE CRIME BUREAU,
RIVKIN RADLER, LLP, DALLAS REGAN,
FARMERS INSURANCE COMPANY,
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO GENERAL INSURANCE COMPANY,
GEICO INDEMNITY INSURANCE COMPANY,
TRAVELERS INDEMNITY COMPANY,
TRAVELERS HOME AND MARINE INSURANCE COMPANY,
STATE FARM FIRE AND CAUSALTY INSURANCE COMPANY,
STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, JOHN AND JANE DOE DEPARTMENT OF JUSTICE
POLICY MAKERS # 1-5 (name(s) who are not fully known at present,
and possibly other unidentified members of the Department of Justice),
FEDERAL BUREAU OF INVESTIGATION SPECIAL AGENTS # 1-5
(name(s) and identification numbers that are not fully known at present,
and possibly other  unidentified members of the Department of Justice),
                                   Defendants.
------------------------------------------------------------------------X

        Plaintiff Mark Shapiro ("Dr. Shapiro" and/or "Plaintiff"), by and through his attorneys,

Davidoff Law Firm, P.L.L.C., complaining of Defendants Daniel Sachs Goldman ("Goldman"),

Nicholas McQuaid ("McQuaid"), Preet Bharara, ("Bharara"), FBI Special Agent Donald G.

Anspacher ("Anspacher"), FBI Assistant Director-in-Charge of the New York Office of the

Federal Bureau of Investigation Janice K. Fedarcyk ("Fedarcyk"), John And Jane Doe

Department Of Justice Policy Makers # 1-5 (name(s) who are not fully known at present, and

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

possibly other unidentified members of the Department of Justice), Federal Bureau Of Investigation Special Agents# 1-5 (name(s) and identification numbers that are not fully known at present, and possibly other unidentified members of the Department of Justice), the Office of the United States Attorney: Southern District of New York ("SDNY"), the Federal Bureau of Investigation ("FBI"), the United States Department of Justice ("USDOJ"), the United States of America (the "United States") (Goldman, McQuaid, Bharara, Anspacher, Fedarcyk, Department Of Justice Policy Makers # 1-5, Federal Bureau Of Investigation Special Agents# 1-5,  SDNY, FBI, USDOJ, the United States, collectively "Government Defendants"), the National Insurance Crime Bureau ("NICB"), Anthony Tardalo, Esq. ("Tardalo") (collectively the "NICB Defendants") Rivkin Radler, LLP, ("Rivkin Radler"), (NICB Defendants and Rivkin Radler LLP collectively the "Faux Law Enforcement Defendants") Dallas Regan ("Regan"), Farmers Insurance Company ("Farmers"), (Regan and Farmers collectively "Farmers Defendants") Government Employees Insurance Company ("GEICO"), GEICO General Insurance Company ("GEICO General"), GEICO Indemnity Insurance Company ("GEICO Indemnity") (GEICO, GEICO General, and GEICO Indemnity collectively "GEICO Defendants"), Travelers Indemnity Company ("Travelers"), Travelers Home and Marine Insurance Company ("Travelers Home") (Travelers and Travelers Home collectively "Travelers Defendants"), State Farm Fire and Casualty Insurance Company ("State Farm Fire"), State Farm Mutual Automobile Insurance Company ("State Farm Auto")(State Farm Fire and State Farm Auto collectively "State Farm Defendants"), (Farmers Defendants, GEICO Defendants, Travelers Defendants, State Farm Defendants collectively the "Defendant Insurance Companies") for conspiring to deprive Dr. Shapiro of his rights associated with the First, Fourth, Fifth, and Fourteenth amendments to the United States Constitution.

## PRELIMINARY STATEMENT

1.      This action is being brought pursuant to 42 U.S.C. §1983 as per the decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 91 S.Ct. 1999 (1971). There also pendent claims.

2.      This case is about conflict of interest inspired corruption of the highest order: the infiltration and annexation of the USDOJ and its various agencies, such as the SDNY and the FBI, on a national scale by the powerful insurance industry.  The above is done with the goal of initiating and controlling investigations as well as prosecutions of so called automobile insurance fraud in order to charge and prosecute for purported fraud and fraud related crimes the maximum number of health care providers and their associates.

3.      The end game of the insurance industry commandeering of the USDOJ is to utilize the federal laws including the Sentencing Guidelines – particularly the loss amount provisions – to force and coerce health care providers to submit to the insurance industry through guilty pleas and massive forfeiture.  The ultimate achievement of the insurance industry is to destroy the health care providers and by doing such destroying each of the providers pending and future claims for reimbursement.  This off course increases the insurance industry's profits as they have been paid healthy premiums up front and avoid paying claims in the end.

4.      This insurance industry usurping of law enforcement is accomplished by an insurance industry trade association known as the NICB.  The NICB is a "not for profit" organization comprised of member insurance companies that comprises nearly 100% of the automobile insurance industry as well as other types of insurance such as homeowners insurance. The NICB is lavishly funded by its member insurance companies.

5.     Despite the NICB's statements to the contrary, the NICB is not a charity – in fact its high ranking members and employees are paid handsomely. The NICB is not a member of law enforcement and the NICB's work is not philanthropic.

6.     The NICB subverts, taints and corrupts investigations by, *inter alia,* falsely initiating complaints of insurance fraud, manufacturing false and/or misleading evidence including the provision of false information under the guise of expertise contained in reports and conversations with members of law enforcement, and pressuring and influencing law enforcement to both investigate and indict health care providers and their associates.  This is all done to create the highest "claim kill" possible in order to increase insurance company profits and to maintain the NICBs existence.

7.     This capture of law enforcement is performed by the NICB without resistance from the USDOJ. On the contrary the USDOJ has an official policy – including a multitude of broad national written policies and local written policies as well as long held custom and practice – that promotes NICB control over the investigative and prosecutorial activities of government law enforcement.

8.     The above policy and custom emanates from the decisions of high level policy makers in Washington D.C. and is foisted upon local branches of the USDOJ, such as the Southern District of New York, as the way business is done.

9.     The USDOJ accomplishes the surrendering of their control to the NICB through what are commonly known as Memorandums of Understanding ("MOUs") between the FBI and other agencies with the NICB.  These MOUs pervade the FBI's dealings with the NICB in insurance related matters and are broad and national in scope as well as local and even case by case.  These MOUs are used to elevate the NICB into the equivalent of a branch of law

enforcement, as evidenced by statements made by high ranking members of the USDOJ, including the U.S. Attorney for the Southern District, which will be discussed infra.

10.     The MOUs are the lynch pin of the insurance industry control of law enforcement investigations as they lend credibility to what is by its very nature a corrupt and conflict of interest-ridden arrangement.  Specifically a private entity that has a financial stake in the investigation, arrest, and prosecution of an entity or individual to which it owes money cannot investigate, arrest, and prosecute that entity.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the parties as Plaintiff alleges that each Defendant acted and conspired to deprive Plaintiff of rights granted to him under the Constitution of the United States of America.  Pursuant to 28 U.S.C. §1331(a), the Court has jurisdiction over Defendants for any such claims arising under the Constitution of the United States of America. *See also,* 28 U.S.C. §1343; 28 U.S.C. §1346; 28 U.S.C. §2201; and 28 U.S.C. §2202.

12.     By two letters dated March 6, 2014 and March 7, 2014, the USDOJ informed Dr. Shapiro that it is in receipt of his notice letter, but it failed to further respond to his administrative claims under the Federal Tort Claims Act ("FTCA"), and further respond after advising Dr. Shapiro's counsel it had too many cases.  Dr. Shapiro has thus exhausted his administrative remedies for purposes of his claims under the FTCA, as more than six (6) months has passed since such letter was sent.  *See* 28 U.S.C. §§2675, 1346.

13.     Venue is proper in the Southern District of New York because a substantial portion of the events complained of and giving rise to Plaintiff's claims occurred in this District,

including the fact that Plaintiff was maliciously prosecuted in the Southern District of New York. *See* 28 U.S.C. §§ 1391(b)(2), 1391(e)(1)(B), 1402(b).

## THE PARTIES

14.     Plaintiff, Dr. Mark Shapiro, is an individual who resides in the Town of Lawrence, County of Nassau, and State of New York.

15.     Defendant Daniel Sachs Goldman was and is believed to be an Assistant United States Attorney who was assigned to be the lead prosecutor and investigator of Dr. Shapiro's case, *United States of America v. Mark Shapiro, et al*., 12-cr-00171-JPO (SDNY) (the "Case"). Dr. Shapiro brings the instant action against Goldman in his individual capacity, as well as in his capacity as an AUSA for the United States Attorney of the SDNY.

16.     Defendant Nicholas McQuaid was an Assistant United States Attorney assigned to Dr. Shapiro's case. Dr. Shapiro brings the instant action against McQuaid in his individual capacity, as well as in his capacity as an AUSA for the United States Attorney of the SDNY.

17.     Defendant Preet Bharara was and is the United States Attorney for the SDNY and was responsible for the oversight and supervision of all investigations and prosecutions in the SDNY, including Dr. Shapiro's case.  Dr. Shapiro brings the instant action against Bharara in his individual capacity, as well as in his capacity as the United States Attorney of the SDNY.

18.     Defendant the SDNY is an agency within the USDOJ, located at 500 Pearl Street, New York, NY  10007, responsible for the investigation and prosecution of criminal cases in the Southern District of New York on behalf of the United States.

19.     Defendant FBI is an agency within the USDOJ that is responsible for investigating and gathering intelligence and information for criminal proceedings, as well as

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

seeking warrants, executing arrests, and administering certain databases that contain and are used to disseminate arrest, detention and other records.

20.     Defendant the USDOJ is a federal agency authorized by federal statute to investigate criminal conduct, make arrests, impose conditions of confinement, and to administer and maintain various databases that contain and are used to disseminate arrest, detention, and other records.  The USDOJ was responsible for investigating Dr. Shapiro's alleged participation in an alleged health care fraud conspiracy, with assistance from the NICB, the FBI, SDNY, as well as the NYPD, DANY, the individual Defendants named herein and the Defendant Insurance Companies.

21.     Donald G. Anspacher is a Special Agent with FBI and upon information contained in the Plaintiff's investigation appears to be the lead agent.  Anspacher investigated Shapiro and others.  Dr. Shapiro brings the instant action against Anspacher in his individual capacity, as well as in his capacity as the United States Attorney of the SDNY.

22.     Jane K. Fedarcyk is the FBI Assistant Director-in-Charge of the New York Office of the Federal Bureau of Investigation.  Dr. Shapiro brings the instant action against Fedarcyk in her individual capacity, as well as in her official as FBI Assistant Director.

23.     John and Jane Doe Department of Justice Policy Makers # 1-5 are yet to be identified high level members of the Department of Justice perhaps reaching to the very top of the DOJ.  Dr. Shapiro brings the instant action against these individuals in their individual capacity, as well as in their official capacity.

24.     Federal Bureau of Investigation Special Agents# 1-5 are yet to be identified FBI agents that are responsible for the "flaking" investigation, arrest and prosecution of Dr. Shapiro.

Dr. Shapiro brings the instant action against these individuals in their individual capacity, as well as in their official capacity.

25.     Defendant the United States is sued under the FTCA, 28 U.S.C. §1346, for tortious acts of its employees committed against Dr. Shapiro.

26.     Defendant the NICB is officially listed as a not-for-profit corporation, incorporated under the laws of the State of Illinois.  The NICB is made up of members (insurance companies) including the Defendant Insurance Companies.

27.     Defendant Anthony Tardalo was and is believed to still be an employee of the NICB and, upon information and belief, held the position of Supervisory Special Agent.  Tardalo and others were responsible for investigating Dr. Shapiro on behalf of the NICB, and personally assisted in the investigation of Dr. Shapiro by providing reports and other materials to members of the SDNY, FBI, USDOJ, as well as the NYPD and DANY.

28.     Defendant Rivkin Radler is a Limited Liability Partnership formed under the laws of the State of New York, with its principal executive office/principal place of business at 926 RXR Plaza, Uniondale, New York,  11556.

29.     Defendant Dallas Regan was, upon information and belief, employed by Farmers Insurance as a Senior Special Investigator/Analyst.  Upon information and belief, Regan was responsible for assisting the NICB, the Defendant Insurance Companies, the FBI, and members of the SDNY in their investigation of Dr. Shapiro, and Regan's improper conduct of falsely accusing Dr. Shapiro in part led to Dr. Shapiro being maliciously prosecuted.

30.     Defendant Farmers Insurance Company is a corporation formed under the laws of Kansas, with its principal executive office/principal place of business at 17000 West 119th Street, Olathe, KS  66061.  Farmers is an insurance company that was and is engaged in issuing

insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

31.    Defendant GEICO is a corporation formed under the laws of Maryland, with its principal executive office/principal place of business at 5260 Western Avenue, Chevy Chase, MD 20815.  GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

32.    Defendant GEICO General Insurance Company is a corporation formed under the laws of Maryland, with its principal office/principal place of business located at 5260 Western Avenue, Chevy Chase, MD  20815.  GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

33.    Defendant GEICO Indemnity Insurance Company is a corporation formed under the laws of Maryland, with its principal executive office/principal place of business at 5260 Western Avenue, Chevy Chase, MD  20815.  GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

34.    Defendant Travelers Indemnity Company is a corporation formed under the laws of Connecticut, with its principal executive office/principal place of business at One Tower Square, Hartford, CT  06183.  Travelers Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

35.     Defendant Travelers Home and Marine Insurance Company is a corporation formed under the laws of Connecticut, with its principal executive office/principal place of business at One Tower Square, Hartford, CT  06183.  Travelers Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

36.     Defendant State Farm Fire and Casualty Insurance Company is a corporation formed under the laws of Illinois, with its principal executive office/principal place of business at One State Farm Plaza, Bloomington, IL  61710.  State Farm Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to the no-fault insurance business.

37.     Defendant State Farm Mutual Automobile Insurance Company is a corporation formed under the laws of Illinois, with its principal executive office/principal place of business at One State Farm Plaza, Bloomington, IL  61710.  State Farm Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to the no-fault insurance business.

## FACTUAL BACKGROUND

## I.   INTRODUCTION

38.     The Government Defendants agreed and conspired with the Faux Law Enforcement Defendants and the Defendant Insurance Companies to cooperate and act in concert to deprive Dr. Shapiro of his constitutional right to be free from deprivation of liberty and property without due process (Fifth and Fourteenth Amendment), further deprived Dr. Shapiro of

his constitutional right to associate (First Amendment) and violated Dr. Shapiro's Fourth Amendment right to be secure in his person, home and dwelling.

39.     Specifically, the Government Defendants, Faux Law Enforcement Defendants and Defendant Insurance Companies fabricated claims, evidence, reports and statements that Dr. Shapiro participated with and was a member of Russian organized crime involved in a conspiracy to commit healthcare fraud.

40.     The indictment obtained against Dr. Shapiro was based solely on the misrepresentations of the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies. The false allegation asserted against Dr. Shapiro was that he prepared radiology reports finding injuries that were not present in the corresponding radiology films. Such false allegation was concocted by the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies and was not supported by any non-fabricated evidence, and was contradicted by the real evidence that the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies did have.

41.     The Government Defendants maliciously prosecuted Dr. Shapiro, which resulted in the Government's dismissal of the indictment against him on December 30, 2013, via the Court entering the *nolle prosequi* at the Government's request.

42.     Ultimately, the complete lack of non-fabricated evidence – real evidence – to support the Government's claim was apparent.  Additionally, the Government conceded that Dr. Shapiro was not a "paper owner" involved in the fraudulent incorporation conspiracy to commit healthcare fraud, which was at the center of the indictment.  Such facts led the AUSA Peter Skinner, whose involvement in Dr. Shapiro's case began at the pre-trial stage, to dismiss the charges against Dr. Shapiro in the face of a pending motion to dismiss, on the eve of trial.  The

dismissal came after almost two years of the Government Defendants intentionally terrorizing, defaming and slandering Dr. Shapiro in the media, in public records, and in the courtroom without an ounce of evidence to support their allegations.

43.     The investigation and prosecution of Dr. Shapiro was conducted by the Government Defendants with the assistance (and pressure and insistence) of the NICB, Tardalo, and the Defendant Insurance Companies, with the no fault law technical assistance of Rivkin Radler, for the sole purposes of furthering the NICB and several of its members' (including the Defendant Insurance Companies) egregious claim-avoidance protocol, i.e., to avoid paying valid claims for medical services that had been properly rendered, as well as to further the general business interests of the Defendant Insurance Companies and the NICB. Thus, the conspiracy and collusive effort of the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies led to an investigation driven and tainted by malice.

44.     The goal of such conspiracy was to convert and exploit state civil regulations into criminal misconduct so as to further intimidate physicians and other medical professionals in the future.  Thus, the arrest and malicious prosecution of Dr. Shapiro was done to appease the NICB and the Defendant Insurance Companies and for purposes of the Government Defendants' own self-aggrandizement.

45.     The Government Defendants, upon information and belief, were also influenced and pressured by the law firm Rivkin Radler, who has among their list of clients the largest of the Defendant Insurance Companies and who overzealously pursues the claim-avoidance protocol on behalf of such clients in civil courts in the State of New York, including in the past against Dr. Shapiro.   Upon information and belief, Rivkin Radler put undue pressure and

threatened to go on a negative public relations campaign against the Government Defendants if they did not prosecute Dr. Shapiro.

46.     The Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies concocted a theory supported by no evidence and contradicted by exculpatory evidence, and exaggerated their alleged loss amounts to obtain an indictment against Dr. Shapiro leading to his arrest and prosecution.

47.     The meritless claims asserted by the Government required Dr. Shapiro to incur almost a half million dollars to defend his name, reputation, and career. This has placed Dr. Shapiro on the brink of financial ruin as he incurred enormous financial damages, suffered a ruined career, and had his name defamed. Even though the Indictment was ultimately dismissed, the resultant damages incurred by Dr. Shapiro are irreparable.

48.     Thus, the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies did act overtly to inflict said constitutional injuries in furtherance of the goals of the conspiracy, and, in fact, damaged Dr. Shapiro.

## II.     THE INDICTMENT AND ARREST OF DR. SHAPIRO AND THE FOLLOWING PRESS RELEASES BY THE GOVERNMENT DEFENDANTS INFLICT MAXIMUM DAMAGE UPON DR. SHAPIRO'S REPUTATION AND PROFESSIONAL LIVELIHOOD

49.     Dr. Shapiro is a board certified radiologist who maintained employment as a radiologist and reviewed radiology films with the same employer since 2001.

50.     Dr. Shapiro also reviewed MRI films for other radiology facilities throughout the course of his employment with his full-time employer, all with the consent and knowledge of his full-time employer.  Dr. Shapiro never visited the other radiology facilities, but would merely

review MRI films that were delivered to him and issue a report as to his findings from his review of each MRI.

51.     On February 29, 2012, Dr. Shapiro was arrested pursuant to an unsealed Indictment.  SA Anspacher was the arresting officer who signed the "Warrant for Arrest" for Dr. Shapiro.  The warrant was then signed by a Federal Magistrate Judge on February 29, 2012.

52.     A variety of the Defendants were present when Dr. Shapiro was handcuffed outside of his residence in Brooklyn, New York, for all the public to see.  It was a gaudy and totally unnecessary show in its size and scope, which was designed to attract maximum attention.

53.     Members of the SDNY, FBI, New York City Police Department ("NYPD") and other law enforcement entities took Dr. Shapiro into custody.  Dr. Shapiro, clothed in his sleeping attire, was not permitted to dress or put a coat on.  Dr. Shapiro was immediately taken to the Fort Hamilton Veteran's Affairs hospital in Brooklyn where most, if not all, of the local arrestees from the unsealed indictment were brought for processing.  Goldman and McQuaid were seen wearing jackets labeled "FBI" while participating in the arrest of Dr. Shapiro and others.

54.     Dr. Shapiro is one of thirty-six (36) defendants named in the unsealed Indictment (the "Indictment") issued by the SDNY, which alleged that Dr. Shapiro was a co-conspirator involved in a $279 million scheme to defraud no-fault automobile insurers.[1]  Dr. Shapiro was specifically charged with conspiracy to commit healthcare fraud and conspiracy to commit mail fraud.

