UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

MARK SHAPIRO,

Case No. 14-cv-10119 (NRB)

                  Plaintiff,

   -v-

**SECOND AMENDED**
**COMPLAINT**

DANIEL SACHS GOLDMAN, NICHOLAS MCQUAID,
PREET BHARARA, DONALD G. ANSPACHER,
MICHAEL SEIFER, JANICE K. FEDARCYK,
THE UNITED STATES OF AMERICA,
ANTHONY TARDALO, SUSUAN Q. HOOD,
ROBERT BRODY, DOUGLAS S. MENGES,
NANCY PIERCE, THE NATIONAL INSURANCE
CRIME BUREAU, RIVKIN RADLER, LLP,
DALLAS RAGAN, FARMERS INSURANCE COMPANY,
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO GENERAL INSURANCE COMPANY, GEICO
INDEMNITY INSURANCE COMPANY, TRAVELERS
INDEMNITY COMPANY, TRAVELERS HOME AND
MARINE INSURANCE COMPANY, STATE FARM FIRE
AND CAUSALTY INSURANCE COMPANY, STATE FARM
MUTUAL AUTOMOBILE INSURANCE COMPANY, JOHN
AND JANE DOE DEPARTMENT OF JUSTICE POLICY
MAKERS # 1-5 (name(s) who are not fully known at present,
and possibly other unidentified members of the Department
of Justice), FEDERAL BUREAU OF INVESTIGATION
SPECIAL AGENTS and ASSISTANT DIRECTORS # 1-10
(name(s) and identification numbers that are not fully known
at present, and possibly other unidentified members of the
Department of Justice),

                  Defendants.

-------------------------------------------------------------------------------X

     Plaintiff Mark Shapiro ("Dr. Shapiro" and/or "Plaintiff"), by and through his attorneys,

Davidoff Law Firm, P.L.L.C., complaining of Defendants Daniel Sachs Goldman ("Goldman"),

Nicholas McQuaid ("McQuaid"), Preet Bharara, ("Bharara"), FBI Special Agent Donald G.

Anspacher ("Anspacher"), FBI Special Agent Michael Seifer, FBI Assistant Director-in-Charge

of the New York Office of the Federal Bureau of Investigation Janice K. Fedarcyk ("Fedarcyk"),

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

John And Jane Doe Department Of Justice Policy Makers # 1-5 (name(s) who are not fully known at present, and possibly other unidentified members of the Department of Justice), Federal Bureau Of Investigation Special Agents# 1-10 (name(s) and identification numbers that are not fully known at present, and possibly other unidentified members of the Department of Justice), the United States of America (the "United States") (Goldman, McQuaid, Bharara, Anspacher, Seifer, Fedarcyk, Department Of Justice Policy Makers # 1-5 etc., Federal Bureau Of Investigation Special Agents# 1-10, etc., the United States, collectively "Government Defendants"); the National Insurance Crime Bureau ("NICB"), Anthony Tardalo, Esq. ("Tardalo"), Susan Q. Hood ("Hood"), Robert Brody ("Brody"), Douglas S. Menges ("Menges"), Nancy Pierce ("Pierce") (collectively the "NICB Defendants"); Rivkin Radler, LLP, ("Rivkin Radler"), Dallas Ragan ("Ragan"), Farmers Insurance Company ("Farmers"), (Ragan and Farmers collectively "Farmers Defendants"); Government Employees Insurance Company ("GEICO"), GEICO General Insurance Company ("GEICO General"), GEICO Indemnity Insurance Company ("GEICO Indemnity"), (GEICO, GEICO General, and GEICO Indemnity collectively "GEICO"); Travelers Indemnity Company ("Travelers"), Travelers Home and Marine Insurance Company ("Travelers Home") (Travelers and Travelers Home collectively "Travelers"); State Farm Fire and Casualty Insurance Company ("State Farm Fire"), State Farm Mutual Automobile Insurance Company ("State Farm Auto")(State Farm Fire and State Farm Auto collectively "State Farm Defendants"); (Farmers Defendants, GEICO Defendants, Travelers Defendants, State Farm Defendants collectively the "Defendant Insurance Companies") ("The "NICB Defendants" and the "Defendant Insurance Companies" are sometimes collectively referred to as the "Faux Law Enforcement Defendants") – for conspiring

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

to deprive Dr. Shapiro of his rights associated with the First, Fourth, Fifth, and Fourteenth amendments to the United States Constitution.

## PRELIMINARY STATEMENT

1.      This action is being brought pursuant to 42 U.S.C. §1983 as per the decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 91 S.Ct. 1999 (1971). There also pendent claims.

2.      This case is about conflict of interest inspired corruption of the highest order: the infiltration and annexation of the United States Department of Justice ("DOJ"), its employees and its various sub-agencies, such as the United States Attorney's Office Southern District of New York ("SDNY") and the FBI, and their employees, on a national scale by the powerful insurance industry.  The above is done with the goal of initiating and controlling investigations as well as prosecutions of so called automobile insurance fraud in order to charge and prosecute for purported fraud and fraud related crimes the maximum number of health care providers and their associates.

3.      The end game of the insurance industry commandeering of the DOJ and their employee/sub agencies is to utilize the federal laws including the Sentencing Guidelines – particularly the loss amount provisions – to force and coerce health care providers to submit to the insurance industry through guilty pleas and massive forfeiture.  The ultimate goal of the insurance industry is to destroy the health care providers and by doing such destroying each of the providers pending and future claims for reimbursement.  This of course increases the insurance industry's profits as they are paid healthy premiums up front and avoid paying claims in the end.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

4.      This insurance industry usurping of law enforcement is accomplished through an insurance industry trade association known as the NICB.  The NICB is a "not for profit" organization comprised of member insurance companies that make up nearly 100% of the automobile insurance industry as well as other types of insurance.

5.      The insurance industry, especially the Defendant Insurance Companies and the NICB are, on paper, different entities but such corporate fiction is a fraud.  The Defendant Insurance Companies control the NICB and are, in effect, the NICB, through lavish funding and by having their senior executives sit on the all-important NICB Board of Governors, which controls the activities of the NICB.

6.      In fact, the relationship between the NICB, Insurance Industry and the FBI is so incestuous that the NICB has advisors to the Board of Governors (insurance industry executives) which advisors include a high level member of the FBI – an assistant director – as well as the President (another insurance industry executive) of the International Association of Special Investigative Units (IASIU), which entity is comprised of members of insurance company Special Investigative Units.

7.      Despite the NICB's statements to the contrary, the NICB is not a charity – in fact its high ranking members and employees are paid handsomely. The NICB is not a member of law enforcement and the NICB's work is not philanthropic.  It is the insurance industry making money for the insurance industry.

8.      The NICB/Insurance Company Defendants subvert, taint and corrupt investigations by, *inter alia,* falsely initiating complaints of insurance fraud, manufacturing false and/or misleading evidence including the provision of false information under the guise of expertise contained in reports and conversations with members of law enforcement, and with

their massive insurance company clout pressuring and influencing law enforcement to both investigate and indict health care providers and their associates.  This is done to create the highest "claim kill" possible in order to increase insurance company profits and to maintain the NICB's existence.

9.      The NICB performs this capture of law enforcement without resistance from the DOJ, its employees or sub agencies or employees. On the contrary, the DOJ, as arranged by its employees and the employees of its sub agencies such as the FBI and SDNY, has an official policy – including a multitude of broad national written policies and local written policies as well as long held custom and practice – that promotes NICB/Insurance Industry control over the investigative and prosecutorial activities of government law enforcement.

10.     The above policy and custom emanates from the decisions of high level policy makers in Washington D.C., but individual written and unwritten policies are created, administered and controlled by employees of the DOJ at the local level.  Such local officials include Defendants Bharara of the SDNY as well as Defendants Seifer, Anspacher, and Fedarcyk of the FBI.

11.     The DOJ, sub agencies and employees accomplish the surrendering of their control to the NICB/Insurance Company Defendants through what are commonly known as Memorandums of Understanding ("MOUs") between the FBI, U.S. Attorney's Offices and other DOJ agencies with the NICB.  These MOUs pervade the FBI's/Federal Prosecutors dealings with the NICB/Insurance Company Defendants in insurance related matters and are broad and national in scope as well as local and even case by case.  These MOUs are used to elevate the NICB/Insurance Company Defendants into the equivalent of a branch of law enforcement.

12.     The MOUs are the lynch pin of the insurance industry control of law enforcement investigations as they lend credibility to what is by its very nature a corrupt and conflict of interest-ridden arrangement.   Specifically a private entity that has a financial stake in the investigation, arrest, and prosecution of an entity or individual to which it owes money cannot investigate, arrest, and prosecute that entity.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the parties as Plaintiff alleges that each Defendant acted and conspired to deprive Plaintiff of rights granted to him under the Constitution of the United States of America.   Pursuant to 28 U.S.C. §1331(a), the Court has jurisdiction over Defendants for any such claims arising under the Constitution of the United States of America. *See also,* 28 U.S.C. §1343; 28 U.S.C. §1346; 28 U.S.C. §2201; and 28 U.S.C. §2202.

14.     By two letters dated March 6, 2014 and March 7, 2014, the USDOJ informed Dr. Shapiro that it is in receipt of his notice letter, but it failed to further respond to his administrative claims under the Federal Tort Claims Act ("FTCA"), and further respond after advising Dr. Shapiro's counsel it had too many cases.   Dr. Shapiro has thus exhausted his administrative remedies for purposes of his claims under the FTCA, as more than six (6) months has passed since such letter was sent.   *See* 28 U.S.C. §§2675, 1346.

15.     Venue is proper in the Southern District of New York because a substantial portion of the events complained of and giving rise to Plaintiff's claims occurred in this District, including the fact that Plaintiff was maliciously prosecuted in the Southern District of New York. *See* 28 U.S.C. §§ 1391(b)(2), 1391(e)(1)(B), 1402(b).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

## THE PARTIES

16.    Plaintiff, Dr. Mark Shapiro, is an individual who resides in the Town of Lawrence, County of Nassau, and State of New York.

17.    Defendant Daniel Sachs Goldman was and is believed to be an Assistant United States Attorney who was assigned to be the lead prosecutor and investigator of Dr. Shapiro's case, *United States of America v. Mark Shapiro, et al*., 12-cr-00171-JPO (SDNY) (the "Case"). Dr. Shapiro brings the instant action against Goldman in his individual capacity, as well as in his capacity as an AUSA for the United States Attorney of the SDNY.

18.    Defendant Nicholas McQuaid was an Assistant United States Attorney assigned to Dr. Shapiro's case. Dr. Shapiro brings the instant action against McQuaid in his individual capacity, as well as in his capacity as an AUSA for the United States Attorney of the SDNY.

19.    Defendant Preet Bharara was and is the United States Attorney for the SDNY and was responsible for the oversight and supervision of all investigations and prosecutions in the SDNY, including Dr. Shapiro's case.

20.    Donald G. Anspacher is a Special Agent with the FBI and upon information contained in the Plaintiff's investigation appears to be the lead agent.  Anspacher investigated Shapiro and others.

21.    Michael Seifer is a Special Agent with the FBI and upon information contained in the Plaintiff's investigation appears to be an important agent in the case.  Seifer investigated Shapiro and others.

22.    Jane K. Fedarcyk is the FBI Assistant Director-in-Charge of the New York Office of the Federal Bureau of Investigation.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

23.     John and Jane Doe Department of Justice ("DOJ") Policy Makers # 1-5 are yet to be identified high level members of the Department of Justice perhaps reaching to the very top of the DOJ.

24.     Federal Bureau of Investigation ("FBI") Special Agents/Assistant Directors # 1-10 are yet to be identified FBI employees that are responsible for the "flaking" investigation, arrest and prosecution of Dr. Shapiro.

25.     Defendant the United States is sued under the FTCA, 28 U.S.C. §1346, for tortious acts of its employees committed against Dr. Shapiro.

26.     Defendant the NICB is officially listed as a not-for-profit corporation, incorporated under the laws of the State of Illinois.  The NICB is made up of members (insurance companies) that directly control, and actively participate in the control of the NICB as members of the NICB Board of Governors including the Defendant Insurance Companies.

27.     Defendant Anthony Tardalo was and is believed to still be an employee of the NICB and, upon information and belief, held the position of Supervisory Special Agent.  Tardalo and others were responsible for investigating Dr. Shapiro on behalf of the NICB/Insurance Company Defendants, and personally assisted in the investigation of Dr. Shapiro by providing reports and other materials to members of the SDNY, FBI, USDOJ, as well as the New York City Police Department ("NYPD") and Office of the District Attorney, New York County. ("DANY")

28.     Defendant Susan Q. Hood was the Immediate Past Chair on the Board of Governors of the NICB.

29.     Defendant Robert Brody was a member of the Board of Governors of the NICB.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

30.     Defendant Douglas S. Menges was a member of the Board of Governors of the NICB.

31.     Defendant Nancy Pierce was a member of the Board of Governors of the NICB.

32.     Defendant Rivkin Radler is a Limited Liability Partnership formed under the laws of the State of New York, with its principal executive office/principal place of business at 926 RXR Plaza, Uniondale, New York, 11556. In this case, Rivkin acted jointly with the Government Defendants, amongst others, as a private of counsel to the Government Defendants investigation and prosecution using material it had gathered from client NICB member insurance companies in preparation for litigation and gathered during litigation; as well as providing expertise in New York No Fault Insurance Laws and Regulations and actual novel theories of criminal liability.

33.     Defendant Dallas Ragan was employed by Farmers Insurance as a Senior Special Investigator/Analyst.  Ragan was responsible for assisting the NICB, the Defendant Insurance Companies, the FBI, and members of the SDNY in their investigation of Dr. Shapiro, and Ragan's improper conduct of falsely accusing Dr. Shapiro in part led to Dr. Shapiro being maliciously prosecuted.

34.     Defendant Farmers Insurance Company is a corporation formed under the laws of Kansas, with its principal executive office/principal place of business at 17000 West 119th Street, Olathe, KS  66061.  Farmers is an insurance company that was and is engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

35.     Defendant GEICO is a corporation formed under the laws of Maryland, with its principal executive office/principal place of business at 5260 Western Avenue, Chevy Chase,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

MD 20815. GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

36. Defendant GEICO General Insurance Company is a corporation formed under the laws of Maryland, with its principal office/principal place of business located at 5260 Western Avenue, Chevy Chase, MD 20815. GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

37. Defendant GEICO Indemnity Insurance Company is a corporation formed under the laws of Maryland, with its principal executive office/principal place of business at 5260 Western Avenue, Chevy Chase, MD 20815. GEICO Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

38. Defendant Travelers Indemnity Company is a corporation formed under the laws of Connecticut, with its principal executive office/principal place of business at One Tower Square, Hartford, CT 06183. Travelers Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to, the no-fault insurance business.

39. Defendant Travelers Home and Marine Insurance Company is a corporation formed under the laws of Connecticut, with its principal executive office/principal place of business at One Tower Square, Hartford, CT 06183. Travelers Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

where they regularly conduct business in, including but not limited to, the no-fault insurance business.

40. Defendant State Farm Fire and Casualty Insurance Company is a corporation formed under the laws of Illinois, with its principal executive office/principal place of business at One State Farm Plaza, Bloomington, IL 61710. State Farm Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to the no-fault insurance business.

41. Defendant State Farm Mutual Automobile Insurance Company is a corporation formed under the laws of Illinois, with its principal executive office/principal place of business at One State Farm Plaza, Bloomington, IL 61710. State Farm Defendants are insurance companies that were and are engaged in issuing insurance policies in the State of New York, where they regularly conduct business in, including but not limited to the no-fault insurance business.

## FACTUAL BACKGROUND

I. **THE INDICTMENT AND ARREST OF DR. SHAPIRO AND THE FOLLOWING PRESS RELEASES BY THE GOVERNMENT DEFENDANTS INFLICT MAXIMUM DAMAGE UPON DR. SHAPIRO'S REPUTATION AND PROFESSIONAL LIVELIHOOD**

42. Dr. Shapiro is a board certified radiologist who maintained employment as a radiologist and reviewed radiology films with the same employer since 2001.

43. Dr. Shapiro also reviewed MRI films for other radiology facilities throughout the course of his employment with his full-time employer. Dr. Shapiro never visited the other radiology facilities, but would merely review MRI films that were delivered to him.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

44.    On February 29, 2012, Dr. Shapiro was arrested pursuant to an unsealed Indictment.  SA Anspacher signed the "Warrant for Arrest" for Dr. Shapiro.  The warrant was then signed by a Federal Magistrate Judge on February 29, 2012.

45.    A variety of the Defendants and others were present when Dr. Shapiro was handcuffed outside of his residence in Brooklyn, New York, for all the public to see.  It was a gaudy and totally unnecessary show in its size and scope, which was designed to attract maximum attention.

46.    Members of the SDNY, FBI, New York City Police Department ("NYPD") and other law enforcement entities took Dr. Shapiro into custody.  Dr. Shapiro, clothed in his sleeping attire, was not permitted to dress or put a coat on.  Dr. Shapiro was immediately taken to the Fort Hamilton Veteran's Affairs hospital in Brooklyn where most, if not all, of the local arrestees from the unsealed indictment were brought for processing.  Goldman and McQuaid were seen wearing jackets labeled "FBI" while participating in the arrest of Dr. Shapiro and others.

47.    Dr. Shapiro is one of thirty-six (36) defendants named in the unsealed Indictment (the "Indictment") issued by the SDNY, which alleged that Dr. Shapiro was a co-conspirator involved in a $279 million scheme to defraud no-fault automobile insurers.[1]  Dr. Shapiro was specifically charged with conspiracy to commit healthcare fraud and conspiracy to commit mail fraud.

48.    Dr. Shapiro pled not guilty to both charges.

---

[1] The case caption is *United States v. Michael Zemylansky, et al.*, 12-cr-171 (JPO).

[2] *See*, *State Farm Mutual Automobile Insurance Company vs. Mallela*, 4 N.Y.3d 313 (2005), in which the New

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

49.     The Indictment was void of any specific, or even general, allegations of acts that Dr. Shapiro committed in furtherance of the allegations of conspiracy to commit healthcare fraud and mail fraud.

50.     The joint Press Release issued by the DOJ, SDNY, FBI, and NYPD in conjunction with the filing of the Indictment, proudly billed the case as the largest no-fault insurance fraud prosecution in history, and highlighted the arrest of ten doctors connected with the alleged scheme, including Dr. Shapiro.  The joint Press Release, which was quoted in multiple media outlets (including those in New York City and State), provided details of the alleged fraudulent incorporation of multiple medical facilities and further alleged the co-conspirators' involvement with Russian organized crime.  The Press Release remains on the websites of the USDOJ and FBI as of the filing of this Complaint.

51.     The indictment and Press Release was written to make the case appear sexy as it harped on the buzz phrase "Russian Organized Crime."  This assertion is untrue because many of the Defendants did not migrate from Russia, but rather were immigrants from other Eurasian Countries.  For example, Dr. Shapiro is not Russian.  Dr. Shapiro is not an immigrant.  Dr. Shapiro's ethnic background is Jewish and like many Jews he was born and raised in the United States of America, a citizen since birth.

52.     As noted in the joint Press Release, Bharara stated "the scheme relied on a cadre of corrupt doctors who essentially peddled their medical licenses like a corner fraudster might sell fake ID's." The Press Release thanked the NICB "and the investigative units of the insurance companies that provided invaluable assistance with the investigation."

53.     According to the Indictment and the joint Press Release, the Government alleged, without specification to Dr. Shapiro's involvement, a wide-spread conspiracy to commit no-fault

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

insurance fraud.  The Indictment alleged that non-physicians were paying physicians to use their names on paperwork filed with the State of New York Secretary of State to establish medical professional corporations ("PCs") and other entities in the greater New York City area, which specialized in the treatment of patients involved in no-fault automobile accidents.  These claims were asserted by the Government, represented by Goldman and McQuaid, at Dr. Shapiro's initial hearing, where Goldman and McQuaid successfully argued to restrict Dr. Shapiro's freedoms and professional opportunities.  Dr. Shapiro posted cash bail in the amount of $15,000.00 and was forced to place a $500,000.00 lien against his residence.

54.     In short, the Government alleged that once the PCs were established under the facially valid cover of the nominal physician-owners, the non-physicians actually owned and operated the companies, and accordingly took the largest share of any profits.  Allegedly, to maintain the appearance that the physicians owned the entities, the non-physicians caused the PCs to contract with management companies (allegedly owned by the non-physicians), providing for the payment of exorbitant fees for routine services.  The Government further alleged that these management companies owned other medical facilities (i.e., chiropractor, acupuncture, physical therapy, etc.) and referred the PC's patients to these facilities when such was medically unnecessary, and/or that the PCs billed no-fault insurance providers for treatments that were not actually provided.  According to the Indictment, if true owners of the PCs were non-physicians, pursuant to New York Law,[2] insurance companies were not required to reimburse those PCs for the invoiced treatments. In essence, the Government alleged that two components of the

---

[2] *See*, *State Farm Mutual Automobile Insurance Company vs. Mallela*, 4 N.Y.3d 313 (2005), in which the New York Court of Appeals held that a violation of a licensing requirement by a medical provider that establishes that the medical provider is not owned and operated by a medical professional renders the medical provider ineligible to be reimbursed by an insurance company for no fault claims that have been assigned to the provider by an individual involved in an automobile accident.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

conspiracy existed: (1) alleged unlawful billing pursuant to a fraudulent incorporation theory, and (2) alleged improper billing for medical services not rendered and/or services rendered but medically unnecessary.

55. Included among those thirty-six (36) defendants named in the Indictment were physicians, non-physicians who allegedly owned the management companies, and attorneys who the Government alleged provided legal services to physicians and management companies in perpetuation of the fraud.

56. A quick factual analysis would yield the conclusion that none of the above applied to Dr. Shapiro who simply interpreted MRI films and did not own or purport to own any medical facilities.