55.     Dr. Shapiro pled not guilty to both charges.

---

[1] The case caption is *United States v. Michael Zemylansky, et al*., 12-cr-171 (JPO).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

56.     The Indictment was void of any specific, or even general, acts that Dr. Shapiro committed in furtherance of the allegations of conspiracy to commit healthcare fraud and mail fraud.

57.     The joint Press Release issued by the USDOJ, SDNY, FBI, and NYPD in conjunction with the filing of the Indictment, proudly billed the case as the largest no-fault insurance fraud prosecution in history, and highlighted the arrest of ten doctors connected with the alleged scheme, including Dr. Shapiro.  The joint Press Release, which was quoted in multiple media outlets (including those in New York City and State), provided details of the alleged fraudulent incorporation of multiple medical facilities and further alleged the co-conspirators' involvement with Russian organized crime.  The Press Release remains on the websites of the USDOJ and FBI as of the filing of this Complaint.

58.     The indictment and Press Release was written to make the case appear sexy as it harped on the buzz phrase "Russian Organized Crime."  This assertion is untrue because many of the Defendants did not migrate from Russia, but rather were immigrants from other Eurasian Countries.  For example, Dr. Shapiro is not Russian.  Dr. Shapiro is not an immigrant.  Dr. Shapiro's background is Jewish and he was born and raised in the United States of America, a citizen since birth.

59.     As noted in the joint Press Release, Bharara stated "the scheme relied on a cadre of corrupt doctors who essentially peddled their medical licenses like a corner fraudster might sell fake ID's," and NYPD Commissioner Ray Kelly commented on the assistance NYPD undercover officers provided in the investigation.  Specifically, the joint Press Release congratulated the NYPD and FBI, and further thanked the NICB, DANY, "and the investigative units of the insurance companies that provided invaluable assistance with the investigation."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

60.     According to the Indictment and the joint Press Release, the Government alleged, without specification to Dr. Shapiro's involvement, a wide-spread conspiracy to commit no-fault insurance fraud.  The Indictment alleged that non-physicians were paying physicians to use their names on paperwork filed with the State of New York Secretary of State to establish medical professional corporations ("PCs") and other entities in the greater New York City area (mainly Brooklyn), which specialized in the treatment of patients involved in no-fault automobile accidents.   These claims were asserted by the Government, represented by Goldman and McQuaid, at Dr. Shapiro's initial hearing, where the Goldman and McQuaid successfully argued to restrict Dr. Shapiro's freedoms and professional opportunities.  Dr. Shapiro posted cash bail in the amount of $15,000.00 and was forced to place a $500,000.00 lien against his residence.

61.     In short, the Government alleged that once the PCs were established under the facially valid cover of the nominal physician-owners, the non-physicians actually owned and operated the companies, and accordingly took the largest share of any profits.  Allegedly, to maintain the appearance that the physicians owned the entities, the non-physicians caused the PCs to contract with management companies (allegedly owned by the non-physicians), providing for the payment of exorbitant fees for routine services.  The Government further alleged that these management companies owned other medical facilities (i.e., chiropractor, acupuncture, physical therapy, etc.) and referred the PC's patients to these facilities when such was medically unnecessary, and/or that the PCs billed no-fault insurance providers for treatments that were not actually provided.  According to the Indictment, if true owners of the PCs were non-physicians, pursuant to New York Law,[2] insurance companies were not required to reimburse those PCs for

---

[2] *See*, *State Farm Mutual Automobile Insurance Company vs. Mallela*, 4 N.Y.3d 313 (2005), in which the New York Court of Appeals held that a violation of a licensing requirement by a

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

the invoiced treatments. In essence, the Government alleged that two components of the conspiracy existed: (1) alleged unlawful billing pursuant to a fraudulent incorporation theory, and (2) alleged improper billing for medical services not rendered and/or services rendered but medically unnecessary.

62.     Included among those thirty-six (36) defendants named in the Indictment were physicians, non-physicians who allegedly owned the management companies and attorneys who the Government alleged provided legal services to physicians and management companies in perpetuation of the fraud.

63.     A quick factual analysis would yield the conclusion that none of the above applied to Dr. Shapiro who simply interpreted MRI films and did not own or purport to own any medical facilities.

64.     After almost two years of requesting a bill of particulars (specific details of the allegations against Dr. Shapiro) from the Government, or otherwise any explanation of what illegal acts Dr. Shapiro allegedly committed, Goldman stated, in open court before the Honorable Paul Oetken, that the Government believed Dr. Shapiro, "inflated reads."[3]   Therefore, the Government alleged that Dr. Shapiro fraudulently stated in his reports that patients sustained injuries when such injuries were not sustained.  In fact, Goldman professed in open court that according to the patients' MRI films, such patients actually didn't have the injuries; or the patients' injuries were actually much less severe than what Dr. Shapiro stated in his reports.

---

medical provider that establishes that the medical provider is not owned and operated by a medical professional renders the medical provider ineligible to be reimbursed by an insurance company for no fault claims that have been assigned to the provider by an individual involved in an automobile accident.

[3] On December 4, 2013, before Judge Oetken in the SDNY, Goldman stated that Dr. Shapiro "inflated reads."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

65.     The Government essentially asserted that Dr. Shapiro fabricated and exaggerated injuries that were not supported by the MRI films in order to allow the medical clinics to gain financially by providing additional treatment and billing additionally based on Dr. Shapiro's "inflated" reports

66.     Early on, Dr. Shapiro requested copies of the MRI films, which Goldman agreed to produce by the end of March 2013 however, as of December 2013 Goldman had failed to produce even one MRI film.  In fact, after being ordered by the Court to produce the MRI films, the Government produced one CD containing approximately six MRI films.  The Government never produced the thousands of MRI films that Goldman and McQuaid claimed to have possession of, nor did the Government ever produce the reports that contradicted Dr. Shapiro's findings, which McQuaid and Goldman claimed be in possession of.  In fact, the Government never indicated one specific case or patient where Dr. Shapiro had allegedly "inflated" his diagnosis.  Not one.

67.     Goldman and McQuaid lied to the Court to perpetuate the prosecution and persecution of Dr. Shapiro for their own personal agendas, including but not limited to Goldman's ego and McQuaid's desire to work for the President, as well as the agenda of their insurance industry/NICB puppeteers.

68.     Dr. Shapiro was not an owner of any PC named in the Indictment, either on paper or in the fraudulent manner alleged in the Indictment.  Rather, Dr. Shapiro was employed as a part-time radiologist by two of the radiology facilities identified in the Indictment, Clearview Medical of Brooklyn, P.C. ("Clearview") and KKM Diagnostic, P.C. ("KKM"), to read radiological films (i.e., MRI and X-Ray) and to provide medical reports based upon his findings. The services Dr. Shapiro performed pertained only to interpreting the radiology films provided to

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

him by Clearview and KKM.  Dr. Shapiro's work was always done at his full-time employment where the radiological films were delivered to and picked up from.[4]  His reports were electronically transmitted to the facilities.  Dr. Shapiro never went to any other facilities he performed reads for, as his work was performed in the same manner a tele-radiologist, who provides services without actually having to be at the location of the patient.  Dr. Shapiro had done similar work intermittently for the owners of Radiology Today P.C., a MRI clinic that previously occupied the address where Clearview was located, which was unbeknownst to Dr. Shapiro at that time.

69.     Because Dr. Shapiro conducted his work for Clearview and KKM at his employer's office, he had no knowledge of the day to day operations of any of the facilities other than Doshi Diagnostic, including those named in the Indictment.  Dr. Shapiro had no role in billing any of the insurance companies as Dr. Shapiro was paid directly by the facilities for the work he performed, which was not contingent upon whether or not the facilities were paid by the insurance companies.[5]

70.     Dr. Shapiro never met with or treated any of the Clearview or KKM patients, never solicited or obtained patients, never made any referrals, and had no choice in which images he was given to review.  Dr. Shapiro simply reviewed the radiology films, created his reports based on his opinions of the films, and electronically transmitted the reports to the medical facilities.

---

[4] Dr. Shapiro's employer permitted him to perform radiology reads for other medical facilities at their office. Dr. Shapiro read MRIs for multiple medical facilities, including Clearview and KKM.

[5] In fact, Dr. Shapiro's compensation was at or below the industry standard for reading MRI's and issuing reports.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

71.     The Government Defendants threatened Dr. Shapiro by stating that if he pursued his lawful medical practice while under federal Indictment, the Government would incarcerate Dr. Shapiro with no opportunity for release pending his trial, and use such against Dr. Shapiro, both in the pending criminal case and in an additional Indictment against him.  Such was done in the face of a Court order granting Dr. Shapiro the ability to execute affirmations for Clearview and KKM patients, which were to be used in his patient's litigations of claims against various insurance industry defendants who refused to pay

72.     McQuaid was vindictive and over the top when he threatened Dr. Shapiro. McQuaid threatened that if Dr. Shapiro continued working in the medical profession they would come after Dr. Shapiro further.  McQuaid's threats were shouted in the Court Room at the close of the hearing despite the ruling of the Magistrate in Dr. Shapiro's favor.  McQuaid's threats had no logical motivation.

73.     Of note McQuaid's threats concerned only Dr. Shapiro's work in private industry No-Fault insurance. Specifically McQuaid did not care about Dr. Shapiro's work in Medicaid or Medicare which evinces McQuaid's and the remainder of the Government Defendants' complicity in the scheme to carry out this tax payer funded investigation and prosecution at the behest and to the benefit of the insurance industry.

74.     In fact McQuaid left his position at the SDNY, and, upon information and belief, as compensation for his work on Dr. Shapiro's criminal case, McQuaid was offered (and he accepted) a position as Associate Counsel with the White House under President Barack Obama. It should be noted that under the Barack Obama presidential administration, most of the insurance companies exponentially increased in value as a result of the President's policies such

as the Affordable Health Care Act and as a result of the approval of prosecutions such as the one brought against Dr. Shapiro.

75.     The Government's threats also forced Dr. Shapiro to place a lien against his residence in order to post bail.  His arrest had a domino effect upon his professional affairs, including his exclusion from multiple banks, insurance companies, and a suspension by the New York State Worker's Compensation Board and other health care governing bodies.  Further Dr. Shapiro's reputation has been damaged to the extent that he is no longer able to find work in his industry to the extent that he did prior to the filing of the frivolous Indictment, the malicious prosecution of him under false pretenses, and the publication of such malicious and frivolous charges, all of which has cost him millions of dollars in lost income, as well as in attorneys' fees and costs needed to defend himself and preserve his medical license.

76.     Dr. Shapiro's annual income was evenly split between his full time employment, and the extra work he did for other facilities, which now is non-existent.  Furthermore, Dr. Shapiro was prohibited from doing any work on no-fault matters during the pendency of his case, which also severely reduced his income.

77.     The conspiracy and collusive effort of the Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies led to a lengthy covert investigation driven and tainted by malice. The Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies concocted a theory supported by no evidence, and contradicted by exculpatory evidence, to obtain an Indictment against Dr. Shapiro, leading to his arrest and prosecution.

78.     The Government Defendants, Faux Law Enforcement Defendants, and Defendant Insurance Companies exaggerated alleged loss amounts and fabricated a claim that Dr. Shapiro

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

participated with and was a member of Russian organized crime, and further conspired to commit healthcare fraud and mail fraud.

79.    Based on recorded conversations from several years of investigation, the Government Defendants, Faux Law Enforcement Defendants, and the Defendant Insurance Companies were well aware that Dr. Shapiro never owned or purported to own any medical facility named in the Indictment and that Dr. Shapiro had no role in billing insurance companies. Such information was corroborated by billing records provided to the Government by the NICB and numerous insurance companies that cooperated with the investigation, including the various Insurance Companies named in the instant Complaint.

80.    During the course of the lengthy covert investigation the Government Defendants and the NICB never obtained evidence to indicate any misconduct and/or unlawful acts as alleged against Dr. Shapiro.  Most significantly, the Government Defendants failed to obtain *any of the radiology films* that Dr. Shapiro examined, even though there was ample opportunity to do so and Goldman and McQuaid claimed that the Government possessed them to the Court.  These films were an obvious necessity to substantiate any allegation that Dr. Shapiro "inflated reads" or exaggerated injuries in his reports.

81.    Further, during the course of the lengthy covert investigation the Government Defendants failed to obtain emails, other written communications, or any recorded conversations to indicate that Dr. Shapiro inflated reads. Additionally, the Government Defendants did not obtain any expert opinion or even seek an expert to review Dr. Shapiro's findings in the reports that were claimed to have been fraudulently produced.

82.    Importantly, Dr. Shapiro's reports based on MRIs from Clearview and KKM patients were in the possession of the Government Defendants as evidenced by the disclosure

provided by the Government during litigation of the case.   These reports were provided to the Government Defendants by the NICB and/or by numerous insurance companies including the Defendant Insurance Companies. Such reports plainly show that Dr. Shapiro reported the existence of a significant injury in approximately 35% of his reports, which is approximately what one may expect to find in a random sample of healthy people who complain of no injuries.

83.     The MRIs Dr. Shapiro reviewed were composed of a sample of patients who complained of injuries due to car accidents, in which on one would obviously expect to find a much higher instance of significant injury than a purportedly healthy population.

84.     A brief review of Dr. Shapiro's reports would have immediately revealed Dr. Shapiro's non-involvement in the alleged conspiracy, and these reports were in the possession of the alleged victims—the Defendant Insurance Companies and others—and were obtained by the Government Defendants and the NICB during the investigation.   In fact, on or about December 14, 2013, after being recently assigned to Dr. Shapiro's case, Assistant United States Attorney Peter Skinner visited Dr. Shapiro's counsel's office to review the reports, which had been organized by Dr. Shapiro's counsel. After a *mere hour* of review, Mr. Skinner realized that the allegations against Dr. Shapiro had no merit, and immediately determined that the Indictment should be dismissed against Dr. Shapiro.

85.     Again, these reports were absolutely available to the Government Defendants as these entities were in possession of the bills and claims that were alleged to have been fraudulently submitted to the alleged victims (the Defendants Insurance Companies and others). Such reports regularly accompany bills and claims submitted to insurance companies.   Thus, the Government Defendants ignored the exculpatory evidence they possessed during the investigation.  Such was done for the sole purpose of arresting Dr. Shapiro, resulting in extensive

benefits to the Government Defendants, Faux Law Enforcement Defendants, and the Defendant Insurance Companies (and others).

86.     Moreover, Dr. Shapiro issued "So Ordered" (by the Court) subpoenas to various insurance companies, including some if not all of the Defendant Insurance Companies and the NICB to produce, among other documents and records, the relevant medical reports at issue in the case that would have included materials that constituted exculpatory evidence as to the criminal charges brought against Dr. Shapiro.  Although the Defendant Insurance Companies and the NICB provided assistance and information, including such exculpatory evidence, to the Government Defendants during the investigation of Dr. Shapiro that lead to his arrest and prosecution, the NICB and many of the Defendant Insurance Companies were unwilling to produce the relevant reports that were requested by Dr. Shapiro pursuant to the subpoenas issued.

87.     Furthermore, Goldman and McQuaid intentionally hid these materials from Dr. Shapiro, even though they possessed them before they went to the Grand Jury seeking an indictment, all for the improper purpose of bolstering their own careers and egos and to gain accolades and friends in the healthcare and insurance industries.  All of this was at the expense of Dr. Shapiro's name, career, and constitutional rights.

**III.    THE EVENTS THAT LED TO DR. SHAPIRO'S ILLEGAL ARREST AND PROSECUTION: THE INSURANCE INDUSTRY'S HIJACKING OF THE GOVERNMENT DEFENDANTS' INVESTIGATION INCLUDING THE DECISIONS AS TO WHO TO TARGET AND THE FABRICATION OF FALSE ACCUSATIONS AND <u>EVIDENCE TO SUPPORT THE PROSECUTION OF SAID TARGETS</u>**

**A.  THE ROLES OF THE VARIOUS CO-CONSPIRATORS**

***1.  The NICB***

88.   The NICBs 2011 through 2013 IRS Form 990 "Return if Organization Exempt from Income Tax" states that the NICB's mission and most significant activities are:

> To lead a united effort of insurers, law enforcement, and representatives of the public to prevent and combat insurance fraud and crime.

89.   The NICB is a non-profit private corporation that is fully funded by the insurance industry with huge sums of money through insurance company membership dues.  It is not a law enforcement agency.  It is not a governmental agency.

90.   The NICB listed in its "Key Benefits of NICB Membership" an advertisement to insurance companies to join the NICB:

> Law enforcement/insurance industry contacts and relationships. Through its relationships with law enforcement and the insurance industry at all levels, the NICB helps Members obtain reports and information that they otherwise could not receive on their own.  The NICB also assists its Members by serving as an outsource solution for their prosecution needs with the ultimate goal of securing restitution.  We leverage our law enforcement relationships, so that Members can focus on identifying new questionable claims and develop future cases …

91.   The NICB boasts that it provides insurance companies with sensitive law enforcement information.  In fact in People v. Ryvkin (Queens County Supreme Court 2465/08), a case that was investigated by essentially the same joint FBI, NYPD, NICB task force as this case, the NYPD detective in charge of the wire room testified at a minimization hearing.  The detective testified that the NICB was given information that was obtained through the various wiretaps on phones, faxes and emails.

> Q. So an insurance industry group is being told what information is being received on a wiretap as the wiretap is ongoing?
>
> A. Correct.
>
> Q. Correct?
>
> A. Correct.

Q. This is a private industry?

A. Yes.

Q. Is there an answer to my prior question?

A. Yes.

Q. Sir, is that proper to be giving out recorded telephone conversations, information from those recorded telephone conversations of U.S. citizens – is it proper to be giving that to a private insurance industry group?  Is that proper?

92.    The law strictly limits the disclosure of information obtained from eavesdropping to another law enforcement officer "to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." Information garnered from eavesdropping most certainly cannot be divulged to civilians.

93.    The NICB also claimed: "The NICB also assists its Members by serving as an outsource solution for their prosecution needs …" Under the law insurance companies do not have recognizable "prosecution needs" nor is it proper for them to have such.  No individual or entity of any kind has a recognizable "prosecution need."  In New York State prosecutions are brought on behalf of the "People of the State of New York."  In the federal system criminal prosecutions are brought on behalf of the "United States of America."

94.    Most brazen is the NICB boast: "We leverage our law enforcement relationships …" It is illegal and unethical for private industry to "leverage" law enforcement.  "Leverage" means "influence", "power", "force", "control."

95.    The following language is taken from Paragraph 9 of the Affidavit of NICB high ranking employee James Hertz which was used by the NICB to attempt to quash a subpoena for records in a prior civil case:

Other NICB agents have also been cross-designated as law enforcement officers in Queens, Nassau and Suffolk Counties for joint investigations. In these investigations NICB agents operate with the same authority as sworn law enforcement officers.[6]

96.   In fact, the NICB and Tardalo filed an absolutely frivolous motion to quash the subpoenas issued by Dr. Shapiro and So Ordered by the Court in the Case. The NICB argued that the NICB was a "Government agent" and that Dr. Shapiro was not permitted to obtain their "government documents" from the NICB. Further, the NICB and Tardalo argued that the subpoenas issued by Dr. Shapiro were overly broad and burdensome, but in the same papers admitted that they obtained materials from its members (insurance companies) and forwarded such materials to the FBI. The NICB and Tardalo's motion was a clear cut attempt to hide the NICB's bad acts.

97.   The NICB and its so called "Special Agents" are required by law to have and maintain private investigators licenses and they do not.

98.   According to Article 7 of the New York State General Business Law, Section 70.

Private Investigators: the following requirements/restrictions are applicable to those who perform Private Investigative Services:

Subdivision 1.

The Department of State shall have the power to issue separate licenses to private investigators …

Subdivision 2.

No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator … without having first obtained from the department of state a license so to do …

Subdivision 3.

---

[6] This would make the NICB a domestic version of the infamous Black Water USA with the Insurance Companies as their master.

No person, firm [etc] … shall engage in the business of furnishing or supplying for a fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company [etc] …without having first obtained from the department of state … a license so to do as private investigator for each such bureau or agency and for each an every sub agency …

Subdivision 4.

Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

Furthermore Section 71 defines "Private Investigator":

"Private Investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to real or personal property; …[etc.]