## II. THE PROSECUTION AND RELATED PROCEEDINGS DEMONSTRATE THAT THE INVESTIGATION AND INDICTMENT OF DR. SHAPIRO WAS CORRUPT; IN FACT THE PROSECUTION CONSISTED IN THE MAIN OF COVERING UP THE CORRUPT INVESTIGATION AND INDICTMENT

57. After almost two years of multiple requests for a bill of particulars (specific details of the allegations against Dr. Shapiro) from the Government, or otherwise any explanation of what illegal acts Dr. Shapiro allegedly committed, Goldman stated, in open court, on December 4, 2013 before the Honorable Paul Oetken, that the Government believed Dr. Shapiro, "inflated reads." Specifically, the Government alleged that Dr. Shapiro fraudulently stated in his reports that patients sustained injuries when such injuries were not sustained. In fact, Goldman professed in open court that according to the patients' MRI films, such patients actually did not have the injuries represented in the reports; or the patients' injuries were actually much less severe than what Dr. Shapiro stated in his reports. Therefore, according to the Government, Dr. Shapiro fabricated and exaggerated injuries in order to allow the medical

clinics to gain financially by providing additional treatment and billing based on Dr. Shapiro's "inflated" reports.

58.     Early on, Dr. Shapiro requested copies of the MRI films, which Goldman agreed to produce by the end of March 2013. However, as of December 2013 Goldman had failed to produce even one MRI film.  In fact, after being ordered by the Court to produce the MRI films, the Government produced one CD containing approximately six MRI films.  The Government never produced the thousands of MRI films that Goldman and McQuaid claimed to have been in possession of, nor did the Government ever produce the reports that contradicted Dr. Shapiro's findings, which McQuaid and Goldman claimed to have been in possession of.  In fact, the Government never indicated one specific case or patient where Dr. Shapiro had allegedly "inflated" his diagnosis.  Not one.

59.     Goldman and McQuaid lied to the Court to perpetuate the prosecution and persecution of Dr. Shapiro for their own personal agendas, including but not limited to Goldman's ego and McQuaid's desire to work for the President, as well as the agenda of their insurance industry/NICB puppeteers.  They covered up the fact that the indictment against Dr. Shapiro was based upon fabrications and thus baseless. (*See infra*)

60.     Dr. Shapiro was not an owner of any PC named in the Indictment, either on paper or in the fraudulent manner alleged in the Indictment.  Rather, Dr. Shapiro was employed as a part-time radiologist by two of the radiology facilities identified in the Indictment, Clearview Medical of Brooklyn, P.C. ("Clearview") and KKM Diagnostic, P.C. ("KKM"), to read radiological films (i.e., MRI and X-Ray) and to provide medical reports based upon his findings. The services Dr. Shapiro performed pertained only to interpreting the radiology films provided to him by Clearview and KKM.  Dr. Shapiro's work was always done at his full-time employment

where the radiological films were delivered to and picked up from. His reports were electronically transmitted to the facilities. Dr. Shapiro never went to any other facilities he performed reads for, as his work was performed in the same manner a tele-radiologist, who provides services without actually having to be at the location of the patient. Dr. Shapiro had done similar work intermittently for the owners of Radiology Today P.C., a MRI clinic that previously occupied the address where Clearview was located, which was unbeknownst to Dr. Shapiro at that time.

61.   Because Dr. Shapiro conducted his work for Clearview and KKM at his employer's office, he had no knowledge of the day to day operations of any of the facilities other than Doshi Diagnostic, including those named in the Indictment. Dr. Shapiro had no role in billing any of the insurance companies as Dr. Shapiro was paid directly by the facilities for the work he performed, which was not contingent upon whether or not the facilities were paid by the insurance companies.[3]

62.   Dr. Shapiro never met with or treated any of the Clearview or KKM patients, never solicited or obtained patients, never made any referrals, and had no choice in which images he was given to review. Dr. Shapiro simply reviewed the radiology films, created his reports based on his opinions of the films, and electronically transmitted the reports to the medical facilities.

63.   The Government Defendants threatened Dr. Shapiro by stating that if he pursued his lawful medical practice while under federal Indictment, the Government would incarcerate Dr. Shapiro with no opportunity for release pending his trial, and use such against Dr. Shapiro, both in the pending criminal case and in an additional Indictment against him. Such was done in

---

[3] In fact, Dr. Shapiro's compensation was at or below the industry standard for reading MRI's and issuing reports.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

the face of a Court order granting Dr. Shapiro the ability to execute affirmations for Clearview and KKM patients, which were to be used in his patients' litigation of claims against various insurance industry defendants who refused to pay.

64.     McQuaid vindictively threatened that if Dr. Shapiro continued working in the medical profession they would come after Dr. Shapiro further.  McQuaid's threats were shouted in the Court Room at the close of the hearing despite the Magistrate's ruling in Dr. Shapiro's favor.  McQuaid's threats had no logical motivation other than to kill insurance claims made against the Insurance Industry Defendants.

65.     McQuaid's threats concerned only Dr. Shapiro's work in private industry No-Fault insurance. Specifically McQuaid did not care about Dr. Shapiro's work in Medicaid or Medicare, which evinces McQuaid's and the remainder of the Government Defendants' complicity in the scheme to carry out this tax payer funded investigation and prosecution at the behest and to the benefit of the Defendant Insurance Companies.

66.     In fact, McQuaid left his position at the SDNY, and, upon information and belief, as compensation for his work on Dr. Shapiro's criminal case, McQuaid was offered (and he accepted) a position as Associate Counsel with the White House under President Barack Obama.

67.     The Government's threats also forced Dr. Shapiro to place a lien against his residence in order to post bail.  His arrest had a domino effect upon his professional affairs, including his exclusion from multiple banks, insurance companies, and a suspension by the New York State Worker's Compensation Board and other health care governing bodies.  Further Dr. Shapiro's reputation has been damaged to the extent that he is no longer able to find work in his industry to the extent that he did prior to the filing of the frivolous Indictment, the malicious prosecution of him under false pretenses, and the publication of such malicious and frivolous

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

charges, all of which has cost him millions of dollars in lost income, as well as in attorneys' fees and costs needed to defend himself and preserve his medical license.

68. Dr. Shapiro's annual income was evenly split between his full time employment, and the extra work he did for other facilities, which now is non-existent. Furthermore, Dr. Shapiro was prohibited from doing any work on no-fault matters during the pendency of his case, which also severely reduced his income.

69. Based on recorded conversations from several years of investigation, the Government Defendants, Faux Law Enforcement Defendants and Rivkin Radler were well aware that Dr. Shapiro never owned or purported to own any medical facility named in the Indictment and that Dr. Shapiro had no role in billing insurance companies. Such information was corroborated by secretary of state filings and billing records provided to the Government by the NICB and numerous insurance companies that cooperated with the investigation, including the various Insurance Companies named in the instant Complaint.

70. During the course of the lengthy covert investigation the Government Defendants and the NICB never obtained evidence to indicate any misconduct and/or unlawful acts as alleged against Dr. Shapiro. Most significantly, the Government Defendants failed to obtain *any of the radiology films* that Dr. Shapiro examined, even though there was ample opportunity to do so and Goldman and McQuaid represented to the Court that the Government possessed them. These films were an obvious necessity to substantiate any allegation that Dr. Shapiro "inflated reads" or exaggerated injuries in his reports.

71. Further, during the course of the lengthy covert investigation the Government Defendants failed to obtain emails, other written communications, or any recorded conversations to indicate that Dr. Shapiro inflated reads. Additionally, the Government Defendants did not

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

obtain any expert opinion or even seek an expert to review Dr. Shapiro's findings in the reports that were claimed to have been fraudulently produced.

72.     Importantly, Dr. Shapiro's reports based on MRIs from Clearview and KKM patients were in the possession of the Government Defendants as evidenced by the disclosure provided by the Government during litigation of the case.   The NICB and/or by numerous insurance companies including the Defendant Insurance Companies provided the MRI reports to the Government Defendants.  Such reports plainly show that Dr. Shapiro reported the existence of a significant injury in approximately 35% of his reports, which is what one may expect to find in a random sample of healthy people who complain of no injuries.

73.     The MRIs Dr. Shapiro reviewed were composed of a sample of patients who complained of injuries due to car accidents, in which on one would obviously expect to find a much higher instance of significant injury than a purportedly healthy population.

74.     A brief review of Dr. Shapiro's reports would have immediately revealed Dr. Shapiro's non-involvement in the alleged conspiracy, and these reports were in the possession of the alleged victims—the Defendant Insurance Companies and others—and were obtained by the Government Defendants and the NICB during the investigation.

75.     In fact, on or about December 14, 2013, after being recently assigned to Dr. Shapiro's case, Assistant United States Attorney Peter Skinner visited Dr. Shapiro's counsel's office to review the reports, which had been organized by Dr. Shapiro's counsel. After a *mere hour* of review, Mr. Skinner realized that the allegations against Dr. Shapiro had no merit, and immediately determined that the Indictment should be dismissed against Dr. Shapiro.

76.     Again, these reports were absolutely available to the Government Defendants as these entities were in possession of the bills and claims that were alleged to have been

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

fraudulently submitted to the alleged victims (the Defendants Insurance Companies and others). Such reports regularly accompany bills and claims submitted to insurance companies. Thus, the Government Defendants ignored the exculpatory evidence they possessed during the investigation. Such was done for the sole purpose of arresting Dr. Shapiro, resulting in extensive benefits to the Government Defendants, Faux Law Enforcement Defendants and Rivkin.

77.     Moreover, Dr. Shapiro issued "So Ordered" (by the Court) subpoenas to various insurance companies, including some if not all of the Defendant Insurance Companies and the NICB to produce, among other documents and records, the relevant medical reports at issue in the case that would have included materials that constituted exculpatory evidence as to the criminal charges brought against Dr. Shapiro. Although the Defendant Insurance Companies and the NICB provided assistance and information, including such exculpatory evidence, to the Government Defendants during the investigation of Dr. Shapiro that lead to his arrest and prosecution, the NICB and many of the Defendant Insurance Companies were unwilling to produce the relevant reports that were requested by Dr. Shapiro pursuant to the subpoenas issued.

78.     Furthermore, Goldman and McQuaid intentionally hid these materials from Dr. Shapiro, even though they possessed them before they went to the Grand Jury seeking an indictment, all for the improper purpose of serving Defendant Insurance Companies as ordered by Defendants Bharara and Fedarcyk.

[The remainder of page is intentionally blank.]

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

**III.   THE MELDING OF GOVERNMENT AND INDUSTRY INTO MERCENARY ROGUE HYBRID ENTITIES THAT PERFROM CORRUPT INVESTIGATIONS AND PROSECUTIONS TO PROFIT THE INSURANCE INDUSTRY: THE DEFENDANT INSURANCE COMPANIES, THE NICB, AND THE GOVERNMENT DEFENDANTS ALONG WITH THEIR EMPLOYEES**

**A. THE NICB AND DEFENDANT INSURANCE COMPANIES ARE FUNCTIONALLY THE SAME ENTITY**

79.    When the investigation of Dr. Shapiro began at the behest of the Faux Law Enforcement Defendants and Rivkin Radler in 2010 every Defendant Insurance Company was a member of the NICB.

80.    Most importantly in 2010 the NICB Board of Governors consisted, amongst a small group of others, of the following individuals from the Defendant Insurance Companies: Susan Q. Hood with the title Immediate Past Chair, Claims Vice President for Defendant State Farm; Robert Brody, Global Claim, Shared Services and Risk Control for Defendant Travelers; Douglas S. Menges, Senior Vice President Auto Claims for Defendant Farmers; Nancy Pierce, Vice President, Claims Home Office for the Defendant Government Employees Insurance Company.

81.    All four of the Defendant Insurance Companies thereby sat on the NICB Board of Governors visa-vi their above named executives.

82.    Also in or about 2010, Rivkin Radler was responsible for litigating actions against Dr. Shapiro on behalf of the Defendant NICB's Board Governors members State Farm (Hood), Travelers (Brody) and GEICO (Pierce) – three out of four.

83.    Further, in 2010 Advisors to the Board included from amongst six persons one Daniel D. Roberts, Assistant Director, Criminal Justice Information Services Division, Federal

Bureau of Investigation.  The position held by Roberts with the FBI in relationship to the NICB will become evident *infra*.

84.    The NICB's By-Laws, IRS Form 909 filings and annual reports make it clear that the NICB and its activities are controlled by the above Board of Governors which is referred to as the "Governing Body" in the IRS Form 909 filings.  For example according to Article III – Board of Governors contained in the By-Laws "Section 1 – General Powers … The management, supervision and control of the affairs of the Corporation [NICB] shall be vested in the Board."   As is an eligibility requirement each of the Defendant Insurance Companies members of the Board are "active senior claims executives or higher level executive of a Member insurance company …" The Board of Governors has the power to create committees to carry out tasks.   The Board of Governors has regular meetings and special meetings.  Furthermore the Board may take any action through what is known as "Section 11- Informal Action" without a meeting. Each member of the Board is a voting member and decisions are made via votes.

85.    The main time commitments of Board members come in the form of meetings setting the NICB agenda.  However according to the IRS Form 909 filings the members of the Board of Governors work on a weekly basis – a nominal number of average hours per week – which is uncompensated.

86.    According to NICB IRS Form 909 filings the NICB "contemporaneously document[s] the meetings held or written actions undertaken during the year by … the governing body [the Board of Governors]" Furthermore the NICB contemporaneously documents the meetings held or written actions undertaken during the year by each committee with authority to

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

act on behalf of the Board of Governors.  Obviously such documentation would be a treasure trove of information if actually kept.

87.    In 2011 (while Dr. Shapiro was being investigated) the NICB Board of Governors consisted of, amongst a small group of others, the following individuals from the Defendant Insurance Companies: Susan Q. Hood with the title Immediate Past Chair, Claims Vice President for Defendant State Farm; Robert Brody, Global Claim, Shared Services and Risk Control for Defendant Travelers;  Douglas S. Menges, Senior Vice President Auto Claims for Defendant Farmers; and Nancy Pierce who was promoted to a titled Board position of Vice Chair, and who is a Vice President, Claims Home Office for the Defendant Government Employees Insurance Company.  The FBI in the form of David Cuthbertson, Assistant Director Criminal Justice Information Services Division (CJIS), Federal Bureau of Investigation still acted as an Advisor to the Board.  An Assistant Director is high ranking position in the FBI.

88.    In 2012, the year of Dr. Shapiro's arrest and prosecution the Board of Governors lineup as it pertains to the Defendant Insurance Companies remained the same.  The FBI in the form of David Cuthbertson, Assistant Director Criminal Justice Information Services Division (CJIS), Federal Bureau of Investigation still acted as an Advisor to the Board.

89.    In 2013 during the prosecution of Dr. Shapiro the Board of Governors representation by the Defendant Insurance Companies remained the same with the exception of the replacement of State Farm's Hood by Kelly Bever, Vice President of Operations of State Farm. The FBI, once again in the form of David Cuthbertson, Assistant Director Criminal Justice Information Services Division (CJIS), Federal Bureau of Investigation still acted as an Advisor to the Board.

90.     The continuity of the Defendant Insurance Companies membership on the Board is a direct result of the fact that the above companies provide more money to the NICB than the other myriad of multiple insurance company members. As such the Defendant Insurance Companies have the bulk of the control of the NICB.

91.     Furthermore the NICB Form 909 filings also demonstrate that the insurance industry almost totally finances the NICB.  In 2013 the latest filing available the insurance industry contributed $44,811,755 in membership dues.  The total amount brought in by the NICB was 46,750,804 dollars. In 2012 the insurance industry funded the NICB to the tune of $44,102,089 dollars in membership dues.  The total amount brought in by the NICB was $46,722,010. In 2011 the insurance industry funded the NICB $42,149,034 dollars in membership dues.  The total amount brought in by the NICB was $44,596,578 dollars.

92.     The NICB is the insurance industry as well as the Defendant Insurance Companies.  At the NICB we find the Defendant Insurance Companies in control and active members of the FBI there to advise.  You literally have the NICB, the Defendant Insurance Companies and the Government in the form of the FBI in the same room at the same time talking about who to investigate and who to prosecute. (*See infra*)

**B. THE CORRUPT RELATIONSHIP BETWEEN THE GOVERNMENT DEFENDANTS AND THE NICB/DEFENDANT INSURANCE COMPANIES**

**The Admissions**

93.     The NICB admits and advertises in every way possible the fact that its function is to make governmental law enforcement investigate, indict, arrest and prosecute those persons that insurance companies unilaterally deem to be engaged in insurance fraud.  For example the

NICBs IRS Form 909 "Return if Organization Exempt from Income Tax" Forms state that the

NICB's mission and most significant activities are:

> To lead a united effort of insurers, law enforcement, and representatives of the public to prevent and combat insurance fraud and crime.

The By-Laws state at Article I, Section 2 - Purpose:

> to gather data pertinent data with respect to insurance crime and fraud and disseminate such information and data to … law enforcement officials … to act as an **interfacing agency** [a governmental like description] between insurance and other companies and the criminal justice system for the prompt investigation of insurance-related crime and fraud **referred** [by the insurance companies] to the Corporation [NICB] for investigation and to provide a deterrent to such activities … to assist … public officials and law enforcement officers in their activities concerning the … detection of insurance related crime and fraud, including the investigation of such crime and fraud … to **encourage** and aid in the **prosecution** of persons engaged in insurance-related crime and fraud … to conduct programs for the education of public officials and law enforcement officers … in the prevention and detection of insurance-related crime and fraud.

94.    The NICB listed in its "Key Benefits of NICB Membership" an advertisement to

insurance companies:

> Law enforcement/insurance industry contacts and relationships. Through its relationships with law enforcement and the insurance industry at all levels, the NICB helps Members obtain reports and information that they otherwise could not receive on their own. The NICB also assists its Members by serving as an outsource solution for their prosecution needs with the ultimate goal of securing restitution. We leverage our law enforcement relationships, so that Members can focus on identifying new questionable claims and develop future cases …

95.    The NICB boasts that it provides insurance companies with sensitive law

enforcement information. In fact in <u>People v. Ryvkin</u> (Queens County Supreme Court 2465/08),

a case that was investigated by essentially the same joint FBI, NYPD, NICB task force as Dr.

Shapiro's case, the NYPD detective in charge of the wire room testified that the NICB was given

information that was obtained through the various wiretaps on phones, faxes and emails:

> Q. So an insurance industry group is being told what information is being received on a wiretap as the wiretap is ongoing?

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

A. Correct.

Q. This is a private industry?

A. Yes.

Q. Sir, is that proper to be giving out recorded telephone conversations, information from those recorded telephone conversations of U.S. citizens – is it proper to be giving that to a private insurance industry group?  Is that proper?

[Objection sustained]

96.     The law strictly limits the disclosure of information obtained from eavesdropping to another law enforcement officer "to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." Information garnered from eavesdropping most certainly cannot be divulged to civilians.

97.     In this case, the eavesdropping application requested permission to share the communications with the NICB/Defendant Insurance Companies:

> IT IS HEREBY REQUESTED that orders be issued authorizing law enforcement officers authorized under Section2510(7) of Title 18, united States Code including special agents of the FBI, deputized NYPD Detectives, other law enforcement officers, and Government employees or individuals operating under a contract with the Government, including translators, to intercept ,wire and electronic communications occurring over the TARGET CELLPHONES concerning the affairs of the enterprise described herein and the TARGET SUBJECTS' commission of the above-described offenses.

Although not explicitly named, the "operating under a contract with the Government" surely includes the NICB/Defendant Insurance Companies.

98.     Additionally, the NICB claimed: "The NICB also assists its Members by serving as an outsource solution for their prosecution needs …" Under the law insurance companies do not have recognizable "prosecution needs" nor is it proper for them to have such.  No individual or entity of any kind has a recognizable "prosecution need."  In New York State prosecutions are

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

brought on behalf of the "People of the State of New York."  In the federal system criminal prosecutions are brought on behalf of the "United States of America."

99.     Most brazen is the NICB boast: "We leverage our law enforcement relationships …" It is illegal and unethical for private industry to "leverage" law enforcement.  "Leverage" means "influence", "power", "force", "control."

100.    The following language is taken from Paragraph 9 of the Affidavit of NICB high ranking employee James Hertz which was used by the NICB to attempt to quash a subpoena for records in a prior civil case:

> Other NICB agents have also been cross-designated as law enforcement officers in Queens, Nassau and Suffolk Counties for joint investigations.  In these investigations NICB agents operate with the same authority as sworn law enforcement officers.[4]

101.    In fact, the NICB and Tardalo filed an absolutely frivolous motion to quash the subpoenas issued by Dr. Shapiro and So Ordered by the Court in the Case.  The NICB argued that the NICB was a "Government agent" and that Dr. Shapiro was not permitted to obtain their "government documents" from the NICB.  Further, the NICB and Tardalo argued that the subpoenas issued by Dr. Shapiro were overly broad and burdensome, but in the same papers admitted that they obtained materials from its members (insurance companies) and forwarded such materials to the FBI.  The NICB and Tardalo's motion was a clear cut attempt to hide the NICB's bad acts.

102.    First if one goes to the FBI's Website one will find a page dedicated to explaining what insurance fraud is and what the FBI is doing to combat it.  One will also find the following on the same page:

> Insurance Fraud Resources

---

[4] This would make the NICB a domestic version of the infamous Black Water USA with the Insurance Companies as their master.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

For more information about Insurance Fraud or where to report it, contact the following organizations.

*\*\**

National Insurance Crime Bureau (NICB)
(800) 8356422

The NICB is a nonprofit organization that partners with insurance companies and law enforcement to help identify, detect, and prosecute insurance criminals. The NICB web site is an excellent source of information.