99.   Pursuant to NY Gen Bus Article 7, Section 72, a Private Investigator's license is far from a mere formality.  There is a rigorous background check including fingerprinting.  It involves the Division of Criminal Justice Services, the FBI, the Chief of Police and the District Attorney in the area the applicant will be practicing, etc.; minimum investigative experience that is rigorous requiring at least three years of prior professional law enforcement investigative experience or experience that is highly comparable (20 years experience for a police officer that did not engage in investigations); and the passing of a rigorous test/exam.

100.  In addition to the above, Article 7 includes a host of administrative requirements that a private investigator must perform and undergo in order to remain licensed.  Private investigators are also subject to a code of conduct and professionalism, which, if violated, leads

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

to sanctions including revocation.  (Sections 73-74)  For example, <u>General Business Law Article 7, Section 74. Issuance of licenses; fee; bonds</u> at <u>Section 74(b)</u> provides an obvious schema for redress by aggrieved entities even requiring that after a license is granted the private investigator must provide "a surety company bond in the sum of ten thousand dollars" before the private investigator can engage in investigations.

101.    Moreover the NICB as a foreign entity is subject to the following under Article 7:

Provided, further, however, before a license is issued to a non-resident the applicant must file with the secretary of state a written consent to the jurisdiction of the courts of New York (i) in any case or cases arising from any contract for which the performance of private investigative services as private investigator … made within the state or to be performed, wholly or in part, within the state or in any way connected with the conduct of business within the state, and (ii) in any case or cases **arising from any tort** occurring within the state occurring in connection with the business of the licensee within the state. (Emphasis added)

102.    Members of the NICB are not licensed by the State of New York as Private Investigators even though their conduct is included in the definitions of private investigator as per <u>Article 7</u>.  This has been verified by the New York Department of State, Division of Licensing.

103.    The NICB avoids formal licensure to avoid being held to a code of conduct enunciated in <u>Article 7,</u> which, if violated, could result in suspension or revocation of said license.  If anything, <u>Article 7</u> is designed to prevent the existence of clandestine shadowy organizations engaging in the intrusion of privacy.

104.    There is a paucity of case law dealing with <u>Article 7</u>.  However, the Supreme Court of New York County Special Term provided the most detailed analysis of <u>Article 7</u> in a vintage decision.  The Court in <u>Shorten v. Milbank</u> stated the following:

What the statute was aimed at was the regulation and control of those conducting the business of private detectives *** Certain evils and abuses growing out of the

> employment [of such private detectives] *** had from time to time attracted the attention of the public, and evidence from such sources had frequently received unfavorable comments from the courts.

170 Misc. 905, 906 (Special Term Sup. Ct. N.Y. Co. 1939) *Affirmed* 256 A.D. 1069 (1st Dep't. 1939) (internal quotations and citations omitted).

105.     The Court went on to further detail the steps that must be taken in order to become a licensed private investigator including background check; sponsorship; examination by the Secretary of State; investigation of character; cannot be a convicted felon or convicted of certain misdemeanors; and the posting of a bond.  Id. at 907.  The Court then stated:

> All of these provisions have for their purposes the protection of the public at large; to prevent from engaging in that business disreputable, incompetent persons who would prey upon the public.  In keeping with these purposes renewals of licenses have been refused where the applicant during the previous license period had been convicted of a crime.

Id.

106.     The Court further stated: "the business [Private Investigator] is malum in se without a license from the state." Id.

107.     The NICB and its "agent"/"investigators" are in violation of New York General Business Law Article 7 and are, and continue to be, guilty of multiple B misdemeanors on a daily basis.  As stated according to General Business Law Article 7, Section 70(4):

> Any person, firm, company, partnership or corporation who violates any provision of this section [investigation without licensure] shall be guilty of a class B misdemeanor

108.     As such the United States Attorney for the SDNY, the FBI, and the USDOJ all promote the commission of crime in New York State on a daily basis in order to benefit the insurance industry.

109.     The NICB has defended itself against complaints that it needs to be licensed by claim to be a philanthropic charity.

110.   The NICB's federal tax filings list the NICB as a 501(c)(4) "Organization type." Quite simply a corporation that falls under IRC 501(c)(4) is not a charity according to the IRS or the Internal Revenue Code. A charity is organized and operated pursuant to 501(c)(**3**) of the Internal Revenue Code.

111.   Furthermore for the tax year beginning January 1, 2013 and ending December 31, 2013 – the NICB's latest filing – the NICB had gross receipts in the amount of $51,743,575.00 dollars.  Its total revenue was $46,750,804.00 dollars.  It expended $31,849,120.00 dollars in salary and employee benefits. The NICB finished the year with net assets in the amount of $25,822,564.00 dollars.

112.   The NICB's current CEO Joseph Wehrle made a total of $503,244.00 dollars in compensation.  CFO Robert Jachnicki made a total of $260,317.00 dollars in compensation. Dan Abbott, Chief Information Officer, made $274,247.00 dollars in total conversation. Drew Sosnowski, Sec/Legal Counsel, made a total of $229,592.00 dollars in compensation.

113.   Let us briefly look at some of the financial dealings of NICB as demonstrated by their most recent their 2013 filing.  The NICB received $44,000,000.00 dollars in membership dues from insurance companies.   The NICB also earned $1,693,751 dollars in investment income.  The NICB's total expenses for the above year were $43,539,548.00 dollars but as stated the NICB ended the year with net assets in the amount of $25,822,564.00 dollars.

114.   The above demonstrates that the NICB is big business.

115.   A charity cannot lobby government like the NICB lobbies government.  IRC 4103(c)(3).  An example of this lobbying is culled from the NICB's own Annual Report for the year 2002.  In the year 2002 the Indiana State Senate debated a bill that would have prohibited state agencies from releasing social security numbers unless required by law or under court

order.  The NICB 2002 Annual Report brags: "When the NICB caught wind of legislation in the Indiana Senate recommending this nondisclosure, we acted quickly to help put the brakes on it." According to the NICB their government affairs team immediately submitted comments and presented testimony.  "The bill never came to a vote and no further action was taken on the proposal, thus helping us ensure that social security numbers from Indiana continue to provide clues for our fraud and theft investigation solutions."  The insurance industry's victory courtesy of the NICB was certainly a defeat for those victimized by identity theft.

116.   In fact under the law an organization must promote the common good and general welfare of the people as a whole in order to be qualified to be a tax exempt Not-For-Profit.  An organization that primarily benefits a private group of citizens cannot qualify for IRC 501(c)(4) exempt status.  *See e.g.* Erie Endowment v. United States, 316 F.2d 151 (2d Cir. 1963). Based upon the above and other conduct the NICB could best be classified as a trade or business association.  Such associations are generally denied 501(c)(4) tax exempt status.  *See e.g.* Contracting Plumbers Cooperative Corp. v. United States, 488 F.2d 684 (2d Cir. 1973) cert. denied, 419 U.S. 827 (1974).   As such the NICB does not even qualify as a not for profit.

117. The NICB utilizes sophisticated lobbying firms to lobby a number of governmental entities including the FBI.

118.  According to various Annual Reports of the NICB, several current and former members of the FBI held positions with the NICB.  For example in 2003, Michael Kirkpatrick, then an active assistant director with the FBI, served on the NICB's Board of Advisors. Likewise, in 2001, Dennis M. Lormel, an active member of the FBI, the Section Chief, Financial Crimes Section of the FBI, sat on the Board of Advisors of the NICB.  In 2005, active FBI Assistant Director Thomas Bush III, Assistant Director of the Criminal Justice Information

Services Division, sat on the Board of Advisors.  In 2006, active FBI Assistant Director Bush was on the Board of Advisors.  In 2003, Eugene Glenn, a former FBI Special Agent who had a 26-year career with the Bureau including serving as the Special Agent in charge of the Salt Lake City Division, was on the Board of Advisors.  In 2003, up to a few years ago, the Chief Executive Officer of the NICB was one Robert "Bear" Bryant.  Shortly before coming to the NICB, Bryant was the Deputy Director of the FBI – the second highest-ranking position with FBI – wherein Bryant managed the day-to-day operations of the FBI. (Bryant has been the CEO of the NICB going as far back as 2000).

119.   An example of the constitutional calamity that occurs when Defendants like State Farm and the NICB team up can be found in <u>Hampton v. State Farm Mutual Automobile Insurance Company</u>, WD 66791 (Court of Appeals of Missouri, Western District, January 8, 2008).  (This is just light work for the NICB and a Defendant Insurance Company).  In <u>Hampton</u> the Plaintiffs reported the theft of their vehicle and made a claim.  State Farm concocted a story claiming that the Plaintiffs actually ditched the vehicle in order to collect insurance money and threatened the claimants with jail if they pursued their claim.  The claimants nevertheless pursued their claim.  State Farm's falsified reports and evidence was passed on to an NICB Agent who persuaded the police to arrest the Hamptons. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.  The Court upheld a punitive damages award of 8 million dollars based on the "egregious acts."

### 2. *AUSAs Goldman and McQuaid, and U.S. Attorney Bharara*

120.   Goldman, along with his cohort, McQuaid, was responsible for the tainted investigation of Dr. Shapiro's alleged participation in the alleged health care fraud conspiracy including promoting and engaging in the fabrication of false evidence and information during the

pre-arrest investigation. Upon information and belief, as the entire Grand Jury Proceeding is a secret known only to the Government, Goldman and McQuaid provided false, coerced, fabricated and misleading information to the Grand Jury.

121.    Goldman and McQuaid knew during the investigation that there was no evidence to support any criminal or civil claims against Dr. Shapiro and in fact aided in the manufacturing of false evidence during the pre-arrest/pre-indictment investigation which included the coercion of their main cooperating witness into fabricating lies about Dr. Shapiro.  The AUSAs also assisted in the creation with the NICB of false documents such as the NICB's grossly inflated "loss amount" chart and the creation of the NICB's grossly inflated unindicted associate chart amongst other fabricated evidence.

120.    Preet Bharara is personally responsible for the un-ethical actions of his Assistants in this matter as Bharara is charged with training, regulating and disciplining his Assistants.  An Assistant United States Attorney ("AUSA") has the power to inflict the worse upon a citizen including loss of liberty, incarceration, economic ruination, the destruction of the citizen's family and even life and death.  As such the monitoring and regulation of AUSAs is as important as the prosecution of crime for a United States Attorney.  In his zeal to appease a politically powerful insurance industry and his superiors in Washington D.C., Bharara promoted the gross misconduct of his AUSAs.

121.    In conjunction with the policy makers from the DOJ and members of the NICB, Bharara permitted Dr. Shapiro's case to be investigated and then maliciously prosecuted to gain headlines and to pad the Defendant Insurance Companies' wallets.  Defendant Bharara issued a self-serving lurid press release (issued jointly by Defendants USDOJ, SDNY, FBI, and NYPD) on February 29, 2012 ("Press Release") that named Dr. Shapiro and further caused Dr. Shapiro

both emotional and financial harm and damages. This Press Release was in many ways more important as a successful prosecution because it: i) ensured that insurance companies would have an alleged justifiable basis to deny insurance claims; ii) promoted the notion that insurance companies must raise rates due to the high amount of insurance fraud when it fact no-fault insurance companies are highly profitable in the State of New York and use the excuse of insurance fraud to increase profitably be delaying and denying legitimate claims; iii) benefited the self-aggrandized the NICB; and iv) benefited the self-aggrandized Bharara and his office.

122.    Bharara betrayed the trust given to the Southern District.  For instance in a RICO action brought by Allstate Insurance Company in the Eastern District of New York based entirely on the indictment in this case a Magistrate Judge in response to arguments made on behalf of one of the Defendants remarked "I trust the Southern District."

### 3.  *The FBI*

123.    The FBI arrested Dr. Shapiro.  Defendant FBI also issued the joint Press Release – which constituted the coup de grace of an NICB sponsored alliance – that named Dr. Shapiro and further caused Dr. Shapiro both emotional and financial harm and damages. Most critically, the USDOJ and the FBI bear more than the lion's share of the responsibility of facilitating the NICB's efforts to improperly influence the decisions and events leading to the violation of Dr. Shapiro's Constitutional rights.

124.    This included the fabrication of evidence and fabrication of conclusions based upon that evidence through the NICB's alleged expertise, which resulted in false conclusions and allegations as to Dr. Shapiro's role  in the conspiracy alleged in the indictment (Dr. Shapiro had no role).

125.   The above was accomplished through a series of written policies known as Memorandums of Understanding ("MOUs") – and other written policies discussed *infra* – between the FBI and the NICB, which were drafted by members of the USDOJ and NICB. These MOUs had the effect of elevating a business trade organization that cared only for their industries' profits – and their high paying jobs with the NICB – into federal law enforcement.

126.   FBI Special Agent Anspacher worked with the NICB and promoted their illegal agenda.   He appears to be the lead agent on the case.   In addition, SA Anspacher was the arresting officer for the arrest of Dr. Shapiro.   SA Anspacher signed the "Warrant for Arrest" for Dr. Shapiro that was signed by a Federal Magistrate Judge on February 29, 2012.

127.   Fedarcyk is the FBI Assistant Director-in-Charge of the New York Office. Fedarcyk was partially responsible for the creation and the administration of the MOU – and possibly multiple MOUs – between the FBI and the NICB.   Fedarcyk was also responsible for the long standing custom and practice of the FBI working with the NICB in New York.   Through Fedarcyk's stewardship the NICB was illegally elevated to the level of governmental law enforcement and experts – which they are not – by the US Attorney's Office and FBI in order to create, *inter alia* (see *infra*), wiretap applications and search warrant applications that contained false conclusions.

128.   In fact, the NICB became the de-facto lead decision makers in the instant investigation through Fedarcyk's stewardship of the illegal alliance with the NICB and, as will be demonstrated, it was the NICBs conclusion, supported by false allegations, that Shapiro and other medical professionals were committing insurance fraud and associated crimes, which was instrumental to the arrest and prosecution of Dr. Shapiro and others.

### 4. *The SDNY*

129.    The SDNY was responsible for and directed and participated in the false investigation of Dr. Shapiro, which falsely alleged his participation in an alleged health care fraud conspiracy, essentially "flaking" Dr. Shapiro. Such was done with assistance from the NICB, the FBI, and the USDOJ, as well as the NYPD, DANY, the individual Defendants named herein, the Defendant Insurance Companies and Rivkin Radler. The SDNY is responsible for the un-ethical actions of its AUSAs in this matter as the SDNY is charged with training, regulating and disciplining said Assistants. The SDNY issued the joint Press Release that named Dr. Shapiro and further caused Dr. Shapiro both emotional and financial harm and damages.

### 5. *The United States Department of Justice*

130.    The USDOJ's role was monumental in facilitating, through both written policy and long standing custom and practice, the infiltration of the insurance industry into the law enforcement actions of the USDOJ, including , the FBI, and the SDNY. The USDOJ issued the joint Press Release that named Dr. Shapiro and further caused Dr. Shapiro both emotional and financial harm and damages.

131.    In addition high ranking members of the USDOJ at the policy making level were and are contacted, lobbied, and inappropriately influenced by the NICB and powerful insurance company entities such a GEICO[7] to, through the NICB, initiate investigations with pre-determined outcomes as to who will be indicted and prosecuted. This is done to hijack law enforcement into "killing" insurance claims, thereby raising insurance industry profits.

---

[7] Multiple GEICO entities fall under the monolithic umbrella of Berkshire Hathaway which is owned by the powerful ardent supporter of the current presidential administration.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

### 6. *Rivkin Radler*

132.   The investigation of Dr. Shapiro was in part initiated and perpetuated by Rivkin Radler who had previously represented various defendants in litigation against Dr. Shapiro.  This was done to put Dr. Shapiro's personal company out of business by not only refusing to compensate Dr. Shapiro's company for services that were properly rendered, but also by influencing a criminal prosecution against him.

133.   On its website (www.rivkinradler.com), Rivkin Radler describes itself as "dedicated to fighting healthcare fraud [that] has saved insurers hundreds of millions of dollars, and led to decisions that will continue to benefit clients for years to come."  Rivkin Radler represents numerous members of the NICB, and was influential in pressing the Government Defendants to bring the charges against Dr. Shapiro, which caused significant harm to Dr. Shapiro.

134.   Evidence supports the conclusion that Rivkin Radler provided legal technical support to the investigation and prosecution of Dr. Shapiro and others.  Government search warrant and eavesdropping applications, as well as the indictment, contain similar language, phrasing, and unique legal theory as Rivkin Radler pleadings in the above mentioned cases.

135.    Rivkin Radler had intimate knowledge of portions of the criminal case that were the subject of a stringent order allowing defense attorneys access to such information only upon the signing of documents essentially swearing that such information could not be shared with anyone save attorneys working on the case, investigators, and the Defendants in order to help in the defense.  The penalty for violation of this order was understood to be jail.

136.   Such information included a list of unindicted entities and individuals that were alleged to be associated with the alleged conspiracy as well as intimate details contained in

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

search warrant applications and the results of the execution of said warrants.  This also included the conversation by the Government's CW-1 and a Gregory Mikhalov revolving around a search of the premises 7122 Bay Parkway, Brooklyn, New York.  Indeed Rivkin Radler appeared to have knowledge of who was to be indicted before the actual obtainment of the Indictments, Such was predicted and likely driven by Rivkin Radler civil RICO actions.

137.   Barry I. Levy, Esq. a partner, attorney and member of Rivkin Radler was responsible for litigating actions against Dr. Shapiro in or about 2010 on behalf of his and Rivkin Radler's clients, including: State Farm, Travelers, and GEICO.  Upon information and belief, Levy was involved with the NICB's investigation of Dr. Shapiro.[8]

138.   Michael A. Sirignano, Esq. is an attorney and member of Rivkin Radler who was responsible for litigating actions against Dr. Shapiro in or about 2010 on behalf of Rivkin Radler's clients: State Farm, Travelers, and GEICO.  Upon information and belief, Defendant Sirignano was involved in the NICB's investigation of Dr. Shapiro.[9]

### 7.   *The Insurance Company Defendants: Killing Claims for Reimbursement by Claiming Insurance Fraud*

139.   The Defendant Insurance Companies all denied claims submitted by Dr. Shapiro and other medical professionals and entities that were proper claims, in an attempt to overly burden and persuade medical professionals to concede medical practices and businesses.

---

[8] Levy lists the following case involving Dr. Shapiro as a significant decision on his Rivkin Radler website profile (http://www.rivkinradler.com/attorney-detail.cfm?pid=12): "*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243 (E.D.N.Y. 2012) (denying motion seeking dismissal of insurers' civil RICO and fraud claims against professional corporation alleged to have operated in violation of state licensing laws and staying the professional corporation's attempts to collect on its pending billing through arbitration)."

[9] Sirignano claims on his Rivkin Radler website profile (http://www.rivkinradler.com/attorney-detail.cfm?pid=70) that his experience includes "acting as lead counsel for insurers in a wide variety of matters, including [supervising] the defense of no fault claims, [counseling] property, automobile and healthcare insurers on fraud prevention, [defending] litigation challenging claims handling practices, and [prosecuting] affirmative recovery litigation in both federal and state court."  Sirignano claims to have "headed the investigation into several large scale fraud schemes and has led the successful prosecution of a number of large recovery actions on behalf of insurers." *Id.*

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

140.     The Insurance Company Defendants are alleged, and falsely claim, to have been a victim of Dr. Shapiro's alleged fraudulent conduct by the Government Defendants in the criminal case, which was ultimately concluded by an order of *nolle prosequi,* at the request of AUSA Peter Skinner whose involvement in Dr. Shapiro's case began at the pre-trial stage. The Defendant Insurance Companies falsely claimed that they were alleged victims of Dr. Shapiro's fraud such that they could seek repayment and an abandonment of claims through the criminal court, including monetary damages from Dr. Shapiro.  The Defendant Insurance Companies, together with the NICB, are responsible for flagging, investigating, and denying its claimants' requests for reimbursement by, in part, utilizing NICB created criteria that hyper inflates the number of "suspect claims" in accordance with their claim-avoidance protocol.

141.     The above NICB false reports of insurance fraud were provided to the NICB and Government Defendants to avoid paying claims.

## B. THE CORRUPT RELATIONSHIP BETWEEN THE GOVERNMENT DEFENDANTS AND THE NICB

142.     The brazen manner in which the insurance industry through the NICB has become an arm of the USDOJ, various U.S. Attorney's Offices and the FBI is extraordinary.