103.    According to various Annual Reports of the NICB, several current and former members of the FBI held positions with the NICB.  We know about the NICB's Board of Advisors containing active FBI Assistant Directors.  This practice dates back for decades. In 2003, up to a few years ago, the Chief Executive Officer of the NICB was one Robert "Bear" Bryant.  Shortly before coming to the NICB, Bryant was the Deputy Director of the FBI – the second highest-ranking position with the FBI – wherein Bryant managed the day-to-day operations of the FBI. (Bryant had been the CEO of the NICB going as far back as 2000).

104.    Bryant is currently engaged in yet more activity that melds the government with a private entity – known as the Markle Foundation –  where Robert "Bear" Bryant was named the National Counterintelligence Executive on September 18, 2009: "responsible for providing the President and Congress with the damage assessment from the ongoing WikiLeaks."

105.    The above as well as the NICB/FBI/Defendant Insurance Companies' involvement in mass data collection is explained by the contents of some of the Memorandums of Understanding that serve as the official justification for the NICB/Defendant Insurance Companies initiation of, and participation in, bogus criminal investigations, indictments and prosecutions by active high level law enforcement agencies.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

**The Memorandums of Understanding ("MOUs")**

106.    The following description of an MOU between the FBI and the NICB can also be found on the FBI Website – "FBI Records: Freedom of Information/Privacy Act" – "Privacy Impact Assessment for the Staged Accident Data Mining Initiative March 2008."  This document is evidentiary corroboration of much of what is alleged in this complaint.  The pertinent parts of the document read as follows:

INTRODUCTION

The FBI has jurisdiction with respect to the investigation and prosecution of mail and wire fraud, including insurance fraud claims arising from automobile accidents. In order to pro-actively identify national fraud trends in automobile accident insurance claims, the FBI initiated a liaison effort with the National Insurance Crime Bureau (NICB) in order to obtain data from the NICB Claimsearch database. The initiative, directly supported by the FBI Directorate of Intelligence's Financial Crimes Intelligence Unit (FCIU), is named the Automobile Accident Insurance Fraud Initiative (AAIFI, or "Staged Accident"). The goal of this initiative is to identify and analyze information regarding potential and ongoing staged accident cases and schemes as well as other automobile insurance fraud schemes. In the regular course of business, NICB analysts review claims in order to discover and analyze claim and fraud trends. Subsequently, NICB began to provide the FBI with data from the Claimsearch database that NICB analysts had determined to be suspicious in nature. The FBI's use and analysis of data provided by the NICB enables the FBI to more efficiently direct investigations and allocate resources to automobile accident fraud investigations. The Staged Accident initiative does not involve an identifiable database that would constitute an information system. Rather, information is simply forwarded to the FBI's FICU from the National Insurance Crime Bureau (NICB), a not-for-profit organization supported by property and casualty insurance companies targeting insurance crimes, via Word document **after analysis and sanitation by NICB. The data transferred from NICB identifies, in list form, individuals or groups of individuals suspected of making suspicious or staged automobile accident claims within the Area of Responsibility (AOR) of the Field Office initially participating in the pilot project. The list of individuals forwarded to the FBI by NICB also includes any identifiers known to NICB as a result of the claims process, such as the name, address, date of birth of the claimant and any injured parties, as well as the name and address of any treating physician or attorney associated with the claim** …

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

In other words the NICB provides their conclusions as to who is committing fraud to the FBI so that the FBI can investigate them – just as the NICB/Defendant Insurance Companies did in this case. (*infra*)

1.1 What information is to be collected?

Pursuant to 18 U.S.C. sections 1341 and 1343, the FBI is authorized to investigate fraud schemes by mail or wire, including insurance fraud, and collect information relevant to such investigations. In the initial stages of this initiative, claims data specific to the AOR of the Field Office participating in the pilot project was and may be collected by NICB member companies and submitted to NICB's Insurance Service Office (ISO) Claimsearch database. **This data was then analyzed by NICB analysts using fraud indicators established by NICB and its member companies to determine which claims were suspicious in nature and related to staged automobile accidents. Thus, to the extent this initiative constitutes data mining, the mining was performed by the NICB before the data was provided to the FBI. The individual data, consisting of claimant and insured personal identifiers such as names, addresses, dates of birth, and social security numbers, was then forwarded by NICB to the FBI, along with a brief description of the claim submitted.** The Personally Identifiable Information the FBI, along with a brief description of the claim submitted. The Personally Identifiable Information (PII) provided by NICB to the FBI is the same PII provided by an individual to his/her insurance company when filing a claim.

107.    The indicators are bogus.  Here is an example of some of these bogus NICB/Defendant Insurance Company indicators taken from an actual insurance company Defendant investigator affidavit used to justify the denial of payments. (i) The insurance investigator swore that the accident involved two older vehicles – a 1999 Ford and a 1989 Honda.  This is meaningless.  State Farm saw fit to accept insurance premiums on this old Honda; (ii) the insurance investigator states that the accident happened "late at night, at 9:30 p.m."  9:30 is not late at night.  Are we supposed to think that anyone driving after 9:00 is looking to get into a staged accident; (iii) the claimant "has a prior loss history."  … it suggests that if you have had accidents in the past any accident going further is suspicious.  (iv) the "claimant vehicle was in a previous loss where the front end was damaged."  Drive in Brooklyn

for a couple of months and count the dents. (v) the investigator – who is now a handwriting expert – states that the claimant's signature on the NF-2 does not match the signature on the insurance application.  But in reality the NF-2 bore only the signature of the claimant – a Ms. Luna – whereas the application was signed by the policyholder – a Ms. Alvarado – who is not Ms. Luna.  As such the signatures should not match. (vi) finally the investigator states: "injuries sustained were all soft tissue and subjective in nature."  The investigator is saying that the insurance company funded NICB – really the insurance industry – does not want insurance companies to pay for soft tissue.  According to Defendant State Farm the above formed the basis for denial of the claim based upon fraud.

108.    In any event the above section of the MOU states that insurance companies give the NICB information as to who they believe is committing fraud and this is submitted to further analysis by the NICB, which uses fraud indicators invented by the NICB and the insurance companies – not what the FBI believes are indicators of fraud.

109.    1.2 From whom is the information collected?

> Information pertaining to automobile accident insurance claims is initially collected by NICB from its member insurance companies. That data is then incorporated into the NICB Insurance Services Office (ISO) Claimsearch database, a repository of claims-related data submitted by NICB members. The ISO database includes property and casualty claims submitted by policyholders. While the FBI is not permitted direct access to the Claimsearch database, **NICB analysts extract possible fraudulent claims data** within the AOR of the initial Field Office participating in the project ...

More of the NICB/Defendant Insurance Companies telling the FBI who to investigate and it continues.

Section 2.0

The Purpose of the System and the Information Collected and Stored within the System.

2.1 Why is the information being collected?

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

The information collected and identified by the NICB is provided to the FBI in order to assist the FBI in the investigation and prosecution of mail and wire fraud, including insurance fraud claims arising from automobile accidents. **Information from the NICB Claimsearch database is reviewed by NICB analysts in order to discover and analyze claim and fraud trends. Information deemed by NICB analysts to be suspicious is forwarded to the FCIU. The FBI's use and analysis of data provided by the NICB enables the FBI to more efficiently direct investigations and allocate resources to automobile accident fraud investigations.**

This indicates that the private insurance industry directs the FBI where to spend tax payer money to investigate individuals that the insurance industry wants the FBI to investigate – obviously to the benefit of the insurance industry. It cannot be denied that providers with a large amount of pending claims would make the best targets for the insurance industry from a dollar and cents perspective.

Section 3.0

Uses of the System and the Information

3.1 Describe all uses of the information.

**The information provided by NICB will be used to identify potential staged accident insurance claims in order to open investigations into cases of possible health care and insurance fraud** …

Section 4.0

Internal Sharing and Disclosure of Information within the System

4.1 With which internal components of the Department is the information shared?

The information received from NICB is shared with personnel in the FBI's FCIU, as well as with managers and personnel assigned to the FBI Field Office participating in this initiative. The information may also be provided to personnel within the appropriate U.S. Attorney's Office for purposes of prosecution.

Section 5.0

External Sharing and Disclosure

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

***

Section 6.0 goes on to state in sum and substance: Individuals "do not have the opportunity to refuse to allow NICB to forward their claim information to the FBI."… "Individuals who are the subject of information provided to the FBI by the NICB do not have the opportunity to consent to specific uses of that information by the FBI, as that information is used for law enforcement investigative purposes." If you make an insurance claim, the FBI knows everything about you. If your insurance company and/or the NICB label your claim fraudulent, the FBI will investigate you.

110.   The NICB works closely with another insurance industry controlled group called the Insurance Services Office Inc. ("ISO"). The main asset of ISO is a mega-database that it sells to insurance companies and makes available to law enforcement as administered by the NICB. In fact, the ISO website informs members of law enforcement that are having difficulties with the ISO database to contact the NICB and gives an NICB telephone number that should be called.

111.   The ISO database includes hundreds of millions of records for American citizens including insurance claims, medical records, motor vehicle reports, police records and driver's license numbers. Contained within these documents are dates of birth, address history, social security numbers, license information, phone numbers, etc., of each citizen.

113.   An example of MOUs was provided by the FBI in response to a FOIA request is an MOU created specifically for the Portland, Oregon field office, which is entitled: "Memorandum of Understanding Between the Federal Bureau of Investigation and National Insurance Crime Bureau." It begins as follows:

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

This Memorandum of Understanding (MOU) constitutes an agreement between the Federal Bureau of Investigation (FBI) and the National Insurance Crime Bureau (NICB) concerning investigative authority and responsibilities in connection with an investigation regarding fraudulent filings and exaggerations of insurance claims which, in part, violate Mail Fraud and Fraud by Wire statutes.

The MOU continues:

The purpose of this MOU is to outline the responsibilities of the FBI and NICB. In addition, this MOU will formalize the relationship between the two organizations with regard to policy, planning, public relations, and the media in order to clarify the role of each organization.

Under "Goal," the MOU states:

The goal of this cooperation between the FBI and NICB is to use the resources and information gathered by both organizations in an effort to prosecute those individuals who are involved in fraudulent insurance practices which violate federal statutes.

114.   Later in the document, NICB is charged, as part of the proposed pact, with monitoring "suspicious claims files involving subjects, to include developing a database of this information."

115.   The FBI also agrees to "provide all physical dwellings, all technical installations, security, and furnishings related to the investigation." In other words the FBI moves in with the NICB.

116. There are certainly similar MOUs governing the ongoing criminal investigation that led to Dr. Shapiro's indictment.  These MOUs and other agreements represent FBI/USDOJ written policy formulated at the policymaker level, which caused Dr. Shapiro to be illegally arrested and prosecuted in the manner described in the next section *infra* and described *supra*.

117.   The ease in which the NICB gets what it wants through MOUs is illustrated by a meeting at which a new MOU was created.  The meeting took place in Buffalo, N.Y. on June 6-7, 2012 and was hosted by the Criminal Justice Information Services (CJIS) Advisory Board,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

which is a division of the FBI. The CJIS was established in February 1992 and is the largest division of the FBI.  Its main feature is a computerized criminal justice information system that is a counterpart to the FBI's National Crime Information Center (NCIC). CJIS offers a much wider range of information nationwide and more precise inquiry search parameters than NCIC. CJIS consists of several databases and one subsystem, and its retrieval and update capabilities are online. The CJIS Division is located in a half million square foot main facility on a 986 acre tract north of Bridgeport, West Virginia.  CJIS services located at this site include the National Crime   Information   Center (NCIC), Integrated   Automated   Fingerprint   Identification System (IAFIS), Law Enforcement Online (LEO), National Instant Criminal Background Check System (NICS), Uniform Crime Reporting Program/National Incident-Based Reporting System (UCR/NIBRS), and Law Enforcement National Data Exchange (N-DEx).   Here statisticians compile vast amounts of data from law enforcement into a series of regular reports. The NICB gained access to this database by simply proposing that it gain access at the Buffalo meeting.

118.   There is also an MOU between U.S. Customs and Border Protection and the NICB that provides for "SHARING OF LICENSE PLATE READER DATA." License plate readers (LPR) refers to the taking of images of license plates for all vehicles that cross the borders of the United States including all "ports of entry."  The image consists of "the license plate number, state of origin, and digital images collected."

IV.    THE EVENTS FROM THE DECISION TO INITIATE THE INVESTIGATION OF DR. SHAPIRO THROUGH THE INDICTMENT OF DR. SHAPIRO

119.   As is clear from another sensationalized Government Defendant press release, as well as such things as wiretap applications, this case, including the alleged "investigation," was a continuation of a prior investigation and mass "take down."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

120.    On October 13, 2010 the FBI, SDNY, NYPD, Department of Homeland Security and Department of Health and Human Resources release a joint press release entitled:

**Manhattan U.S. Attorney Charges 44 Members and Associates of an Armenian-American Organized Crime Enterprise with $100 Million Medicare Fraud**
*Defendants Also Charged with Racketeering, Identity Theft, and Money Laundering Crimes Armenian "Vor" Charged with Protecting Alleged Medicare Fraud Scheme*[5]

121.    Prominently displayed in a photo of the press conference is Defendants Bharara, Fedarcyk, with NYPD Police Commissioner Kelly.  The press release announced:

> [T]he unsealing of charges, in two separate indictments, against 44 alleged members and associates of an Armenian-American organized crime enterprise, for a range of offenses including the operation of at least 118 medical clinics located in 25 states that submitted over $100 million in bogus claims to Medicare. The alleged $100 million Medicare fraud scheme identified today is the largest, single Medicare fraud ever charged.

The press release describes an investigation into a Medicare fraud scheme that dovetailed into an investigation of No Fault Fraud – the so called Chevrin indictment.

122.    Bharara, in the same breath,  thanked the "FBI, NYPD, HIS, and HHS for their work in the investigation, which he noted was ongoing, Mr. Bharara also thanked the National Insurance Crime Bureau for their assistance in the investigation …"

123.    The "ongoing" "investigation" mentioned by Bharara was the criminal investigation that prompted Plaintiff's arrest and indictment.  As it revolved strictly around private No-Fault insurance from the beginning, it was clearly led, especially as to Dr. Shapiro, by the NICB.

### A.  The Ground Work Laid by Defendant Bharara that Made the Indictment of the Innocent in the Southern District the Way Business is Done

---

[5] We are informed by an expert in the field that a true "Vor" is considered the equivalent of a John Gotti.   A pre-requisite is hard time in a Soviet work camp prison.  Vors have a special inconspicuous tattoo on one of their fingers.  Apparently the Vor in this case is named such because he allegedly made threats to kill people – how this information was acquired is not mentioned.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

124.    The investigation has learned from sources within the U.S. Attorney's Office, Southern District of New York, that the Defendant United States Attorney for the Southern District of New York, Preet Bharara, has reduced the legal threshold necessary to make a decision to indict an individual/entity from the legally required "probable cause" to the lower level of "reasonable suspicion" which "reasonable suspicion" standard pertains to decisions to stop and frisk a person. *Terry v. Ohio*, 392 U.S. 1 (1968).  The above is criminal conduct.

125.    The above was done in order to create more sensationalized press releases as we have seen in this case. In fact a separate source stated that upon the arrival of Defendant Bharara in 2009 the person that handled media duties left the position and was replaced by others that increased press activity ten-fold.

126.    Bharara's illegal lowering of the threshold for when a person is indicted places Defendant Bharara right in the grand jury room directing the proceedings when the Defendants, including Dr. Shapiro, in the underlying criminal matter were indicted.  In addition Bharara is personally responsible for the un-ethical actions of his Assistants in this matter as Bharara is charged with training, regulating and disciplining his Assistants.  An AUSA has the power to inflict the worst upon a citizen including loss of liberty, economic ruination, the destruction of the citizen's family and even life and death. The regulation of AUSAs is as important as the prosecution of crime for a United States Attorney.  In his malicious zeal Bharara promoted the gross misconduct of his AUSAs in his own self-image.

127.    In fact the April 10, 2015 Memorandum Opinion and Order of Judge Valerie Caproni in United *State v. Silver*, 15-CR-93 (VEC) (S.D.N.Y. 2015) corroborates a portion of the above proposed amended pleadings.  The Opinion addressed the defendant Silver's motion seeking the extraordinary relief of having the indictment against him dismissed. Silver argued

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

that Defendant Bharara's pre-indictment media blitz prejudiced Silver because it had an undue influence on the grand jury.   Key in the analysis was, amongst other things, the Southern District's press release and Defendant Bharara's accompanying statement.[6]   Judge Caproni heavily chastised Defendant Bharara's media activities, i.e.:

> In this case, the U.S. Attorney, while castigating politicians in Albany for playing fast and loose with the ethical rules that govern their conduct, strayed so close to the edge of the rules governing his own conduct that Defendant Sheldon Silver has a non-frivolous argument that he [Bharara] fell over the edge to the Defendant's prejudice.

128.   On point with this case is the following observation of the Court:

> In particular, the Court is troubled by remarks by the U.S. Attorney that appeared to bundle together unproven allegations regarding the Defendant with broader commentary on corruption and a lack of transparency in certain aspects of New York State politics.

In the case at bar Bharara bundled together untrue vague innuendo – lies – with broader commentary about fraud that made Dr. Shapiro appear guilty through the mere association of being named in an indictment with others.

129.   For anyone who resists the notion that the NICB and the so called investigative units of Defendants GEICO, State Farm, Travelers and Farmers were directly involved in the investigation that led to the flaking[7] of Dr. Shapiro you will see more but for now see the following "Prepared Remarks" of Defendant Bharara:

> **United States V. Mikhail Zemlyansky, Et Al. Prepared Remarks Of United States Attorney Preet Bharara**
>
> February 29, 2012
>
> Good afternoon. My name is Preet Bharara, and I am the United States Attorney for the Southern District of New York.

---

[6] There is a statement in this matter too which contains various key admissions pertaining to other Defendants which we will see shortly.
[7] The term "Flaking" means the fabrication of charges through false evidence.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Today, we announce the indictment of 36 individuals for participating in a colossal health care and insurance fraud scheme. Unlike many such schemes we have seen recently, the one described in today's indictment involved the systematic abuse of New York State's no-fault insurance law to defraud private insurance companies on an unprecedented scale and relied on the corruption of more than a dozen professionals.

In fact, we believe this is the single largest no-fault insurance fraud case in history.

The alleged amount of intended fraud was more than $275 million, and the actual loss was more than $113 million. *[No tangible evidence supports any of the above numbers]*

It involved, as alleged, a "criminal organization consisting primarily of individuals of Russian descent in the United States participating in organized criminal activities." *[The "Russian descent" comment has no legitimate purpose other than racial and racist overtones. Substitute "Irish"; "Italian" or "African American", etc. and there would be a tremendous backlash]*

As described, the defendants worked hand-in-hand to create more than 100 fraudulent medical clinics in New York City. *[This is a false number unsupported by the indictment or evidence]* These so-called medical clinics, we alleged, were nothing more than fraud mills *[NICB and insurance company phrase],* as their only reason for being was to take advantage of New York State's patient friendly no-fault insurance law. *["patient friendly" is a phrase coined by Defendant Rivkin Radler in various RICO actions; myriads of people who have had their claims denied by crooked Independent Medical Examinations would disagree with the "friendly' description]* That's a law designed to provide a safety net to accident victims in New York State who have suffered real injuries in real automobile accidents. *[Calling "no fault" a "safety net" is a lie since no fault is expensive insurance that must be purchased by car owners that yields huge profits as demonstrated by their incredible advertising budgets; this falsehood appears to be the promotion of the insurance industry as "good guys."]* In this case, the defendants allegedly turned that law on its head by using it to steal hundreds of millions of dollars based on medical claims that ranged from wild exaggerations to outright fabrications.

***

Today's indictment is noteworthy for another reason also: as I mentioned, the charged crimes could never have happened without the participation of more than a dozen corrupt professionals – the defendants include 10 medical doctors and three licensed attorneys.

As described in the indictment, the scheme relied on a cadre of corrupt doctors who essentially peddled their medical licenses like a corner fraudster might sell fake ID's – except that those medical licenses allowed unlawful entry, not to a club or a bar, but to a multi-billion dollar pool of insurance proceeds.

Before I get to the details, let me introduce and thank our partners in this case.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

I am joined here today by the FBI, led by Assistant Director in Charge of the FBI New York Field Office, Janice Fedarcyk … [etc]

I'd also like to thank the FBI's Eurasian Organized Crime Task Force, **the staff from the National Insurance Crime Bureau, the investigation units from the victim insurance companies who also provided invaluable assistance** …

Now let me briefly explain this fraud scheme. *[wherein Bharara gives his description of what can only be described as the "alleged scheme" since, as demonstrated with regard to Dr. Shapiro, the two doctors that were fully acquitted, the attorney that was fully acquitted, the hung juries and the fact that the last trial has yet to be held the scheme as alleged was full of nonsense allegations]* …

First, the New York no-fault law requires that medical clinics be incorporated by medical professionals – in other words, as you might expect, medical clinics must be run by actual doctors. *[Meanwhile Hospitals are owned by layperson business persons so you might not expect that medical clinics must be owned by medical professionals if not for the revolving door of insurance company execs that served as Superintendent of Insurance.]*

This alleged intricate kickback arrangement kept the fraud churning and the defendants' pockets flush *[We must have professionals writing these comments]* …

These defendants then used that money in part to finance their own lavish personal lifestyles – including vacations in Mexico and Atlantic City, purchases of luxury items at Louis Vuitton, Chanel, and Saks Fifth Avenue, as well as expensive jewelry and limousines. *[Where is the relevancy – many middleclass people have splurged on a Mexico vacation.  Many poor people have frequented Atlantic City.]*

Today's charges expose a colossal criminal trifecta, as the fraud's tentacles simultaneously reached into the medical system, the legal system, and the insurance system, pulling out cash to fund the defendants' lavish lifestyles.  *[More irrelevant hyperbole]*

As mentioned, among the defendants were medical doctors, attorneys and medical professionals who, rather than acting as gatekeepers against fraud, actively carried out the fraud. *[Seems to want to capitalize on the perceived dislike of doctors and attorneys]*

The loss amount to automobile insurance companies in this case is, in a word, staggering. *[As will be demonstrated this is a lie too]* And for every dollar these defendants stole from private insurers, that cost ends up being passed on to the people of this state. So let the message be clear to those who think they can get away with such a blatant fraud: we will use every resource at our disposal to punish you for your crimes and to protect New Yorkers.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

What be garnered from the above: 1) as highlighted the NICB and insurance companies – that includes the Insurance Company Defendants – provided "invaluable assistance" and 2) Defendant Bharara has a perverse and unethical penchant for trying his case in the media with lurid falsehoods and juicy tabloid generalizations that raises a presumption that he is unfit to be U.S. Attorney for the Southern District or any district and for which the United States is liable to many.  As discussed in Judge Caproni's decision this man Bharara's press activity goes as far as statements released on twitter.