143.     First if one goes to the FBI's Website one will find a page dedicated to explaining what insurance fraud is and what the FBI is doing to combat it.  One will also find the following on the same page:

Insurance Fraud Resources

For more information about Insurance Fraud or where to report it, contact the following organizations.

***

National Insurance Crime Bureau (NICB)

(800) 8356422
The NICB is a nonprofit organization that partners with insurance companies and law enforcement to help identify, detect, and prosecute insurance criminals. The NICB web site is an excellent source of information.

Although the above seems harmless enough, the FBI should not be endorsing any private entity.

What follows is not harmless.

144.    The following description of an MOU between the FBI and the NICB can also be found on the FBI Website – "FBI Records: Freedom of Information/Privacy Act" – "Privacy Impact Assessment for the Staged Accident Data Mining Initiative March 2008."  This document is an admission of much of what is alleged in this complaint.   The pertinent parts of the document read as follows:

INTRODUCTION

The FBI has jurisdiction with respect to the investigation and prosecution of mail and wire fraud, including insurance fraud claims arising from automobile accidents. In order to pro-actively identify national fraud trends in automobile accident insurance claims, the FBI initiated a liaison effort with the National Insurance Crime Bureau (NICB) in order to obtain data from the NICB Claimsearch database. The initiative, directly supported by the FBI Directorate of Intelligence's Financial Crimes Intelligence Unit (FCIU), is named the Automobile Accident Insurance Fraud Initiative (AAIFI, or "Staged Accident"). The goal of this initiative is to identify and analyze information regarding potential and ongoing staged accident cases and schemes as well as other automobile insurance fraud schemes. In the regular course of business, NICB analysts review claims in order to discover and analyze claim and fraud trends. Subsequently, NICB began to provide the FBI with data from the Claimsearch database that NICB analysts had determined to be suspicious in nature. The FBI's use and analysis of data provided by the NICB enables the FBI to more efficiently direct investigations and allocate resources to automobile accident fraud investigations. The Staged Accident initiative does not involve an identifiable database that would constitute an information system. Rather, information is simply forwarded to the FBI's FICU from the National Insurance Crime Bureau (NICB), a not-for-profit organization supported by property and casualty insurance companies targeting insurance crimes, via Word document **after analysis and sanitation by NICB. The data transferred from NICB identifies, in list form, individuals or groups of individuals suspected of making suspicious or staged automobile accident claims within the Area of Responsibility (AOR) of the Field Office initially participating in the pilot project. The list of individuals forwarded to the FBI by NICB also includes any identifiers known to NICB as a result of the claims process, such as the name,**

**address, date of birth of the claimant and any injured parties, as well as the name and address of any treating physician or attorney associated with the claim** …

In other words the NICB provides their conclusions as to who is committing fraud to the FBI so that they can investigate them.

1.1 What information is to be collected?

Pursuant to 18 U.S.C. sections 1341 and 1343, the FBI is authorized to investigate fraud schemes by mail or wire, including insurance fraud, and collect information relevant to such investigations. In the initial stages of this initiative, claims data specific to the AOR of the Field Office participating in the pilot project was and may be collected by NICB member companies and submitted to NICB's Insurance Service Office (ISO) Claimsearch database. **This data was then analyzed by NICB analysts using fraud indicators established by NICB and its member companies to determine which claims were suspicious in nature and related to staged automobile accidents.[10] Thus, to the extent this initiative constitutes data mining, the mining was performed by the NICB before the data was only provided to the FBI. The individual data, consisting of claimant and insured personal identifiers such as names, addresses, dates of birth, and social security numbers, was then forwarded by NICB to the FBI, along with a brief description of the claim submitted.** The Personally Identifiable Information the FBI, along with a brief description of the claim submitted. The Personally Identifiable Information (PII) provided by NICB to the FBI is the same PII provided by an individual to his/her insurance company when filing a claim.

---

[10] The indicators are bogus.  Here is how one attorney tore apart an Affidavit from a State Farm "Investigator" based upon NICB Staged Accident indicators:

"At paragraph 7 we have an analysis using the Insurance Company funded NICB fraud indicators.  At "7 (A)" Smith states that the accident involved two older vehicles – a 1999 Ford and a 1989 Honda.  This is meaningless.  State Farm saw fit to accept insurance premiums on this old Honda.  At "7 (B)" Smith tells us that the accident happened "late at night, at 9:30 p.m."  9:30 is not late at night.  Are we supposed to think that anyone driving after 9:00 is looking to get into a staged accident.  At "7 (C)" we learn that a claimant named Javier "has a prior loss history." … it suggests that if you have had accidents in the past any accident going further is suspicious.  I have had at least 6 accidents in my four plus decades of a life.  Why should I bother buying insurance.  At "7 D" we learn that the "claimant vehicle was in a previous loss where the front end was damaged."  The same can be said of my Hyundai.  Drive in Brooklyn for a couple of months and count the dents.

41.       At "7 E" Smith – who is now a handwriting expert – states that the claimant's – Ms. Luna's – signature on the NF-2 does not match the signature on the insurance application.  Here we have an Exhibit J.  This is really the height of ridiculousness because Exhibit J only contains the signature of Ms. Luna on the NF-2.  The application was signed by the policyholder – a Ms. Alvarado – who is not Ms. Luna.  Ms. Luna's signature does not match Ms. Alvarado's but I think that is irrelevant and expected.

42.       Finally at "7 (F)" Smith tells us that the "injuries sustained were all soft tissue and subjective in nature." What Ms. Smith is saying is that the insurance company funded NICB – really an arm of the insurance industry – does not want insurance companies to pay for soft tissue.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Insurance companies give the NICB information as to who they believe are committing fraud and this is submitted to further analysis by the NICB, which uses fraud indicators invented by the NICB and the insurance companies – not what the FBI believes are indicators of fraud.

1.2 From whom is the information collected?

Information pertaining to automobile accident insurance claims is initially collected by NICB from its member insurance companies. That data is then incorporated into the NICB Insurance Services Office (ISO) Claimsearch database, a repository of claims-related data submitted by NICB members. The ISO database includes property and casualty claims submitted by policyholders. While the FBI is not permitted direct access to the Claimsearch database, **NICB analysts extract possible fraudulent claims data** within the AOR of the initial Field Office participating in the project ...

More the NICB tells the FBI who to investigate.

Section 2.0

The Purpose of the System and the Information Collected and Stored within the System.

2.1 Why is the information being collected?

The information collected and identified by the NICB is provided to the FBI in order to assist the FBI in the investigation and prosecution of mail and wire fraud, including insurance fraud claims arising from automobile accidents. **Information from the NICB Claimsearch database is reviewed by NICB analysts in order to discover and analyze claim and fraud trends. Information deemed by NICB analysts to be suspicious is forwarded to the FCIU. The FBI's use and analysis of data provided by the NICB enables the FBI to more efficiently direct investigations and allocate resources to automobile accident fraud investigations.**

This indicates that the private insurance industry directs the FBI where to spend tax payer money to investigate individuals that the insurance industry wants the FBI to investigate – obviously to the benefit of the insurance industry. It cannot be denied that providers with a large amount of pending claims would make the best targets for the insurance industry from a dollar and cents perspective.

Section 3.0

Uses of the System and the Information

3.1 Describe all uses of the information.

**The information provided by NICB will be used to identify potential staged accident insurance claims in order to open investigations into cases of possible health care and insurance fraud** …

Section 4.0

Internal Sharing and Disclosure of Information within the System

4.1 With which internal components of the Department is the information shared?

The information received from NICB is shared with personnel in the FBI's FCIU, as well as with managers and personnel assigned to the FBI Field Office participating in this initiative. The information may also be provided to personnel within the appropriate U.S. Attorney's Office for purposes of prosecution.

Section 5.0

External Sharing and Disclosure

***

Section 6.0

Notice

6.2 **Do individuals have an opportunity and/or right to decline to provide information?**

Individuals whose information is collected by the NICB and provided by the NICB to the FBI **do not have the opportunity to refuse to allow NICB to forward their claim information to the FBI.** Based on general insurance industry practice, and subject to the provisions of any individual insurance contract, individuals are generally required to provide their insurance carrier with information necessary to process a claim. Failure to provide an insurance carrier with claim-related information may result in denial of that claim. Before such information is provided by NICB to the FBI, the information is first reviewed by NICB. Before such information is provided by NICB to the FBI, the information is first reviewed by NICB personnel. **Only data indicating possible fraudulent automobile accident insurance claims is forwarded to the FBI.**

6.3 **Do individuals have an opportunity to consent to particular uses of the information, and if so, what is the procedure by which an individual would provide such consent?**

Individuals who are the subject of information provided to the FBI by the NICB **do not have the opportunity to consent to specific uses of that information by the FBI,** as that information is used for law enforcement investigative purposes.

If you make an insurance claim, the FBI knows everything about you.  If your insurance company and/or the NICB label your claim fraudulent, the FBI will investigate you.

Conclusion

The goal of the Staged Accident initiative is to identify and analyze information regarding potential and ongoing staged automobile accident cases and schemes as well as other automobile insurance fraud schemes while also protecting individual privacy and complying with privacy laws ...

The rest of this section is excessive verbiage that fails to explain that your already violated privacy is done in compliance with privacy laws none of which are named.

Approval Signature Page

_____/S/_____03/10/2008_____
David C. Larson
Acting Deputy General Counsel and
FBI Privacy and Civil Liberties Officer

_____/S/_____05/05/2008_____
Kenneth P. Mortensen
Acting Privacy and Civil Liberties Officer
Department of Justice

This initiative was included in the Department of Justice's Report on Data-Mining Activities Pursuant to Section 126 of the Patriot Improvement and Reauthorization Act of 2005, which was forwarded to the Congress in July, 2007. That report indicated that a Privacy Impact Assessment would be completed for this initiative.

145.    The NICB works closely with an insurance industry controlled group called the Insurance Services Office Inc. ("ISO"), mentioned above.  The main asset of ISO is a mega-data base that it sells to insurance companies and makes available to law enforcement as administered

by the NICB.  In fact, the ISO website informs members of law enforcement that are having difficulties with the ISO database to contact the NICB and gives an NICB telephone number that should be called.

146.    The ISO database includes hundreds of millions of records for American citizens including insurance claims, medical records, motor vehicle reports, police records and driver's license numbers.  Contained within these documents are dates of birth, address history, social security numbers, license information, phone numbers, etc., of each citizen.

147.    The ISO database is a "Pandora's Box" of identity theft – an identity theft haven where dangerous criminals have everything and more than needed to successfully obtain credit, credit cards, private records, etc., using the identity of American citizens to cause financial ruin, credit destruction, and grief all along the way.

148.    An example of one of a series of MOUs was provided by the FBI in response to FOIA request.  The FOIA request came as a result of what many felt was a racially motivated nationwide joint FBI/NICB effort known as Operation Sudden Impact, which will be discussed *infra*. The production in response to the FOIA request included hundreds of pages of redacted documents and failed to include thousands of pages of other relevant materials.

149.    Among documents included in the FOIA response was a proposed MOU, which outlined the relationship between the FBI and the NICB.  The MOU was included as part of the documentation for a proposed undercover operation to be carried out by the Portland, Oregon, field office of the FBI in relation to an Operation Sudden Impact investigation, code named "Kung Pow II."

150.    The undercover operation was approved by the FBI's Criminal Undercover Operations Review Committee on April 13, 1994, according to the FOIA documents. On April

22, 1994, the Kung Pow II undercover plan was approved by the assistant director of the FBI's

Criminal Investigation Division, Larry A. Potts.  Potts is the same individual who approved the

"Rules of Engagement" authorizing the use of deadly force at Ruby Ridge.  Potts also played a

lead role in the FBI's handling of the Branch Davidian crisis in Waco.  Potts is no longer with the

FBI.  He now works for a private firm called Investigative Group International Inc., which does

work for public agencies as well as private companies and individuals

151.   The proposed MOU is four pages long; however, several passages were redacted

by FBI personnel before the document was released. Whether the MOU was put into effect by

the FBI's Portland field office, or whether similar MOUs were authorized through different FBI

field offices, is not clear from the FOIA documents released.

152.   The Portland document is entitled: "Memorandum of Understanding Between the

Federal Bureau of Investigation and National Insurance Crime Bureau." It begins as follows:

> This Memorandum of Understanding (MOU) constitutes an agreement between the
> Federal Bureau of Investigation (FBI) and the National Insurance Crime Bureau (NICB)
> concerning investigative authority and responsibilities in connection with an investigation
> regarding fraudulent filings and exaggerations of insurance claims which, in part, violate
> Mail Fraud and Fraud by Wire statutes.

The MOU continues:

> The purpose of this MOU is to outline the responsibilities of the FBI and NICB. In
> addition, this MOU will formalize the relationship between the two organizations with
> regard to policy, planning, public relations, and the media in order to clarify the role of
> each organization.

Under "Goal," the MOU states:

> The goal of this cooperation between the FBI and NICB is to use the resources and
> information gathered by both organizations in an effort to prosecute those individuals
> who are involved in fraudulent insurance practices which violate federal statutes.

153.    Later in the document, NICB is charged, as part of the proposed pact, with monitoring "suspicious claims files involving subjects, to include developing a database of this information."

154.    The FBI also agrees to "provide all physical dwellings, all technical installations, security, and furnishings related to the investigation." In other words the FBI moves in with the NICB.

155.    The above MOU, as discussed *infra*, caused a firestorm—and there are certainly similar MOUs governing the ongoing criminal investigation that led to Dr. Shapiro's indictment. These MOUs and other agreements represent FBI/USDOJ written policy formulated at the policymaker level, which caused Dr. Shapiro to be illegally arrested and prosecuted in the manner described in the next section *infra* and described *supra*.

156.    The ease in which the NICB gets what it wants through MOUs is illustrated by a meeting at which a new MOU was created.  The meeting took place in Buffalo, N.Y. on June 6-7, 2012 and was hosted by the Criminal Justice Information Services (CJIS) Advisory Board, which is a division of the FBI. The CJIS was established in February 1992 and is the largest division of the FBI.  Its main feature is a computerized criminal justice information system that is a counterpart to the FBI's National Crime Information Center (NCIC). CJIS offers a much wider range of information nationwide and more precise inquiry search parameters than NCIC. CJIS consists of several databases and one subsystem, and its retrieval and update capabilities are online. The CJIS Division is located in a half million square foot main facility on a 986 acre tract north of Bridgeport, West Virginia.  CJIS services located at this site include the National Crime Information Center (NCIC), Integrated Automated Fingerprint Identification System (IAFIS), Law Enforcement Online (LEO), National Instant Criminal Background Check

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

System (NICS), Uniform Crime Reporting Program/National Incident-Based Reporting System (UCR/NIBRS), and Law Enforcement National Data Exchange (N-DEx). Here statisticians compile vast amounts of data from law enforcement into a series of regular reports detailing the state of crime in communities across the country. The mission of CJIS is to reduce terrorist and criminal activities by maximizing the ability to provide timely and relevant criminal justice information.

157.    In any event, as told to us by CJIS, here is how the NICB picked an even bigger piece of the truly massive and monolithic information contained above.

NCIC Issue #1

Proposal from National Insurance Crime Bureau (NICB) to Modify the Memorandum of Understanding (MOU) with the FBI

Mr. Patsy T. Sabatelli, FBI CJIS Division, presented this issue. The purpose of this issue was to determine if the current MOU between the FBI and NICB should be modified to expand NICB's "Authorized Use" of the NCIC data to include heavy equipment fleet owners who are self-insured and heavy equipment rental companies. In 1994, the CJIS Advisory Policy Board (APB) voted to give the NICB the capability to access the NCIC Vehicle File via a "mirror image file" to be updated automatically and simultaneously via a direct link to NCIC. The NICB use of the NCIC Vehicle "mirror image file" is currently regulated by an MOU between the FBI and NICB and outlines the following uses, access, and services made available to the NICB through their NCIC Vehicle "mirror image file." In 2006, the APB authorized the expansion of the MOU to include the vehicle finance industry in order to more effectively combat vehicle theft. The NICB requested to expand its authorized use of NCIC data to include heavy equipment fleet owners who are self-insured and heavy equipment rental companies in order to combat vehicle theft. If approved, the "Authorized Use" section of the current MOU would be modified to specifically include heavy equipment rental companies and heavy equipment fleet owners who are self-insured. APB Item 12, Page #3

Discussion: The Subcommittee members stated that all five Working Groups endorsed the expansion. However, they requested clarification as to why nine members of the Western Working Group opposed the expanded access. It was thought that the Western Working Group members felt that NICB would continue to request additional access or other entities.

FBI Action Item: In future cases in which similarly situated entities are requesting

expanded NCIC access authorization, the FBI should forward the requests through the Advisory Process consent agenda formality.

NCIC Subcommittee Action:
Motion: Mr. Michael McDonald moved to endorse Option 1: Expand the Authorized Use of NCIC data by NICB to include heavy equipment fleet owners who are self-insured and heavy equipment rental companies.

Second: Ms. Wendy L. Brinkley

Action: Motion carried.

Now the FBI is giving the NICB yet more information including information about self–insured, which logic dictates the NICB should not need.

158.    Although not involving the FBI, a fairly new form of MOU between the NICB and the United States in the form of two separate MOUs is raising some questions by such organizations as the ACLU.

159.    The first MOU is between the USDOJ, the Drug Enforcement Administration, the U.S. Department of Homeland Security, and the U.S. Customs and Border Protection regarding, "SHARING OF LICENSE PLATE READER DATA."  License plate readers (LPR) refers to the taking of images of license plates for all vehicles that cross the borders of the United States including all "ports of entry."  The image consists of "the license plate number, state of origin, and digital images collected" by any party to the agreement."  The purpose of this agreement is not only the sharing of the information but "to authorize further dissemination of the Parties' license plate reader data."  Enter the second MOU.

160.    The second MOU is between U.S. Customs and Border Protection and the NICB. It is seven pages of unnecessary verbiage that can be summed up by one line from the MOU: "LPR information on vehicles departing from and arriving into the United States will be provided to the NICB …" One can certainly imagine that he NICB must be aware of any  little

boy or girl on a family trip to Canada or Mexico crossing the border in the family vehicle..  It begs the question, is there still a Constitutional guaranty of privacy or have we become a police state where industry is the top cop.

### C.  A STEP BY STEP NARRATIVE OF HOW AND WHAT THE DEFENDANTS DID IN THEIR ATTEMPT TO BUILD A FACADE OF JUSTIFICATION TO ARREST DR. SHAPIRO

161.    As is clear from another sensationalized Government Defendant press release, as well as such things as wiretap applications, this case, including the alleged "investigation," was a continuation of a prior investigation and mass "take down."

162.    On October 13, 2010 the FBI, SDNY, NYPD, Department of Homeland Security and Department of Health and Human Resources release a joint press release entitled:

> **Manhattan U.S. Attorney Charges 44 Members and Associates of an Armenian-American Organized Crime Enterprise with $100 Million Medicare Fraud**
> *Defendants Also Charged with Racketeering, Identity Theft, and Money Laundering Crimes Armenian "Vor" Charged with Protecting Alleged Medicare Fraud Scheme[11]*

163.    Prominently displayed in a photo of the press conference is Defendants Bharara, Fedarcyk, with NYPD Police Commissioner Kelly.  The press release announced:

> [T]he unsealing of charges, in two separate indictments, against 44 alleged members and associates of an Armenian-American organized crime enterprise, for a range of offenses including the operation of at least 118 medical clinics located in 25 states that submitted over $100 million in bogus claims to Medicare. The alleged $100 million Medicare fraud scheme identified today is the largest, single Medicare fraud ever charged.

---

[11] We are informed by an expert in the field that a true "Vor" is considered the equivalent of a John Gotti.  A pre-requisite is hard time in a Soviet work camp prison.  Vors have a special inconspicuous tattoo on one of their fingers.  Apparently the Vor in this case is named such because he allegedly made threats to kill people – how this information was acquired is not mentioned.  If threatening to kill someone made one a Vor the rush hour Long Island Expressway would contain hundreds of Vors on any given day.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

The press release describes an investigation into a Medicare fraud scheme that dovetailed into an investigation of No Fault Fraud – the so called Chevrin indictment.