## B.      The Insurance Company Defendants/NICB's Decision to Target Dr. Shapiro

130.     Sometime during the first half of 2010, the exact date is known only to the Defendants, Susan Q. Hood (Claims Vice President for Defendant State Farm); Robert Brody (Global Claim, Shared Services and Risk Control for Defendant Travelers);  Douglas S. Menges (Senior Vice President Auto Claims for Defendant Farmers); Nancy Pierce, (Vice President, Claims Home Office for the Defendant Government Employees Insurance Company), along with Daniel D. Roberts (Assistant Director, Criminal Justice Information Services Division, Federal Bureau of Investigation) made the decision to target Dr. Shapiro.

131.     The decision to target Dr. Shapiro appears to have been made at a so called "Informal Meeting" (see *supra*) of the Board of Governors to which all the above named individuals and their respective Insurance Company Defendants were members.  However the decision could have been made at an above described "Special Meeting" or through contact with a Board of Governors appointed Committee – once again see above.  The exact information is in the Defendant's possession but all of the above processes are essentially the same in their workings.   Key Board members such as the representatives of the Defendant Insurance Companies vote on a course of action and other members of the Board of Governors join.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

132.   The decision to go after Dr. Shapiro was based upon two things: 1) the dollar amount of outstanding claims against the Insurance Company Defendants connected to Shapiro through his reads that could be eliminated via Dr. Shapiro's indictment; 2) expediency – the FBI had informed the NICB/Defendant Insurance Companies that the so called "Vor" investigation – described above – had identified Dr. Shapiro as being associated – however tenuously through reads – with individuals that were purportedly layperson owners.

133.   According to the NICB's own IRS Form 909 targeting medical providers and medical clinics is what the NICB/Defendant Insurance Companies does.  (See Part III "Statement of Program Service Accomplishments" at #4 "Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses Section 501(c)(3) and 501(c)(4) organizations" of said forms). For example:

> Investigations - NICB's investigative efforts produced 1,208 prosecutive administrative actions (PAA) related to medical fraud …

> ***

> Data Analytics - Established the Aggregated Medical Datbase program Published 155 Med AWARE alterts [*sic*] identifying 144 clinics and 169 providers Published 343 strategic alerts and 878 medical fraud task force alerts Published 19 nation-wide ForeCast reports and 180 analytical products to support investigations Started two additional initiatives - To produce 52 state and national ForeCAST reports focusing on medical questionable claims and all questionable claims submitted by members …

134.   The decision to indict Dr. Shapiro was transmitted to the FBI via the above Advisor to the Board of Governors Daniel D. Roberts, Assistant Director, Criminal Justice Information Services Division, Federal Bureau of Investigation amongst others unknown at this time.

135.   Once the decision was made by the Defendant Insurance Companies and their NICB alter ego to go after Dr. Shapiro, the indictment and prosecution of Dr. Shapiro was a

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

foregone conclusion.   Dr. Shapiro would be indicted without any evidence except for the minimal fabrication and false perjured testimony that is required to make the decision to indict in Bharara's grand jury room of reasonable suspicion – once again one cannot legally indict on suspicion alone no matter if the suspicion is reasonable or unreasonable.

### C.       The MOUs Used in the Investigation of Dr. Shapiro and His Co-Defendants

136.     There are multiple Memorandums of Understanding ("MOUs") in this case. As already discussed, these MOUs laid out a framework for the NICB's/Defendant Insurance Companies significant involvement in this case.

137.     The "Staged Accident Data Mining Initiative" described above and the "NICB's Authorized Use of NCIC Data" MOU as described above are two broad and general MOUs that pertain to this investigation.

138.     There is at least one if not two case specific MOUs that pertain to the NICB's/Insurance Company Defendants' joint investigation of Dr. Shapiro along with the Government Defendants.  The case specific document is entitled: "Memorandum of Understanding between the Federal Bureau of Investigation and National Insurance Crime Bureau." It contains language that, in sum, states the following:

> This Memorandum of Understanding (MOU) constitutes an agreement between the Federal Bureau of Investigation (FBI) and the National Insurance Crime Bureau (NICB) concerning investigative authority and responsibilities in connection with an investigation regarding fraudulent filings and exaggerations of insurance claims which, in part, violate Mail Fraud and Fraud by Wire statutes.

> The purpose of this MOU is to outline the responsibilities of the FBI and NICB. In addition, this MOU will formalize the relationship between the two organizations with regard to policy, planning, public relations, and the media in order to clarify the role of each organization.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

The goal of this cooperation between the FBI and NICB is to use the resources and information gathered by both organizations in an effort to prosecute those individuals who are involved in fraudulent insurance practices which violate federal statutes.

NICB is charged with monitoring "suspicious claims files involving subjects, to include developing a database of this information."

The FBI also agrees to provide all physical dwellings, all technical installations, security, and furnishings related to the investigation.

In other words the FBI moves in with the NICB.

139.    This investigation has found in the NICB/Insurance Company MOU examples discussed that a case specific MOU involving a local FBI Field Office and US Attorney's District and the NICB will always be created and implemented with direct input from the U.S. Attorney – in this case Bharara – and the FBI Assistant Director-in-Charge – in this case Fedarcyk.

140.    Both Bharara and Fedarcyk were responsible for the creation and the administration of the case specific MOU between the FBI and the NICB that governed the investigation of this case.  Fedarcyk and Bharara were also responsible for the long standing custom and practice of the FBI working with the NICB in New York.  Through Fedarcyk and Bharara's stewardship the NICB was illegally elevated to the level of governmental law enforcement and experts – which they are not – by the US Attorney's Office and FBI in order to create fabricated evidence and perjured affidavits and grand jury testimony.

**D.    The Implementation of the Corrupt Decision to Indict: The So Called Investigation**

141.    The FBI has an official document known as a "302" or "Form 302."  The "302s" start as hand written notes that are then reduced to type written reports.  Amongst other information the forms include the subject of the interview, the interviewing FBI agent, the date,

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

those present for the interview and a summary of the witnesses' statements. The "302s" in this case demonstrate that members of the NICB – and therefore the Defendant Insurance Companies – were present for many of the witness interviews. This goes back to at least 2010 and probably prior to 2010.

142. In addition Defendants Goldman and McQuaid were present for many interviews and participated in said interviews prior to the presentation of evidence to the grand jury that would indict Dr. Shapiro – it appears as far back as 2010 if not further. Both Goldman and McQuaid therefore acted as investigators no different than an FBI agent.

143. Simultaneous to the above, in or about the winter of 2010/2011 the Defendant Rivkin Radler gave copies of the litigation and investigative files to the joint government, NICB, Defendant Insurance Company investigation. These files were created as a result of, and in support of, civil actions brought by Rivkin Radler against Dr. Shapiro on behalf of Defendants GEICO, State Farm and Travelers. In fact on its website (www.rivkinradler.com), Rivkin Radler describes itself as "dedicated to fighting healthcare fraud [that] has saved insurers hundreds of millions of dollars, and led to decisions that will continue to benefit clients for years to come." Rivkin Radler represents numerous members of the NICB.

144. Rivkin Radler provided legal technical support to the investigation and prosecution of Dr. Shapiro and others. This included knowledge of the Insurance Law and implementing no fault regulations. Moreover Government search warrant and eavesdropping applications, as well as the indictment, contain similar language, phrasing, and unique legal theory as Rivkin Radler pleadings in the above mentioned cases.

145. In corroboration of the above, Rivkin Radler had intimate knowledge of portions of the criminal case that were the subject of a stringent order allowing defense attorneys access

to such information only upon the signing of documents essentially swearing that such information could not be shared with anyone save attorneys working on the case, investigators, and the Defendants in order to help in the defense. The penalty for violation of this order was understood to be jail.

146.    Such information included a list of unindicted entities and individuals that were alleged to be associated with the alleged conspiracy as well as intimate details contained in search warrant applications and the results of the execution of said warrants. This also included the conversation by the Government's CW-1 and a Gregory Mikhalov revolving around a search of the premises 7122 Bay Parkway, Brooklyn, New York. Indeed Rivkin Radler appeared to have knowledge of who was to be indicted before the actual obtainment of the Indictments. Such was predicted and driven by Rivkin Radler civil RICO actions.

147.    Moreover Rivkin Radler was able to allege the following in a Civil Rico Complaint:

> In fact, GEICO received billing for services allegedly rendered at the Remsen Clinic [377 Remsen Avenue, Brooklyn, New York] from a "revolving door" of more than 40 different healthcare provider names … A number of the providers used to bill GEICO from this location have been identified by the U.S. Government as being used in furtherance of an Organized No Fault fraud crime ring, involving laypersons who set up and illegally control medical clinics. See, United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO).

148.    The drafters of this Second Amended Complaint know what Rivkin is referring to only because we were defense counsel on Dr. Shapiro's criminal case. Rivkin derived these facts from documents that were under seal and provided to defense counsel in the criminal action. Such were primarily used to calculate intended and actual loss amounts. (Discussed *infra*) The information contained therein is bogus, but nevertheless it was clearly understood

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

that these documents provided by the Government were of the upmost sensitivity and not for the public's eyes including companies and law firms.

149.     Rivkin Radler and GEICO only received this information through their efforts in support of the investigation and prosecution.

150.     Barry I. Levy, Esq. a partner of Rivkin Radler was responsible for litigating actions against Dr. Shapiro in or about 2010 on behalf of his and Rivkin Radler's clients, including: State Farm, Travelers, and GEICO.  Levy was involved with the NICB's investigation of Dr. Shapiro.[8]

151.     Michael A. Sirignano, Esq. is an attorney and member of Rivkin Radler who was responsible for litigating actions against Dr. Shapiro in or about 2010 on behalf of Rivkin Radler's clients: State Farm, Travelers, and GEICO.  Upon information and belief, Defendant Sirignano was involved in the NICB's investigation of Dr. Shapiro.[9]

### 1.     *The Clearview Analysis*

152.     On September 17, 2010 NICB (so called) Special Agent Defendant Tardalo issued to the FBI what has been dubbed the "Clearview Analysis."  This 35 page report centered on "Clearview of Brooklyn Medical P.C. 2965 Ocean Parkway Brooklyn, N.Y. 11235."  In this report we find that "SSA Tardalo searched ISO [discussed above] which shows over 400 claims

---

[8] Levy lists the following case involving Dr. Shapiro as a significant decision on his Rivkin Radler website profile (http://www.rivkinradler.com/attorney-detail.cfm?pid=12): "*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243 (E.D.N.Y. 2012) (denying motion seeking dismissal of insurers' civil RICO and fraud claims against professional corporation alleged to have operated in violation of state licensing laws and staying the professional corporation's attempts to collect on its pending billing through arbitration)."

[9] Sirignano claims on his Rivkin Radler website profile (http://www.rivkinradler.com/attorney-detail.cfm?pid=70) that his experience includes "acting as lead counsel for insurers in a wide variety of matters, including [supervising] the defense of no fault claims, [counseling] property, automobile and healthcare insurers on fraud prevention, [defending] litigation challenging claims handling practices, and [prosecuting] affirmative recovery litigation in both federal and state court."  Sirignano claims to have "headed the investigation into several large scale fraud schemes and has led the successful prosecution of a number of large recovery actions on behalf of insurers." *Id*.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

with a number of referrals." Apparently sheer volume is a red flag for fraud and not a red flag for success. According to the report "ISO search shows numerous referrals for staged accidents, caused accidents, fake and exaggerated injuries and excessive treatment."

153.    Further the report stated that "NICAP Query shows 44 reports related to Clearview …and numerous referrals have been entered into NICAP (see below)."[10] What follows below is a heavily redacted disjointed presentation of what were labeled as questionable claims. This consists of dates, locations and reporting insurance companies – consisting almost entirely of Defendant GEICO companies' flagged claims. Amongst short conclusory labels of fraud, Dr. Shapiro's name is mentioned as a "Provider of Services."

154.    As discussed and demonstrated above, the NICB and insurance company indicia of fraud are bogusly designed to label almost anything as potential fraud including an "older vehicle" involved in an accident; a prior claim history; an accident after 9:00 PM, etc. Furthermore, the insurance company Special Investigative Unit and Claims Handlers are incentivized financially to deny claims. As such their accounts suffer from an inherent bias.

155.    The Clearview Analysis mischaracterized Dr. Shapiro's reports as suspicious and further implicated Dr. Shapiro in alleged instances of healthcare fraud without any evidence Dr. Shapiro actually participated. For example, Progressive and the NICB alleged Dr. Shapiro's involvement in an instance involving a claimant named G. N.  G.N. participated in an allegedly staged accident on 134th Street in Jamaica, Queens. On or about June 15, 2010, Dr. Shapiro created an MRI report based on an MRI of G.N.'s brain, which indicated no remarkable findings. However, the NICB and Progressive characterized Dr. Shapiro's involvement with the alleged

---

[10] NICAP is NICB trademarked computer software and computer software encoded on CD-ROMS containing information relating to insurance fraud and for use in case management providing an online computer database in the field of insurance fraud investigation.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

staged accident as knowingly fraudulent. Thus, they knowingly fabricated evidence against Dr. Shapiro and submitted such evidence directly to the Goldman, McQuaid and the FBI, including in all probability Anspacher and Seifer.

156. GEICO did the exact same thing, falsely claiming Dr. Shapiro's reports dated June 1, 2010 aided fraudulent claims connected with claimant T.C. However, the MRI reports for T.C. are similarly unremarkable—and even if the reports indicated a serious injury, which they are not, only cross referencing such reports with the actual MRI images could raise suspicion of Dr. Shapiro's negligence or knowing misrepresentation. In other words, based solely on Dr. Shapiro's reports, there is no way to determine that the reports were inaccurate. However, the Defendant Insurance Companies and the NICB repeatedly characterized Dr. Shapiro as a knowing participant in a healthcare fraud scheme. The Clearview Analysis is therefore nothing but fabricated evidence and false claims.

157. The heavy mention of the Defendant GEICO companies in the Clearview analysis is no coincidence. The GEICO companies as well as the other Insurance Company Defendants had a clear agenda to eliminate Shapiro – especially GEICO – as evidenced by the many of the Defendant Insurance Companies – GEICO, Travelers and State Farm – utilization of Defendant Rivkin Radler to pursue Dr. Shapiro civilly.

## 2. *The Wiretap Applications*

158. On October 8, 2010, nearly a month after the so called "Clearview Analysis" the Government Defendants presented a series of documents in support of an application for an eavesdropping warrant on a cell phone the user of which the Government mistakenly identified. The documents were signed by the Judge on October 8, 2010. Included in this package is the Affidavit of an FBI Special Agent Seifer.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

159.    The Affidavit makes reference to the case mentioned in the above discussed "Vor" October 13, 2010 Bharara Press release including the names and prior wiretaps related to the investigation.   In fact the Affidavit states that the present investigation for which the application was being submitted "grew out of an off shoot" of the "Vor" Press Release investigation which was also still ongoing – for five more days.

160.    The first mention of the NICB in the Affidavit goes like this:

> Often, the National Insurance Crime Bureau ("NICB") becomes aware that a particular clinic is generating an unusually high volume of questionable claims.   In such instances, after the NICB conducts clinic inspections and examinations of patients under oath (known as "EUOs"), and slows down the processing and payment of claims, a clinic will simply change its locale, name and/or "front" doctor, and continue to operate as before.

First, the Affidavit is mistaken in that the NICB does not conduct EUOs.   Insurance companies conduct EUOs.   More and more of these EUOs are being conducted by law firms such as Defendant Rivkin Radler with the purpose of building a criminal and civil case.   Under the guise of litigating fraudulent incorporation allegations, Rivkin Radler is fond of demanding onerous financial documents including complete bank records containing statements and every check written.   The same is true of income tax records. The real purpose is to put the medical provider through an insurance company tax audit.   This is done to bully the provider into dropping the provider's claims.

161.    In any event, the above-cited statement from the Affidavit elevates the NICB to expert status because it states, in essence, that if the NICB labels a provider as bad it must be so. The above-cited statement also blindly attaches scrutiny to volume – an insurance provider is targeting solely for observing instances of what the NICB deems as a high volume of patients – as already stated and now corroborated.   Once again, the determination of what is suspicious is

left to the NICB/Insurance Defendant indicia – as already described – which is designed to turn any claim into a potentially questionable one.

162.    The Affidavit further states:

> Finally, based on documents and records I received from NICB, as well as discussions I have had with an NICB investigator (as described more fully below), I believe that Clearview is engaged in mail, wire, and/or bank fraud because of the excessive number of bills NICB has identified as well as the types of treatments and bills submitted to insurance companies by mail.

The above is a particularly dull-witted justification for claiming serious crimes: "the excessive number of bills NICB has identified as well as the types of treatments and bills submitted to insurance companies by mail."

163.    What the above-cited statement indicates is that a medical provider is a criminal because they are successful. Obviously, according to the above-cited statement, members of Clearview – including Dr. Shapiro who merely reads MRI films – are being labeled criminals for providing diagnostic tests to many patients.  In other words, if you eliminate such individuals, the insurance industry will save a lot of money.

164.    The above-referenced Affidavit was drafted by Defendant Goldman. As demonstrated, the Affidavit contains sworn testimony that is misleading at best and more akin to perjury.  There is more.

165.    The Affidavit for the most intrusive form of Government surveillance (so sayeth the Courts) continues:

> I have also obtained records that were voluntarily supplied by the NICB on behalf of various insurance companies.  Included in those records was the following:

a.      An MRI report on Clearview letter head that was signed by Mark Shapiro, M.D., a board certified radiologist, for a patient named "M. P.," dated March 4, 2010.  The address included on the report was the Clearview Address and the phone number associated with Clearview was (718) 332-0700 (the "Clearview Phone")

b.      A spreadsheet that includes a compilation of bills from Dr. Mark Shapiro to various insurance companies for June 7, 2010, through June 11, 2010.  This spreadsheet includes 24 bills with Dr. Shapiro as provider, all for $878 to $912. Clearview is the provider for eight of the bills …

166.    Dr. Shapiro located the above referenced report for M. P., the patient noted by the Affiant in the above-captioned passage.  Here it is:

T1 and T2 weighted images in multiple planes through the intervertebral disc spaces demonstrate straightening of the cervical lordosis. The vertebral bodies are normal in height and signal. There is no abnormal signal in the surrounding soft tissues.  Evaluation of the cervical cord is limited. The C2-3 and C3-4 discs are normal in height and signal.  There is no bulge or herniation.  There is no central spinal stenosis or foraminal impingement. The C4-5 and C5-6 discs are normal in height and signal.  There are focal bulges, creating impingement on the neural canal. The C6-7 and C7-T1 discs are normal in height and signal.  There is no bulge or herniation.  There is no central spinal stenosis or foraminal impingement.

The above-cited MRI report bears not one single hallmark of an "inflated read."  There is no herniation, normal disc height and signal, no stenosis, and for the most part no impingement. The only positive findings are the focal bulges.

167.    What is most disturbing, however, is that the NICB provided the Seifer, Anspacher, Goldman, and McQuaid the MRI reports and probably the MRI films, which were certainly available.  Therefore, the parties who participated in creating the contents of these applications were well aware that M.P.'s MRI report was consistent with his actual MRI.  Thus,

the allegation contained in the application that Dr. Shapiro created a bogus report for M.P. was knowingly false.

168.    Study after study including studies done by the New England Journal of Medicine have demonstrated that from a sample of asymptomatic individuals – no pain or restriction of movement – over one third will have disc herniations and/or significant bulges.   The report demonstrates a fairly healthy spine.   Its inclusion in this affidavit is yet another attempt to manufacture evidence and constitutes perjury, however subtle.

169.    Finally once again the Affidavit mentions that a, "spreadsheet includes 24 bills with Dr. Shapiro as provider, all for $878 to $912.  Clearview is the provider for eight of the bills …"  The most logical response to this is, "so what."  That is what MRIs cost.  There is CPT code that insurance companies and providers must abide by in terms of what sums are paid.  And 24 bills are hardly staggering.  The message is, if you eliminate Shapiro's billing you save the insurance industry money – the Defendant Insurance Companies (GEICO, State Farm, Travelers, Farmers).

170.    And it goes on.

We have continued to receive information from NICB related to Clearview and the Tannella Law Office, as well as individuals associated with those entities. However, it takes weeks, if not months, for claims to be filed and processed, and therefore we are receiving information after a delay. As described above in paragraph 21, these records show that multiple clinics have billed no-fault automobile insurance companies for the provision of MRI services by Clearview at least as recently' as June 2010. These records have included some bills, some compilations of bills associated with Clearview and the Tannella Law Office (such as the spreadsheet referenced above), **as well as information gathered as part of the NICB's' own investigation into no-fault insurance fraud suspected to exist at Clearview and the Tannella Law Office, including, for example, information that since its incorporation in September 2009, Clearview has submitted more than 400 no-fault insurance claims.** We are awaiting more information from the NI'CB related to the TARGET SUBJECTS, Clearview and the Tannella Law Office. I also understand that from time to time insurance companies interview patients and doctors about claims, and we have requested such records to the

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

extent they exist. Notwithstanding the value of the information already provided, it simply corroborates other evidence that might be developed by interception of the TARGET CELL PHONE and cannot, on its own, establish that a fraudulent scheme exists. Moreover, because of the lag time in receiving information particularly bills for treatments – the information is mostly helpful in a historical context once other evidence of fraud, such as wire interception of the TARGET CELLPHONE, is developed.