164.    As per orders from top brass at the USDOJ – discussed *infra* – Bharara, in the same breath,  thanked the "FBI, NYPD, HIS, and HHS for their work in the investigation, which he noted was ongoing, Mr. Bharara also thanked the National Insurance Crime Bureau for their assistance in the investigation …"

165.    The "ongoing" "investigation" mentioned by Bharara was the criminal investigation that prompted Plaintiff's arrest and indictment.   As it revolved strictly around private No-Fault insurance from the beginning, it was clearly led, especially as to Dr. Shapiro, by the NICB.

   *a.  **The Clearview Analysis***

166.    On September 17, 2010 NICB (so called) Special Agent Defendant Tardalo issued to the FBI what has been dubbed the "Clearview Analysis."   This 35 page report centered on "Clearview of Brooklyn Medical P.C. 2965 Ocean Parkway Brooklyn, N.Y. 11235."   In this report we find that "SSA Tardalo searched ISO [discussed above] which shows over 400 claims with a number of referrals."   Apparently sheer volume is a red flag for fraud and not a red flag for success.  According to the report "ISO search shows numerous referrals for staged accidents, caused accidents, fake and exaggerated injuries and excessive treatment."

167.     Further the report stated that "NICAP Query shows 44 reports related to Clearview …and numerous referrals have been entered into NICAP (see below)."[12] What follows below is a heavily redacted disjointed presentation of what were labeled as questionable

---

[12] NICAP is NICB trademarked computer software and computer software encoded on CD-ROMS containing information relating to insurance fraud and for use in case management providing an online computer database in the field of insurance fraud investigation.

claims. This consists of dates, locations and reporting insurance companies – consisting almost entirely of Defendant GEICO companies' flagged claims. Amongst short conclusory labels of fraud, Dr. Shapiro's name is mentioned as a "Provider of Services."

168.    As discussed and demonstrated above, the NICB and insurance company indicias of fraud are bogusly designed to label almost anything as potential fraud including an "older vehicle" involved in an accident; a prior claim history; an accident after 9:00 PM, etc. Furthermore the insurance company Special Investigative Unit and Claims Handlers are incentivized financially to deny claims. As such their accounts suffer from an inherent bias. This is supported by numerous studies which warn insured to be careful with their phraseology when reporting a claim.

169.    The Clearview Analysis is therefore nothing but fabricated evidence and false claims.

170.    The heavy mention of the Defendant GEICO companies in the Clearview analysis is no coincidence. The GEICO companies as well as the other Insurance Company Defendants had a clear agenda to eliminate Shapiro – especially GEICO – as evidenced by the many of the Defendant Insurance Companies – GEICO, Travelers and State Farm – utilization of Defendant Rivkin Radler to pursue Dr. Shapiro civilly.

171.    Upon information and belief, the multiple GEICO entities that fall under the monolithic umbrella of Berkshire Hathaway pushed high ranking members of the USDOJ at the policy making level to eliminate Shapiro and others as providers of services that bill.

172.    In addition, upon information and belief, Rivkin Radler contacted the Defendant SDNY pushing them to specifically eliminate Shapiro.

### b. *The Clearview Analysis Wiretap Applications*

173.     On October 8, 2010, nearly a month after the so called "Clearview Analysis" the Government Defendants presented a series of documents in support of an application for an eavesdropping warrant on a cell phone the user of which the Government mistakenly identified. The documents were signed by the Judge on October 8, 2010. Included in this package is the Affidavit of an FBI Special Agent.[13]

174.     The Affidavit makes reference to the case discussed in the above "Vor" Press release including the names and prior wiretaps related to the investigation.  In fact the Affidavit states that the present investigation for which the application was being submitted "grew out of an off shoot" of the above mentioned Vor Press Release investigation which was also still ongoing – for five more days.

175.     The first mention of the NICB in the Affidavit goes like this:

> Often, the National Insurance Crime Bureau ("NICB") becomes aware that a particular clinic is generating an unusually high volume of questionable claims.  In such instances, after the NICB conducts clinic inspections and examinations of patients under oath (known as "EUOs"), and slows down the processing and payment of claims, a clinic will simply change its locale, name and/or "front" doctor, and continue to operate as before.

First, the Affidavit is mistaken in that the NICB does not conduct EUOs.  Insurance companies conduct EUOs.  More and more of these EUOs are being conducted by law firms such as Defendant Rivkin Radler with the purpose of building a criminal and civil case.  Under the guise of litigating fraudulent incorporation allegations, Rivkin Radler is fond of demanding onerous financial documents including complete bank records containing statements and every check written.  The same is true of income tax records. The real purpose is to put the medical provider

---

[13] Details are being omitted due to the sensitive nature of this matter.  Some of these details do not speak well as to the careless nature of the Government Defendants' work on this matter.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

through an insurance company tax audit.  This is done to bully the provider into dropping the provider's claims.

176.    In any event, the above-cited statement from the Affidavit attempts to elevate the NICB to expert status because it states, in essence, that if the NICB labels a provider as bad it must be so.  The above-cited statement also blindly attaches scrutiny to volume – an insurance provider is targeting solely for observing instances of what the NICB deems as a high volume of patients.  Once again, the determination of what is suspicious is left to the NICB/Insurance Defendant indicia, which is designed to turn any claim into a potentially questionable one.

179.    The Affidavit further states:

> Finally, based on documents and records I received from NICB, as well as discussions I have had with an NICB investigator (as described more fully below), I believe that Clearview is engaged in mail, wire, and/or bank fraud because of the excessive number of bills NICB has identified as well as the types of treatments and bills submitted to insurance companies by mail.

The above is a particularly dull-witted justification for claiming serious crimes: "the excessive number of bills NICB has identified as well as the types of treatments and bills submitted to insurance companies by mail."

180.    What the above-cited statement indicates is that a medical provider is a criminal because they are successful.    Obviously, according to the above-cited statement, members of Clearview – including Dr. Shapiro who merely reads MRI films – are being labeled criminals for merely providing diagnostic tests to many patients.   In other words, if you eliminate such individuals, the insurance industry will save a lot of money.

181.    The above-referenced Affidavit was drafted by Defendant Goldman, possibly with the assistance of others.  As demonstrated, the Affidavit contains sworn testimony that is

misleading at best and more akin to false misrepresentation which is sworn – maybe not perjury, but certainly prosecutorial misconduct.  There is more.

182.    The Affidavit for the most intrusive form of Government surveillance (so sayeth the Courts) continues:

> I have also obtained records that were voluntarily supplied by the NICB on behalf of various insurance companies.  Included in those records was the following:
>
> a.    An MRI report on Clearview letter head that was signed by Mark Shapiro, M.D., a board certified radiologist, for a patient named "M. P.," dated March 4, 2010.  The address included on the report was the Clearview Address and the phone number associated with Clearview was (718) 332-0700 (the "Clearview Phone")
>
> b.    A spreadsheet that includes a compilation of bills from Dr. Mark Shapiro to various insurance companies for June 7, 2010, through June 11, 2010.  This spreadsheet includes 24 bills with Dr. Shapiro as provider, all for $878 to $912. Clearview is the provider for eight of the bills …

183.    Dr. Shapiro located the above referenced report for M. P., the patient noted by the Affiant in the above-captioned passage.  Here it is:

T1 and T2 weighted images in multiple planes through the intervertebral disc spaces demonstrate straightening of the cervical lordosis. The vertebral bodies are normal in height and signal. There is no abnormal signal in the surrounding soft tissues.  Evaluation of the cervical cord is limited. The C2-3 and C3-4 discs are normal in height and signal.  There is no bulge or herniation.  There is no central spinal stenosis or foraminal impingement. The C4-5 and C5-6 discs are normal in height and signal.  There are focal bulges, creating impingement on the neural canal. The C6-7 and C7-T1 discs are normal in height and signal.  There is no bulge or herniation.  There is no central spinal stenosis or foraminal impingement.

The above-cited MRI report bears not one single hallmark of an "inflated read."  There is no herniation, normal disc height and signal, no stenosis, and for the most part no impingement.  The only positive findings are the focal bulges.

184.   Study after study including studies done by the New England Journal of Medicine have demonstrated that from a sample of asymptomatic individuals – no pain or restriction of movement – over one third will have disc herniations and/or significant bulges.

185.   The report demonstrates a fairly healthy spine.  Its inclusion in this affidavit is yet another attempt to manufacture evidence and constitutes sworn misrepresentation, however subtle.

186.   Finally once again the Affidavit mentions that a, "spreadsheet includes 24 bills with Dr. Shapiro as provider, all for $878 to $912.  Clearview is the provider for eight of the bills …" The most logical response to this is, "so what."  That is what MRIs cost.  There is CPT code that insurance companies and providers must abide by in terms of what sums are paid.  And 24 bills is hardly staggering.   The message is, if you eliminate Shapiro's billing you save the insurance industry money.

187.   And it goes on.

We have continued to receive information from NICB related to Clearview and the Tannella Law Office, as well as individuals associated with those entities. However, it takes weeks, if not months, for claims to be filed and processed, and therefore we are receiving information after a delay. As described above in paragraph 21, these records show that multiple clinics have billed no-fault automobile insurance companies for the provision of MRI services by Clearview at least as recently' as June 2010. These records have included some bills, some compilations of bills associated with Clearview and the Tannella Law·Office (such as the spreadsheet referenced above), **as well as information gathered as part of the NICB's' own investigation into no-fault insurance fraud suspected to exist at Clearview and the Tannella Law Office, including, for example, information that since its incorporation in September 2009, Clearview has submitted more than 400 no-fault insurance claims.** We are awaiting more information from the NI'CB related to the TARGET SUBJECTS, Clearview and the

Tannella Law Office. I also understand that from time to time insurance companies interview patients and doctors about claims, and we have requested such records to the extent they exist. Notwithstanding the value of·the information already provided, it simply corroborates other evidence that might be developed by interception of the TARGET CELL PHONE and cannot, on its own, establish that a fraudulent scheme exists. Moreover, because of the lag time in receiving information particularly bills for treatments – the information is mostly helpful in a historical context once other evidence of fraud, such as wire interception of the TARGET CELLPHONE, is developed.

The interception of the TARGET CELLPHONE is necessary to obtain additional evidence regarding who is participating in fraud and confirm Clearview, the Tannella Law Office, and other entities are submitting fraudulent billing. Even where these documents obtained demonstrate the involvement of additional persons and entities in the scheme, the records alone do not demonstrate that the persons or entities are committing the TARGET OFFENSES absent evidence proving that they understand the fraud. Wire interceptions are necessary to obtain such evidence. **Moreover, the wire interceptions will likely provide us with leads that can enable us to request documents from NICB.** (Emphasis added)

Once again the Affidavit in Support of the Wiretap Application cites to the NICB in support of

probable cause of criminality, which evidence consists of a volume of MRI scans and reads:

> information gathered as part of the NICB's' own investigation into no-fault insurance fraud suspected to exist at Clearview and the Tannella Law Office, including, for example, information that since its incorporation in September 2009, Clearview has submitted more than 400 no-fault insurance claims.

188.    The intent of the Defendants is clear:  eliminate Dr. Shapiro to eliminate his

billing and increase the Defendant insurance company profits.  For each and every one of the 400

claims, some citizen paid a healthy insurance premium.  Now the insurance industry, including

the Insurance Company Defendants, is using the Government Defendants and their misleading

fabrications to maximize their profits.  With regard to Dr. Shapiro, the eavesdropping warrant

affidavit is like the Clearview Analysis with more insurance industry false information added.

189.    Finally, the Affidavit contains a fairly lengthy description of the No-Fault law and

the alleged scheme, which appears quite similar to various RICO complaints drafted by Rivkin

Radler against various providers on behalf of the Defendant Insurance Companies. This supports the conclusion that Rivkin Radler provided legal assistance to the Government Defendants.

190.    Defendant Goldman had more involvement in the above-referenced Affidavit. Aside from drafting the Affidavit, Goldman also swears to it veracity. As part of the package of documents that must be submitted to obtain an eavesdropping warrant, Goldman provided his own Affidavit that was also signed and sworn to before a Federal Judge on October 8, 2010. In Goldman's Affidavit, Goldman states that he has read the contents of the Affidavit – he actually drafted it – and that he spoke with the FBI Special Agent. In sum and substance Goldman vouches for its veracity.

191.    On November 10, 2010 an extension of the above wiretap was sought through submission of a new version of the FBI Agent Affidavit (the same agent as above) and another Affidavit from Defendant Goldman. It contains exactly the same false and misleading information as discussed above. The same is true for a package of wiretap materials that were signed by a Federal Judge on December 15, 2010. The fabrication and misrepresentation is perpetuated. Meanwhile the Affidavit describes multiple key conversation intercepts, none of which implicate Dr. Shapiro.

192.    The above same is true for a number of packages of wiretap materials that were signed by Federal Judges. The fabrication and misrepresentation is perpetuated. Meanwhile the Affidavit describes key conversation intercepts none of which implicate Dr. Shapiro.

193.    The misrepresentations perpetuated in materials submitted and authorized on January 15, 2011, and again in  a package of wiretap materials that were signed by a Federal Judge in March of 2011. (Except Defendant Anspacher is the FBI agent on the FBI Affidavit and McQuaid is the AUSA on the AUSA Affidavit)  In addition, the March 2011 materials

contain statements from CW-1 that indicate that Clearview has been shut down by a GEICO lawsuit that, upon information and belief, was filed by Rivkin Radler. The fabrication and misrepresentation is perpetuated again and again. Meanwhile, the Affidavit describes key conversation intercepts, which again do not implicate Dr. Shapiro.

194.    The same is true for a package of wiretap materials that were signed by a Federal Judge on April 4, 2011. Defendant Anspacher is the FBI agent on the FBI Affidavit and McQuaid is the AUSA on the AUSA Affidavit. In addition a CW-1 states that Clearview has been shut down by a GEICO lawsuit that, upon information and belief, was filed by Rivkin Radler. Again the fabrication and misrepresentation is perpetuated and again the Affidavit describes key conversation intercepts, none of which implicate Dr. Shapiro.

195.    The same facts are true concerning packages submitted in support of wiretap materials that were signed by a Federal Judges on May 18, 2011 and June 28, 2011.

196.    The FBI, SDNY and Defendants Goldman and McQuaid are so reliant on the NICB that they elevate the NICB to expert status in Search Warrant Applications. This is demonstrated by a Search Warrant Application Affidavit created by Goldman or McQuaid wherein an FBI Agent swears that:

(i)     The facts in the Affidavit are based upon, *inter alia*, conversations with, "investigators with the [NICB]," and in an attendant footnote states: "I am aware that the NICB is a not-for-profit organization that receives support from property and casualty insurers and that works with insurers and law enforcement agencies to facilitate the detection, investigation and prosecution of insurance fraud,"

(ii)    Vital information was obtained from, among other sources, "NICB investigators,"

(iii)    Probable cause is formed by EUO summaries of claimants, which, as a matter of practice, are conducted by insurance company lawyers upon persons that are unrepresented and confused, and wherein said summaries often do not resemble the actual testimony.

### c.   *The Coercion of Robert Sukhman: The Superstar Cooperator*

197.    On or about July 12, 2012 Robert Sukhman was approached by FBI agents with an offer of a cooperation deal.  Sukhman had been the subject of an intense investigation involving wiretaps and heavy surveillance amongst other data collection efforts.  Everything about his life, family, friends, interests, etc. was known to the Government Defendants.

198.    On July 13, 2011 Sukhman and his attorney met with Defendants Goldman and McQuaid, along with other Government Defendants.

199.    The evidence points to Sukhman as one of the biggest and most important targets of the investigation.

200.    Goldman and McQuaid threatened Sukhman with massive jail time if he did not become an active cooperator.  In addition they threatened to arrest Sukhman's father for his involvement in criminal activity.

201.    Furthermore, Sukhman's wife Lana had a law firm called the Law Office of Lana Sukhman located at 586 Midland Avenue #2c, Staten Island, NY 10306.  Ms.Sukhman's law firm specialized in No-Fault collections and arbitrations for bills that were not paid by the insurance companies (known as denied bills).  In fact, Ms. Sukhman's law firm commenced litigation and arbitration actions and collected money on such actions for certain of the medical provider P.C. entities that were allegedly illegally owned by the Defendants in the criminal case.

202.    Lana Sukhman and her law firm filed arbitrations on behalf of the McGuire P.C.s and collected money for them even though Ms. Sukhman knew that the P.C.s were illegally

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

billing because they were owned by her husband who was not a medical professional.  As such, Ms. Sukhman was committing mail fraud, RICO conspiracy, Health Care Fraud, etc.  As a result Goldman and McQuaid threatened to arrest and prosecute Robert Sukhman's wife.

203.    Due to the above threats which included: massive incarceration for Sukhman, massive incarceration for Sukhman's father, and massive incarceration for Sukhman's wife, Sukhman made it known that he would do or say whatever the Government Defendants wanted him to do or say.  The threat to arrest Sukhman's wife and destroy the family was a tactic used by Goldman and McQuaid a number of times.

204.    Sukhman's efforts were monumental and resulted in a number of arrests and prosecutions that were highly questionable.  Sukhman also began saying things to Goldman and McQuaid while under interrogation.  Sukhman invented the allegation that Shapiro's reads were "good," meaning fraudulently inflated.  Specifically, Sukhman stated that these reads would show a much higher rate of pathology:  "7 out of the 10 reports will have either a herniation or double disk bulge" Sukhman testified at trial.

205.    As such the pre-indictment interrogation of Sukhman by Goldman and McQuaid yielded the fabricated evidence and served as the sole allegation as against Dr. Shapiro.  An allegation that, as demonstrated, is totally false.

### d.  _The Fabricated Loss Amounts: The NICB Tail that Wags the Dog_

206.    Per the Federal Sentencing Guidelines, in a case involving fraud, etc. where money is taken, the amount taken, called the "loss amount," is of great importance.  Of equal importance is the amount intended to be illegally taken, known as the "intended loss amount."  This is due to the fact that the amount actually taken or the amount intended to be taken via fraud (for instance) yield the same number of points under the Sentencing Guidelines.  This point

number correlates to suggested months of incarceration. The higher the amount that was intended to be fraudulently obtained, the higher the points; and the higher the points the longer the period of incarceration for a convicted Defendant.

207.   It works sort of like a game show. Let us say that a person is convicted or pleads guilty to Health Care Fraud. The base number for said conviction is 6 points, which the Sentencing Guidelines chart yields 0-6 months of incarceration for a person like Dr. Shapiro who has never been convicted of a crime.

208.   But if the government pushes for "sophisticated means" like they did for some in this case then we get 2 more points which yields a total of 8 points which still yields only 0-6 months for first time offenders.

209.   Let us say the Government claims "10 or more victims." That is what they did for some in this case. That is 2 more points for a total of 10 points and an incarceration period of 6 to 12 months for first time offenders.

210.   Let us say the Government claims that the Defendant's scheme attempted to steal $5,000 or less – that is no increase. But if the Government argues that the Defendant attempted to steal over $5,000.00, that is an additional 2 points for a total of 12 points, and now the correlating incarceration period is 10-16 months. Let us say the Government asserts that more than $30,000 was intended to be stolen –that's an additional 6 points, which is an 18 point total and produces a ranged of 27 to 33 months in prison.

211.   In this case the Government Defendants asserted that Dr. Shapiro intended to fraudulently steal the sum of $10,302,119.67 dollars. That is an additional 20 points which gives a total of 30 points. 30 points warrants a sentencing range of 97-121 months according to the Sentencing Guidelines.

212.    The Federal Sentencing Guidelines are no longer mandatory but are advisory. Still Judges usually follow them pretty closely unless there are extenuating circumstances.

213.    How did Goldman and McQuaid come up with such a high intended loss amount number of $10,302,119.67 dollars?   Goldman and McQuaid worked with the NICB pre-indictment to fabricate the intended loss amount.

214.    Goldman and McQuaid fabricated the intended loss amount with the NICB in the following fashion.  Any medical provider who billed anything for medical treatment on a patient for whom Dr. Shapiro performed a read of an MRI had their total billing factored into Dr. Shapiro's loss amount.  In other words Dr. Shapiro did some, but not all the reads for Clearview. Clearview billed insurance companies, including the Insurance Company Defendants – the largest amount of bills went to GEICO – in the amount of $4,159,673.89 dollars in total.  That amount was included in Dr. Shapiro's intended loss amount.