The interception of the TARGET CELLPHONE is necessary to obtain additional evidence regarding who is participating in fraud and confirm Clearview, the Tannella Law Office, and other entities are submitting fraudulent billing. Even where these documents obtained demonstrate the involvement of additional persons and entities in the scheme, the records alone do not demonstrate that the persons or entities are committing the TARGET OFFENSES absent evidence proving that they understand the fraud. Wire interceptions are necessary to obtain such evidence. **Moreover, the wire interceptions will likely provide us with leads that can enable us to request documents from NICB.** (Emphasis added)

Once again the Affidavit in Support of the Wiretap Application cites to the NICB in support of probable cause of criminality, which evidence consists of a volume of MRI scans and reads:

information gathered as part of the NICB's' own investigation into no-fault insurance fraud suspected to exist at Clearview and the Tannella Law Office, including, for example, information that since its incorporation in September 2009, Clearview has submitted more than 400 no-fault insurance claims.

171.   Finally, the Affidavit contains a fairly lengthy description of the No-Fault law and the alleged scheme, which appears quite similar to various RICO complaints drafted by Rivkin Radler against various providers on behalf of the Defendant Insurance Companies.  This supports the conclusion that Rivkin Radler provided legal assistance to the Government Defendants.

172.   Defendant Goldman had substantial involvement in the above-referenced Affidavit.  Aside from drafting the Affidavit, Goldman also swears to it veracity.  As part of the package of documents that must be submitted to obtain an eavesdropping warrant, Goldman provided his own Affidavit that was also signed and sworn to before a Federal Judge on October 8, 2010.  In Goldman's Affidavit, Goldman states that he has read the contents of the Affidavit –

he actually drafted it – and that he spoke with the FBI Special Agent.  In sum and substance Goldman vouches for its veracity.

173.    On November 10, 2010 an extension of the above wiretap was sought through submission of a new version of the FBI Agent Affidavit (Defendant Seifer) and another Affidavit from Defendant Goldman.  It contains exactly the same false and misleading information as discussed above. The same is true for a package of wiretap materials that were signed by a Federal Judge on December 15, 2010.  The fabrication and misrepresentation is perpetuated. Meanwhile the Affidavit describes multiple key conversation intercepts, none of which implicate Dr. Shapiro.

174.    The same is true for a number of packages of wiretap materials that were signed by Federal Judges.  The fabrication and misrepresentation is perpetuated.  Meanwhile the Affidavit describes key conversation intercepts none of which implicate Dr. Shapiro. The misrepresentations perpetuated in materials submitted and authorized on January 15, 2011, and again in  a package of wiretap materials that were signed by a Federal Judge in March of 2011. (Except Defendant Anspacher is the FBI agent on the FBI Affidavit and McQuaid is the AUSA on the AUSA Affidavit.)  In addition, the March 2011 materials contain statements from CW-1 that indicate that Clearview has been shut down by a GEICO lawsuit that, upon information and belief, was filed by Rivkin Radler.  The fabrication and misrepresentation is perpetuated again and again.  Meanwhile, the Affidavit describes key conversation intercepts, which again do not implicate Dr. Shapiro.

175.    The same is true for a package of wiretap materials that were signed by a Federal Judge on April 4, 2011.  Defendant Anspacher is the FBI agent on the FBI Affidavit and McQuaid is the AUSA on the AUSA Affidavit.  In addition a CW-1 states that Clearview has

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

been shut down by a GEICO lawsuit that, upon information and belief, was filed by Rivkin Radler. Again the fabrication and misrepresentation is perpetuated and again the Affidavit describes key conversation intercepts, none of which implicate Dr. Shapiro.

176. The same facts are true concerning packages submitted in support of wiretap materials that were signed by a Federal Judges on May 18, 2011 and June 28, 2011.

177. The Government Defendants including Goldman and McQuaid are so reliant on the NICB that they elevate the NICB to expert status in Search Warrant Applications. This is demonstrated by a Search Warrant Application Affidavits created by Goldman and McQuaid wherein an FBI Agent swears that:

(i) The facts in the Affidavit are based upon, *inter alia*, conversations with, "investigators with the [NICB]," and in an attendant footnote states: "I am aware that the NICB is a not-for-profit organization that receives support from property and casualty insurers and that works with insurers and law enforcement agencies to facilitate the detection, investigation and prosecution of insurance fraud,"

(ii) Vital information was obtained from, among other sources, "NICB investigators,"

(iii) Probable cause is formed by EUO summaries of claimants, which, as a matter of practice, are conducted by insurance company lawyers upon persons that are unrepresented and confused, and wherein said summaries often do not resemble the actual testimony.

178. As noted, Anspacher and Seifer are FBI Agents who investigated Dr. Shapiro. FBI Special Agent Anspacher worked with the NICB and promoted their illegal agenda. He appears to be the lead agent on the case. In addition, SA Anspacher was the arresting officer for the arrest of Dr. Shapiro. SA Anspacher signed the "Warrant for Arrest" for Dr. Shapiro that was signed by a Federal Magistrate Judge on February 29, 2012. In the course of the

investigation, Anspacher and Seifer facilitated an intentional abuse of Dr. Shapiro's constitutional rights by working with members of the NICB to achieve the malicious prosecution of Dr. Shapiro without probable cause.

179.    Anspacher and Seifer aided in Dr. Shapiro's unlawful arrest and prosecution by perpetuating knowingly false theories describing Dr. Shapiro's criminal conduct.  These theories were false because there was absolutely no evidence to support them. Because Anspacher and Seifer were aware that there was no evidence to support their theories, they knowingly and intentionally aided in Dr. Shapiro's malicious prosecution. Goldman and McQuaid also participated by drafting affirmations attesting to veracity of the substance of the applications. Additionally, as noted throughout the applications, the NICB was a main source of evidence and information for Anspacher, Seifer, Goldman, and McQuaid.

180.    Anspacher and Seifer's actions are evidenced in numerous eavesdropping applications, where they described conduct as suspicious or criminal while knowing fully well that such conduct was not suspicious or criminal.  For example, under a heading titled "Probable Cause," the application states:

> In a typical no-fault insurance scheme, a clinic will order MRIs - which may or may not be performed, but often are not medically needed - for patients claiming back pain, and then fraudulently bill insurance companies for these costly but unnecessary procedures. In addition, the MRIs are often accompanied by bogus reports, which are used by the doctors to inflate treatments and provide additional unnecessary treatments.

181.    Despite the absence of any evidence whatsoever to indicate that any doctor had created a bogus MRI report to inflate treatments, Goldman, McQuaid, Anspacher and Seifer included this paragraph in their eavesdropping applications.  Additionally, this information was

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

provided by the NICB/Defendant Insurance Companies GEICO, State Farm, Travelers and Farmers.

182.    As further evidence of probable cause, the eavesdropping applications list "a spreadsheet that includes a compilation of bills from Dr. Mark Shapiro to various insurance companies for June 7, 2010 through June 11, 2010." However, out of the twenty-four (24) patients listed on the spreadsheet, Dr. Shapiro only examined MRI's related to nine of them. Further, out of those nine MRI reports he created, less than half indicate the existence of a remarkable phenomenon—which is slightly more than one would expect to find in population of healthy people. Still the FBI agents mischaracterize these exculpatory reports, half of which have no relation to Dr. Shapiro, as evidence of his involvement in a conspiracy.

183.    The FBI agents, as well as McQuaid and Goldman, knew that there was not probable cause to indicate Dr. Shapiro knowingly participated in an alleged healthcare fraud scheme. Seifer explicitly admitted as much in that portion of a wiretap application seeking an extension of an existing wiretap, wherein the government must demonstrate a need for continued monitoring: "Even where these documents obtained demonstrate the involvement of additional persons and entities in the scheme, the records alone, do not demonstrate that the persons or entities are committing the TARGET OFFENSES absent evidence proving that they understand the fraud."[11]    The documents discussed do not demonstrate Dr. Shapiro's involvement because they indicate he was performing legitimate work by creating accurate reports; however, as stated by Seifer, even if Dr. Shapiro's reports did somehow implicate him in the conspiracy, there is still no proof that he understood the fraud.

_____

[11] Seifer's above statement, although true, was made solely for the purpose of persuading the court to grant an extension of the wiretap.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

184.    The above-captioned paragraph were included in search warrant applications dated October 8, 2010, November 10, 2010, December 15, 2010, January 18, 2011, March 12, 2011, April 4, 2011, May 18, 2011, and June 28, 2011.   Seifer signed off on affidavits included as "Exhibit B" on the October 8, 2010, November 10, 2010, December 15, 2010, January 18, 2011 applications, while Anspacher did the same for the March 12, 2011, April 4, 2011, May 18, 2011, and June 28, 2011 applications.   Goldman drafted the applications and attested to the contents of these documents, including the above-referenced paragraphs, for the applications dated October 8, 2010, November 10, 2010, December 15, 2010, January 18, 2011, May 18, 2011, March 12, 2011.   McQuaid did the same for the applications dated April 4, 2011 and June 28, 2011.

185.    Also contained in the eavesdropping applications is a description of a recorded telephone conversation between Dr. Shapiro and Mikhail Zemlyansky.   The actual conversation primarily consisted of Dr. Shapiro's comment that there would be a problem if he incorporated his new MRI company, but was delayed in actually opening up the business.   This absurd comment is a byproduct of the rough treatment he received from Defendants Rivkin Radler, GEICO, State Farm, and Travelers.   Despite the clearly innocuous nature of the exchange, Anspacher and Seifer's characterization of the conversation goes as follows:

> Based on their familiarity with this investigation, the agents believe that UM-1 is a Doctor who is working with ZEMLYANSKY to open up a new medical clinic as part of ZEMLYANSKY's no-fault insurance fraud scheme. UM-1 1 s concerns about having "issues" relate to concerns that insurance companies had identified UM-1 as someone who had engaged in suspicious billing practices in the past and, that, as a result, insurance companies would be likely to challenge claims submitted by a clinic opened under the name of UM-1. Finally, the agents believe that as a result of the fraudulent claims sent to insurance companies from the clinic that UM-1 and ZEMLYANSKY are planning to run, the TARGET SUBJECTS would receive checks from the insurance companies in the

mail which would then be deposited, and that the scheme run through the clinic would therefore constitute mail fraud and bank fraud.

The completely invented criminal characterization of this conversation resulted in the fabrication of evidence against Dr. Shapiro. Thus, without any evidence to support the assertion, the application states that Dr. Shapiro is conspiring to open a MRI clinic with Mikhail Zemlyansky to fraudulently bill insurance companies.

186. This fabrication of incriminating evidence was included in eavesdropping applications dated March 12, 2011, April 4, 2011, May 18, 2011 and June 28, 2011. The March 12, 2011 and May 18, 2011 applications are were authored by Goldman and the April 4, 2011 and June 28, 2011 applications were authored by McQuaid. Although Anspacher signed off on the affidavits attached as "Exhibit B" to all the applications, Goldman and McQuaid wrote them, and in any case attested to their contents by signing the applications.

187. Further, the NICB is credited throughout all the applications as the main source of information related to the fraud. The NICB is also credited with aiding in the investigation by supplying their expertise. Therefore, the NICB is also providing and perpetuating false representations that led to the malicious prosecution of Dr. Shapiro.

**3.** ***The Coercion of Robert Sukhman: The Superstar Incentivized Snitch***

188. On or about July 12, 2011 Robert Sukhman was approached by FBI agents with an offer of a cooperation deal. Sukhman had been the subject of an intense investigation involving wiretaps and heavy surveillance amongst other data collection efforts. Everything about his life, family, friends, interests, etc. was known to the Government Defendants, NICB and GEICO, State Farm, Travelers and State Farm.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

189.    On July 13, 2011 Sukhman and his attorney met with Defendants Goldman and McQuaid, prior to the presentation of evidence to a Grand Jury to indict Dr. Shapiro.

190.    The evidence points to Sukhman as being the biggest and most important target of the investigation.

191.    Goldman and McQuaid threatened Sukhman with massive jail time if he did not become an active cooperator. In addition they threatened to arrest Sukhman's father for his involvement in criminal activity.

192.    Furthermore, Sukhman's wife Lana had a law firm called the Law Office of Lana Sukhman located at 586 Midland Avenue #2c, Staten Island, NY 10306. Ms.Sukhman's law firm specialized in No-Fault collections and arbitrations for bills that were not paid by the insurance companies (known as denied bills). In fact, Ms. Sukhman's law firm commenced litigation and arbitration actions and collected money on such actions for certain of the medical provider P.C. entities that were allegedly illegally owned by the Defendants in the criminal case.

193.    Lana Sukhman and her law firm filed arbitrations on behalf of the McGuire P.C.s and collected money for them even though Ms. Sukhman knew that the P.C.s were allegedly illegally billing because they were owned by her husband who was not a medical professional. As such, Ms. Sukhman was committing mail fraud, RICO conspiracy, Health Care Fraud, etc. As a result Goldman and McQuaid threatened to arrest and prosecute Robert Sukhman's wife.

194.    Due to the above threats which included massive incarceration for Sukhman, massive incarceration for Sukhman's father, and massive incarceration for Sukhman's wife, Sukhman made it known that he would do or say whatever the Government Defendants wanted him to do or say. The threat to arrest Sukhman's wife and destroy the family was a tactic used by Goldman and McQuaid a number of times.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

195.    Sukhman's efforts were monumental and resulted in a number of arrests and prosecutions that were highly questionable.  Sukhman also began saying things to Goldman and McQuaid while under interrogation.  Sukhman invented the allegation that Shapiro's reads were "good," meaning fraudulently inflated.   Specifically, Sukhman stated that these reads would show a much higher rate of pathology:  "7 out of the 10 reports will have either a herniation or double disk bulge" Sukhman testified at trial.  As documented, when Sukhman testified to the above he committed perjury which was suborned by the individual Government Defendants.

196.    As such the pre-indictment interrogation of Sukhman by Goldman and McQuaid yielded the fabricated evidence that served as the sole surviving allegation as against Dr. Shapiro.  An allegation that, as demonstrated, is totally false.

197.    In the wake of the indictment and criminal proceedings in this case which case is still not over there have been many Civil RICOs filed against medical providers associated with the case.  No lawsuit has been filed against Sukhman or his wife because the Government, insurance industry and the NICB have protected the Sukhmans.  Sukhman has not spent a day in jail.

#### 4. *The Fabricated Loss Amounts: The NICB Tail that Wags the Dog*

198.    Per the Federal Sentencing Guidelines, in a case involving fraud, etc. where money is taken, the amount taken, called the "loss amount," is of great importance.  Of equal importance is the amount intended to be illegally taken, known as the "intended loss amount." This is due to the fact that the amount actually taken or the amount intended to be taken via fraud (for instance) yield the same number of points under the Sentencing Guidelines.  This point number correlates to suggested months of incarceration.  The higher the amount that was

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

intended to be fraudulently obtained, the higher the points; and the higher the points the longer the period of incarceration for a convicted Defendant.

199.   It works sort of like a game show.  Let us say that a person is convicted or pleads guilty to Health Care Fraud.  The base number for said conviction is 6 points, which the Sentencing Guidelines chart yields 0-6 months of incarceration for a person like Dr. Shapiro who has never been convicted of a crime.

200.   But if the government pushes for "sophisticated means" like they did for some in this case then we get 2 more points which yields a total of 8 points which still yields only 0-6 months for first time offenders.

201.   Let us say the Government claims "10 or more victims."  That is what they did for some in this case.  That is 2 more points for a total of 10 points and an incarceration period of 6 to 12 months for first time offenders.

202.   Let us say the Government claims that the Defendant's scheme attempted to steal $5,000 or less – that is no increase.  But if the Government argues that the Defendant attempted to steal over $5,000.00, that is an additional 2 points for a total of 12 points, and now the correlating incarceration period is 10-16 months.  Let us say the Government asserts that more than $30,000 was intended to be stolen –that's an additional 6 points, which is an 18 point total and produces a ranged of 27 to 33 months in prison.

203.   In this case the Government Defendants asserted that Dr. Shapiro intended to fraudulently steal the sum of $10,302,119.67 dollars.  That is an additional 20 points which gives a total of 30 points.  30 points warrants a sentencing range of 97-121 months according to the Sentencing Guidelines.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

204.    The Federal Sentencing Guidelines are no longer mandatory but are advisory. Still Judges usually follow them pretty closely unless there are extenuating circumstances.

205.    How did Goldman and McQuaid come up with such a high intended loss amount number of $10,302,119.67 dollars?  Goldman and McQuaid worked with the NICB/Defendant Insurance Companies pre-indictment to fabricate the intended loss amount.

206.    Goldman and McQuaid fabricated the intended loss amount with the NICB/Defendant Insurance Companies in the following fashion.  Any medical provider who billed anything for medical treatment on a patient for whom Dr. Shapiro performed a read of an MRI had their total billing factored into Dr. Shapiro's loss amount.  In other words Dr. Shapiro did some, but not all the reads for Clearview.  Clearview billed insurance companies, including the Insurance Company Defendants – the largest amount of bills went to GEICO – in the amount of $4,159,673.89 dollars in total.  That amount was included in Dr. Shapiro's intended loss amount.

207.    Joseph Vitoulis, DO, P.C. (found not guilty by a jury) billed a total of $1,688,128.46 dollars for various medical modalities.  Because Dr. Shapiro performed some reads for patients that attended that facility, his intended loss amount included every dollar billed by that facility.

208.    The above miscarriage of justice was based upon the theory that an MRI promoted other fraudulent treatments. As will be discussed *infra*, for Goldman and McQuaid, all No-Fault claims are presumed fraudulent.

209.    During the pre-indictment investigation Goldman and McQuaid directed the NICB/Defendant Insurance Companies to create a loss amount chart based upon the above theory.  The NICB/Defendant Insurance Companies in conjunction with Goldman and McQuaid

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

did create a loss amount chart that included 133 medical entities, the vast majority of which were never even mentioned in the indictment or wiretaps, etc. – but Rivkin Radler somehow knows who they are as demonstrated above.

210.    The loss amount chart constitutes fabricated evidence that was created pre-indictment and presented to the Grand Jury.  It is also the source of the grossly exaggerated Press Release claim asserting that the case was the "Largest No-Fault Automobile Insurance Fraud Case Charged to Date," consisting of a "$279 Million Health Care Fraud Scheme."

211.    The first truly insidious purpose behind the fabricated loss amounts is that the additional years of imprisonment that result under the Sentencing Guidelines (the massive amount of imprisonment based upon the fabricated loss amounts in this case) acts as an inducement for the Defendant to take a plea.  A plea with far less months of incarceration is arrived at by simply cutting the loss amount.  Thus in a case like Dr. Shapiro's, the Government will offer a loss amount of more than $1,000,000 but less than 2.5 million thereby cutting the points by 4.  In addition, a plea reduces the point total by 3 for so called "acceptance."  That is a total reduction of 7 points which yields 17 points or 24-30 months of imprisonment as opposed to 97 to 121 months, in our hypothetical.  This irresistible incentive strongly encouraged Defendants to take guilty pleas.

212.    Goldman and McQuaid only had the power to create such incentives because they worked with the NICB/Insurance Company Defendants to fabricate loss amounts.   Ultimately, most of the bogus cases supported by false allegations and fabricated evidence never saw the light of day because they concluded in plea bargains.

213.    In the above manner the fabricated loss amounts also act to cover-up the gross illegality of prosecutions because it reduces the risks of persons like Dr. Shapiro who have the

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

courage to take on the Government/NICB/Insurance Industry and their cadre of lawyers and win. They then bring lawsuits which expose what this case is exposing.

214.    The second truly insidious purpose behind the fabricated loss amounts is that the fabricated loss amounts – in this case $279 Million – was presented to the Grand Jury.  This number was believed by the Grand Jury who generally believes their government.  The shock value of that number alone is enough to get a Grand Jury to overlook obvious weaknesses in the Government's case and indict the proverbial ham sandwich.

215.    Finally the fabricated number "$279 Million" drives Defendant Bharara's craze to indict because it creates the headlines he so maliciously craves.

### 5. *The Money-Driven Overzealous Insurance Company Defendants*

216.    In Plaintiff's criminal case, not only did the Defendant Insurance Companies (GEICO, State Farm, Travelers and Farmers) falsely accuse Dr. Shapiro of insurance fraud, but they also provided false information in the form of claims flagged for suspicious activity based on their doctored database and indicators of suspicion in order to avoid paying claims.

217.    What follows is proof of such conduct in the form of an email written by Defendant Tardalo on behalf of the Defendant NICB to members of the insurance industry, including GEICO, State Farm, Travelers and Farmers:

> Please find included the bills and records requested. Feel free to contact me directly with any questions or concerns.
>
> Thank you,
>
> Dallas Ragan
>
> Senior Special Investigator / Analyst
> SIU Major Operations - Medical
> HelpPoint® Claim Services by Farmers®
> E-mail: dallas.ragan@hpcs.com

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Po Box 6061, Deltona, Fl. 32728-6061
Cell: 407.256.9023

Subject: US Attorney's Office request

To All,

The US Attorney's Office SDNY is requesting information to assist in their case involving Dr Mark Shapiro. The US Attorney is requesting all billing where Dr Mark Shapiro is named on the bills as the treating provider, employee, or doing the MRI reads for KKM Medical Diagnostics PC TIN: 272610823 and Clearview of Brooklyn Medical PC 270896603. Please forward me all billing requested ASAP.

**The US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money**. [Emphasis added] Please lets take the time and get them what they need to make this case.