215.    Joseph Vitoulis, DO, P.C. billed a total of $1,688,128.46 dollars for various medical modalities as this P.C. is not an MRI facility.  Because Dr. Shapiro performed some reads for patients that attended that facility, his intended loss amount included every dollar billed by that facility.

216.    The above miscarriage of justice was based upon the theory that an MRI promoted other fraudulent treatments. As will be discussed *infra*, for Goldman and McQuaid, all No-Fault claims are presumed fraudulent.

217.    During the pre-indictment investigation Goldman and McQuaid directed the NICB to create a loss amount chart based upon the above theory.  The NICB in conjunction with Goldman and McQuaid did create a loss amount chart that included 133 medical entities, the vast majority of which were never even mentioned in the indictment or wiretaps, etc.

218.     The loss amount chart constitutes fabricated evidence that was created pre-indictment and upon information and belief presented to the Grand Jury.  It is also the source of the grossly exaggerated Press Release claim asserting that the case was the "Largest No-Fault Automobile Insurance Fraud Case Charged to Date," consisting of a "$279 Million Health Care Fraud Scheme."

219.     The truly insidious purpose behind the fabricated loss amounts is that the additional years of imprisonment that result under the Sentencing Guidelines (the massive amount of imprisonment based upon the fabricated loss amounts in this case) acts as an inducement for the Defendant to take a plea.  A plea with far less months of incarceration is arrived at by simply cutting the loss amount.  Thus in a case like Dr. Shapiro's, the Government will offer a loss amount of more than $1,000,000 but less than 2.5 million thereby cutting the points by 4.  In addition, a plea reduces the point total by 3 for so called "acceptance."  That is a total reduction of 7 points which yields 17 points or 24-30 months of imprisonment as opposed to 97 to 121 months, in our hypothetical.   This irresistible incentive strongly encouraged Defendants to take guilty pleas.

220.     Goldman and McQuaid only had the power to create such incentives because they worked with the NICB to fabricate loss amounts.   Ultimately, most of the bogus cases supported by false allegations and fabricated evidence never saw the light of day because they concluded in plea bargains.

   e.  ***The Money-Driven Overzealous Insurance Company Defendants***

221.     Each one of the Defendant Insurance Companies is like a shop keeper that falsely accuses someone of shoplifting to a police officer.  Hypothetically, the police officer will arrest

an innocent person based on the shop keeper's false accusation.  If the truth comes to light, however, the shopkeeper will be liable for false arrest.

222.    In Plaintiff's criminal case, not only did the Defendant Insurance Companies falsely accuse Dr. Shapiro of insurance fraud, but they also provided false information in the form of claims flagged for suspicious activity based on their doctored database and indicators of suspicion.  Such was done at the behest of the NICB and its insurance industry constituents, including the Defendant Insurance Companies, in order to avoid paying claims.

224.    What follows is proof of such conduct in the form of an email or letter written by Defendant Tardalo on behalf of the Defendant NICB to members of the insurance industry, Including the Defendant Insurance Companies:

> Please find included the bills and records requested. Feel free to contact me directly with any questions or concerns.
>
> Thank you,
>
> Dallas Ragan
>
> Senior Special Investigator / Analyst
> SIU Major Operations - Medical
> HelpPoint® Claim Services by Farmers®
> E-mail: dallas.ragan@hpcs.com
> Po Box 6061, Deltona, FL. 32728-6061
> Cell: 407.256.9023
>
>
> Subject: US Attorney's Office request
>
> To All,
>
> The US Attorney's Office SDNY is requesting information to assist in their case involving Dr Mark Shapiro. The US Attorney is requesting all billing where Dr Mark Shapiro is named on the bills as the treating provider, employee, or doing the MRI reads for KKM Medical Diagnostics PC TIN: 272610823 and Clearview of Brooklyn Medical PC 270896603. Please forward me all billing requested ASAP.

**The US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money**. Please lets take the time and get them what they need to make this case.

Confidential Information
Additionally they are looking for any information you may have where defendant Mark Danilovich may be involved in a medical facility in New Jersey. If you any information on this please let me know.

Thank you,
Tony

Supervisory Special Agent Anthony Tardalo
National Insurance Crime Bureau-New York Region
145 Pinelawn Road Suite 330S
Melville, New York 11747
Office: (847) 544-7834
Fax: (847) 544:7277
ATardalo@nicb.org

(emphasis added). The above correspondence and reply are not dated, but were likely written pre-indictment as it seeks information that would be used in the above discussed search warrant applications and loss amount charts.

225.    The above correspondence also demonstrates that this case was all about saving insurance industry money and an invitation to the insurance industry to fabricate:

The US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money. Please lets take the time and get them what they need to make this case.

226.  Further, included below is Defendant McQuaid's argument at a hearing before Judge Katz wherein Dr. Shapiro sought permission to sign affirmations regarding the findings of his pre-indictment MRI reads for a facility that was not even mentioned in the indictment.  Such affirmations were needed for former patients' auto accident litigation against various insurance companies, including the Defendant Insurance Companies .  Without the affirmations, these

patient-claimants could not continue their lawsuits because they would not be able to prove

injury as a threshold issue.  As per a bail condition Dr. Shapiro was not permitted read any MRI

films related to No-Fault.  In an abundance of caution his attorney sought permission to allow

Dr. Shapiro to sign these affirmations

> 227.   McQuaid acted in the following manner:
>
>> MR. McQUAID: Judge, let me explain the basis for our opposition … Our
>> view is that this is an industry [inaudible] no fault [inaudible] industry is
>> absolutely ripe with fraud. … We have absolutely no problem with Dr.
>> Shapiro providing affidavits in cases that don't involve no fault Insurance
>> ... as of now we have not found a so called legitimate no fault claim that
>> we can [inaudible].[14]

After Judge Katz granted Dr. Shapiro's request and the hearing concluded, McQuaid

immediately shouted at Dr. Shapiro while still inside the court room.  McQuaid threatened that if

Dr. Shapiro signed any affirmations, additional charges would be brought and Dr. Shapiro would

be incarcerated.  Of course McQuaid did not care about Dr. Shapiro's work in Medicare or

Medicaid as such entities did not maintain close ties to his office.

> 228.   Finally, there is a unique and novel theory in the Plaintiff's indictment that, as

enunciated by Goldman in documents and open Court, goes like this:  All of the multiple

treatments in this case, even if medically necessary, performed properly by licensed medical

providers and actually helpful to the patient are still fraudulent.  The reason is that said treatment

was the result of a pre-determined cookie cutter protocol of treatment that was not specifically

designed for the individual patient.   So according to Goldman, any predetermined care

constitutes fraud by a doctor, even if it helps the patient.

---

[14] Plaintiff would like to include more of the quoted transcript but much of it was inaudible.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

229.     This novel (and inane) theory benefits insurance companies, including the Defendant Insurance Companies, because if an insurer does not want to pay a claim for treatment, the insurance company can simply state that the treatment is not sufficiently tailored to the individual. This theory ignores the fact that all the patients are being treated for soft tissue injuries caused by automobile accidents primarily involving the spine, which often require predictable treatments, e.g., a chiropractic adjustment, hot and cold packs, electrical stimulation, etc. – there is really no way to artfully do any of the above.

230.     The theory has recently become more popular to insurance companies due to the current insurer friendly climate of this State, which was somewhat created by sensational press releases.   However, at the time of the Plaintiff's indictment, such was a theory primarily espoused only by Rivkin Radler.   This is further proof that Rivkin Radler, given their close relationship to the Insurance Company Defendants (especially GEICO) gave technical assistance to this prosecution against Dr. Shapiro.

### *f.* ***The MOUs Make all of the Above Possible***

231.     There is a Memorandum of Understanding ("MOU") as described in detail above in this case.   In fact there is more than one MOU.   As already discussed, these MOUs laid out a framework for the NICB's significant involvement in this case.   In fact the "Staged Accident Data Mining Initiative" described above and the "NICB's Authorized Use of NCIC Data" MOU as described above pertain to this investigation.

232.     The MOU or MOUs specific to this case that justify the NICB's inclusion in the investigation and decision making were never provided to the Defendants in Plaintiff's criminal case, but will be obtained through discovery.   A recent press release by the FBI tells us about at least one of them:

**New York City Employee Pleads Guilty In Manhattan Federal Court To Million-Dollar Medicaid Fraud**

**FOR IMMEDIATE RELEASE**

Thursday, September 11, 2014

\*\*\*

Mr. Bharara praised the investigative work of the FBI's Health Care Fraud Task Force and the DOI for their assistance in this investigation, which he noted remains ongoing. The New York FBI Health Care Fraud Task Force was formed in 2007 in an effort to combat health care fraud in the greater New York City area. The task force comprises agents, officers, and investigators from the FBI, NYPD, the New York State Insurance Fraud Bureau, U.S. Department of Labor, U.S. Office of Personnel Management Inspector General, U.S. Food and Drug Administration, New York State Attorney General's Office, New York State Office of Medicaid Inspector General, New York State Health and Hospitals Inspector General, and the **National Insurance Crime Bureau**.

(Emphasis added)

233.    According to Defendant U.S. Attorney Bharara, the NICB is a member of the FBI's Health Care Task Force, as are NICB agents, officers and investigators.  The NICB shares this distinction with a list of entities totally comprised of government law enforcement including the FBI, NYPD, and other notable law enforcement agencies listed in the above caption.

**IV.    GOVERNMENT PROSECUTES DR. SHAPIRO WITH NO EVIDENCE TO SUPPORT ANY PROBABLE CAUSE OF WRONGDOING**

234.    In his March 2013 opposition to Dr. Shapiro's Omnibus motion and Motion to Dismiss, Goldman, in bad faith, lied to the Court and to Dr. Shapiro's counsel (Jonathan Marc Davidoff, Esq.) by stating, in response to counsel's request for incriminating MRI films, that the Government would produce MRI films to Dr. Shapiro's defense team by the end of March 2013. As explained *supra*, these MRI films were necessary to show that Dr. Shapiro made material

misrepresentations in his reports, allegedly in furtherance of a conspiracy.[15]   However, it wasn't until December of 2013, just weeks before AUSA Peter Skinner requested an order of *nolle prosequi* as to Plaintiff, that Goldman produced a mere five (5) MRI films to Dr. Shapiro's counsel. Amazingly, none of the five (5) films were associated with any of Dr. Shapiro's reports that indicated significant injury, nor were they even inconsistent with the findings indicated in the correlating reports.

235.   Upon information and belief, attorneys who worked at Rivkin Radler pressured the Government Defendants to indict Dr. Shapiro by threatening to publically proclaim that the Government refused to prosecute fraudulent healthcare providers that were bilking insurance companies, and that such failures would cause insurance premiums to skyrocket.   Michael Sirignano and Barry Levy, in their employment with Rivkin Radler, had previously represented Travelers, State Farm, and GEICO in separate lawsuits against Dr. Shapiro,[16] and egregiously sought a declaration that these insurance companies were not obligated to pay Dr. Shapiro and his company under a theory of fraudulent incorporation.

236.   In September 2013, the U.S. District Court for the Southern District of New York held a trial for the first group of defendants.[17]  Among those tried in the first wave were two non-physician owners of management companies who the Government alleged were the masterminds of the conspiracy, as well as three physicians that the Government alleged were paper owners of fraudulently incorporated PCs, which were allegedly truly owned and operated by the

---

[15] Clearly, to allege that Dr. Shapiro inflated reads, one must certainly compare at least one MRI report to a corresponding MRI film in order to establish the alleged exaggerated or fabricated injury.

[16] Such lawsuit involved a healthcare entity owned by Dr. Shapiro that was not named in or alleged to be involved in any of the misconduct claimed in the Government's Indictment.

[17] The Court ordered separate trials for groups of defendants based on the Government's selected groupings.

masterminds of the conspiracy.  The Government requested that Dr. Shapiro be tried by himself at the end of 2013 or the beginning of 2014.

237.    Included in those who testified at trial were employees of the PCs, patients of the PCs, cooperating witnesses, insurance billing experts, and FBI agents.  Among the evidence presented by the Government were several recorded telephone conversations and a voluminous amount of corporate records, bank statements, medical reports, insurance bills, and reimbursement requests.  Despite the allegation that Dr. Shapiro was involved in a criminal conspiracy with every defendant on trial, not one piece of evidence was presented to support the claim that Dr. Shapiro was involved in the fraudulent incorporation of any of the facilities. Nor was their one radiology film or report brought into evidence (or even mentioned) to establish that Dr. Shapiro issued one fraudulent finding, or even a negligent or incorrect finding.

238.    In November 2013, following seven weeks of trial testimony, the Government and defense rested their cases and the jury began nearly seven days of deliberations, after which the jury delivered a verdict of not-guilty with respect to two of the three physicians. As to the other physician, the jury ended without a verdict, 10-1 for acquittal.  As to one of the non-physicians, the jury acquitted him of all counts except for one, and hung on the last count, 8-3 for acquittal.  As for the second non-physician, the jury also hung, 8-3 for an acquittal.

239.    The Government's prosecution of Dr. Shapiro continued for more than twenty-two (22) months before the SDNY filed *nolle prosequi* in the face of a motion to dismiss and a rapidly approaching trial date.   During the course of the prosecution, Dr. Shapiro not only attacked the accuracy of the claims and charges made in the Indictment, but also made an innocence proffer, which was supported by positive polygraph results.  Further, Dr. Shapiro

repeatedly and unceasingly pleaded with the Government to produce one shred of evidence to support its claims, which it never did.

240. The Government's dismissal came after almost two years of publically running Dr. Shapiro's name through the mud, claiming in the media and public records that Dr. Shapiro was engaged in health insurance fraud and involved with Russian organized crime, all of which was not supported by any facts or evidence. The dismissal came after Dr. Shapiro was forced to engage multiple lawyers and spend hundreds of thousands of dollars to defend his name and reputation. The dismissal came after Dr. Shapiro incurred enormous financial damages that resulted in his income being reduced by almost $1,000,000 a year (to date), and which is unlikely to ever be recovered. The dismissal came after the Government intentionally refused to objectively review the evidence, but rather pushed forward and prohibited Dr. Shapiro from partaking in certain healthcare employment, which resulted in Dr. Shapiro's temporary suspension by health care governing bodies.

241. The Indictment was obtained based solely on the misrepresentations of the Government Defendants, the NICB and the Defendant Insurance Companies. The allegation asserted against Dr. Shapiro that he fraudulently prepared radiology reports by finding injuries that were not present in the corresponding radiology films was concocted by the Government Defendants, Faux Law Enforcement Defendants, and the Defendant Insurance Companies. Such assertion was not only unsupported by the evidence, but was in fact contradicted by the evidence in possession of the Government Defendants, the NICB and the Defendant Insurance Companies. The arrest and malicious prosecution of Dr. Shapiro was done in accordance with a preconceived motivation to indict Dr. Shapiro, to appease the NICB and the Defendant Insurance Companies, and for purposes of the Government Defendant's own self-aggrandizement.

## V.    **CUSTOM AND POLICY**

242.    The prevailing policies governing the relationship between the NICB and members of the USDOJ, including the FBI and SDNY, enabled the Defendants to deprive Plaintiff of his constitutional rights.   They are created by policy making members of the USDOJ/FBI in conjunction with the NICB. These policies, however, are not new and have in fact regularly caused the deprivation of citizens' rights in the past.   The Defendants continue to implement these customs and policies despite the fact that they are aware that the policies continually cause the deprivation of citizens' constitutional rights.

### a.  *Formal Written Policy Created by Members of the USDOJ and FBI at the Policy Making Level*

243.    There is at least one MOU, and likely multiple MOUs, that governed the FBI/SDNY/NICB investigation of Plaintiff's criminal case.  In fact the "Staged Accident Data Mining Initiative" described above and the "NICB's Authorized Use of NCIC Data" MOU as described above pertain to this investigation.

242.    As recent joint SDNY/FBI Press Release tells us about at least one MOU applicable to this case wherein Defendant Bharara stated that "the New York FBI Health Care Fraud Task Force was formed in 2007 in an effort to combat health care fraud in the greater New York City area. The task force comprises agents, officers, and investigators from the FBI, NYPD, the New York State Insurance Fraud Bureau, U.S. Department of Labor, U.S. Office of Personnel Management Inspector General, U.S. Food and Drug Administration, New York State Attorney General's Office, New York State Office of Medicaid Inspector General, New York State Health and Hospitals Inspector General, and the **National Insurance Crime Bureau**."

245.    Members of that very task force handled this case.

246.    Through the use of MOUs, the NICB is permitted unfettered access in the investigation and prosecution of defendants.  These MOUs pervade the USDOJ's dealings with the NICB in insurance related matters and are both national and local in their scope.  The MOUs are used to elevate the NICB into the equivalent of a branch of law enforcement.

247.    Although Plaintiff does not have access to any of the MOUs governing the criminal investigation that prompted his indictment, their existence will surely be confirmed through the discovery process in this case.  Until then, however, references to similar MOUs are instructive to illustrate their function and impact on USDOJ/FBI investigations.  As discussed *supra,* a MOU related to an investigation conducted by the Portland FBI field office states:

> The purpose of this MOU is to outline the responsibilities of the FBI and NICB. In addition, this MOU will formalize the relationship between the two organizations with regard to policy, planning, public relations, and the media in order to clarify the role of each organization […] The goal of this cooperation between the FBI and NICB is to use the resources and information gathered by both organizations in an effort to prosecute those individuals who are involved in fraudulent insurance practices which violate federal statutes.

248.    A second example of an MOU, also described *supra,* specifically paves the road for the NICB to provide the FBI with data from the database that NICB analysts determine to be suspicious in nature. This exchange of information supposedly enables the FBI to more efficiently direct investigations and allocate resources to automobile accident fraud investigations.  However, as evidenced by the Government's treatment of Plaintiff in his criminal proceeding, the NICB's determination of what is suspicious is often flawed, resulting in unfounded prosecutions at the expense of citizens' constitutional rights.  These reoccurring violations of citizens' rights are only possible through the USDOJ's use of MOUs.

249.    For example, as outlined in the description of one particular MOU, which certainly contained directives governing the criminal investigation relating to Plaintiff, the NICB

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

is responsible for searching its database to provide the FBI with the names of those who should be investigated for health care fraud.  Pursuant to the MOU, however, members of FBI are not permitted to access the database to determine who should or should not be investigated.  Thus, only the NICB decides who to implicate in the criminal investigations.  These MOUs also allow for the sharing of sensitive information with the FBI, at the sole discretion of the NICB, which often results in FBI investigations of citizens.

250.    The process in which the NICB influences the creation and direction of the MOUs is illustrated by a 2012 Buffalo, N.Y. meeting, discussed *supra,* between NICB and other various members of the USDOJ, which was hosted by the CJIS, a division of the FBI.

251.    Further, the recent use of MOUs by and between various departments of the U.S. Customs and NICB regarding license plate data has triggered a response by the ACLU, who is concerned with the excessive sharing of citizens' information permitted by the MOUs.

252.    The culture created by the extensive NICB participation in the criminal investigation and prosecution, which was explicitly sanctioned by MOUs created by the policymaking members of the USDOJ/FBI in conjunction with the NICB, and further supervised by Defendant Fedarcyk of the FBI and Defendant USA Preet Bharara of the SDNY are directly responsible for the violation of Dr. Shapiro's civil rights.  Furthermore, the severe risk of the violation of citizens' constitutional rights due to the intimate relationship between the NICB and USDOJ/FBI has been an issue well documented and debated for almost 20 years.  The violation of constitutional rights due to NICB involvement in health care fraud investigations has been voiced by members of congress as well as prominent civil rights organizations.

   **b.   _Custom and Practice_**

      i.   _Operation Sudden Impact_

253.     In 1994, the FBI and the NICB participated in Operation Sudden Impact, which was designed to fight health care fraud related to fraudulent No-Fault personal injury claims. Through the use of MOUs created by members of the USDOJ/FBI and the NICB, the Operation fostered an intimate relationship between the FBI and NICB, permitting the NICB to participate in every facet of the investigative process, including frequent participation in raiding targeted law offices and health clinics.

254.     Operation Sudden Impact also involved FBI and NICB utilization of the media to an extent unprecedented at the time.  The USDOJ/FBI prepared form Press Releases for local FBI field offices.  The USDOJ/FBI insisted that the press releases thank the NICB.  Further for press purposes the takedown had to occur on the same day across the country.  The FBI coordinated the simultaneous takedown of forty-one (41) medical facilities throughout the country in one day, scheduled at the same time.  The FBI notified prominent media outlets and the orchestrated takedown received tremendous coverage across the nation.  What also began to receive attention, however, was the negative impact of the close relationship between the NICB and the FBI.