Confidential Information
Additionally they are looking for any information you may have where defendant Mark Danilovich may be involved in a medical facility in New Jersey. If you any information on this please let me know.

Thank you,
Tony

Supervisory Special Agent Anthony Tardalo
National Insurance Crime Bureau-New York Region
145 Pinelawn Road Suite 330S
Melville, New York 11747
Office: (847) 544-7834
Fax: (847) 544:7277
ATardalo@nicb.org

The above correspondence and reply are not dated, but were written pre-indictment as it seeks information that would be used in the above discussed search warrant applications and loss amount charts.

218.    The above correspondence also demonstrates that this case was all about saving insurance industry money and an invitation to the insurance industry to fabricate:

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

The US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money. Please lets take the time and get them what they need to make this case.

219.    Further, included below is Defendant McQuaid's argument at a hearing before Judge Katz wherein Dr. Shapiro sought permission to sign affirmations regarding the findings of his pre-indictment MRI reads for a facility that was not even mentioned in the indictment. Such affirmations were needed for former patients' auto accident litigation against various insurance companies, including the Defendant Insurance Companies. Without the affirmations, these patient-claimants could not continue their lawsuits because they would not be able to prove injury as a threshold issue. As per a bail condition Dr. Shapiro was not permitted read any MRI films related to No-Fault. In an abundance of caution his attorney sought permission to allow Dr. Shapiro to sign these affirmations.

220.    McQuaid acted in the following manner:

> MR. McQUAID: Judge, let me explain the basis for our opposition … Our view is that this is an industry [inaudible] no fault [inaudible] industry is absolutely ripe with fraud. … We have absolutely no problem with Dr. Shapiro providing affidavits in cases that don't involve no fault Insurance ... as of now we have not found a so called legitimate no fault claim that we can [inaudible].[12]

After Judge Katz granted Dr. Shapiro's request and the hearing concluded, McQuaid immediately shouted at Dr. Shapiro while still inside the court room. McQuaid threatened that if Dr. Shapiro signed any affirmations, additional charges would be brought and Dr. Shapiro would be incarcerated. Of course McQuaid did not care about Dr. Shapiro's work in Medicare or Medicaid as such entities did not maintain close ties to his office. McQuaid acted the way he did to satisfy his insurance company puppet masters.

---

[12] Plaintiff would like to include more of the quoted transcript because it demonstrates an over the top zeal that can only be described as cult like, but much of it was inaudible.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

221.    Finally, there is a unique and novel theory in the Plaintiff's indictment that, as enunciated by Goldman in documents and open Court, goes like this:  All of the multiple treatments in this case, even if medically necessary, performed properly by licensed medical providers and actually helpful to the patient are still fraudulent.  The reason is that said treatment was the result of a pre-determined cookie cutter protocol of treatment that was not specifically designed for the individual patient.  So according to Goldman, any predetermined care constitutes fraud by a doctor, even if it helps the patient.

222.    This novel (and inane) theory benefits insurance companies, including the Defendant Insurance Companies, because if an insurer does not want to pay a claim for treatment, the insurance company can simply state that the treatment is not sufficiently tailored to the individual. This theory ignores the fact that all the patients are being treated for soft tissue injuries caused by automobile accidents primarily involving the spine, which often require predictable treatments, e.g., a chiropractic adjustment, hot and cold packs, electrical stimulation, etc. – there is really no way to artfully do any of the above.

223.    The theory has recently become more popular to insurance companies due to the current insurer friendly climate of this State, which was somewhat created by sensational press releases.  However, at the time of the Plaintiff's indictment, such was a theory primarily espoused only by Rivkin Radler.  This is further proof that Rivkin Radler, given their close relationship to the Insurance Company Defendants GEICO, Travelers and State Farm gave technical assistance to this prosecution against Dr. Shapiro.

224.    In corroboration of the above it should be noted that GEICO, State Farm, Travelers and Farmers all denied claims submitted by Dr. Shapiro and other medical

professionals and entities that were proper claims, in an attempt to overly burden and persuade medical professionals to concede medical practices and businesses.

225.   GEICO, State Farm, Travelers and Farmers are alleged, and falsely claim, to have been a victim of Dr. Shapiro's alleged fraudulent conduct in the criminal case, which was ultimately concluded by an order of *nolle prosequi,* at the request of AUSA Peter Skinner whose involvement in Dr. Shapiro's case began at the pre-trial stage. GEICO, State Farm, Travelers and Farmers falsely claimed that they were alleged victims of Dr. Shapiro's fraud via their Board of Governors members of the NICB and the FBI that sits as Advisors to the Board of Governors such that they could seek repayment and an abandonment of claims through the criminal court, including monetary damages from Dr. Shapiro. GEICO, State Farm, Travelers and Farmers, together with the NICB, are responsible for flagging, investigating, and denying its claimants' requests for reimbursement by utilizing NICB created criteria, and their own criteria that is further improved upon by the NICB, that hyper inflates the number of "suspect claims" in accordance with their claim-avoidance protocol.

## V.   THE GOVERNMENT PROSECUTES DR. SHAPIRO WITH NO EVIDENCE TO SUPPORT ANY PROBABLE CAUSE OF WRONGDOING

226.   In his March 2013 opposition to Dr. Shapiro's Omnibus Motion and Motion to Dismiss, Goldman, in bad faith, lied to the Court and to Dr. Shapiro's counsel (Jonathan Marc Davidoff, Esq.) by stating, in response to counsel's request for incriminating MRI films, that the Government would produce MRI films to Dr. Shapiro's defense team by the end of March 2013. As explained *supra*, these MRI films were necessary to show that Dr. Shapiro made material

misrepresentations in his reports, allegedly in furtherance of a conspiracy.[13] However, it was not until December of 2013, just weeks before AUSA Peter Skinner requested an order of *nolle prosequi* as to Plaintiff, that Goldman produced a mere five (5) MRI films to Dr. Shapiro's counsel. Amazingly, none of the five (5) films were associated with any of Dr. Shapiro's reports that indicated significant injury, nor were they even inconsistent with the findings indicated in the correlating reports.

227.    In September 2013, the U.S. District Court for the Southern District of New York held a trial for the first group of defendants.[14] Among those tried in the first wave were two non-physician owners of management companies who the Government alleged were the masterminds of the conspiracy, as well as three physicians that the Government alleged were paper owners of fraudulently incorporated PCs, which were allegedly truly owned and operated by the masterminds of the conspiracy. The Government requested that Dr. Shapiro be tried by himself at the end of 2013 or the beginning of 2014.

228.    Included in those who testified at trial were employees of the PCs, patients of the PCs, cooperating witnesses, insurance billing experts, and FBI agents. Among the evidence presented by the Government were several recorded telephone conversations and a voluminous amount of corporate records, bank statements, medical reports, insurance bills, and reimbursement requests. Despite the allegation that Dr. Shapiro was involved in a criminal conspiracy with every defendant on trial, not one piece of evidence was presented to support the claim that Dr. Shapiro was involved in the fraudulent incorporation of any of the facilities. Nor

---

[13] Clearly, to allege that Dr. Shapiro inflated reads, one must certainly compare at least one MRI report to a corresponding MRI film in order to establish the alleged exaggerated or fabricated injury.

[14] The Court ordered separate trials for groups of defendants based on the Government's selected groupings.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

was their one radiology film or report brought into evidence (or even mentioned) to establish that Dr. Shapiro issued one fraudulent finding, or even a negligent or incorrect finding.

229.   In November 2013, following seven weeks of trial testimony, the Government and defense rested their cases and the jury began nearly seven days of deliberations, after which the jury delivered a verdict of not-guilty with respect to two of the three physicians. As to the other physician, the jury ended without a verdict, 10-1 for acquittal.  As to one of the non-physicians, the jury acquitted him of all counts except for one, and hung on the last count, 8-3 for acquittal.  As for the second non-physician, the jury also hung, 8-3 for an acquittal.

230.   The Government's prosecution of Dr. Shapiro continued for more than twenty-two (22) months before the SDNY filed *nolle prosequi* in the face of a motion to dismiss and a rapidly approaching trial date.   During the course of the prosecution, Dr. Shapiro not only attacked the accuracy of the claims and charges made in the Indictment, but also made an innocence proffer, which was supported by positive polygraph results.  Further, Dr. Shapiro repeatedly and unceasingly pleaded with the Government to produce one shred of evidence to support its claims, which it never did.

231.   The Government's dismissal came after almost two years of publically running Dr. Shapiro's name through the mud, claiming in the media and public records that Dr. Shapiro was engaged in health insurance fraud and involved with Russian organized crime, all of which was not supported by any facts or evidence.  The dismissal came after Dr. Shapiro was forced to engage multiple lawyers and spend hundreds of thousands of dollars to defend his name and reputation.  The dismissal came after Dr. Shapiro incurred enormous financial damages that resulted in his income being reduced by almost $1,000,000 a year (to date), and which is unlikely to ever be recovered.   The dismissal came after the Government intentionally refused to

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

objectively review the evidence, but rather pushed forward and prohibited Dr. Shapiro from partaking in certain healthcare employment, which resulted in Dr. Shapiro's temporary suspension by health care governing bodies.

## VI.   THE FABRICATED EVIDENCE AND PERJURED TESTIMONY DESCRIBED IN DETAIL ABOVE WAS THE ONLY EVIDENCE PRESENTED TO THE GRAND JURY TO INDICT DR. SHAPIRO

232.   The totality of the pleadings in this complaint – especially the non-indictment indictment and the Governments shifting theories and attempts to avoid any enunciation of a theory and then the attempt to provide no evidence of their fall back theory – demonstrates that all the Government had was the fabrications and perjury demonstrated in great detail above.

233.   The above fabrications in conjunction with the sweep them up phenomena as enunciated in the indictment – every doctor is a fake owner – and the $279 Million claimed losses was enough for a susceptible grand jury to indict the equivalent of the wrapper that the ham sandwich came in – Dr Shapiro.

234.   The Indictment was obtained based solely on the misrepresentations of the Government Defendants, the NICB along with their controllers GEICO, State Farm, Travelers, Farmers and Rivkin Radler.

## VII.   THE NICB'S AND INSURANCE INDUSTRY'S CRIMINAL BEHAVOIR IN NEW YORK

235.   According to Article 7 of the New York State General Business Law, Section 70. Private Investigators: the following requirements/restrictions are applicable to those who perform Private Investigative Services:

Subdivision 1.

The Department of State shall have the power to issue separate licenses to private investigators …

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Subdivision 2.

No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator … without having first obtained from the department of state a license so to do …

Subdivision 3.

No person, firm [etc] … shall engage in the business of furnishing or supplying for a fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company [etc] …without having first obtained from the department of state … a license so to do as private investigator for each such bureau or agency and for each and every sub agency …

Subdivision 4.

Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

236.    Furthermore Section 71 defines "Private Investigator":

"Private Investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to real or personal property; …[etc.]

237.    Pursuant to NY Gen Bus Article 7, Section 72, a Private Investigator's license is far from a mere formality.  There is a rigorous background check including fingerprinting.  It involves the Division of Criminal Justice Services, the FBI, the Chief of Police and the District Attorney in the area the applicant will be practicing, etc.; minimum investigative experience that is rigorous requiring at least three years of prior professional law enforcement investigative

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

experience or experience that is highly comparable (20 years experience for a police officer that did not engage in investigations); and the passing of a rigorous test/exam.

238.    In addition to the above, Article 7 includes a host of administrative requirements that a private investigator must perform and undergo in order to remain licensed.   Private investigators are also subject to a code of conduct and professionalism, which, if violated, leads to sanctions including revocation.  (Sections 73-74)  For example, General Business Law Article 7, Section 74. Issuance of licenses; fee; bonds at Section 74(b) provides an obvious schema for redress by aggrieved entities even requiring that after a license is granted the private investigator must provide "a surety company bond in the sum of ten thousand dollars" before the private investigator can engage in investigations.

239.    Moreover the NICB as a foreign entity is subject to the following under Article 7:

Provided, further, however, before a license is issued to a non-resident the applicant must file with the secretary of state a written consent to the jurisdiction of the courts of New York (i) in any case or cases arising from any contract for which the performance of private investigative services as private investigator … made within the state or to be performed, wholly or in part, within the state or in any way connected with the conduct of business within the state, and (ii) in any case or cases **arising from any tort** occurring within the state occurring in connection with the business of the licensee within the state. (Emphasis added)

240.    Members of the NICB are not licensed by the State of New York as Private Investigators even though their conduct is included in the definitions of private investigator as per Article 7.   This has been verified by the New York Department of State, Division of Licensing.

241.    The NICB avoids formal licensure to avoid being held to a code of conduct enunciated in Article 7, which, if violated, could result in suspension or revocation of said

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

license.   If anything, Article 7 is designed to prevent the existence of clandestine shadowy organizations engaging in the intrusion of privacy.

242.    The Supreme Court of New York County Special Term provided the most detailed analysis of Article 7 in a vintage decision.  The Court in Shorten v. Milbank stated the following:

> What the statute was aimed at was the regulation and control of those conducting the business of private detectives *** Certain evils and abuses growing out of the employment [of such private detectives] *** had from time to time attracted the attention of the public, and evidence from such sources had frequently received unfavorable comments from the courts.

170 Misc. 905, 906 (Special Term Sup. Ct. N.Y. Co. 1939) *Affirmed* 256 A.D. 1069 (1st Dep't. 1939) (internal quotations and citations omitted).

243.    The Court went on to further detail the steps that must be taken in order to become a licensed private investigator including background check; sponsorship; examination by the Secretary of State; investigation of character; cannot be a convicted felon or convicted of certain misdemeanors; and the posting of a bond.  Id. at 907.  The Court then stated:

> All of these provisions have for their purposes the protection of the public at large; to prevent from engaging in that business disreputable, incompetent persons who would prey upon the public.  In keeping with these purposes renewals of licenses have been refused where the applicant during the previous license period had been convicted of a crime.

Id.

244.    The Court further stated: "the business [Private Investigator] is malum in se without a license from the state."  Id.

245.    The NICB and its Insurance Company owners are in violation of New York General Business Law Article 7 and are, and continue to be, guilty of multiple B misdemeanors on a daily basis.  As stated according to General Business Law Article 7, Section 70(4):

Any person, firm, company, partnership or corporation who violates any provision of this section [investigation without licensure] shall be guilty of a class B misdemeanor

246.    As such the United States Attorney for the SDNY Preet Bharara, the FBI in the form of Federcyk, the entire DOJ, and the insurance industry including especially GEICO, State Farm, Travelers and Farmers all promote the commission of crime in New York State on a daily basis in order to benefit the insurance industry.

## VIII.    CUSTOM AND POLICY

247.    The prevailing policies governing the relationship between the NICB/Defendant Insurance Companies and members of the DOJ, including the FBI (Federcyk) and SDNY (Bharara), enabled the Defendants to deprive the Plaintiff of his constitutional rights.  They are created by policy making members of the USDOJ/FBI – including at the local level Federcyk and Bharara – in conjunction with the NICB and its insurance company Board of Governors including GEICO, State Farm, Travelers and Farmers.

248.    These policies, however, are not new and have in fact regularly caused the deprivation of citizens' rights in the past.  The Defendants continue to implement these customs and policies despite the fact that they are aware that the policies continually cause the deprivation of citizens' constitutional rights.

### a. *Formal Written Policy Created by Members of the DOJ at the Policy Making Level and Local Level*

249.    Through the use of MOUs, as described above, the NICB is permitted unfettered access in the investigation and prosecution of citizens.  These MOUs pervade the DOJ's dealings with the NICB in insurance related matters and are both national and local in their scope.  The MOUs are used to elevate the NICB into the equivalent of a branch of law enforcement.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

250.    The culture created by the extensive NICB participation in the criminal investigation and prosecution, which was explicitly sanctioned by MOUs created by the policymaking members of the DOJ/FBI in conjunction with the NICB, and further created and supervised at the local level by Defendant Fedarcyk of the FBI and Defendant USA Preet Bharara of the SDNY are directly responsible for the violation of Dr. Shapiro's civil rights. Furthermore, the severe risk of the violation of citizens' constitutional rights due to the intimate relationship between the NICB and DOJ/FBI has been an issue well documented and debated for almost 20 years.  The violation of constitutional rights due to NICB involvement in health care fraud investigations has been voiced by members of congress as well as prominent civil rights organizations.

### b. *Custom and Practice*

#### i. *Operation Sudden Impact*

251.    In 1994, the FBI and the NICB participated in Operation Sudden Impact, which was designed to fight health care fraud related to fraudulent No-Fault personal injury claims. Through the use of MOUs created by members of the USDOJ/FBI and the NICB, the Operation fostered an intimate relationship between the FBI and NICB, permitting the NICB to participate in every facet of the investigative process, including frequent participation in raiding targeted law offices and health clinics.

252.    Operation Sudden Impact also involved FBI and NICB utilization of the media to an extent unprecedented at the time.  The USDOJ/FBI prepared form Press Releases for local FBI field offices.  The USDOJ/FBI insisted that the press releases thank the NICB.  Further for press purposes the takedown had to occur on the same day across the country.  The FBI coordinated the simultaneous takedown of forty-one (41) medical facilities throughout the

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

country in one day, scheduled at the same time.  The FBI notified prominent media outlets and the orchestrated takedown received tremendous coverage across the nation.  What also began to receive attention, however, was the negative impact of the close relationship between the NICB and the FBI.

253.    As the multitude of investigations connected to Operation Sudden Impact progressed, repeated complaints surfaced alleging unfounded criminal allegations that resulted in arrests and selective targeting of citizens based on race.  Evidence surfaced that many field offices were not prepared to arrest anyone on the planned "takedown" day, but nevertheless, arrests were made.  It also became clear that many investigations connected with Operation Sudden Impact were motivated by racial discrimination, as evidenced by the 77 cases involving minorities that were targeted, compared to the 10 cases involving non-minorities.  It should come as no surprise that none of the NICB's leadership is comprised of a single minority person.

254.    At the behest of civil rights organizations, including the renowned League of United Latin American Citizens (LULAC), members of Congress were compelled, through hearings and letters, to investigate the close relationship of the FBI and NICB in the summer of 2000.  Members of Congress were concerned that the close relationship between the NICB and other governmental agencies was resulting in the infringement of citizens' constitutional rights, including arrests without probable cause, selective enforcement of the laws, and the disclosure of sensitive information of citizens.

255.    In response to these concerns, A. Robert Walsh, a member of the legislative counsel of the FBI's Office of Public Records and Congressional Affairs wrote a letter addressed to members of congress.  His letter assured the members of congress that although the FBI and NICB maintain a close working relationship, the FBI always leads the joint investigations and

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

continues to implement strategies in accordance with relevant HIPPA regulations.  While Mr.

Walsh did acknowledge the existence and frequent use of MOUs between the NICB and the FBI,

he assured the members of congress that the NICB did not operate as official law enforcement

officers and that the investigations did not target minorities.

256.    However, Walsh's statements were contradicted by documents received through

FOIA that demonstrated that NICB Special Agents participated in the execution of search

warrants and the interrogation of defendants, as in this case.

257.    In fact, the NICB maintained in a Motion to Quash Dr. Shapiro's subpoena that

the NICB was not the equivalent of federal agents in this matter but were federal law

enforcement and as such were immune to subpoena.

258.    In another affidavit to quash a subpoena in another matter the Associate General

Counsel of the NICB James Hertz argued that the NICB was in fact law enforcement cross

designated in cases with the FBI, amongst other law enforcement entities, and that the NICB

performed all the functions of FBI Agents.

259.    In any event Walsh's correspondence corroborates that the FBI was put on notice

of the problem of joint NICB-FBI investigations.

260.    As seen in Operation Impact, the media was effectively utilized to defame

Plaintiff, while assuredly thanking all the proper entities involved in the criminal investigation,

including the NICB, of course.  In fact, consistent with the regular customs of the FBI and

USDOJ, press releases always thank the NICB for its efforts, as evidenced by the recent

September 11, 2014 press release issued in connection with the FBI arrest of Akim Murray on

charges related to health care fraud.  The release states:

The New York FBI Health Care Fraud Task Force was formed in 2007 in an effort to combat health care fraud in the greater New York City area. The task force comprises agents, officers, and investigators from the FBI, NYPD, the New York State Insurance Fraud Bureau, U.S. Department of Labor, U.S. Office of Personnel Management Inspector General, U.S. Food and Drug Administration, New York State Attorney General's Office, New York State Office of Medicaid Inspector General, New York State Health and Hospitals Inspector General, and the National Insurance Crime Bureau

261.    Not surprisingly, the NICB is the only non law enforcement and non government entity named in the press release; however, their extreme participation in all health care investigations in unquestionable—and this same task force investigated Dr. Shapiro.

### ii.    Hampton v. State Farm

262.    Another example of the repeated violation of constitutional rights that occurs when Defendants like State Farm and the NICB team up can be found in Hampton v. State Farm Mutual Automobile Insurance Company[15], discussed *supra*.  In Hampton the Plaintiffs reported the theft of their vehicle and made a claim.  State Farm concocted a story claiming that the Plaintiffs actually ditched the vehicle in order to collect insurance money and threatened the claimants with jail if they pursued their claim.

263.    After the claimants moved forward with pursuing their claim, members of State Farm falsified reports and evidence, which was passed on to an NICB Agent who persuaded the police to arrest the Hamptons. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.  The Court upheld a punitive damages award of 8 million dollars based on the egregious circumstances brought on by State Farm, and facilitated by the NICB.

---

[15] WD 66791 (Court of Appeals of Missouri, Western District, January 8, 2008).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

### iii.   Operation BORIS

264.    In the early 2000's, the NICB participated in Operation BORIS with members of the Suffolk County District Attorney's Office.  Prior to BORIS the NICB had set up a permanent office and presence in the Suffolk County District Attorney's Office as part of the DA's Insurance Crimes Unit.  This unit consisted of Suffolk County DA prosecutors, Suffolk County Police Department Detectives and NICB "Special Agents" as well as insurance company SIU Investigators working side by side in the DA's Hauppauge Offices.