255.     As the multitude of investigations connected to Operation Sudden Impact progressed, repeated complaints surfaced alleging unfounded criminal allegations that resulted in arrests and selective targeting of citizens based on race.  Evidence surfaced that many field offices were not prepared to arrest anyone on the planned "takedown" day, but nevertheless, arrests were made.  It also became clear that many investigations connected with Operation Sudden Impact were motivated by racial discrimination, as evidenced by the 77 cases involving minorities that were targeted, compared to the 10 cases involving non-minorities.

256.    At the behest of civil rights organizations, including the renowned League of United Latin American Citizens (LULAC), members of Congress were compelled, through hearings and letters, to investigate the close relationship of the FBI and NICB in the summer of 2000.  Members of Congress were concerned that the close relationship between the NICB and other governmental agencies was resulting in the infringement of citizens' constitutional rights, including arrests without probable cause, selective enforcement of the laws, and the disclosure of sensitive information of citizens.

257.    In response to these concerns, A. Robert Walsh, a member of the legislative counsel of the FBI's Office of Public Records and Congressional Affairs wrote a letter addressed to members of congress.  His letter assured the members of congress that although the FBI and NICB maintain a close working relationship, the FBI always leads the joint investigations and continues to implement strategies in accordance with relevant HIPPA regulations.  While Mr. Walsh did acknowledge the existence and frequent use of MOUs between the NICB and the FBI, he assured the members of congress that the NICB did not operate as official law enforcement officers and that the investigations did not target minorities.

258.    However Walsh statements were contradicted by documents received through FOIA that demonstrated that NICB Special Agents participated in the execution of search warrants and the interrogation of defendants.

259.    In fact the NICB maintained in a Motion to Quash Dr. Shapiro's subpoena that the NICB was not the equivalent of federal agents in this matter but were federal law enforcement and as such were immune to subpoena.

260.    In another affidavit to quash a subpoena in another matter the Associate General Counsel of the NICB James Hertz argued that the NICB was in fact law enforcement cross

designated in cases with the FBI, amongst other law enforcement entities, and that the NICB performed all the functions of FBI Agents.

261. In any event Walsh's correspondence corroborates that the FBI was put on notice of the problem of joint NICB-FBI investigations.

262. As seen in Operation Impact, the media was effectively utilized to defame Plaintiff, while assuredly thanking all the proper entities involved in the criminal investigation, including the NICB, of course. In fact, consistent with the regular customs of the FBI and USDOJ, press releases always thank the NICB for its efforts, as evidenced by the recent September 11, 2014 press release issued in connection with the FBI arrest of Akim Murray on charges related to health care fraud. The release states:

> The New York FBI Health Care Fraud Task Force was formed in 2007 in an effort to combat health care fraud in the greater New York City area. The task force comprises agents, officers, and investigators from the FBI, NYPD, the New York State Insurance Fraud Bureau, U.S. Department of Labor, U.S. Office of Personnel Management Inspector General, U.S. Food and Drug Administration, New York State Attorney General's Office, New York State Office of Medicaid Inspector General, New York State Health and Hospitals Inspector General, and the National Insurance Crime Bureau

263. Not surprisingly, the NICB is the only non law enforcement and non government entity named in the press release; however, their extreme participation in all health care investigations in unquestionable—and this same task force investigated Dr. Shapiro.

*ii. Hampton v. State Farm*

264. Another example of the repeated violation of constitutional rights that occurs when Defendants like State Farm and the NICB team up can be found in <u>Hampton v. State Farm Mutual Automobile Insurance Company</u>[18], discussed *supra*. In <u>Hampton</u> the Plaintiffs reported the theft of their vehicle and made a claim. State Farm concocted a story claiming that the

---

[18] WD 66791 (Court of Appeals of Missouri, Western District, January 8, 2008).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Plaintiffs actually ditched the vehicle in order to collect insurance money and threatened the claimants with jail if they pursued their claim.

265.    After the claimants moved forward with pursuing their claim, members of State Farm falsified reports and evidence, which was passed on to an NICB Agent who persuaded the police to arrest the Hamptons. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.  The Court upheld a punitive damages award of 8 million dollars based on the egregious circumstances brought on by State Farm, and facilitated by the NICB.

### iii.   *Operation Boris*

266.    In the early 2000's, the NICB participated in Operation Boris with members of the Suffolk County District Attorney's Office. Prior to BORIS the NICB had set up a permanent office and presence in the Suffolk County District Attorney's Office as part of the DA's Insurance Crimes Unit.  This unit consisted of Suffolk County DA prosecutors, Suffolk County Police Department Detectives and NICB "Special Agents" working side by side in the DA's Hauppauge Offices.

267.    The NICB on behalf of State Farm and the insurance industry led the investigation by making key decisions as to who the targets would be, what records would be subpoenaed, who would be indicted and who would be arrested, as well as what locations would be the subject of search warrants.  The Suffolk County DA/State Farm/NICB matter morphed into an investigation involving what was termed the "Suffolk County Task Force."  This "task force" was staffed by NICB "Special Agents", investigators from the Suffolk County DA's Office, and a host of insurance company investigative employees.

268.    Out of approximately 585 indictments well over half were never unsealed and expired due to defective indictments devoid of any evidence.  Of those that were unsealed, the only convictions were a small number of pleas taken by low-level perpetrators. Almost everyone else received an Adjournment in Contemplation of Dismissal (ACD), which is a fancy way of saying: "Case dismissed."  Some of these ACDs were a sight to behold – instead of the classic 6 months for the charges to be dismissed some of the BORIS ACDs were literally 72 hour ACDs, meaning the cases were dismissed in 72 hours.

269.    Also in connection with Operation Boris, State Farm was found to have funneled illegal funds to the Suffolk County District Attorney's Office through the NICB.

270.    While federal authorities were not widely involved in Operation Boris, lead Suffolk County prosecutor Peter Smith was in constant communication with Ben Warner and other members of the FBI.  Thus, the intimate relationship of the NICB, local authorities, coupled with indirect FBI oversight, resulted in constitutional violations similar to those experienced by Plaintiff, who was similarly indicted without probable cause and for the sole purpose of benefitting various insurance companies' bottom line.

### iv. *The Continuous Line of SDNY/FBI Press Releases Thanking the FBI for their Investigative Assistance*

271.    There are a multitude of SDNY/FBI Press Releases that elevate the NICB to the level of law enforcement wherein they are thanked for their investigative assistance.

272.    Some examples include those already mentioned: The February 29, 2012 Press Release for this case wherein Defendant Bharara thanked the NICB and the investigative units of the insurance companies "that provided invaluable assistance with the investigation;" the above quoted Akim Murray Press Release wherein the NICB is thanked and named as a member of the

Government Health Care Task Force.; the already mentioned "Vor" Press Release of October 13, 2010 wherein "BHARARA also thanked the National Insurance Crime Bureau for their assistance in the investigation."

273.    Other pertinent press releases include the SDNY/FBI October 20, 2014 release entitled: "Twenty–Four Defendants Charged in Health Care Billing Scams that Defrauded Insurance Companies, Medicare, and Medicaid Out of Millions of Dollars" wherein Defendant Bharara "thanked the National Insurance Crime Bureau for its assistance in the investigation"; the December 4, 2014 (just a couple of weeks ago) SDNY/FBI press releases entitled: "Long Island Man Sentenced in Manhattan Federal Court to 10 Years in Prison for Insurance Scam in Which he Caused Dozens of Intentional Car Crashes" wherein Bharara "praised the outstanding investigative work of the FBI, and thanked the National Insurance Crime Bureau for its assistance in the case."

274.    There are more of such press releases.  They demonstrate that there is a custom and practice in the Southern District of joint SDNY/FBI/NICB and other law enforcement agency investigations that the NICB – a private insurance company trade group – participates in.

## CLAIMS FOR RELIEF

275.    With the exception of the pendent state claims, Plaintiff brings the following claims for relief pursuant to 42 U.S.C. §1983 as per the decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 91 S.Ct. 1999 (1971), which provides Plaintiff with a remedy against those who deprive him of his constitutional rights under the color of federal law.

## AS AND FOR THE FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
**(Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983)**

276.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "274" with the same force and effect as if fully set forth herein. Defendants, collectively and individually, while acting under color of federal law, engaged in conduct which constituted a violation of the Constitution of the United States.

277.   All of the aforementioned acts deprived Plaintiff Mark Shapiro of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

278.   As a result of Defendants' aforementioned conduct, Plaintiff Mark Shapiro's liberty was restricted for an extended period of time, he was subjected to an utterly baseless and selective criminal prosecution, his personal and professional reputation has been permanently destroyed, he suffered massive economic losses, he was forced to incur substantial legal expenses, his ability to contract independently was permanently destroyed, his present and future earning capacity was substantially impaired, he was publicly embarrassed and humiliated, he was caused to suffer severe emotional distress, he was held in custody against his will, he was subjected to onerous and restrictive bail conditions, and he otherwise suffered a deprivation of his constitutional and civil rights.

**[Remainder of page is intentionally blank.]**

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

## AS AND FOR THE SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (False Arrest Under 42 U.S.C. 42 U.S.C. § 1983)

279.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "274" with the same force and effect as if fully set forth herein.

280.    As a result of defendants' aforementioned conduct, Plaintiff Mark Shapiro was taken into custody by Donald G Anspacher, Defendant from the FBI, in accordance with the express directives, guidance, and advice of AUSAs Goldman and McQuaid.  Defendant AUSAs Goldman and McQuaid worked closely with members of the NICB, including but not limited to Anthony Tardalo, who together with the AUSAs Goldman and McQuaid, were advised and directed by members of Rivkin Radler, GEICO, Travelers, State Farm, and Farmers.

281.    For example, a wire tap application related to Plaintiff's criminal case, completed and executed by a member of the FBI, and sworn to by Defendant Goldman, contains statements indicating that the NICB provided the FBI with a medical report created by Plaintiff in connection with a specific patient who attended Clearview.  According to the application, "based on discussions with NICB investigator," this specific medical report, which is described in the "probable cause" section of the application, is suspicious and constitutes evidence of Plaintiff's criminal activity and involvement in the alleged criminal conspiracy.

282.    This report, however, is about as innocuous as they come.  There are no serious injuries noted and there is no other reason besides suggestions from the NICB that would lead the FBI to believe that this report was suspicious.  More importantly, there was no MRI film to compare to the report to determine whether or not the Plaintiff made fraudulent misrepresentations in his report.  Plaintiff cannot be legitimately arrested based on the allegation

that Plaintiff fraudulently "inflated" his reports without having **even one** of Plaintiff's reports that was inconsistent with what the corresponding MRI showed.

283.    Despite these facts, members of the FBI and AUSAs Goldman and McQuaid represented that this report served as evidence indicating Plaintiff's involvement in a criminal conspiracy.  This misrepresentation of facts, which was initiated by members of the NICB and others in the auto insurance industry, including the Defendant Insurance Companies, and which was knowingly improperly adopted by AUSAs Goldman and McQuaid is one instance of Defendants' misrepresentation and fabrication of evidence against Plaintiff, which upon information and belief, was presented by Goldman and McQuaid to the Grand Jury prior to Plaintiff's arrest.

284.    AUSA's Goldman and McQuaid also coerced false testimony from cooperating witness Robert Sukhman, and, upon information and belief, presented it to the Grand Jury.  After gathering evidence from various sources including wire taps, on or about July 12, 2011, members of the Government including Goldman and McQuaid approached Sukhman and advised him that he was the subject of an ongoing criminal investigation. At some point thereafter, Goldman and McQuaid pressured Sukhman by threatening to arrest Sukhman's wife and his father, based on their involvement with alleged No-Fault fraud.  AUSA Goldman and McQuaid coerced Sukhman into identifying Dr. Shapiro as inflating his MRI reads and into testifying that, *inter alia,* the radiologist employed by Mikhail Zemylyansky fraudulently exaggerated and/or fabricated the existence of injuries and noted these misrepresentations in his

reports.[19] Plaintiff was the only radiologist that read reports for Mikhail Zemylyansky and thus, through his false coerced testimony, Sukhman attempted to implicate Plaintiff in the conspiracy.

285.    Moreover, such was done in accordance with the prevalent and controlling polices of the USDOJ/FBI, which are created by members of the USDOJ/FBI in conjunction with the NICB, and which are described in a number of MOUs that establish the parameters of the close relationship between the USDOJ/FBI and the NICB. Part of the governing policy was described on the record before Judge Katz by AUSA McQuaid on April 2, 2012, when McQuaid essentially argued that the Government adheres to a presumption that every MRI report created in relation to a No-Fault claim was fraudulently created.

286.    The prevalent and controlling policies created by policymaking members of the USDOJ/FBI in conjunction with the NICB were administered and supervised locally by members of the SDNY, including USA Preet Bharara. As a result, Plaintiff was subjected to an illegal, improper, and false arrest by the Defendants, and was caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the Defendants in criminal proceedings, without any probable cause, privilege or consent.

287.    As a result of the foregoing, Plaintiff Mark Shapiro was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

---

[19] At trial, Sukhman described the fraudulent MRI reports as "good reads."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

## AS AND FOR THE THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDNATS
### (Malicious Prosecution Under 42 U.S.C. § 1983)

288.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "274" with the same force and effect as if fully set forth herein.

289.    Defendants, specifically members of the FBI, NICB, Rivkin Radler and the Insurance Company Defendants individually and collectively manufactured false evidence and forwarded this false evidence to prosecutors in the SDNY, including AUSAs Goldman and McQuiad, grossly distorting what was, at most, a civil contract dispute into a tale of grave criminal misconduct, which all Defendants *knew* at the time was wholly untrue. Further, AUSAs Goldman and McQuaid coerced false testimony from Robert Sukman, which attempted to implicate Plaintiff in the alleged criminal conspiracy.   Such was done in accordance with prevalent polices created by members of the USDOJ/FBI in conjunction with the NICB, which are described in MOUs and implemented at a local level by members of the SDNY including USA Preet Bharara.

290.    Through an extreme level of involvement in the investigation, the NICB, Rivkin Radler, and the Insurance Company Defendants falsely told members of the FBI and AUSAs Goldman and McQuaid that Plaintiff was a member of a criminal conspiracy designed to commit health care fraud. Such allegations were knowingly false because the above mentioned Defendants affirmatively mischaracterized innocuous evidence as probative of Plaintiff's guilt. In providing such false and misleading information to prosecutors, Defendant Anthony Tardalo of the NICB, the FBI, Rivkin Radler, and the Insurance Company Defendants provided AUSAs

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Goldman and McQuaid the opportunity to knowingly continue to misrepresent exculpatory evidence as probative of Plaintiff's guilt in order to pursue criminal charges against Plaintiff.

291.    Further, AUSAs Goldman and McQuaid, who participated extensively in the investigation of these preliminary allegations against Plaintiff, did indeed continue to misrepresent exculpatory evidence as probative of Plaintiff's guilt, while affirmatively refusing to find or examine any evidence to corroborate the FBI, NICB, Rivkin Radler, and Insurance Company Defendants' claims that Plaintiff was involved in an alleged criminal conspiracy by "inflating reads.,"[20] The AUSAs did so even though the evidence provided to them did not constitute probable cause to arrest Plaintiff, which would have required *at least one report* by Plaintiff that was inconsistent with the corresponding MRI film.  Instead, AUSAs Goldman and McQuaid failed to make a full and complete statement of the material facts to the Grand Jury, as they were required to do under New York State Law, constituting an intentional misrepresentation of Plaintiff's actual involvement in an alleged conspiracy.

292.    Specifically, members of the NICB, FBI, Rivkin Radler, the Insurance Company Defendants and AUSAs Goldman and McQuaid failed to disclose the following material exculpatory facts: i) there were absolutely no MRI images in existence that supported the theory that Plaintiff was misrepresenting patient's injuries in order to allow medical treatment facilities to bill for additional procedures and treatment; and ii) the totality of Plaintiff's medical reports indicated, by a far margin, that Plaintiff did not indicate that an abnormally high number of patients had the type of injuries that would necessitate additional treatment, including the reports specifically cited by the FBI as suspicious in its wire tap application.

---

[20] Before requesting an order of *nolle prosequi*, the Government alleged that Plaintiff "inflated reads", meaning he exaggerated or made up injuries that were not present upon his review of a patient's MRI film in order to allow medical clinics to administer additional treatment and procedures.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

293.    Upon information and belief, the failure of the members of the NICB, FBI, Rivkin Radler, the Insurance Company Defendants and AUSAs Goldman and McQuaid to present this exculpatory evidence to the Grand Jury was a substantial factor in influencing the Grand Jury's decision to indict Plaintiff. Such was possible because of the prevalent directives and policies created by members of the USDOJ/FBI in conjunction with the NICB, which were implemented at a local level by members of the SDNY, including USA Preet Bharara.

294.    Further, AUSAs Goldman and McQuaid coerced co-defendant Robert Sukhman into implicating Plaintiff in a criminal conspiracy by pressuring Sukhman to falsely state and testify that Dr. Shapiro was fraudulently indicating the existence of exaggerated and fabricated injuries in his reports so that medical clinics would be permitted to administer additional treatment. Such false information, which was coerced by AUSAs Goldman and McQuaid, was upon information and belief a substantial factor in influencing the Grand Jury's decision to indict plaintiff herein.

295.    By misrepresenting information about Plaintiff, in addition to withholding material exculpatory evidence from the Grand Jury, the NICB, FBI, Rivkin Radler, the Insurance Company Defendants, and AUSAs Goldman and McQuaid acted with malice and with the express purpose of securing an indictment against Plaintiff.  Because such was done in accordance with controlling polices created by members of the USDOJ/FBI in conjunction with the NICB, and implemented by members of the SDNY, including Preet Bharara all Defendants expressed the requisite malice.

296.    As a result of the foregoing, all Defendants were directly and actively involved in the initiation of criminal proceedings against Plaintiff.

297.     Defendants lacked probable cause to initiate criminal proceedings against Plaintiff.

298.     Defendants acted with malice in initiating criminal proceedings against Plaintiff.

299.     All Defendants were also directly involved in the *continuation* of criminal proceedings against Plaintiff, as they actively participated in the unlawful and improper investigation being conducted by the FBI, NICB, AUSAs Goldman and McQuaid, which was supervised by USA Preet Bharara. Further, AUSAs Goldman and McQuaid threatened Plaintiff with criminal charges if he continued to execute affirmations in support of claimants who were in litigation against various insurance companies, including the Defendant Insurance Companies, despite a court order explicitly permitting Plaintiff to execute the affirmations.

300.     Defendants lacked probable cause to continue criminal proceedings against Plaintiff.

301.     Defendants acted with malice in continuing criminal proceedings against Plaintiff.

302.     Defendants misrepresented, falsified, and coerced evidence throughout all phases of the criminal proceedings, in addition to withholding material exculpatory evidence throughout all phases of the criminal proceedings.

303.     Notwithstanding the unlawful and fraudulent conduct of Defendants, the criminal proceedings were terminated in Plaintiffs' favor on December 30, 2013, when, upon request of AUSA Peter Skinner, the Honorable Richard J. Sullivan granted an order of *nolle prosequi* to be filed as to Plaintiff, and no further criminal charges were ever re-filed against Plaintiff.[21]

304.     As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer

---

[21] As detailed sufficiently in Plaintiff's abuse of process action, the desired damage had already been done.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

## AS AND FOR THE FOURTH CLAIM FOR RELIEF AGAISNT ALL DEFENDANTS
### (Denial of Constitutional Right to Fair Trial Under 42 U.S.C. § 1983 Due to Fabrication of Evidence)

305.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "274" with the same force and effect as if fully set forth herein.

306.    In creating false evidence against Plaintiff and in providing false and misleading testimony, coerced testimony, and otherwise misrepresenting evidence with respect thereto, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

307.    As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, to an opportunity confront adverse witnesses and to present exculpatory evidence, all without probable cause.

## AS AND FOR THE FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDNATS
### (Malicious Abuse of Process Under 42 U.S.C.§ 1983)

308.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "274" with the same force and effect as if fully set forth herein.