265.    The NICB on behalf of State Farm and the insurance industry led the investigation by making key decisions as to who the targets would be, what records would be subpoenaed, who would be indicted and who would be arrested, as well as what locations would be the subject of search warrants.  The Suffolk County DA/State Farm/NICB matter morphed into an investigation involving what was termed the "Suffolk County Task Force."  This "task force" was staffed by NICB "Special Agents", investigators from the Suffolk County DA's Office, and a host of insurance company investigative employees.

266.    Out of approximately 585 indictments well over half were never unsealed and expired due to defective indictments devoid of any evidence.  Of those that were unsealed, the only convictions were a small number of pleas taken by low-level perpetrators. Almost everyone else received an Adjournment in Contemplation of Dismissal (ACD), which is a fancy way of saying: "Case dismissed."  Some of these ACDs were a sight to behold – instead of the classic 6 months for the charges to be dismissed some of the BORIS ACDs were literally 72 hour ACDs, meaning the cases were dismissed in 72 hours.

267.    Also in connection with Operation Boris, State Farm was found to have funneled illegal funds to the Suffolk County District Attorney's Office through the NICB.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

268.    While federal authorities were not widely involved in Operation Boris, lead Suffolk County prosecutor Peter Smith was in constant communication with Ben Warner and other members of the FBI.   Thus, the intimate relationship of the NICB, local authorities, coupled with indirect FBI oversight, resulted in constitutional violations similar to those experienced by Plaintiff, who was similarly indicted without probable cause and for the sole purpose of benefitting various insurance companies' bottom line.

### iv.   *The Continuous Line of SDNY/FBI Press Releases Thanking the FBI for their Investigative Assistance*

269.    There are a multitude of SDNY/FBI Press Releases that elevate the NICB to the level of law enforcement wherein they are thanked for their investigative assistance.

270.    Some examples include those already mentioned: The February 29, 2012 Press Release for this case wherein Defendant Bharara thanked the NICB and the investigative units of the insurance companies "that provided invaluable assistance with the investigation;" the above quoted Akim Murray Press Release wherein the NICB is thanked and named as a member of the Government Health Care Task Force.; the already mentioned  Press Release of October 13, 2010 wherein "BHARARA also thanked the National Insurance Crime Bureau for their assistance in the investigation."

271.    Other pertinent press releases include the SDNY/FBI October 20, 2014 release entitled: "Twenty–Four Defendants Charged in Health Care Billing Scams that Defrauded Insurance Companies, Medicare, and Medicaid Out of Millions of Dollars" wherein Defendant Bharara "thanked the National Insurance Crime Bureau for its assistance in the investigation"; the December 4, 2014 (just months ago) SDNY/FBI press releases entitled: "Long Island Man Sentenced in Manhattan Federal Court to 10 Years in Prison for Insurance Scam in Which he

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Caused Dozens of Intentional Car Crashes" wherein Bharara "praised the outstanding investigative work of the FBI, and thanked the National Insurance Crime Bureau for its assistance in the case."

272.    There are more of such press releases.  They demonstrate that there is a custom and practice in the Southern District of joint SDNY/FBI/NICB and other law enforcement agency investigations that the NICB – a private insurance company trade group – participates in.

## FEDERAL CLAIMS FOR RELIEF

273.    Plaintiff brings the following claims for relief pursuant to 42 U.S.C. §1983 as per the decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 91 S.Ct. 1999 (1971), which provides Plaintiff with a remedy against those who deprive him of his constitutional rights under the color of federal law and the Federal Torts Claim Act.

274.    For the purpose of this section of the complaint entitled "federal claims for relief," the following definitions will be used:  The following persons, Defendants Bharara, Fedarcyk, Goldman, McQuaid, Anspacher, Seifer, and all Jane and John Does of the DOJ/FBI will be collectively referred to as the "Government Employees Defendants."  The following persons and entities, Defendants the NICB, Tardalo, Hood, Brody, Menges, Pierce, GEICO, State Farm, Travelers, Farmers, Regan, and Rivkin Radler will be collectively referred to as the "Non Government Defendants."   The United States of America will be referred to as the "United States."

[The remainder of page is intentionally blank.]

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

**AS AND FOR THE FIRST CLAIM FOR RELIEF AGAINST THE GOVERNMENT**
**EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS**
**(Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983 as per *Bivens*)**

275.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "274" with the same force and effect as if fully set forth herein. Defendants, collectively and individually, while acting under color of federal law, engaged in conduct which constituted a violation of the Constitution of the United States.

276.    All of the aforementioned acts deprived Dr. Shapiro of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

277.    As a result of Defendants' aforementioned conduct, Dr. Shapiro's liberty was restricted for an extended period of time, he was subjected to an utterly baseless and selective criminal prosecution, his personal and professional reputation has been permanently destroyed, he suffered massive economic losses, he was forced to incur substantial legal expenses, his ability to contract independently was permanently destroyed, his present and future earning capacity was substantially impaired, he was publicly embarrassed and humiliated, he was caused to suffer severe emotional distress, he was held in custody against his will, he was subjected to onerous and restrictive bail conditions, and he otherwise suffered a deprivation of his constitutional and civil rights.

[The remainder of page is intentionally blank.]

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

**AS AND FOR THE SECOND CLAIM FOR RELIEF AGAINST THE GOVERNMENT EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS**
**(False Arrest Under 42 U.S.C. § 1983 as per *Bivens*)**

278.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "277" with the same force and effect as if fully set forth herein.

279.    As a result of Defendants' aforementioned conduct, Dr. Shapiro was taken into custody by Anspacher with the assistance of Seifer in accordance with the express directives, guidance, and advice of Bharara, Fedarcyk, and AUSAs Goldman and McQuaid.  Defendant AUSAs Goldman and McQuaid worked closely with members of the NICB, including but not limited to Tardalo, Hood, Brody, Menges, and Pierce who together with the AUSAs Goldman and McQuaid, were advised and directed by members of Rivkin Radler, GEICO, Travelers, State Farm, and Farmers.

280.    For example, wire tap applications related to Plaintiff's criminal case, completed and executed by Anspacher and Seifer, and sworn to by Defendants Goldman and McQuaid, contain statements indicating that the NICB provided the FBI with a medical reports created by Plaintiff in connection with a specific patients who attended Clearview.  According to the application, "based on discussions with NICB investigator," this specific medical report, which is described in the "probable cause" section of the application, is suspicious and constitutes evidence of Plaintiff's criminal activity and involvement in the alleged criminal conspiracy.

281.    This report, however, is about as innocuous as they come.  Defendants knew these reports were not suspicious.  More importantly, Defendants did not provide or review any MRI films to compare to the report to determine whether or not the Plaintiff made fraudulent

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

misrepresentations in his report.  Plaintiff cannot be legitimately arrested based on the allegation that Plaintiff fraudulently "inflated" his reports without having *even one* of Plaintiff's reports that was inconsistent with what the corresponding MRI showed.

282.    Despite these facts, the Defendants represented that these reports served as evidence indicating Plaintiff's involvement in a criminal conspiracy.  This misrepresentation of facts, which was initiated by the Non Government Defendants, and which was knowingly improperly adopted by Government Employee Defendants' misrepresentation and fabrication of evidence against Plaintiff, which was presented by Goldman and McQuaid to the Grand Jury prior to Plaintiff's arrest.

283.    AUSA's Goldman and McQuaid also coerced false testimony from cooperating witness Robert Sukhman and presented it to the Grand Jury.  After gathering evidence from various sources including wire taps, on or about July 12, 2011, members of the Government including Goldman and McQuaid approached Sukhman and advised him that he was the subject of an ongoing criminal investigation. At some point thereafter, Goldman and McQuaid pressured Sukhman by threatening to arrest Sukhman's wife and his father, based on their involvement with alleged No-Fault fraud.  AUSA Goldman and McQuaid coerced Sukhman into identifying Dr. Shapiro as inflating his MRI reads and into testifying that, *inter alia,* the radiologist employed by Mikhail Zemylyansky fraudulently exaggerated and/or fabricated the existence of injuries and noted these misrepresentations in his reports.[16]

284.    Moreover, such was done in accordance with the prevalent and controlling polices of the Government Employee Defendants, which are created by members of the Government Employee Defendants in conjunction with the NICB, and which are described in a number of

---

[16] At trial, Sukhman described the fraudulent MRI reports as "good reads."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

MOUs that establish the parameters of the close relationship between the Government Employee Defendants and the NICB. Part of the governing policy was described on the record before Judge Katz by AUSA McQuaid on April 2, 2012, when McQuaid essentially argued that the every No-Fault claim is fraudulent.

285.    The prevalent and controlling policies created by policymaking members of the USDOJ/FBI in conjunction with the NICB were created and supervised locally by members of Bharara and Fedarcyk. As a result, Plaintiff was subjected to an illegal, improper, and false arrest by the Defendants, and was caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the Defendants in criminal proceedings, without any probable cause, privilege or consent.

286.    As a result of the foregoing, the Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

**AS AND FOR THE THIRD CLAIM FOR RELIEF AGAINST THE GOVERNMENT EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS**
**(Malicious Prosecution Under 42 U.S.C. § 1983 as per *Bivens*)**

287.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "286" with the same force and effect as if fully set forth herein.

288.    Defendants, individually and collectively, manufactured false evidence and forwarded this false evidence grossly distorting what was, at most, a civil contract dispute into a tale of grave criminal misconduct, which all Defendants *knew* at the time was wholly untrue. Further, AUSAs Goldman and McQuaid coerced false testimony from Robert Sukman, which

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

attempted to implicate Plaintiff in the alleged criminal conspiracy.  Such was done in accordance with prevalent polices created by members of the Government Employee Defendants in conjunction with the NICB, which are described in MOUs and are created and implemented at a local level by Bharara and Fedarcyk.

289.    Through an extreme level of involvement in the investigation, the Non Government Defendants provided the Government Employee Defendants with fabricated evidence of wrongdoing indicating that Plaintiff was a member of a criminal conspiracy designed to commit health care fraud. Such allegations were knowingly false because all the Defendants affirmatively mischaracterized innocuous evidence as probative of Plaintiff's guilt. In providing such false and misleading information to prosecutors, the Non Government Defendants provided AUSAs Goldman and McQuaid the opportunity to knowingly continue to misrepresent exculpatory evidence as probative of Plaintiff's guilt in order to pursue criminal charges against Plaintiff.

290.    Further, AUSAs Goldman and McQuaid, who participated extensively in the investigation of these preliminary allegations against Plaintiff, continued to misrepresent exculpatory evidence as probative of Plaintiff's guilt, while affirmatively refusing to find or examine any evidence to corroborate claims that Plaintiff was involved in an alleged criminal conspiracy by "inflating reads.,"[17] The AUSAs did so even though the evidence provided to them did not constitute probable cause to arrest Plaintiff, which would have required *at least one report* by Plaintiff that was inconsistent with the corresponding MRI film.  Instead, AUSAs Goldman and McQuaid failed to make a full and complete statement of the material facts to the

---

[17] Before requesting an order of *nolle prosequi*, the Government alleged that Plaintiff "inflated reads", meaning he exaggerated or made up injuries that were not present upon his review of a patient's MRI film in order to allow medical clinics to administer additional treatment and procedures.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Grand Jury constituting an intentional misrepresentation of Plaintiff's actual involvement in an alleged conspiracy.

291.    Specifically, Defendants failed to disclose the following material exculpatory facts: i) there were absolutely no MRI images in existence that supported the theory that Plaintiff was misrepresenting patient's injuries in order to allow medical treatment facilities to bill for additional procedures and treatment; and ii) the totality of Plaintiff's medical reports indicated, by a far margin, that Plaintiff did not indicate that an abnormally high number of patients had the type of injuries that would necessitate additional treatment, including the reports specifically cited by the FBI as suspicious in its wire tap application.

292.    The failure of the members of the Defendants to present this exculpatory evidence to the Grand Jury was a substantial factor in influencing the Grand Jury's decision to indict Plaintiff.  Such was possible because of the prevalent directives and policies created by members of the Government Employee Defendants in conjunction with the Non Government Defendants, which were implemented at a local level by Bharara and Fedarcyk.

293.    Further, AUSAs Goldman and McQuaid coerced Robert Sukhman into implicating Plaintiff in a criminal conspiracy by pressuring Sukhman to falsely state and testify that Dr. Shapiro was fraudulently indicating the existence of exaggerated and fabricated injuries in his reports so that medical clinics would be permitted to administer additional treatment. Such false information, which was coerced by AUSAs Goldman and McQuaid, was a substantial factor in influencing the Grand Jury's decision to indict plaintiff herein.

294.    By misrepresenting information about Plaintiff, in addition to withholding material exculpatory evidence from the Grand Jury, the Defendants acted with malice and with the express purpose of securing an indictment against Plaintiff.  Because such was done in

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

accordance with controlling polices created by Government Employee Defendants in conjunction with the NICB, and implemented by Bharara and Fedarcyk, expressed the requisite malice.

295.    As a result of the foregoing, all Defendants were directly and actively involved in the initiation of criminal proceedings against Plaintiff.

296.    Defendants lacked probable cause to initiate criminal proceedings against Plaintiff.

297.    Defendants acted with malice in initiating criminal proceedings against Plaintiff.

298.    All Defendants were also directly involved in the *continuation* of criminal proceedings against Plaintiff, as they actively participated in the unlawful and improper investigation being conducted by the Defendants, which was led by Bharara and Fedarcyk. Further, AUSAs Goldman and McQuaid threatened Plaintiff with criminal charges if he continued to execute affirmations in support of claimants who were in litigation against various insurance companies, including the Defendant Insurance Companies, despite a court order explicitly permitting Plaintiff to execute the affirmations.

299.    Defendants lacked probable cause to continue criminal proceedings against Plaintiff.

300.    Defendants acted with malice in continuing criminal proceedings against Plaintiff.

301.    Defendants misrepresented, falsified, and coerced evidence throughout all phases of the criminal proceedings, in addition to withholding material exculpatory evidence throughout all phases of the criminal proceedings.

302.    Notwithstanding the unlawful and fraudulent conduct of Defendants, the criminal proceedings were terminated in Plaintiffs' favor on December 30, 2013, when, upon request of

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

AUSA Peter Skinner, the Honorable Richard J. Sullivan granted an order of *nolle prosequi* to be filed as to Plaintiff, and no further criminal charges were ever re-filed against Plaintiff.[18]

303.   As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

### AS AND FOR THE FOURTH CLAIM FOR RELIEF AGAISNT THE GOVERNMENT EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS
**(Denial of Constitutional Right to Fair Trial Under 42 U.S.C. § 1983 as per *Bivens* Due to Fabrication of Evidence)**

304.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "303" with the same force and effect as if fully set forth herein.

305.   In creating false evidence against Plaintiff and in providing false and misleading testimony, coerced testimony, and otherwise misrepresenting evidence with respect thereto, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

306.   As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services without ever being afforded due process, including but not limited to, a hearing, an opportunity

---

[18] As detailed sufficiently in Plaintiff's abuse of process action, the desired damage had already been done.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

to be heard, to an opportunity confront adverse witnesses and to present exculpatory evidence, all without probable cause.

### AS AND FOR THE FIFTH CLAIM FOR RELIEF AGAINST
### DANIEL SACHS GOLDMAN AND NICOLAS MCQUAID
### (Inducement of False Testimony in Violation of 42 U.S.C. §1983 as per *Bivens*)

307.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "306" as if the same were more fully set forth at length herein.

308.    Defendant AUSAs Goldman and McQuaid, acting in an investigative capacity, met with and interviewed several witnesses during the pre-trial investigation.

309.    Defendant AUSAs Goldman and McQuaid, acting in an investigative capacity, coerced codefendant Sukhman to implicate Plaintiff in the alleged criminal conspiracy by pressuring him into providing false statements and testimony indicating Plaintiff was fraudulently exaggerating or fabricating his patients' injuries in Plaintiff's reports.

310.    Defendants accomplished such coercion by threatening to prosecute Sukhman's wife and father if he did not fully cooperate in the SDNY's investigation.  Such cooperation included providing false testimony that attempted to implicate Plaintiff in the criminal conspiracy. Thus, Defendants, harassed, threatened, pressured, intimidated, manipulated and coerced Sukhman to provide false "bad act" evidence against Plaintiff.

311.    As a result of the Defendants' coercion, Sukhman, upon information belief, subsequently provided such false testimony to the Grand Jury as well as at trial before the Honorable Judge Oetken, on September 30, 2013.

312.    As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer

severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

**AS AND FOR THE SIXTH CLAIM FOR RELIEF AGAISNT THE GOVERNMENT EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS**
**(Conspiracy to Violate Plaintiff's Civil Rights in Violation of 42 U.S.C. §1983 as per *Bivens*)**

313. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "312" as if the same were more fully set forth at length herein.

314. Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest, prosecution, pretrial detention, conviction and imprisonment of Plaintiff.

315. Throughout the period of the conspiracy, the Defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for Plaintiff's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe Plaintiff guilty of any crime.

316. Pursuant to the conspiracy, the conspirators intentionally, recklessly, negligently, and/or with complete indifference to the rights of Plaintiff: (a) knowingly misrepresented evidence; (b) manufactured false evidence and; (c) pressured, intimidated, threatened, coerced and induced a witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony; (d) failed to correct such false statements and testimony; and (e) withheld from the Grand Jury and trial judge evidence favorable to the accused on the issue of guilt or innocence.

317. The aforesaid conduct of Defendants operated to deprive Plaintiff of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

(a) Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c) Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and,

(d) To timely disclosure of all evidence favorable to the defense on the issues of guilt or innocence and/or punishment, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

318.    As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

### AS AND FOR THE SEVENTH CLAIM FOR RELIEF AGAINST GOVERNMENT EMPLOYEE DEFENDANTS AND NON GOVERNMENT DEFENDANTS
**("Stigma Plus" Claim in Violation of 42 U.S.C. §1983 as per *Bivens*)**

319.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "318" as if the same were more fully set forth at length herein.

320.    The information provided by Defendants to the press was materially false and misleading.

321.    As a result of false and misleading information provided to the press, Plaintiff was the subject of extensive and highly prejudicial news coverage, including coverage by PBS, NBC News, the New York Times, the Daily News, the New York Post, and WCBS and WINS News Radio.

322.    As a result of Defendants' statements to the press, Plaintiff's reputation was severely and permanently damaged.  To this day, the story of Plaintiff's arrest and indictment is *still* the first story that appears when doing a Google search of "Dr. Mark Shapiro Radiologist" on the Internet. Yet, there is *no* mention of the fact that the charges against Plaintiff were actually abandoned by the SDNY, in the face of a motion to dismiss the indictment or inspect the grand jury minutes.

323.    Plaintiff was never afforded an opportunity for a name clearing hearing at any time before, during, or after his criminal prosecution.

324.    As a result of Defendants' statements to the press, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was deprived of his right to a name-clearing hearing, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

## AS AND FOR THE EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS THE BHARARA AND FEDARCYK
### (Deliberate Indifference to Training in Violation of 42 U.S.C. §1983 as per *Bivens*)

325.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "324" as if the same were more fully set forth at length herein.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

326. The Government Employee Defendants initiated and continued criminal proceedings against Plaintiff, despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize Plaintiff's liberty, wellbeing, safety and constitutional rights.

327. Such was done in accordance with policies and procedures created by Bharara and Fedarcyk.

328. Defendants Bharara and Fedarcyk exhibited a deliberate indifference toward the training and supervision of its attorneys and agents regarding the ethical boundaries of presenting evidence against the accused. Defendants Bharara and Fedarcyk exhibited a deliberate indifference by continuing to create and implement policies in conjunction with the NICB, which resulted in benefits to the NICB and its insurance company constituents at the expense of regularly violating the constitutional rights of its citizens.

329. Specifically, the Bharara and Fedarcyk employ a policy of sanctioning, securing, and developing an intimate relationship between the NICB and other law enforcement agencies, including the FBI and the SDNY. This intimate relationship between the Government Employee Defendants and the NICB allows members of the NICB/Insurance Company Defendants unfettered direct access to confidential information at the expense of citizens of The United Sates of Americas. Essentially, this policy encourages the exchange of citizens' private information from the Government Employee Defendants to the Non Government Defendants, which is a felony offense. Moreover, the intimate relationship created, supported, and implemented by policy maker members of the USDOJ/FBI, including many of the Government Employee Defendants, directly fosters the perversion of the criminal justice system to the benefit of the

NICB and its insurance company constituents and at the expense of its citizens' constitutional rights.

330.    As evidenced from the conduct of AUSAs Goldman, McQuaid, Anspacher, and Seifer in Plaintiff's matter, defendant Bharara and Fedarcyk exhibited a deliberate indifference toward the training and supervision of attorneys and FBI agents regarding prosecutorial and investigatory misconduct, in that Defendants Bharara and Fedarcyk:

> a) Intentionally and/or recklessly failed to properly instruct, train and/or supervise AUSAs and agents with regard to their obligations to avoid prosecutorial misconduct in the grand jury; and,
>
> b) Intentionally and/or recklessly failed to properly instruct, train and/or supervise AUSAs and agents with regard to their obligations to act as an officer of the public, and of the duty of fair dealing owed to the accused.

331.    The aforesaid deliberate indifference to the training and supervision of its attorneys and agents by Bharara and Fedarcyk may be inferred from the fact that the prosecutorial misconduct in this case was *not* an isolated incident, but rather, occurred on *multiple* occasions throughout the proceedings.  Prosecutors and agents' misconduct included 1) alleging that Plaintiff fraudulently exaggerated or fabricated the existence of injuries in order to bolster his medical reports while knowing that there was no evidence to indicate the allegation; and 2) deliberately failing to examine any MRI films to corroborate such allegation. Further, AUSAs Goldman and McQuaid coerced cooperating witness Robert Sukhman into providing false testimony implicating Plaintiff in the alleged criminal conspiracy to commit health care fraud and improperly threatened Plaintiff with further criminal charges if he executed

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

affirmations in support of claimants against NICB constituents despite an order from the court explicitly permitting Plaintiff to execute such affirmations.