309.    Defendants, collectively and individually, while acting under color of federal law, conspired and ultimately succeeded in depriving Plaintiff of his constitutional right to be free from deprivation of liberty and property without due process.

310.    The Defendants fabricated, exaggerated, and misrepresented evidence to perpetuate false conclusions in order to support their pre-conceived decision to arrest, indict, and prosecute Plaintiff in furtherance of a conspiracy and in accordance with policies created by policymaking members of the USDOJ/FBI in conjunction with the NICB, which were administered locally by members of SDNY, including USA Preet Bharara and AUSAs Goldman and McQuaid.   These acts in furtherance of the conspiracy constitute an abuse of the legal process by all Defendants, including those FBI, SDNY, and USDOJ Defendants who regularly employ the criminal justice process.   Such was done without justification and through collusion with the NICB, members Rivkin Radler, and the Defendant Insurance Companies to benefit the NICB, members of Rivkin Radler, and the Defendant Insurance Companies.

311.    Defendants continued such abuse in furtherance of the conspiracy's goals throughout the duration of proceedings against Plaintiff.   AUSAs Goldman and McQuaid, under the supervision of Preet Bharara, and in accordance with directives and policies created by members of the USDOJ/FBI in conjunction with the NICB, continued their abuse of the instituted criminal process for the benefit of the NICB, members of Rivkin Radler, and the Defendant Insurance Companies, who increased profits by Plaintiff's inclusion in the indictment.

312.    The NICB, Rivkin Radler and Defendant Insurance Companies profited by the abuse of process and the continued abuse of process as evidenced by a large reduction in the amount of No-Fault insurance claims the Insurance Companies paid out, illustrated by multiple global withdrawals of claims, saving the Defendant Insurance Companies millions of dollars.

313.    Additionally, despite a court order permitting Plaintiff to execute affirmations for Clearview and KKM patients that had cases pending against various insurance companies, including the Defendant Insurance Companies, AUSAs McQuaid and Goldman threatened Plaintiff with additional criminal charges if he executed any affirmations in support of those claimants.   Clearly the AUSAs were more concerned with saving the Defendant Insurance Companies money than fairly prosecuting Plaintiff or investigating his involvement in the alleged criminal conspiracy.   Defendants were able to accomplish these actions as a result of prevailing policies created by members of the USDOJ/FBI in conjunction with the NICB, which were implemented locally by members of the SDNY and FBI, including USA Preet Bharara and AUSAs Goldman and McQuaid.

314.    Members of the Government benefitted as well, as evidenced by the massive amount of good press received in connection with the case, as well as AUSA McQuaid's new employment opportunity with the President of the United States.

### AS AND FOR THE SIXTH CLAIM FOR RELIEF AGAINST DEFENDNATS DANIEL SACHS GOLDMAN AND NICOLAS MCQUAID (Inducement of False Testimony in Violation of 42 U.S.C. §1983)

315.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "274" as if the same were more fully set forth at length herein.

316.    Defendant AUSAs Goldman and McQuaid, acting in an investigative capacity, met with and interviewed several witnesses during the pre-trial investigation.

317.    Defendant AUSAs Goldman and McQuaid, acting in an investigative capacity, coerced codefendant Sukhman to implicate Plaintiff in the alleged criminal conspiracy by

pressuring him into providing false statements and testimony indicating Plaintiff was fraudulently exaggerating or fabricating his patients' injuries in Plaintiff's reports.

318.    Defendants accomplished such coercion by threatening to prosecute Sukhman's wife and father if he did not fully cooperate in the SDNY's investigation.  Such cooperation included providing false testimony that attempted to implicate Plaintiff in the criminal conspiracy. Thus, Defendants, harassed, threatened, pressured, intimidated, manipulated and coerced Sukhman to provide false "bad act" evidence against Plaintiff.

319.    As a result of the Defendants' coercion, Sukhman, upon information belief, subsequently provided such false testimony to the Grand Jury as well as at trial before the Honorable Judge Oetken, on September 30, 2013.

320.    As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

## AS AND FOR THE SEVENRH CLAIM FOR RELIEF AGAISNT ALL DEFENDANTS
### (Conspiracy to Violate Plaintiff's Civil Rights)

321.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "274" as if the same were more fully set forth at length herein.

322.    Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest, prosecution, pretrial detention, conviction and imprisonment of Plaintiff.

323.    Throughout the period of the conspiracy, the Defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Plaintiff's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe Plaintiff guilty of any crime.

324.     Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of Plaintiff: (a) knowingly misrepresented evidence; (b) manufactured false evidence and; (c) pressured, intimidated, threatened, coerced and induced a witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony; (d) failed to correct such false statements and testimony; and (e) withheld from the Grand Jury and trial judge evidence favorable to the accused on the issue of guilt or innocence.

325.     The aforesaid conduct of Defendants operated to deprive Plaintiff of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

(a) Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c) Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and,

(d) To timely disclosure of all evidence favorable to the defense on the issues of guilt or innocence and/or punishment, pursuant to the due process clauses of the Fifth and

Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

326.   As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

## AS AND FOR THE EIGHTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### ("Stigma Plus" Claim Under 42 U.S.C. § 1983)

327.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "274" as if the same were more fully set forth at length herein.

328.   The information provided by Defendants to the press was materially false and misleading.

329.   As a result of false and misleading information provided to the press, Plaintiff was the subject of extensive and highly prejudicial news coverage, including coverage by PBS, NBC News, the New York Times, the Daily News, the New York Post, and WCBS and WINS News Radio.

330.   As a result of Defendants' statements to the press, Plaintiff's reputation was severely and permanently damaged. To this day, the story of Plaintiff's arrest and indictment is *still* the first story that appears when doing a Google search of "Dr. Mark Shapiro Radiologist" on the Internet. Yet, there is *no* mention of the fact that the charges against Plaintiff were actually abandoned by the SDNY, in the face of a motion to dismiss the indictment or inspect the grand jury minutes.

331.    Plaintiff was never afforded an opportunity for a name clearing hearing at any time before, during, or after his criminal prosecution.

332.    As a result of Defendants' statements to the press, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was deprived of his right to a name-clearing hearing, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

### AS AND FOR THE NINTH CLAIM FOR RELIEF AGAINST DEFENDANT THE UNITED STATES OF AMERICA
### (Liability Under Section 42 U.S.C. §1983– Deliberate Indifference to Training)

333.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "263" as if the same were more fully set forth at length herein.

334.    Defendants initiated and continued criminal proceedings against Plaintiff, despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize Plaintiff's liberty, wellbeing, safety and constitutional rights.

335.    Such was done by members of the SDNY in accordance with policies and procedures created by the USDOJ/FBI in conjunction with the NICB, which was implemented by the members of the SDNY and FBI for the benefit of the NICB, Rivkin Radler, and the Insurance Company Defendants.

336.    Defendant The United States of America exhibited a deliberate indifference toward the training and supervision of its attorneys of the SDNY regarding the ethical boundaries of presenting evidence against the accused.  Defendant United States of America exhibited a deliberate indifference by continuing to create and implement policies in conjunction with the

NICB, which resulted in benefits to the NICB and its insurance company constituents at the expense of regularly violating the constitutional rights of its citizens.

337.   Specifically, the United States of America employs a policy of sanctioning, securing, and developing an intimate relationship between the NICB and other law enforcement agencies, including the FBI and the SDNY.  This intimate relationship between the Government Defendants and the NICB allows members of the NICB unfettered direct access to confidential information at the expense of citizens of The United Sates of Americas.  Essentially, this policy encourages the exchange of citizens' private information from the Government Defendants to the NICB, which is a misdemeanor offense.  Moreover, the intimate relationship created, supported, and implemented by policy maker members of the USDOJ/FBI, including many of the Government Defendants, directly fosters the pervasion of the criminal justice system to the benefit of the NICB and its insurance company constituents and at the expense of its citizens' constitutional rights.

338.   As evidenced from the conduct of AUSAs Goldman and McQuaid in the Grand Jury proceedings in Plaintiff's matter, defendant United States of America exhibited a deliberate indifference toward the training and supervision of attorneys in the SDNY regarding prosecutorial misconduct during the grand jury presentation, in that Defendant United States of America:

     a)  Intentionally and/or recklessly failed to properly instruct, train and/or supervise AUSAs with regard to their obligations to avoid prosecutorial misconduct in the grand jury as required by People v. Huston, 88 N.Y.2d 400 (1996); and,

     b)  Intentionally and/or recklessly failed to properly instruct, train and/or supervise AUSAs with regard to their obligations to act as an officer of the public, and of

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

the duty of fair dealing owed to the accused. People v. Pelchat, 62 N.Y.2d at 105; C.P.L. 190.25(5), (6).

339.    The aforesaid deliberate indifference to the training and supervision of its attorneys by Defendant United States of America may be inferred from the fact that the prosecutorial misconduct in this case was *not* an isolated incident, but rather, occurred on *multiple* occasions throughout the grand jury proceedings.   Upon information and belief, prosecutors misconduct included 1) alleging that Plaintiff fraudulently exaggerated or fabricated the existence of injuries in order to bolster his medical reports while knowing that there was no evidence to indicate the allegation; 2) deliberately failing to examine any MRI films to corroborate such allegation. Further, AUSAs Goldman and McQuaid coerced cooperating witness Robert Sukhman into providing false testimony implicating Plaintiff in the alleged criminal conspiracy to commit health care fraud and improperly threatened Plaintiff with further criminal charges if he executed affirmations in support of claimants against NICB constituents despite an order from the court explicitly permitting Plaintiff to execute such affirmations.

340.    The aforesaid deliberate indifference to the training and supervision of AUSAs by the Defendant United States of America may further be inferred from the fact that AUSAs Goldman and McQuaid were *not* punished or disciplined in any way for the misconduct noted above.  Further, AUSAs Goldman and McQuaid were not punished or disciplined in any way for procuring the indictment against Plaintiff by without any evidence whatsoever, which was evident when AUSA Peter Skinner requested an order of *nolle prosequi*.

341.    The foregoing unlawful policy of Defendant as implemented by FBI, USDOJ, SDNY, and NICB is the direct and moving force behind the constitutional violations suffered by

Plaintiff and is substantially certain to result in the violation of the constitutional rights of other citizens in the future.

342.   The acts complained of were carried out by the aforementioned individual Defendants in their capacities as members of the NICB, USDOJ, SDNY, and FBI pursuant to the customs, policies, usages, practices, procedures, and rules of the United States of America, many of which are explicitly described in MOUs.   As a direct and proximate result of the foregoing practices and policies of the United States of America, which were created by the USDOJ/FBI in conjunction with the NICB, and implemented by the USDOJ, NICB, SDNY, and FBI, Plaintiff was denied fundamental constitutional rights, was subjected to grossly improper and repeated instances of prosecutorial misconduct, was deprived of his liberty, was forced to incur substantial legal expenses, had his reputation destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

343.   It can be inferred that policy making members of the USDOJ/FBI, and all other Government Defendants were on notice that the policies created, implemented, and supported by the Government Defendants and the NICB, usually thorough the use of MOUs, were benefitting members of the insurance industry at the expense of its citizens' constitutional rights based on reoccurring legitimate complaints alleging that violations were occurring, including:

> a.   *Operation Sudden Impact*: In 1994, the FBI and the NICB participated in Operation Sudden Impact, which was designed to fight health care fraud related to fraudulent No-Fault personal injury claims.   Through the use of MOUs created by members of the USDOJ and the NICB, the Operation fostered an intimate relationship between the FBI and NICB, permitting the NICB to participate in every facet of the investigative process, including frequent participation in raiding

targeted law offices and health clinics. At the behest of civil rights organizations, members of Congress, through hearings and letters, began probing the close relationship of the FBI and NICB in the summer of 2000.  Members of Congress were concerned that the close relationship between the NICB and other governmental agencies was resulting in infringement of citizens' constitutional rights, including arrests without probable cause as well as selective enforcement of the laws. The FBI responded to Congress' concerns by letter of A. Robert Walsh, a member of the legislative counsel of the FBI's Office of Public Records and Congressional Affairs.  His letter assured Congress that although the FBI and NICB maintain a close working relationship, the FBI always leads the joint investigations. The fact that the FBI formally responded by letter to members of congress, who were explicitly concerned with the civil rights of the citizens, surely serves to establish that the United States of America is on notice of these issues.

b. _Operation Boris_:  In the early 2000's, the NICB participated in Operation Boris with members of the Suffolk County District Attorney's Office. During the Operation, State Farm was found to have funneled illegal funds to the Suffolk County District Attorney's Office through the NICB.  The Operation also resulted in 585 indictments, over half of which were never unsealed and prosecuted.  Thus, the intimate relationship of the NICB and local authorities resulted in constitutional violations similar to those experienced by Plaintiff, who was similarly Indicted without probable cause and for the sole purpose of benefiting various insurance companies' bottom line.

c. <u>*Hampton v. State Farm Mutual Automobile Insurance Company*</u>, WD 66791:  An example of the constitutional calamity that occurs when Defendants like State Farm and the NICB team up can be found in this case, where the Plaintiffs reported the theft of their vehicle and made a claim.  State Farm concocted a story claiming that the Plaintiffs actually ditched the vehicle in order to collect insurance money and threatened the claimants with jail if they pursued their claim.  The claimants nevertheless pursued their claim.  State Farm falsified reports and evidence was passed on to an NICB Agent who persuaded the police to arrest the Hamptons. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.  The Court upheld a punitive damages award of 8 million dollars based on the "egregious acts."

d. <u>*Okslen Accupuncture v. Dinallo*</u>, 77 A.D.3d. 451 (2d.Dep't 2010); : Lawsuits alleging violations of citizens' civil rights due to illegal investigative acts performed by members of the NICB, which is an organization unlicensed to perform any investigative acts.

e. <u>*Matter of Okslen Acupuncture P.C. v. Cuomo*</u>, 85 A.D. 661 (1st Dep't. 2011): Article 78 proceeding to compel attorney general to enforce the law requiring the NICB to obtain a private investigator's license or to prosecute the NICB for their failure to do such.

f. <u>*AVA Acupuncture P.C. et al. v. State Farm Automobile Insurance Company, et al*</u>. (08 Civ. 650 Southern District of New York) (SAS): Insurance Company Defendants and the NICB worked together to defraud EIPs and their medical provider assignees by engaging in wholesale bad faith in violation of a plethora of

New York State Laws and have hijacked law enforcement into indicting and arresting individuals and corporate entities. All of the above was and is being perpetrated to increase profits at the expense of New York State Citizens.

g. In the past 3 years, the close relationship between the NICB and the United States Customs and Boarder Protection (CBP) has come under fire as the NICB is alleged to have illegally disclosed private information of citizens to its insurance company constituents, in violation of citizens' constitutional rights. The NICB's access to sensitive information is permitted by a number of MOUs dating back to 2005, which establish the parameters of the intimate relationship between the NICB and CBP.

344. Thus, the United States of America is on notice that the policies and customs created by members of the USDOJ/FBI in conjunction with the NICB, which essentially sanction NICB involvement in state and federal law enforcement and prosecutorial activities and continue to result in regular and repeated violations of its citizens' rights. Despite actual and constructive notice of repeated violations of its citizens' rights, the United States of America, through the actions of the policy making members of the Government Defendants in conjunction with NICB, chooses to continue to implement said policies, which continue to result in repeated violations of its citizens constitutional rights.

**AND FOR A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Tortious Interference and Conspiracy to Commit Tortious Interference)**

345. Plaintiff repeats and realleges paragraphs 1 through 274 above as set forth in fully herein.

346.     As and for Plaintiff's claim against all Defendants for tortious interference with business relations and contracts and conspiracy to commit tortious interference, Plaintiff alleges as follows: Defendants, collectively and individually, investigated, arrested, indicted, and prosecuted Plaintiff without probable cause for the sole purpose of preventing him from continuing his ethical, responsible, and legal medical practice, in direct benefit to the NICB and the Defendant Insurance Companies, and in furtherance of the conspiracy.

347.     The NICB, Rivkin Radler, and the Insurance Company Defendants supplied false and misleading allegations to members of the SDNY.  Members of the SDNY facilitated the criminal prosecution of Plaintiff, without probable cause, and in accordance with prevailing policies created by members of the USDOJ/FBI in conjunction of the NICB. Further, members of the SDNY threatened Plaintiff by stating that if he continued to execute affirmations in support of claimants' lawsuits against members of the insurance industry, the Government would incarcerate Plaintiff with no opportunity for release pending his trial, and would file another Indictment against him.  The fraudulent and unjustified implementation and continuation of the criminal process against Plaintiff interfered with Plaintiff's contract with his employer and others that he independently contracted with in that due to the malicious prosecution, Plaintiff was no longer able to work on No-Fault matters, which constituted a significant portion of his work with Doshi Diagnostic and other medical facilities.

348.     The Defendants were aware of the existence of Plaintiff's right to profit from his No-Fault employment pursuant to contracts with Doshi Diagnostic and other medical facilities, and the institution of the malicious prosecution and abuse of process rendered Plaintiff unable to perform under such contracts.  The Defendants' intentional interference with Plaintiff's existing

contracts resulted in significant monetary damages to Plaintiff, while simultaneously benefitting the Defendant Insurance Companies, the NICB, and Rivkin Radler.

### AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST DEFENDANTS THE SDNY, FBI, USDOJ, AND THE UNITED STATES
**(Defamation and Slander Per Se
and Conspiracy to Commit Defamation and Slander Per Se)**

349.    Plaintiff repeats and realleges paragraphs 1 through 274 above as set forth in fully herein.

350.    As and for Plaintiff's claim against the Government Defendants for defamation and slander per se and conspiracy to commit defamation and slander per se, Plaintiff alleges as follows:

351.    The SDNY, FBI, and NYPD issued a joint Press Release in conjunction with the Indictment claiming that Plaintiff was engaged in healthcare insurance fraud and involved with Russian organized crime, all of which was not supported by any facts or evidence, and all of which was known to be false by the SDNY, the FBI, and NYPD with respect to Plaintiff.

352.    The Press Release was continuously and is continuously published from February 29, 2012 to the present moment because it remains posted at http://www.fbi.gov./newyork/press-releases/2012/manhattan-u.s.-attorney-announces-charges-against-36-individuals-for-particpating-in-279-million-health-care-fraud-scheme.

353.    The defamatory statements were originally made at the above web location where it remains for all to be seen.

354.    The exact wording and language of the defamatory statement is contained in a copy of the above press release which is attached as **Exhibit 1** to this Complaint and incorporated into the pleadings.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

355.    Further, these statements resulted in Plaintiff's loss of income and ruined Plaintiff's reputation with respect to his work in radiology. The joint Press Release sullying Plaintiff's name remains uncontroverted, causing further harm to Plaintiff and his reputation, and continues to appear on the FBI's and SNDY's websites to this day.

**WHEREFORE,** Plaintiff Dr. Shapiro requests that the Court enter judgment in favor of Plaintiff as follows:

a.  Damages pursuant to violations of 42 U.S.C. Section 1983 in an amount to be proven at trial;

b.  Damages pursuant to common law malicious prosecution and conspiracy to commit malicious prosecution in an amount to be proven at trial;

c.  Damages pursuant to common law abuse of process and conspiracy to commit abuse of process in an amount to be proven at trial;

d.  Damages pursuant to common law tortious interference and conspiracy to commit tortious interference in an amount to be proven at trial;

e.  Damages pursuant to common law defamation and slander *per se* and conspiracy to commit defamation and slander *per se* in an amount to be proven at trial;

f.  Punitive damages to be determined at trial;

g.  Awarding Plaintiff his attorneys' fees, costs, and disbursement; and

h.  For all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable by right pursuant to the Federal Rules of Civil Procedure Rule 38 and other rules.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

## RESERVATION OF RIGHT TO AMEND PLEADINGS

Plaintiff reserves the right to amend these pleadings to add any and all claims that she

determines are just and appropriate.

Dated:  New York, New York
        January 13, 2015

                            DAVIDOFF LAW FIRM, PLLC

                            _____
                            Jonathan Marc Davidoff, Esq. (#JD9157)
                            Glen Alan Kendall, Esq. (#GK0285)
                            *Attorneys for Plaintiff*
                            228 East 45th Street, Suite 1700
                            New York, New York 10017
                            Tel:  212-587-5971
                            Fax:  212-658-9852
                            Email: jonathan@davidofflawfirm.com
                                   glen@davidofflawfirm.com