332.   The aforesaid deliberate indifference to the training and supervision of AUSAs by the Defendant Bharara and Fedarcyk may further be inferred from the fact that AUSAs Goldman and McQuaid and agents Anspacher and Seifer were *not* punished or disciplined in any way for the misconduct noted above.  Further, AUSAs Goldman and McQuaid and agents Anspacher and Seifer were not punished or disciplined in any way for procuring the indictment against Plaintiff by without any evidence whatsoever, which was evident when AUSA Peter Skinner requested an order of *nolle prosequi*.

333.   The foregoing unlawful policy of Defendants Bharara and Fedarcyk is the direct and moving force behind the constitutional violations suffered by Plaintiff and is substantially certain to result in the violation of the constitutional rights of other citizens in the future.

334.   The acts complained of were carried out by the aforementioned individual Defendants Bharara and Fedarcyk in their capacities as U.S. Attorney and Assistant Director-in-charge of the FBI New York Field Office. As a direct and proximate result of the foregoing practices and policies of the Bharara and Fedarcyk, Plaintiff was denied fundamental constitutional rights, was subjected to grossly improper and repeated instances of prosecutorial misconduct, was deprived of his liberty, was forced to incur substantial legal expenses, had his reputation destroyed, and was otherwise deprived of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

335.   It can be inferred that Bharara and Fedarcyk, and all other Government Employee Defendants were on notice that the policies created, implemented, and supported by the Government Employee Defendants and the NICB, usually thorough the use of MOUs, were

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

benefitting members of the insurance industry at the expense of its citizens' constitutional rights based on reoccurring legitimate complaints alleging that violations were occurring, including:

a. *Operation Sudden Impact*: In 1994, the FBI and the NICB participated in Operation Sudden Impact, which was designed to fight health care fraud related to fraudulent No-Fault personal injury claims. Through the use of MOUs created by members of the USDOJ and the NICB, the Operation fostered an intimate relationship between the FBI and NICB, permitting the NICB to participate in every facet of the investigative process, including frequent participation in raiding targeted law offices and health clinics. At the behest of civil rights organizations, members of Congress, through hearings and letters, began probing the close relationship of the FBI and NICB in the summer of 2000. Members of Congress were concerned that the close relationship between the NICB and other governmental agencies was resulting in infringement of citizens' constitutional rights, including arrests without probable cause as well as selective enforcement of the laws. The FBI responded to Congress' concerns by letter of A. Robert Walsh, a member of the legislative counsel of the FBI's Office of Public Records and Congressional Affairs. His letter assured Congress that although the FBI and NICB maintain a close working relationship, the FBI always leads the joint investigations. The fact that the FBI formally responded by letter to members of congress, who were explicitly concerned with the civil rights of the citizens, surely serves to establish that the United States of America is on notice of these issues.

b. *Operation Boris*:  In the early 2000's, the NICB participated in Operation Boris with members of the Suffolk County District Attorney's Office. During the Operation, State Farm was found to have funneled illegal funds to the Suffolk County District Attorney's Office through the NICB.  The Operation also resulted in 585 indictments, over half of which were never unsealed and prosecuted.  Thus, the intimate relationship of the NICB and local authorities resulted in constitutional violations similar to those experienced by Plaintiff, who was similarly indicted without probable cause and for the sole purpose of benefitting various insurance companies' bottom line.

c. *Hampton v. State Farm Mutual Automobile Insurance Company*, WD 66791:  An example of the constitutional calamity that occurs when Defendants like State Farm and the NICB team up can be found in this case, where the Plaintiffs reported the theft of their vehicle and made a claim.  State Farm concocted a story claiming that the Plaintiffs actually ditched the vehicle in order to collect insurance money and threatened the claimants with jail if they pursued their claim.  The claimants nevertheless pursued their claim.  State Farm falsified reports and evidence was passed on to an NICB Agent who persuaded the police to arrest the Hamptons. They were subsequently cleared and brought suit for malicious prosecution and punitive damages.  The Court upheld a punitive damages award of 8 million dollars based on the "egregious acts."

d. *Okslen Accupuncture v. Dinallo*, 77 A.D.3d. 451 (2d.Dep't 2010); : Lawsuits alleging violations of citizens' civil rights due to illegal investigative acts

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

performed by members of the NICB, which is an organization unlicensed to perform any investigative acts.

e. *Matter of Okslen Acupuncture P.C. v. Cuomo*, 85 A.D. 661 (1st Dep't. 2011): Article 78 proceeding to compel attorney general to enforce the law requiring the NICB to obtain a private investigator's license or to prosecute the NICB for their failure to do such.

f. *AVA Acupuncture P.C. et al. v. State Farm Automobile Insurance Company, et al.* (08 Civ. 650 Southern District of New York) (SAS): Insurance Company Defendants and the NICB worked together to defraud EIPs and their medical provider assignees by engaging in wholesale bad faith in violation of a plethora of New York State Laws and have hijacked law enforcement into indicting and arresting individuals and corporate entities. All of the above was and is being perpetrated to increase profits at the expense of New York State Citizens.

g. In the past 3 years, the close relationship between the NICB and the United States Customs and Border Protection (CBP) has come under fire as the NICB is alleged to have illegally disclosed private information of citizens to its insurance company constituents, in violation of citizens' constitutional rights. The NICB's access to sensitive information is permitted by a number of MOUs dating back to 2005, which establish the parameters of the intimate relationship between the NICB and CBP.

336. Thus, Defendants Bharara and Fedarcyk know that their policies and customs continue to result in regular and repeated violations of its citizens' rights. Despite actual and constructive notice of repeated violations of its citizens' rights, Bharara and Fedarcyk choose to

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

continue to implement said policies, which continue to result in repeated violations of its citizens constitutional rights.

## AS AND FOR THE NINTH CLAIM FOR RELIEF AGAINST THE UNITED STATES
### (Malicious Abuse of Process under the FTCA)

337.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "336" with the same force and effect as if fully set forth herein.

338.   The Government Employee Defendants fabricated, exaggerated, and misrepresented evidence to perpetuate false conclusions in order to support their pre-conceived decision to arrest, indict, and prosecute Plaintiff in furtherance of a conspiracy and in accordance with policies created by Government Employee Defendants in conjunction with the NICB, which were administered locally by members Government Employee Defendants.  These acts in furtherance of the conspiracy constitute an abuse of the legal process by Government Employee Defendants who regularly employ the criminal justice process.  Such was done without justification and through collusion with the Non Government Defendants.

339.   Government Employee Defendants continued such abuse in furtherance of the conspiracy's goals throughout the duration of proceedings against Plaintiff.  AUSAs Goldman and McQuaid, led by Bharara, and in accordance with directives and policies created by the Government Employee Defendants in conjunction with the NICB, continued their abuse of the instituted criminal process for the benefit of the Non Government Defendants, who increased profits by Plaintiff's inclusion in the indictment.

340.   The Non Government Defendants profited by the abuse of process and the continued abuse of process as evidenced by a large reduction in the amount of No-Fault

insurance claims the Defendant Insurance Companies paid out, illustrated by multiple global withdrawals of claims, saving the Defendant Insurance Companies millions of dollars.

341.   Additionally, despite a court order permitting Plaintiff to execute affirmations for Clearview and KKM patients that had cases pending against various insurance companies, including the Defendant Insurance Companies, AUSAs McQuaid and Goldman threatened Plaintiff with additional criminal charges if he executed any affirmations in support of those claimants.   Clearly the AUSAs were more concerned with saving the Defendant Insurance Companies money than fairly prosecuting Plaintiff or investigating his involvement in the alleged criminal conspiracy.   Government Employee Defendants were able to accomplish these actions as a result of prevailing policies created by them in conjunction with the Non Government Defendants, which were implemented locally by Government Employee Defendants.

342.   Government Employee Defendants benefitted as well, as evidenced by the massive amount of good press received in connection with the case as well as AUSA McQuaid's new employment opportunity with the President of the United States.

### AS AND FOR THE TENTH CAUSE OF ACTION AGAINST
### THE UNITED STATES
### (False Arrest under the FTCA)

343.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "342" with the same force and effect as if fully set forth herein.

344.   As a result of Government Employee Defendants' aforementioned conduct, Dr. Shapiro was taken into custody by Anspacher with the assistance of Seifer in accordance with the express directives, guidance, and advice of Bharara, Fedarcyk, and AUSAs Goldman and

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

McQuaid.   AUSAs Goldman and McQuaid worked closely with members of the NICB, including but not limited to Tardalo, Hood, Brody, Menges, and Pierce who together with the AUSAs Goldman and McQuaid, were advised and directed by members of Rivkin Radler, GEICO, Travelers, State Farm, and Farmers.

345.   For example, wire tap applications related to Plaintiff's criminal case, completed and executed by Anspacher and Seifer, and sworn to by Goldman and McQuaid, contain statements indicating that the NICB provided the FBI with a medical reports created by Plaintiff in connection with a specific patients who attended Clearview.  According to the application, "based on discussions with NICB investigator," this specific medical report, which is described in the "probable cause" section of the application, is suspicious and constitutes evidence of Plaintiff's criminal activity and involvement in the alleged criminal conspiracy.

346.   This report, however, is about as innocuous as they come.  The Government Employee Defendants and Non Government Defendants knew these reports were not suspicious. More importantly, the Government Employee Defendants and Non Government Defendants did not provide or review any MRI films to compare to the report to determine whether or not the Plaintiff made fraudulent misrepresentations in his report.  Plaintiff cannot be legitimately arrested based on the allegation that Plaintiff fraudulently "inflated" his reports without having *even one* of Plaintiff's reports that was inconsistent with what the corresponding MRI showed.

347.   Despite these facts, the Government Employee Defendants and Non Government Defendants represented that these reports served as evidence indicating Plaintiff's involvement in a criminal conspiracy.  This misrepresentation of facts, which was initiated by the Non Government Defendants, and which was knowingly improperly adopted by Government

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

Employee Defendants' misrepresentation and fabrication of evidence against Plaintiff, which was presented by Goldman and McQuaid to the Grand Jury prior to Plaintiff's arrest.

348.    AUSA's Goldman and McQuaid also coerced false testimony from cooperating witness Robert Sukhman and presented it to the Grand Jury.  After gathering evidence from various sources including wire taps, on or about July 12, 2011, members of the Government including Goldman and McQuaid approached Sukhman and advised him that he was the subject of an ongoing criminal investigation. At some point thereafter, Goldman and McQuaid pressured Sukhman by threatening to arrest Sukhman's wife and his father, based on their involvement with alleged No-Fault fraud.  AUSA Goldman and McQuaid coerced Sukhman into identifying Dr. Shapiro as inflating his MRI reads and into testifying that, *inter alia,* the radiologist employed by Mikhail Zemylyansky fraudulently exaggerated and/or fabricated the existence of injuries and noted these misrepresentations in his reports.[19]

349.    Moreover, such was done in accordance with the prevalent and controlling polices of the Government Employee Defendants, which are created by members of the Government Employee Defendants in conjunction with the NICB, and which are described in a number of MOUs that establish the parameters of the close relationship between the Government Employee Defendants and the NICB. Part of the governing policy was described on the record before Judge Katz by AUSA McQuaid on April 2, 2012, when McQuaid essentially argued that the every No-Fault claim is fraudulent.

350.    The prevalent and controlling policies created by policymaking members of the USDOJ/FBI in conjunction with the NICB were created and supervised locally by members of Bharara and Fedarcyk. As a result, Plaintiff was subjected to an illegal, improper, and false arrest

---

[19] At trial, Sukhman described the fraudulent MRI reports as "good reads."

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

by the Government Employee Defendants and Non Government Defendants, and was caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the Government Employee Defendants and Non Government Defendants in criminal proceedings, without any probable cause, privilege or consent.

351.    As a result of the foregoing, the Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

**AS AND FOR THE ELEVENTH CLAIM FOR RELIEF AGAINST THE GOVERNMENT EMPLOYEE DEFENDANTS AND THE NON GOVERNMENT DEFENDANTS**
**(Malicious Prosecution under the FTCA)**

352.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "351" with the same force and effect as if fully set forth herein.

353.    The Government Employee Defendants and Non Government Defendants, individually and collectively, manufactured false evidence and forwarded this false evidence grossly distorting what was, at most, a civil contract dispute into a tale of grave criminal misconduct, which the Government Employee Defendants and Non Government Defendants *knew* at the time was wholly untrue.  Further, AUSAs Goldman and McQuaid coerced false testimony from Robert Sukman, which attempted to implicate Plaintiff in the alleged criminal conspiracy.  Such was done in accordance with prevalent polices created by members of the Government Employee Defendants in conjunction with the NICB, which are described in MOUs and are created and implemented at a local level by Bharara and Fedarcyk.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

354.    Through an extreme level of involvement in the investigation, the Non Government Defendants provided the Government Employee Defendants with fabricated evidence of wrongdoing indicating that Plaintiff was a member of a criminal conspiracy designed to commit health care fraud. Such allegations were knowingly false because the Government Employee Defendants and Non Government Defendants affirmatively mischaracterized innocuous evidence as probative of Plaintiff's guilt. In providing such false and misleading information to prosecutors, the Non Government Defendants provided AUSAs Goldman and McQuaid the opportunity to knowingly continue to misrepresent exculpatory evidence as probative of Plaintiff's guilt in order to pursue criminal charges against Plaintiff.

355.    Further, AUSAs Goldman and McQuaid, who participated extensively in the investigation of these preliminary allegations against Plaintiff, continued to misrepresent exculpatory evidence as probative of Plaintiff's guilt, while affirmatively refusing to find or examine any evidence to corroborate claims that Plaintiff was involved in an alleged criminal conspiracy by "inflating reads."[20] The AUSAs did so even though the evidence provided to them did not constitute probable cause to arrest Plaintiff, which would have required *at least one report* by Plaintiff that was inconsistent with the corresponding MRI film.  Instead, AUSAs Goldman and McQuaid failed to make a full and complete statement of the material facts to the Grand Jury constituting an intentional misrepresentation of Plaintiff's actual involvement in an alleged conspiracy.

356.    Specifically, the Government Employee Defendants and Non Government Defendants failed to disclose the following material exculpatory facts: i) there were absolutely

---

[20] Before requesting an order of *nolle prosequi*, the Government alleged that Plaintiff "inflated reads", meaning he exaggerated or made up injuries that were not present upon his review of a patient's MRI film in order to allow medical clinics to administer additional treatment and procedures.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

no MRI images in existence that supported the theory that Plaintiff was misrepresenting patient's injuries in order to allow medical treatment facilities to bill for additional procedures and treatment; and ii) the totality of Plaintiff's medical reports indicated, by a far margin, that Plaintiff did not indicate that an abnormally high number of patients had the type of injuries that would necessitate additional treatment, including the reports specifically cited by the FBI as suspicious in its wire tap application.

357.   The failure of the Government Employee Defendants and Non Government Defendants to present this exculpatory evidence to the Grand Jury was a substantial factor in influencing the Grand Jury's decision to indict Plaintiff.  Such was possible because of the prevalent directives and policies created by members of the Government Employee Defendants in conjunction with the Non Government Defendants, which were implemented at a local level by Bharara and Fedarcyk.

358.   Further, AUSAs Goldman and McQuaid coerced Robert Sukhman into implicating Plaintiff in a criminal conspiracy by pressuring Sukhman to falsely state and testify that Dr. Shapiro was fraudulently indicating the existence of exaggerated and fabricated injuries in his reports so that medical clinics would be permitted to administer additional treatment. Such false information, which was coerced by AUSAs Goldman and McQuaid, was a substantial factor in influencing the Grand Jury's decision to indict plaintiff herein.

359.   By misrepresenting information about Plaintiff, in addition to withholding material exculpatory evidence from the Grand Jury, the Government Employee Defendants and Non Government Defendants acted with malice and with the express purpose of securing an indictment against Plaintiff.  Because such was done in accordance with controlling polices

created by Government Employee Defendants in conjunction with the NICB, and implemented by Bharara and Fedarcyk, expressed the requisite malice.

360.    As a result of the foregoing, the Government Employee Defendants and Non Government Defendants were directly and actively involved in the initiation of criminal proceedings against Plaintiff.

361.    The Government Employee Defendants and Non Government Defendants lacked probable cause to initiate criminal proceedings against Plaintiff.

362.    The Government Employee Defendants and Non Government Defendants acted with malice in initiating criminal proceedings against Plaintiff.

363.    The Government Employee Defendants and Non Government Defendants were also directly involved in the *continuation* of criminal proceedings against Plaintiff, as they actively participated in the unlawful and improper investigation being conducted by the Government Employee Defendants and Non Government Defendants, which was led by Bharara and Fedarcyk. Further, AUSAs Goldman and McQuaid threatened Plaintiff with criminal charges if he continued to execute affirmations in support of claimants who were in litigation against various insurance companies, including the Defendant Insurance Companies, despite a court order explicitly permitting Plaintiff to execute the affirmations.

364.    The Government Employee Defendants and Non Government Defendants lacked probable cause to continue criminal proceedings against Plaintiff.

365.    The Government Employee Defendants and Non Government Defendants acted with malice in continuing criminal proceedings against Plaintiff.

366.    The Government Employee Defendants and Non Government Defendants misrepresented, falsified, and coerced evidence throughout all phases of the criminal

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

proceedings, in addition to withholding material exculpatory evidence throughout all phases of the criminal proceedings.

367.   Notwithstanding the unlawful and fraudulent conduct of the Government Employee Defendants and Non Government Defendants, the criminal proceedings were terminated in Plaintiffs' favor on December 30, 2013, when, upon request of AUSA Peter Skinner, the Honorable Richard J. Sullivan granted an order of *nolle prosequi* to be filed as to Plaintiff, and no further criminal charges were ever re-filed against Plaintiff.[21]

368.   As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, and lost his ability to contract independently for his services.

## PENDENT CLAIMS

### AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST NON GOVERNMENT DEFENDANTS
#### (Tortious Interference and Conspiracy to Commit Tortious Interference)

369.   Plaintiff repeats and realleges paragraphs 1 through 368 above as set forth in fully herein.

370.   As and for Plaintiff's claim against the Non Government Defendants for tortious interference with business relations and contracts and conspiracy to commit tortious interference, Plaintiff alleges as follows:  Defendants, collectively and individually, investigated, arrested, indicted, and prosecuted Plaintiff without probable cause for the sole purpose of preventing him

---

[21] As detailed sufficiently in Plaintiff's abuse of process action, the desired damage had already been done.

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

from continuing his ethical, responsible, and legal medical practice, in direct benefit to the Non Government Defendants, and in furtherance of the conspiracy.

371.   The Non-Government Defendants supplied false and misleading allegations to members of the Government Employee Defendants.  The Government Employee Defendants facilitated the criminal prosecution of Plaintiff, without probable cause, and in accordance with prevailing policies created by members of the Government Employee Defendants in conjunction of the NICB. Further, Goldman and McQuaid threatened Plaintiff by stating that if he continued to execute affirmations in support of claimants' lawsuits against members of the insurance industry, the Government would incarcerate Plaintiff with no opportunity for release pending his trial, and would file another Indictment against him.   The fraudulent and unjustified implementation and continuation of the criminal process against Plaintiff interfered with Plaintiff's contract with his employer and others that he independently contracted with in that due to the malicious prosecution, Plaintiff was no longer able to work on No-Fault matters, which constituted a significant portion of his work with Doshi Diagnostic and other medical facilities.

372.   The Defendants were aware of the existence of Plaintiff's right to profit from his No-Fault employment pursuant to contracts with Doshi Diagnostic and other medical facilities, and the institution of the malicious prosecution and abuse of process rendered Plaintiff unable to perform under such contracts.  The Defendants' intentional interference with Plaintiff's existing contracts resulted in significant monetary damages to Plaintiff, while simultaneously benefitting the Non Government Defendants.

WHEREFORE, Plaintiff Dr. Shapiro requests that the Court enter judgment in favor of Plaintiff as follows:

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th St., New York, New York 10017● Telephone (212)587-5971● Fax (212)658-9852

a. Damages pursuant to violations of 42 U.S.C. Section 1983 per *Bivens* in an amount to be proven at trial, including the following claims:

    i. Deprivation of Federal Civil Rights;

    ii. False Arrest;

    iii. Malicious Prosecution;

    iv. Denial of Constitutional Right to Fair Trial;

    v. Inducement of False Testimony;

    vi. Conspiracy to Violation Plaintiff's Civil Rights;

    vii. Stigma Plus;

    viii. Deliberate Indifference to Training;

b. Damages pursuant to violations of the Federal Tort Claim Act in an amount to be proven at trial, including the following claims:

    i. Malicious Abuse of Process;

    ii. False Arrest;

    iii. Malicious Prosecution;

c. Damages pursuant to common law tortious interference and conspiracy to commit tortious interference in an amount to be proven at trial;

d. Awarding Plaintiff his attorneys' fees, costs, and disbursement; and

e. For all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable by right pursuant to the Federal Rules of Civil Procedure Rule 38 and other rules.

## RESERVATION OF RIGHT TO AMEND PLEADINGS

Plaintiff reserves the right to amend these pleadings to add any and all claims that she determines are just and appropriate.

Dated: New York, New York
       July 2, 2015

DAVIDOFF LAW FIRM, PLLC

Jonathan Marc Davidoff, Esq. (#JD9157)
Raymond Zuppa, Esq. (Of Counsel)
Robert Fantone, Esq. (Of Counsel)
*Attorneys for Plaintiff*
228 East 45th Street, Suite 1700
New York, New York 10017
Tel: 212-587-5971
Fax: 212-658-9852
Email: jonathan@davidofflawfirm.com
       glen@davidofflawfirm.com