UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
MARK SHAPIRO,

                      Plaintiff,

          - against -                           **MEMORANDUM AND ORDER**

DANIEL SACHS GOLDMAN, NICHOLAS MCQUAID,          14 Civ. 10119 (NRB)
PREET BHARARA, DONALD G. ANSPACHER,
MICHAEL SEIFER, JANICE K. FEDARCYK,
THE UNITED STATES OF AMERICA,
ANTHONY TARDALO, SUSAN Q. HOOD,
ROBERT BRODY, DOUGLAS S. MENGES,
NANCY PIERCE, THE NATIONAL INSURANCE
CRIME BUREAU, RIVKIN RADLER, LLP,
DALLAS RAGAN, FARMERS INSURANCE COMPANY,
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO GENERAL INSURANCE COMPANY, GEICO
INDEMNITY INSURANCE COMPANY, TRAVELERS
INDEMNITY COMPANY, TRAVELERS HOME AND
MARINE INSURANCE COMPANY, STATE FARM FIRE
AND CASUALTY INSURANCE COMPANY, STATE
FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
JOHN AND JANE DOE DEPARTMENT OF JUSTICE
POLICY MAKERS #1-5 (name(s) who are not
fully known at present, and possibly other
unidentified members of the Department of
Justice), FEDERAL BUREAU OF INVESTIGATION
SPECIAL AGENTS and ASSISTANT DIRECTORS
#1-10 (name(s) and identification numbers
that are not fully known at present, and
possibly other unidentified members of the
Department of Justice),

                      Defendants.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     In  2012,  plaintiff  Mark  Shapiro,  a  medical  doctor,  was

indicted and arrested for his alleged participation in a conspiracy

to  commit  insurance  fraud.   On  December  30,  2013,  the  charges

against him were dismissed on the Government's recommendation by an order of <u>nolle prosequi</u>. Plaintiff now alleges he was a victim of a wide-ranging conspiracy between the United States Government and various individuals and entities in the automobile insurance industry to violate his civil and constitutional rights. His Second Amended Complaint asserts twelve causes of action -- principally pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) ("<u>Bivens</u>"), and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671-2680 (the "FTCA") -- against a variety of Government and private defendants. The defendants move to dismiss. For the following reasons, the motions to dismiss are granted.

## I. BACKGROUND[1]

### A. The Alleged Insurance Fraud Scheme

On February 28, 2012, an indictment in <u>United States v. Zemlyansky</u>, No. 12 Cr. 171 (JPO) (S.D.N.Y), was filed in this Court. <u>See</u> SAC ¶ 47; Krause Decl. Ex. A (the "Indictment"). The Indictment charged 36 defendants with multiple counts of RICO

---

[1]     Factual background is drawn from the plaintiff's Second Amended Complaint, ECF No. 112 ("SAC" or "Complaint"), as well as certain documents submitted by the Government as exhibits to the Declaration of Andrew Krause, ECF No. 153 ("Krause Decl."), that are referred to, relied upon, and quoted by the Complaint. <u>See</u> <u>Faulkner v. Beer</u>, 463 F.3d 130, 134 (2d Cir. 2006); <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.3d 42, 47 (2d Cir. 1991). Additionally, we take judicial notice of the public docket sheet in the underlying criminal case, entitled <u>United States v. Zemlyansky</u>, No. 12 Cr. 171 (JPO) (S.D.N.Y.). <u>See</u> <u>Mangiafico v. Blumenthal</u>, 471 F.3d 391, 398 (2d Cir. 2006); <u>Fairley v. Collins</u>, No. 09 Civ. 6894 (PGG), 2011 WL 1002422, at *1 n.2, *4 n.5 (S.D.N.Y. Mar. 15, 2011).

conspiracy, conspiracy to commit health care fraud, conspiracy to commit mail fraud, and conspiracy to commit money laundering fraud. It alleged a multifaceted scheme to defraud private insurance companies of more than $275 million under New York State's no-fault automobile insurance laws.[2]   Indictment ¶ 1; see SAC ¶¶ 53-55 (summarizing Indictment's allegations).   First, as part of the alleged scheme, numerous medical clinics -- so-called "no-fault clinics" -- were created solely to defraud insurance companies under New York's no-fault insurance laws by routinely billing automobile insurance companies under the no-fault laws for medical treatments that were never provided or that were not medically necessary.   Indictment ¶ 4.

Second, the Indictment alleged that certain non-physician individuals paid physicians to act as straw owners to incorporate professional corporations through which the no-fault clinics could bill insurance companies and make referrals.   However, these non-physician individuals owned, operated, and controlled the clinics, in violation of a requirement under New York law that such clinics are incorporated, owned, operated, and controlled solely by

---

[2]   New York's no-fault insurance laws require every vehicle registered in New York to have automobile insurance that enables the vehicle's driver and passengers to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault.   They also require payments for medical treatments to be made promptly, obviating the need for motor vehicle occupants involved in accidents to file lawsuits to be reimbursed for medical treatments.   See N.Y. Ins. Law §§ 5101-09.

licensed medical practitioners to be eligible for reimbursement under the no-fault laws.  Id. ¶¶ 5-6.

Finally, the Indictment alleged that the no-fault clinics made referrals to so-called "modality clinics" for additional excessive and unnecessary treatments, including unnecessary MRIs, x-rays, physical therapy, and medical equipment, in exchange for cash kickbacks.  The modality clinics, like the no-fault clinics, were allegedly fraudulently incorporated by licensed medical practitioners who did not actually own, operate, or control them. Id. ¶ 7.

A review of the docket sheet in the Zemlyansky case indicates that it is still ongoing and has since expanded to include 44 defendants.  To date, 36 defendants have been convicted (of whom two are awaiting sentencing), three have been acquitted at trial, and five (including plaintiff here) have had all charges dismissed by an order of nolle prosequi.  See Zemlyansky, No. 12 Cr. 171 (JPO).

**B. Plaintiff's Alleged Role in the Scheme**

Plaintiff, a board-certified radiologist, was one of the 36 defendants initially named in the Indictment.  SAC ¶ 42, 47.  He was alleged to have been a co-conspirator in the no-fault insurance fraud scheme and was charged with one count of conspiracy to commit health care fraud and one count of conspiracy to commit mail fraud. Id. ¶ 47; see Indictment ¶¶ 23-38.  Plaintiff was arrested on

4

February 29, 2012, the day after the Indictment was filed, pursuant
to an arrest warrant signed by Magistrate Judge Theodore M. Katz.
SAC ¶ 44; Krause Decl. Ex. C (arrest warrant for Mark Shapiro).

According to the Complaint, during the course of the
prosecution, Assistant United States Attorney ("AUSA") Daniel S.
Goldman asserted that the Government believed plaintiff "inflated
reads" when reviewing MRI films referred to him by clinics targeted
in the criminal case, in that he "fraudulently stated in his
reports that patients sustained injuries when such injuries were
not sustained" so that the clinics could "gain financially by
providing additional treatment and billing based on Dr. Shapiro's
'inflated' reports."  SAC ¶ 57.

Plaintiff asserts the Government's theory was faulty.  He
explains that although he was "employed as a part-time radiologist"
by two of the alleged modality clinics -- Clearview Medical of
Brooklyn, P.C. ("Clearview") and KKM Diagnostics, P.C. ("KKM") --
to read radiological films and provide medical reports based on
his findings, he had no involvement with Clearview or KKM beyond
reviewing films (which were delivered to and picked up from his
place of full-time employment) and electronically transmitting his
reports.  SAC ¶ 60.  Accordingly, plaintiff explains, he never met
with or treated any Clearview of KKM patients and had no knowledge
of those clinics' operations or insurance billing practices.  Id.
¶¶ 56, 60-62.  Additionally, plaintiff repeatedly asserts that in

the course of his almost two-year-long criminal case, the Government failed to bring forward any evidence that he "inflated reads" in his work on behalf of these clinics.  Id. ¶¶ 58, 70, 71, 166, 226 n.13, 281, 346.

## C. Plaintiff's Theory of Conspiracy

Plaintiff alleges that his indictment, arrest, and prosecution were the result of a broad conspiracy between the United States Government and the private insurance industry, the goal of which is to unscrupulously prosecute fraud cases against health care providers in order to minimize insurers' reimbursement costs and thereby maximize their profits.

### 1. The Alleged Role of the NICB and Other Private Defendants

Plaintiff alleges that the initial decision to target him in 2010 originated with the defendant National Insurance Crime Bureau ("NICB"), an insurance industry trade association organized as an Illinois not-for-profit corporation, which is "comprised of member insurance companies that make up nearly 100% of the automobile insurance industry."[3]  SAC ¶¶ 4, 26, 130-32.  The alleged function of the NICB "is to make governmental law enforcement investigate, indict, arrest and prosecute those persons that insurance companies unilaterally deem to be engaged in insurance fraud."

---

[3]    At the same time, the Complaint alleges that the NICB decided to "go after" Shapiro based in part on the fact that the FBI had previously identified him as being associated with a different insurance fraud scheme.  SAC ¶ 132.

<u>Id.</u> ¶ 93. The "Defendant Insurance Companies"[4] "control the NICB and are, in effect, the NICB," by providing substantial funding and by having their senior executives sit on the NICB Board of Governors, which "controls the activities of the NICB." <u>Id.</u> ¶ 5. The Board of Governors is composed in part of employees of the insurance company defendants and between 2010 and 2013 included defendants Susan Q. Hood (a Vice President of State Farm), Robert Brody (an employee of Travelers), Douglas S. Menges (a Senior Vice President of Farmers), and Nancy Pierce (a Vice President of GEICO). <u>Id.</u> ¶¶ 80, 87-89. In addition, an Assistant Director of the FBI served as an advisor to the NICB Board of Governors in 2010, 2011, 2012, and 2013. <u>Id.</u> ¶ 83, 87-89. Plaintiff describes the relationship between the NICB, the insurance industry, and the FBI as "incestuous." <u>Id.</u> ¶ 6.

Plaintiff claims that the NICB and various components of the United States Department of Justice ("DOJ") have entered into "Memorandums of Understanding" ("MOUs"). SAC ¶¶ 11-12. Through these MOUs, which plaintiff says range from "broad and national in

---

[4]     The Complaint defines "Defendant Insurance Companies" to include the following groups of defendants: (1) Farmers Insurance Company ("Farmers"); (2) Government Employees Insurance Company, GEICO General Insurance Company, and GEICO Indemnity Insurance Company (collectively, "GEICO"); (3) Travelers Indemnity Company and Travelers Home and Marine Insurance Company (collectively, "Travelers"); State Farm Fire and Casualty Insurance Company and State Farm Mutual Automobile Insurance Company (collectively, "State Farm"). SAC at 2. Curiously, the Complaint also includes defendant Dallas Ragan, a natural person, among the Defendant Insurance Companies. <u>Id.</u> We will use the term "insurance company defendants" to refer to Farmers, GEICO, Travelers, and State Farm, but not Ragan, whom we consider a "private individual defendant."

scope" to "local and even case by case," "[t]he DOJ, sub agencies [sic] and employees accomplish the surrendering of their control to the NICB/Insurance Company Defendants." Id. ¶ 11. Such MOUs "are the lynch pin of the insurance industry control of law enforcement investigations," id. ¶ 12, resulting in the NICB's "capture of law enforcement without resistance from the DOJ," id. ¶ 9. Thus, "the DOJ, as arranged by its employees and the employees of its sub agencies [sic] such as the FBI and [United States Attorney's Office for the Southern District of New York], has an official policy -- including . . . national written policies as well as long held custom and practice -- that promotes NICB/Insurance Industry control over the investigative and prosecutorial activities of government law enforcement." Id.

The Complaint alleges the existence of four particular MOUs. The first, entitled "Privacy Impact Assessment for the Staged Accident Data Mining Initiative March 2008,"[5] describes an initiative in which NICB analysts -- who regularly "review claims in order to discover and analyze claim and fraud trends" -- would transmit information to the FBI identifying "in list form, individuals or groups of individuals suspected of making suspicious or staged automobile accident claims[.]" SAC ¶ 106.

---

[5]     The Government has submitted a complete copy of this document, which the Complaint quotes extensively. See Krause Decl. Ex. E. It is an FBI assessment documenting the Privacy Act implications of a "liaison effort" with the NICB, and it was not signed by any non-Government defendant. Id.

The transmitted information includes "the name and address of any treating physician or attorney associated with the claim[.]"  Id.

The second MOU, entitled "Memorandum of Understanding Between the Federal Bureau of Investigation and National Insurance Crime Bureau," was allegedly prepared for the Portland, Oregon field office of the FBI.  SAC ¶¶ 113-15, 138.  It states in part that "[t]he goal of this cooperation between the FBI and the NICB is to use the resources and information gathered by both organizations in an effort to prosecute those individuals who are involved in fraudulent insurance practices which violate federal statutes."  Id. ¶ 113.

The third MOU was allegedly created at a June 2012 meeting hosted by a division of the FBI in Buffalo, New York, SAC ¶ 117, and the fourth was allegedly made between the NICB and U.S. Customs and Border Protection, id. ¶ 118.  Plaintiff posits that "[t]here are certainly similar MOUs governing the ongoing criminal investigation that led to [his] indictment," id. ¶ 116, and that defendants Preet Bharara (United States Attorney for the Southern District of New York) and Janice K. Fedarcyk (Assistant Director in Charge of the FBI's New York Division) would have been responsible for the creation of such MOUs and the working relationship between the NICB and the DOJ in New York, id. ¶¶ 139-40.  Through these MOUs, plaintiff says, "the NICB is permitted unfettered access in the investigation and prosecution of

citizens," id. ¶ 249, and, "[t]hrough Fedarcyk and Bharara's stewardship the NICB was illegally elevated to the level of governmental law enforcement," id. ¶ 140.   The Complaint also describes prior events that plaintiff says indicate an "intimate relationship between the NICB and DOJ/FBI," including a 1994 FBI Operation, a 2008 Missouri case, and a local law enforcement operation in the early 2000s.   Id. ¶¶ 251-68.

### 2. Investigation and Indictment of Plaintiff

Plaintiff claims the indictment of Shapiro and 35 others was an outgrowth of a Medicare fraud investigation conducted by the FBI, the United States Attorney's Office ("USAO"), the NICB, and others.   SAC ¶¶ 119-23, 159.   Plaintiff asserts AUSA Goldman and AUSA Nicholas McQuaid participated in early investigatory interviews, id. ¶ 142, and that the law firm of Rivkin Radler, LLP, also participated in the investigation by (1) providing its files related to previous civil actions it brought against Shapiro on behalf of GEICO, State Farm, and Travelers, and (2) providing "legal technical support to the investigation and prosecution," id. ¶¶ 143-44.   Plaintiff claims the insurance company defendants falsely accused him of insurance fraud and "provided false information in the form of claims flagged for suspicious activity based on their doctored database and indicators of suspicion in order to avoid paying claims."   Id. ¶ 216.   His "proof" of this conduct is an email written by defendant Anthony Tardalo (a

"Supervisory Special Agent" at the NICB), "on behalf of NICB to members of the insurance industry, including GEICO, State Farm, Travelers, and Farmers[.]"   Id. ¶ 217.  In relevant part, the Tardalo email states the following:

> To All,
>
> The US Attorney's Office SDNY is requesting information to assist in their case involving Dr[.] Mark Shapiro. The US Attorney is requesting all billing where Dr[.] Mark Shapiro is named on the bills as the treating provider, employee, or doing the MRI reads for [KKM and Clearview].  Please forward me all billing requested ASAP.
>
> The US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money.  Please let[']s take the time and get them what they need to make this case.

Id. ¶ 217 (plaintiff's emphasis removed).  Defendant Dallas Ragan (a "Senior Special Investigator/Analyst" at Farmers, id. ¶ 33), appears to have responded to Tardalo attaching the "bills and records requested."   Id. ¶ 217.  Plaintiff claims that Ragan's role was to assist the NICB, the insurance company defendants, the FBI, and the USAO in investigating him, and that Ragan "falsely accus[ed]" him in this case.   Id. ¶ 33.

The Complaint discusses four alleged components of the investigation: (a) an analysis of the Clearview clinic prepared by the NICB, SAC ¶¶ 152-57; (b) wiretap applications, id. ¶¶ 158-87; (c) the testimony of Robert Sukhman, id. ¶¶ 188-97; and (d) a chart stating amounts lost as a result of the alleged fraud scheme, id.

¶¶ 198-215.  He also alleges (e) certain bad conduct by U.S. Attorney Bharara in connection with the criminal case.

### (a) The Clearview Analysis

Plaintiff alleges that a 35-page report dated September 17, 2010, prepared by Tardalo on behalf of the NICB (the "Clearview Analysis"), identified a large volume of insurance claims associated with Clearview, as well as medical reports that the NICB believed contained indicia of fraud.  SAC ¶¶ 152-54.  The Clearview Analysis reportedly named Shapiro as a "Provider of Services," id. ¶ 153, and "mischaracterized [his] reports as suspicious and further implicated [him] in alleged instances of healthcare fraud without any evidence [he] actually participated," id. ¶ 155.  The Clearview Analysis was allegedly submitted "directly to the [sic] Goldman, McQuaid, and the FBI, including in all probability [defendants Donald] Anspacher and [Michael] Seifer," id. ¶ 155, two FBI Special Agents involved in the investigation, id. ¶¶ 20-21.

### (b) The Wiretap Applications

Plaintiff alleges that between October 2010 and June 2011, AUSAs Goldman and McQuaid and Special Agents Seifer and Anspacher were involved in preparing wiretap applications in connection with the investigation.  SAC ¶¶ 158-87.  The wiretap applications described, among other things, how the NICB "becomes aware that a particular clinic is generating an unusually high volume of

questionable claims." Id. ¶ 160.  Shapiro alleges that in an affidavit in support of the wiretap application, Special Agent Seifer stated that he "believe[d] Clearview [was] engaged in mail, wire, and/or bank fraud" "based on the documents and records I received from NICB," which indicated "the excessive number of bills NICB ha[d] identified as well as the type of treatments and bills submitted to insurance companies by mail." Id. ¶¶ 162.  Plaintiff asserts the NICB was "the main source of information related to the fraud." Id.  ¶ 187.  He also claims that the wiretap application listed certain records provided by the NICB, including one of Shapiro's MRI reports written on Clearview's letter head and a spreadsheet containing a compilation of bills from Shapiro (in which Clearview is listed as the provider) to various insurance companies for services provided in June 2010.  Id. ¶ 165.  He claims that Goldman, McQuaid, Seifer, and Anspacher incorporated "knowingly false theories describing Dr. Shapiro's criminal conduct," and that the "theories were false because there was absolutely no evidence to support them." Id. ¶ 179.  Shapiro alleges that subsequent applications to extend the wiretap "perpetuated" the same "fabrication and misrepresentation" in the original application.  Id. ¶¶ 173-75.

Additionally, the Complaint alleges that affidavits in support of applications to extend the wiretap described "key conversational intercepts," but that none of these conversations

truly implicated Shapiro in any criminal wrongdoing.  SAC ¶¶ 173-75.  In particular, later iterations of the wiretap applications allegedly included a description of a conversation between Shapiro and Mikhail Zemlyanksy, another individual charged in the Indictment, in which Shapiro is described as working with Zemlyanksy "to open up a new medical clinic as part of Zemlyanksy's no-fault insurance fraud scheme."  Id. ¶¶ 185-86.  The "criminal characterization of this conversation" by the Government, plaintiff says, was "completely invented" and "resulted in the fabrication of evidence against Dr. Shapiro."  Id. ¶ 185.

### (c) The Sukhman Testimony

The Complaint alleges that on or about July 12, 2011, "FBI agents" approached Robert Sukhman -- another defendant charged in the Indictment and allegedly "the biggest and most important target of the investigation," SAC ¶ 190 -- "with an offer of a cooperation deal."  Id. ¶ 188.  Plaintiff asserts that AUSAs Goldman and McQuaid met with Sukhman and Sukhman's attorney on July 13, 2011, "prior to the presentation of evidence to a Grand Jury to indict Dr. Shapiro."  Id. ¶ 189.  Plaintiff claims that Goldman and McQuaid "threatened Sukhman with massive jail time," id. ¶ 191, "threatened to arrest Sukhman's father for his involvement in criminal activity," id., and "threatened to arrest and prosecute Robert Sukhman's wife" for her criminal activities in connection with the no-fault scheme, id. ¶¶ 192-94, all in order to induce

14

Sukhman's cooperation.   Plaintiff alleges that, while "under interrogation" by Goldman and McQuaid, Sukhman "invented the allegation that Shapiro's reads were 'good,' meaning fraudulently inflated."   Id. ¶ 195.   Accordingly, plaintiff says, Sukhman testified at a later trial in the criminal case that "7 out of the 10 [MRI] reports will have either a herniation or double disk bulge," a false statement that constituted perjury.   Id.

### (d) The Loss Amount Chart

Plaintiff alleges that AUSAs Goldman and McQuaid worked with the NICB and other private defendants to produce a loss amount chart claiming that Shapiro "intended to steal the sum of $10,302,119.67." SAC ¶¶ 203, 205.   This intended loss amount was "fabricated" because it "was based upon the theory that an MRI promoted other fraudulent treatments," and accordingly incorporated the costs of other treatments billed by Clearview for any patient for whom Shapiro had performed an MRI read.   Id. ¶¶ 206, 208.   Noting that in a criminal fraud prosecution, the loss amount calculation "is of great importance" in sentencing, id. ¶ 198, plaintiff asserts the inflated loss amount theory was presented to the grand jury and "believed by the Grand Jury who generally believes their government.   The shock value of that number alone is enough to get a Grand Jury to overlook obvious weaknesses in the Government's case and indict the proverbial ham sandwich."   Id. ¶ 214.   Plaintiff alleges that the loss amount

15

attributed to him, combined with other fabricated loss amounts, totaled $279 million, a figure the Government presented both to the grand jury and the public as the amount of alleged fraud.  Id. Plaintiff posits that "the fabricated number '$279 Million' drives Defendant Bharara's craze to indict because it creates the headlines he so maliciously craves." Id. ¶ 215.

### (e) Alleged Conduct by U.S. Attorney Bharara

The Complaint further alleges that, in order to facilitate the prosecution of Shapiro, U.S. Attorney Bharara "reduced the legal threshold necessary to make a decision to indict an individual/entity from the legally required 'probable cause' to the lower level of 'reasonable suspicion[.]'"  SAC ¶ 124. Plaintiff claims this "was done in order to create more sensationalized press releases." Id. ¶ 125.

The Complaint discusses a press release issued by the USAO on February 29, 2012, and contemporaneous prepared remarks made by Bharara at a press conference.  The press release described the Zemlyansky case as "the largest no-fault insurance fraud prosecution in history," and noted that ten doctors and three lawyers had been charged as part of the scheme.  Id. ¶ 50; see Krause Decl. Ex. B (complete press release).  In the press release, Fedarcyk is quoted in part as saying: "Our investigation uncovered a pattern of lucrative fraud exploiting New York's no-fault auto insurance system to the tune of more than a quarter of a billion

16

dollars.  The criminal enterprise, while it lasted, was obscenely profitable." Krause Decl. Ex. B, at 2.  Bharara's press conference remarks also described the alleged scheme, which he said "relied on a cadre of corrupt doctors who essentially peddled their medical licenses like a corner fraudster might sell fake ID's -- except that those medical licenses allowed unlawful entry, not to a club or a bar, but to a multi-billion dollar pool of insurance proceeds." SAC ¶ 52; Krause Decl. Ex. F, at 2 (complete transcript of remarks).  Bharara thanked, among others, "the staff from the National Insurance Crime Bureau," as one of "our partners in this case." SAC ¶ 52; Krause Decl. Ex. F, at 2.  No direct mention of Shapiro is made in either the press release or Bharara's remarks, except in a chart at the end of the press release listing each indicted defendant's name and his or her age, place of residence, alleged role in the scheme, charges, and maximum penalty.  Krause Decl. Ex. B, at 4-6.

### 3. The Criminal Case

The Complaint describes events following plaintiff's indictment and arrest.  Plaintiff claims that at a court hearing after his indictment, his counsel sought permission for him to produce affirmations relating to his MRI reads on behalf of patients involved in unrelated auto accident litigation.  SAC ¶ 219.  AUSA McQuaid objected to Shapiro providing affidavits in any cases involving no-fault claims.  Id. ¶ 220.  Following a ruling

17

from the court granting Shapiro's request, AUSA McQuaid allegedly "shouted at Dr. Shapiro while still inside the court room" and "threatened that if Dr. Shapiro signed any affirmations, additional charges would be brought and Dr. Shapiro would be incarcerated." Id.

Additionally, plaintiff claims AUSA Goldman "lied to the Court and to Dr. Shapiro's counsel" by stating that the Government "would produce MRI films to Dr. Shapiro's defense team by the end of March 2013." Id. ¶ 226. These MRI films were allegedly provided to the Government by the private defendants. Id. ¶¶ 57–58, 72, 74. According to plaintiff, they would have proven that he did not "inflate" readings of MRI films in his reports. Id. ¶¶ 74–75. However, AUSAs "Goldman and McQuaid intentionally hid these materials from Dr. Shapiro[.]" Id. ¶ 78.

Plaintiff further alleges that "[d]uring the course of the prosecution, [he] not only attacked the accuracy of the claims and charges made in the Indictment, but also made an innocence proffer, which was supported by positive polygraph results." SAC ¶ 230. On or about December 14, 2013, plaintiff says, newly-assigned AUSA Peter Skinner travelled to Shapiro's counsel's office and reviewed a set of Shapiro's MRI reports that had been compiled by defense counsel. Id. ¶ 75. Shapiro says these reports "were absolutely available" to the Government defendants, who therefore "ignored the exculpatory evidence they possessed during the investigation."

Id. ¶ 76.  He asserts that following AUSA Skinner's review of the MRI reports, Skinner "immediately determined that the Indictment should be dismissed against Dr. Shapiro."  Id. ¶ 75.

On December 30, 2013, upon the recommendation of the U.S. Attorney's Office, an order of nolle prosequi was entered, dismissing the criminal charges against Shapiro.  Id. ¶¶ 230, 302.

## D. Procedural History

On December 24, 2014, plaintiff filed a 73-page, 201-paragraph Complaint in this Court.  ECF No. 1.  On January 15, 2015, he filed a 107-page, 355-paragraph First Amended Complaint.  ECF No. 4.  On June 4, 2015, having received numerous pre-motion letters setting forth defendants' anticipated arguments for dismissal, we granted plaintiff leave to file a second amended complaint.  ECF No. 103.  At that time, we wrote: "plaintiff is cautioned that, given this opportunity to amend, the Court is highly unlikely to permit a further amendment if defendants' motions [to dismiss] are granted in whole or in part."  Id. at 2. We additionally wrote: "[a]s the First Amended Complaint, comprising 107 pages and 355 paragraphs, is already prolix, counsel should consider tightening the next version to make a concise presentation of the legally material allegations."  Id. at 1 n.1.

On July 2, 2015, plaintiff filed his 115-page, 372-paragraph Second Amended Complaint.  ECF No. 112.

The SAC names 25 defendants, whom we organize as follows. First, we define as "Government defendants" nine defendants consisting of (a) the United States and (b) eight "Government employee defendants," namely: (1) AUSA Goldman, (2) AUSA McQuaid, (3) U.S. Attorney Bharara, (4) FBI Assistant Director in Charge Fedarcyk, (5) FBI Special Agent Anspacher, (6) FBI Special Agent Seifer, (7) "John and Jane Doe DOJ Policy Makers #1-5," and (8) "FBI Special Agents/Assistant Directors #1-5." Second, we divide the 16 remaining defendants (the "private defendants") into two sub-groups: (a) 10 "private entity defendants," namely, the NICB, the insurance company defendants, and Rivkin Radler; and (b) six "private individual defendants," namely, Tardalo, Hood, Brody, Menges, Pierce, and Ragan.

The SAC contains twelve causes of action. Counts One through Eight allege violations of plaintiff's federal constitutional rights "under 42 U.S.C. § 1983 as per Bivens."[6] Counts Nine, Ten, and Eleven assert claims under the FTCA for malicious abuse of process, false arrest, and malicious prosecution. Count Twelve alleges tortious interference and conspiracy to commit tortious interference. The following chart indicates the defendants named in each claim:

---

[6]      At oral argument, plaintiff's counsel confirmed that Counts One through Eight are to be construed as Bivens claims, given that the Complaint alleges the deprivation of plaintiff's constitutional rights under color of federal law, not state law. Oral Arg. Tr. ("Tr.") 5:16-25, June 29, 2016.

Claims and Defendants in Plaintiff's Second Amended Complaint

| Count No. | Claim | Private Defendants | | United States | Government Employee Defendants | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Private Entity Defs. | Private Individual Defs. | | Bharara | Fedarcyk | Goldman | McQuaid | Anspacher | Seifer | DOJ/FBI "John Does" |
| 1 | Bivens, "deprivation of Federal civil rights" | x | x | | x | x | x | x | x | x | x |
| 2 | Bivens, false arrest | x | x | | x | x | x | x | x | x | x |
| 3 | Bivens, malicious prosecution | x | x | | x | x | x | x | x | x | x |
| 4 | Bivens, fabrication of evidence | x | x | | x | x | x | x | x | x | x |
| 5 | Bivens, inducement of false testimony | | | | | | x | x | | | |
| 6 | Bivens, conspiracy to violate plaintiff's civil rights | x | x | | x | x | x | x | x | x | x |
| 7 | Bivens, "stigma plus" | x | x | | x | x | x | x | x | x | x |
| 8 | Bivens, deliberate indifference to training | | | | x | x | | | | | |
| 9 | FTCA, malicious abuse of process | | | x | | | | | | | |
| 10 | FTCA, false arrest | | | x | | | | | | | |
| 11 | FTCA, malicious prosecution | x | x | | x | x | x | x | x | x | x |
| 12 | Tortious interference | x | x | | | | | | | | |

The defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Briefing of the motions was extensive. The Government submitted a legal memorandum in support of its motion to dismiss.  ECF No. 152 ("Gov. Mem.").  Plaintiff responded, ECF No. 175 ("Opp'n to Gov. Mem."), and the Government replied, ECF No. 182.  The Government also submitted a sur-reply, ECF No. 197, to which plaintiff responded, ECF No. 201.  Finally, plaintiff and the Government submitted unsolicited letters discussing the import, if any, of the decision in <u>Ganek v.</u> <u>Leibowitz</u>, No. 15 Civ. 1446 (WHP), --- F. Supp. 3d ----, 2016 WL 929227 (S.D.N.Y. Mar. 10, 2016).  ECF Nos. 203-04, 206-07.

The private defendants, divided into six groups based on their legal representation, submitted a joint memorandum, ECF No. 165 ("Priv. Mem.") as well as supplemental individual memoranda, ECF Nos. 159, 162, 167, 170, 179.[7]  Plaintiff responded, ECF No. 186 ("Opp'n to Priv. Mem."), and the private defendants (both jointly and separately), replied, ECF Nos. 194 ("Priv. Reply"), 192-93, 195-96, 199.  Finally, plaintiff submitted a sur-reply to the private defendants.  ECF No. 205.  All told, we received and reviewed over 350 pages of briefing.

Oral argument was heard on June 29, 2016.

---

[7]     State Farm relies solely on the private defendants' joint memoranda and did not submit supplemental memoranda in support of its motion to dismiss.  <u>See</u> Decl. of Douglas W. Dunham, ECF No. 173.

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must "'state a claim to relief that is plausible on its face'" by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Where a plaintiff has not "nudged [his] claims across the line from conceivable to plausible," dismissal is appropriate.  Twombly, 550 U.S. at 570. In applying this standard, we accept as true all factual allegations in the plaintiff's pleadings and draw all reasonable inferences his favor.  Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012).  We do not, however, accept as true "'a formulaic recitation of the elements of a cause of action,'" "'naked assertion[s]' devoid of 'further factual enhancement,'" or "a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555, 557) (brackets in Iqbal).

## III. DISCUSSION

### A. The Private Defendants

Plaintiff advances eight of his twelve claims against the private defendants.  As noted, we divide the private defendants into two sub-groups: the private entity defendants and the private

23

individual defendants.  We conclude that plaintiff has failed to state claims against either group.  Therefore, the private defendants' motions to dismiss are granted.

**1.  _Bivens_ Claims Against The Private Entity Defendants**

Most of plaintiff's claims against the private entity defendants are _Bivens_ claims.  In _Bivens_, the Supreme Court recognized an implied private right of action for damages against individual federal officers who violate a plaintiff's constitutional rights.  403 U.S. at 397.  To maintain a _Bivens_ action, a plaintiff must "allege that [1] a defendant acted under color of federal law [2] to deprive plaintiff of a constitutional right."  _Tavarez v. Reno_, 54 F.3d 109, 110 (2d Cir. 1995).  To do so, the plaintiff must allege facts "indicating that the defendants were personally involved in the claimed constitutional violation."  _Arar v. Ashcroft_, 585 F.3d 559, 569 (2d Cir. 2009) (en banc).

The Supreme Court has held that _Bivens_ actions may not be brought against a federal agency, _FDIC v. Meyer_, 510 U.S. 471, 485, (1994), or a private entity, _Corr. Servs. Corp. v. Malesko_, 534 U.S. 61, 71 (2001), even if acting under color of federal law, given that "[t]he purpose of _Bivens_ is to deter individual federal officers from committing constitutional violations," and "inferring a constitutional remedy against a private entity" would frustrate such individualized deterrence, _id._ at 70-71.  Relying on _Malesko_, courts have held that _Bivens_ claims may not be advanced

24

against a corporate entity.[8]  See Watson v. Zerillo, No. 14-CV-02591 (CBA)(VMS), 2014 WL 2566910, at *2 (E.D.N.Y. June 6, 2014); Orellana v. World Courier, Inc., No. 09-CV-576 (NGG)(ALC), 2010 WL 3861013, at *2 (E.D.N.Y. Sept. 28, 2010); Bender v. Gen. Servs. Admin., 539 F. Supp. 2d 702, 708 (S.D.N.Y. 2008) (Lynch, J.). Malesko's rationale applies equally to partnerships such as Rivkin Radler.  See Rodriguez ex rel. Rodriguez-Hazbun v. Nat'l Ctr. for Missing & Exploited Children, No. CIV.A. 03-120 (RWR), 2005 WL 736526, at *9 (D.D.C. Mar. 31, 2005).  For this sufficient reason alone, Counts One, Two, Three, Four, Six, and Seven are dismissed as to the NICB, the insurance company defendants, and Rivkin Radler.

## 2. "Under Color of Federal Law"

### a. Legal Standard for Federal Action

In asserting a Bivens claim against individual private actors, a plaintiff must establish that the private actor was acting under "color of federal law."  "To determine whether a defendant has acted under color of federal law for purposes of a Bivens action, courts look to the more established body of law

---

[8]     Plaintiff urges us to distinguish Malesko on its facts and to recognize the Bivens remedy against the private entity defendants in the context of this case.  Opp'n to Priv. Mem. 20–21.  We decline to do so.  Such a result would be contrary to the Supreme Court's articulation of Bivens' general purpose.  Thus it is not surprising that plaintiff is unable to identify a post-Malesko case in which the Bivens remedy was extended to reach a corporate entity.  Moreover, we are cognizant that "the Supreme Court has warned that the Bivens remedy is an extraordinary thing that should rarely if ever be applied in new contexts." Arar, 585 F.3d at 571 (internal quotation marks omitted).

that defines the analogous term -- under color of state law -- with regard to actions under 24 U.S.C. § 1983." <u>Bender</u>, 539 F. Supp. 2d at 707; <u>see</u> <u>Chin v. Bowen</u>, 833 F.2d 21, 24 (2d Cir. 1987). In the Section 1983 context, a defendant acts "under color of state law" when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988) (internal quotation marks omitted). Specifically, state action can be attributed to a private entity when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

<u>Sybalski v. Indep. Grp. Home Living Program, Inc.</u>, 546 F.3d 255, 257 (2d Cir. 2008) (quoting <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001)) (brackets in <u>Sybalski</u>).

Plaintiff advances three theories to support a finding that the private defendants are federal actors. None withstands analysis.

### b. Judicial Estoppel

First, plaintiff claims Tardalo and the NICB are judicially

estopped from arguing they are not federal actors because they previously asserted they were "government agents" in connection with their motion to quash a subpoena served by plaintiff in the criminal case. Opp'n to Priv. Mem. 22-23. We reject this theory. It is undisputed that the criminal case was dismissed before the motion to quash was decided by the court. Therefore, even assuming the prior inconsistent statement was made, because it was never "adopted by the first tribunal in some manner, such as by rendering a favorable judgment," it cannot be the predicate for judicial estoppel. Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (citation omitted). Moreover, plaintiff offers no basis in law or logic to hold the admission of two defendants in a prior proceeding against the 14 other private defendants in this case.

### c. Joint Action

Second, plaintiff argues that the private defendants' alleged participation in this case, as part of a broader cooperative arrangement between the NICB, the insurance company defendants, the FBI, and the USAO renders the private defendants joint actors with respect to Shapiro's arrest and prosecution. Opp'n to Priv. Mem. 27-28. The SAC does not allege that any private defendant personally participated in plaintiff's arrest or prosecution. Instead, plaintiff points to his allegations that: (1) MOUs exist memorializing and governing the relationship between the FBI and

NICB; (2) the FBI's website refers visitors to the NICB as an "insurance fraud resource," SAC ¶ 102, and the NICB's website touts its cooperative relationship with the FBI; (3) in this particular case, Tardalo and the NICB "voluntarily supplied" records "on behalf of various insurance companies," id. ¶ 165, as shown by Tardalo's email seeking billing information relating to plaintiff; and (4) in his 2012 press conference, Bharara thanked the NICB and insurance company investigative units for their "invaluable assistance with the investigation," id. ¶ 52.   He also alleges that AUSAs Goldman and McQuaid collaborated with the NICB and insurance company defendants to create the loss amount chart.  SAC ¶ 209.  Thus, plaintiff argues, the private defendants were willful participants in the investigation, arrest, and prosecution of Shapiro, rendering them joint federal actors for the purposes of Bivens.

Stripped of their accompanying legal conclusions, these factual allegations do not plausibly allege joint action.   A cooperative relationship in which a private party generates and communicates leads to law enforcement does not render the private party a joint actor liable under Section 1983 or Bivens with respect to a subsequent investigation, arrest, and prosecution. See Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir. 1999) ("[P]rovision of background information to a police officer does not by itself make [the private party] a joint

participant in state action under Section 1983."); <u>Liwer v. Hair</u>
<u>Anew</u>, No. 99 Civ. 11117 (SAS), 2000 WL 223828, at *2 (S.D.N.Y.
Feb. 25, 2000).

Instead, "[i]n considering joint action claims, courts must
assess whether the police independently evaluated the situation."
<u>Rodriguez v. Winski</u>, 973 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).
Where "a police officer exercises independent judgment in how to
respond to a private party's legitimate request for assistance,
the private party is not 'jointly engaged' in the officer's conduct
so as to render it a state actor under Section 1983." <u>Ginsberg</u>,
189 F.3d at 272; <u>see</u> <u>Serbalik v. Gray</u>, 27 F. Supp. 2d 127, 131
(N.D.N.Y. 1998) ("[A] private party does not act under color of
state law when she merely elicits but does not join in an exercise
of official state authority.").  This is the case even if the
information provided is deliberately false.  <u>See</u> <u>Vazquez v. Combs</u>,
No. 04 Civ. 4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22,
2004) ("[M]erely filing a complaint with the police, reporting a
crime, [or] requesting criminal investigation of a person . . .
even if the complaint or report is deliberately false, does not
give rise to a claim against the complainant for a civil rights
violation."); <u>Jones v. Maples/Trump</u>, 98 Civ. 7132 (SHS), 2002 WL
287752, at *5 (S.D.N.Y. Feb. 26, 2002) ("[A] private party's
providing false information to an arresting officer is not, by
itself, sufficient to state a claim against that private party

under § 1983." (internal quotation marks omitted)).  Similarly,
"one's motivation is irrelevant to the determination of whether
one is a state actor."  <u>Young v. Suffolk Cnty.</u>, 705 F. Supp. 2d
183, 196 (E.D.N.Y. 2010) (citing <u>Kash v. Honey</u>, 38 F. App'x 73,
75-76 (2d Cir. 2002)).

     Thus, the alleged relationship between the insurance company
defendants, NICB, FBI, and USAO asserted in the Complaint -- in
which the NICB analyzes a database of insurance companies' no-
fault claims, generates lists of potentially fraudulent claims,
and forwards that data to the FBI for use in possible insurance
fraud investigations and later prosecutions by the USAO -- is
insufficient to establish joint federal action.  Even if, as
plaintiff insists, the NICB provided false information aimed at
harming plaintiff and helping the insurance company defendants,
such communication "in no way involved the type of improper
abdication of decision-making authority from police to a private
party that would give rise to an inference of joint action."
<u>Winski</u>, 973 F. Supp. 2d at 422.  For these reasons, the private
defendants were not joint actors with the Government.

          **d. Conspiracy**

     Third, plaintiff claims he has pled joint federal action
because he has adequately pled a conspiracy with respect to Count
Six.  Opp'n to Priv. Mem 23-26.  Once again, we draw from the
Section 1983 context.  <u>Chin</u>, 833 F.2d at 24.  The elements of a

Section 1983 conspiracy involving a private party are: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002).

Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. Id. at 325. "A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." Fisk v. Letterman, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (report and recommendation), adopted in relevant part, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).

Plaintiff has not adequately pled facts permitting a plausible inference of the alleged conspiratorial agreement. As an initial matter, our discussion of the "joint action" test is sufficient to resolve the issue: because the agreement between the private and Government defendants, to the extent it exists, does not render the private defendants joint federal actors, it could not have involved "acting in concert," a necessary element of a Section 1983 (or Bivens) conspiracy.[9]

---

[9]    Courts have noted that the analysis of joint action and conspiracy claims under Section 1983 are similar, and they have evaluated the issues concurrently. See Ciambriello, 292 F.3d at 324; Winski, 973 F. Supp. 2d at 428; Forbes v.

The conspiracy claim also fails because plaintiff does not plausibly plead an agreement between the Government and private defendants. The core of plaintiff's theory of the conspiracy is that the NICB has "capture[d] law enforcement" in that the FBI and U.S. Attorney's office have agreed to cede control over its investigative and prosecutorial activities to the NICB and its constituent insurance companies. SAC ¶ 9. No non-conclusory claim in the Complaint supports this notion. Plaintiff discusses "MOUs" between the private and Government defendants, but none of the alleged MOUs evinces a surrendering or delegation of Government authority to the NICB, and plaintiff's assertion that "[t]here are certainly similar MOUs governing the ongoing criminal investigation that led to Dr. Shapiro's indictment," id. ¶ 116, is pure speculation. Plaintiff's allegations of meetings of the NICB Board of Governors to direct particular investigations, id. ¶¶ 84-86, and a specific "informal meeting" at which the Board of Governors agreed to target Shapiro, id. ¶ 131, are similarly conclusory, and plaintiff notably does not claim that any Government defendant attended any of these meetings. In sum, there is no plausible allegation of agreement and concerted action between the private and Government defendants.

---

City of New York, No. 05 Civ. 7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008); Fisk, 401 F. Supp. 2d at 375-78.

Finally, even if such an agreement between the private and Government defendants did exist, plaintiff has failed to allege that it had the impermissible goal of inflicting unconstitutional injury upon him.  See Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998) (holding alleged cooperative relationship between Government and private defendants insufficient to support a conspiracy claim).  Plaintiff relies heavily on the Tardalo email -- in which Tardalo requests information on insurance claims involving Shapiro and states that "[t]he US Attorney's Office is doing a great job getting the Global withdrawals and saving your companies a ton of money" -- as proof of a "sinister objective to the Government's prosecution of Dr. Shapiro."  SAC ¶ 216; Opp'n to Priv. Mem. 25.  There is no question but that the NICB is financially motivated to save its member companies the expense of paying fraudulent claims.  But it is a vast leap from that general and legitimate motivation to a conclusion that Shapiro was deliberately falsely targeted as part of a conspiracy with the Federal Government.  Plaintiff's assertions do not begin to bridge the gulf.  Moreover, in general, the cooperation of citizens (corporate or individual) with law enforcement is essential and is to be encouraged.

For these reasons, we conclude that plaintiff has not adequately alleged that the private defendants were acting under

color of federal law.  Therefore, plaintiff's <u>Bivens</u> claims pled against the private defendants must be dismissed.[10]

### 3. Personal Involvement

A related but independent deficiency is that plaintiff has not alleged the personal involvement of many, if not all, of the private defendants in the alleged constitutional violations. Factual allegations against specific private defendants in the SAC are scarce and largely content-neutral.  The NICB and Tardalo are alleged to have prepared the Clearview Analysis, which implicated Shapiro in the suspected insurance fraud, and sent it to the Government.  Ragan, the analyst for Farmers, merely responded to Tardalo's request for information on claims associated with plaintiff.  The insurance company defendants are only alleged (as a group) to have funded and directed the NICB.[11]  Hood, Brody, Menges, and Pierce are only alleged (as a group) to have participated in NICB board meetings.  Finally, Rivkin Radler allegedly provided its files in previous cases litigated against Shapiro and gave "legal technical support."  None of these

---

[10]    We do not reach the private defendants' additional arguments their allegedly wrongful conduct is shielded by: (1) the <u>Noerr-Pennington</u> doctrine, which protects certain First Amendment petitioning activity; and (2) New York's Financial Services Law § 405, which protects the provision of information to law enforcement officials regarding suspected violations of the banking or insurance laws.  <u>See</u> Priv. Mem. 13-17; Priv. Reply 9-13.

[11]    We do not reach the private defendants' additional argument that plaintiff improperly seeks to pierce the corporate veil in his efforts to hold the insurance company defendants liable for the conduct of the NICB, alleged to be a corporation controlled by the insurance company defendants.  <u>See</u> Priv. Mem. 17-20.

individuals or entities is alleged to have personally participated in the arrest, indictment, or prosecution of plaintiff, the sources of his asserted constitutional injuries.  For this independent reason, none of the private defendants is an appropriate target of plaintiff's Bivens claims, and thus Counts One, Two, Three, Four, Six, and Seven are dismissed against them.

### 4. FTCA Claims

Plaintiff pleads Count Eleven, a malicious prosecution claim brought under the FTCA, against all of the private defendants. FTCA claims may only be brought against the United States.  See 28 U.S.C. § 2679(b)(1).  Therefore, Count Eleven must be dismissed as to the private defendants.

### 5. Tortious Interference Claim

Count Twelve asserts a claim of "tortious interference and conspiracy to commit tortious interference" against the private defendants.  "It is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."  Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y., 464 F.3d 255, 262 (2d Cir. 2006).  Because we dismiss the Bivens and FTCA claims against the private defendants,

we decline to exercise pendent jurisdiction over the related state claim.  Therefore, Count Twelve is dismissed.[12]

## B.  The Government Defendants

Plaintiff advances eleven claims against the Government defendants.  We find each claim legally insufficient and therefore grant the Government defendants' motion to dismiss.

### 1. Bivens Claims

Plaintiff asserts eight Bivens claims against the Government employee defendants.  Counts One ("deprivation of federal rights"), Two (false arrest), Three (malicious prosecution), Four (fabrication of evidence), Six (conspiracy to violate plaintiff's civil rights), and Seven ("stigma plus") are advanced against all of the Government employee defendants, including the "John Doe" defendants.[13]  Count Five (inducement of false testimony) is pled only against Goldman and McQuaid.  Count Eight (deliberate

---

[12]    Even if we were to assert jurisdiction, we would conclude that the claim is not well pled.  Construed as a claim of tortious interference with contract, plaintiff's claim fails to allege: (1) a specific contractual term that was breached; (2) that the private defendants had knowledge of the contract; (3) that the private defendants intentionally procured a third-party's breach of that contract; and (4) actual breach of the contract.  Construed as a claim of tortious interference with business relations, plaintiff fails to allege: (1) the existence of a continuing, non-contractual relationship with a third party; and (2) that the private defendants interfered with that relationship using wrongful means.

[13]    Plaintiff's claims are inadequately pled against the two groups of "John Doe" defendants: "Department of Justice Policy Makers #1-5" and "[FBI] Special Agents and Assistant Directors #1-10."  The Complaint fails even to attempt to identify any "John Doe" officer or allege any specific conduct undertaken by such an officer.  For these reasons, the Bivens claims against these two categories of defendants are dismissed.  See Barone v. United States, No. 12 Civ. 4103 (LAK), 2014 WL 4467780, at *22 & n.23 (S.D.N.Y. Aug. 21, 2014) (report and recommendation), adopted, 2014 WL 4467780 (S.D.N.Y. Sept. 10, 2014).

indifference to training) is pled only against Bharara and Fedarcyk.

As noted, in order to state a _Bivens_ claim, a plaintiff must specifically allege that the defendant was personally involved in the purported constitutional violation; the doctrines of vicarious liability and respondeat superior are inapplicable. _Iqbal_, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Additionally, although the Complaint is unclear whether the Government employee defendants are being sued in their official or individual capacities, the doctrine of sovereign immunity bars _Bivens_ actions against current or former federal employees in their official capacities, as such actions are tantamount to suits against the United States. _King v. Simpson_, 189 F.3d 284, 287 (2d Cir. 1999); _Robinson v. Overseas Military Sales Corp._, 21 F.3d 502, 510 (2d Cir. 1994). See also Pl.'s Ltr. of May 18, 2015, at 1, ECF No. 100 (acknowledging that _Bivens_ claims against the Government employee defendants in their official capacities should be dismissed). Therefore, we consider plaintiff's _Bivens_ claims against the Government employee defendants to be lodged against them in their individual capacities.

### a. "Deprivation of Federal Rights"

Count One alleges that Shapiro was deprived of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights because he was "held in custody against his will"; "subjected to onerous and restrictive bail conditions," "an utterly baseless and selective prosecution," economic damages, personal and reputational harm, public humiliation, and emotional distress; and "otherwise suffered a deprivation of his constitutional and civil rights." SAC ¶¶ 276–77.   Beyond this conclusory list of asserted injuries, Count One does not discuss any additional facts or explain what facts gave rise to each alleged violation of his rights.   In essence, plaintiff complains of the consequences of being prosecuted without the end result of conviction.

This pleading does not conform to the Federal Rules.   By not explaining which facts give rise to the five different Constitutional violations asserted, plaintiff fails to give defendants fair notice of the substantive and factual grounds upon which the claim rests, in violation of Rule 8(a)(2).   See Alvarez v. Cnty. of Orange, N.Y., 95 F. Supp. 3d 385, 399 (S.D.N.Y. 2015); Widget v. Town of Poughkeepsie, No. 12 Civ. 3459 (ER), 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013);   Sforza v. City of New York, No. 07 Civ. 6122 (DLC), 2009 WL 857496, at *12 (S.D.N.Y. Mar. 31, 2009).

Certain aspects of Count One also fail for specific reasons. First, the Supreme Court has "declined to extend Bivens to a claim

sounding in the First Amendment," Iqbal, 556 U.S. at 675 (citing Bush v. Lucas, 462 U.S. 367 (1983)), as has the Second Circuit, Turkmen v. Hasty, 789 F.3d 218, 236 (2d Cir. 2015).  Second, other than the conclusory assertion that they were violated, the Complaint contains no allegations related to the First or Eighth Amendments.  Third, plaintiff cannot assert a due process claim against the Government employee defendants under the Fourteenth Amendment, which constrains the conduct of states, not the Federal Government.

Thus, only the Fourth and Fifth Amendment claims remain.  As to these, plaintiff makes no effort to "explain how th[e] claim[s are] distinct from those identified in his other claims for relief." Widget, 2013 WL 1104273, at *4.  Nor can we perceive any reason why they are distinct from constitutional claims asserted in elsewhere in the Complaint involving identical injuries.  See SAC ¶¶ 286, 303, 312, 318, 324, 351, 368.

In his opposition memorandum, plaintiff recasts Count One as an independent substantive due process claim based on a "pattern of harassment" by Government officials designed to "drive [him] out of business."  Opp'n to Gov. Mem. 40–41 (citing Bertuglia v. City of New York, 839 F. Supp. 2d 703 (S.D.N.Y. 2012)); see Chalfy v. Turoff, 804 F.2d 20, 22 (2d Cir. 1986) (per curiam) ("[A] true pattern of harassment by government officials may make out a section 1983 claim for violation of due process of law[.]").

Neither this legal theory nor facts suggesting such a "pattern of harassment" are present in the Complaint.  Even if they were, such a claim is "difficult to maintain," <u>Bertuglia</u>, 839 F. Supp. 2d at 719, and is particularly inappropriate in this context, when a plaintiff's allegations "are largely premised on alleged conduct proscribed by the Fourth Amendment," <u>Kastle v. Town of Kent, N.Y.</u>, No. 13 Civ. 2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar. 21, 2014) ("The Court concludes plaintiffs' claims are therefore substantially 'covered' by the Fourth Amendment (and by procedural due process protections with respect to the alleged evidence fabrication) and declines to expand the concept of substantive due process to encompass such conduct.").  For these reasons, we grant the Government defendants' motion to dismiss Count One.

### b. False Arrest

Count Two asserts a <u>Bivens</u> claim for false arrest.  The claim is governed by New York law because Shapiro was arrested in New York.  SAC ¶ 45; <u>see</u> <u>Russo v. City of Bridgeport</u>, 479 F.3d 196, 203 (2d Cir. 2007).  A plaintiff alleging false arrest in New York must show that: "'(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'"  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (quoting <u>Broughton v. State of New York</u>, 37 N.Y.2d 451, 456, 335 N.E.2d 310 (1975)).

An arrest made pursuant to an arrest warrant is privileged. Therefore, "[a]n arrest carried out pursuant to a warrant may not give rise to a claim for false arrest even though a claim of malicious prosecution may follow such an arrest." Davis v. United States, No. 03 Civ. 1800 (NRB), 2004 WL 324880, at *8 (S.D.N.Y. Feb. 19, 2004); see Wallace v. Kato, 549 U.S. 384, 389–90 (2007) (distinguishing the torts of false imprisonment and malicious prosecution); Broughton, 37 N.Y.2d at 457–58, 335 N.E.2d 310 ("When an unlawful arrest has been effected by a warrant an appropriate form of action is malicious prosecution.").

As the Complaint acknowledges, Shapiro was arrested pursuant to an arrest warrant signed by a Magistrate Judge. SAC ¶ 44. This alone forecloses a claim for false arrest. Accordingly, the Government defendants' motion to dismiss Count Two is granted.

### c. Malicious Prosecution

Count Three asserts a Bivens claim for malicious prosecution. As with the false arrest claim, New York law applies because the alleged misconduct occurred in New York. Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010). To plead a claim of malicious prosecution in New York, the plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id.

(internal quotation marks omitted); see Martin v. City of Albany, 42 N.Y.2d 13, 16, 364 N.E.2d 612 (1977).  New York law "places a heavy burden on malicious prosecution plaintiffs" to permit the accusing officers "room for benign misjudgments[.]"  Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004) (quoting Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195, 734 N.E.2d 750 (2000)).

### i. Immunity

Before turning to each of the Government employee defendants named in the malicious prosecution claim, we note that the doctrines of absolute and qualified immunity apply to the conduct of federal officers and may bar lawsuits against them.

The doctrine of absolute immunity bars claims against Government attorneys with regard to their actions in carrying out their prosecutorial functions.  See Buckley v. Fitzsimmons, 509 U.S. 259, 272–73 (1993); Imbler v. Pachtman, 424 U.S. 409, 430–31 (1976); see also Zahrey v. Coffey, 221 F.3d 342, 346 (2d Cir. 2000) ("This immunity law applies to Bivens actions as well as actions under section 1983.").  "[A]s long as a prosecutor acts with colorable authority, absolute immunity shields his performance of advocative functions regardless of motivation."  Bernard v. Cnty. of Suffolk, 356 F.3d 495, 498 (2d Cir. 2004).  That a Government attorney "may or may not have engaged in questionable or harmful conduct during the course of his representation of the State in th[e] litigation is irrelevant" as "[t]he immunity attaches to his

function, not the manner in which he performed it." Barrett v. United States, 798 F.2d 565, 573 (2d Cir. 1986). These protected functions include decisions to bring an indictment, presentations to a grand jury, and presentations of evidence to the court. Bernard, 356 F.3d at 503.

In contrast, the conduct of law enforcement officials, including prosecutors, who are performing investigative functions is protected by qualified immunity. Buckley, 509 U.S. at 273; Bernard, 356 F.3d at 502. Qualified immunity "protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

### ii. Goldman and McQuaid

As prosecutors, AUSAs Goldman and McQuaid are entitled to absolute immunity. This immunity extends to their decision to bring an indictment and their presentations to the grand jury, even if the grand jury presentation included submission of false evidence. Hill v. City of New York, 45 F. 3d 653, 661–62 (2d Cir. 1995). Likewise, a prosecutor who coerces and harasses a witness "into giving false testimony and offering up 'bad act' evidence . . . in order to get an indictment" is entitled to absolute immunity. Bertuglia, 839 F. Supp. 2d at 735. Finally, "a

prosecutor enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function." Schnitter v. City of Rochester, 556 F. App'x 5, 7 (2d Cir. 2014) (citing Warney v. Monroe County, 587 F.3d 113, 125 (2d Cir. 2009)). Thus, plaintiff's claims related to: (1) the alleged coercion of the cooperating witness Sukhman in an effort to indict plaintiff; (2) the alleged wrongful decision indict plaintiff; (3) the alleged presentation of false evidence to the grand jury; and (4) the alleged failure to disclose exculpatory evidence are all barred by the doctrine of absolute immunity.

In an effort to avoid the absolute immunity bar, plaintiff stresses his allegations that Goldman and McQuaid were involved in the investigation of the case. He argues that they fabricated evidence against him in connection with the wiretap applications, and that they participated in interviews with unspecified witnesses as far back as 2010, two years prior to plaintiff's indictment and arrest. Opp'n to Gov. Mem. 19-22.

To the extent Goldman and McQuaid were engaged in investigatory functions, they are protected by qualified immunity, which is sufficient to bar this aspect of plaintiff's malicious prosecution claim. First, as discussed in detail below, because plaintiff fails to allege that he was the target of any wiretap or

44

wiretap application, we cannot see how Goldman and McQuaid's
alleged participation in preparing the wiretap applications in the
criminal case violated plaintiff's individual rights.   Second,
plaintiff does not explain, and we cannot conceive, how
prosecutors' participation in unspecified witness interviews years
prior to plaintiff's indictment and arrest could have violated
plaintiff's clearly established constitutional rights.   We thus
conclude that absolute and qualified immunity bar the entirety of
plaintiff's malicious prosecution claim against Goldman and
McQuaid.

### iii. Bharara and Fedarcyk

The SAC fails to allege the personal involvement of U.S.
Attorney Bharara and Assistant Director in Charge Fedarcyk in the
investigation or prosecution of plaintiff.   The specific
allegations regarding Bharara relate to his involvement in the
press release and press conference and his general supervisory
authority as U.S. Attorney.   See SAC ¶¶ 52, 78, 121-22, 124-26,
129, 270-71, 279, 285.   The non-conclusory factual allegations
against Fedarcyk are even more attenuated as they are limited to
her presence at the 2012 press conference.   Id. ¶ 129.   None of
these assertions suggest Bharara or Fedarcyk's personal
involvement in the case.   Plaintiff's allegations that Bharara and
Fedarcyk implemented an "official policy" surrendering law
enforcement functions to the insurance industry, id. ¶¶ 9, 139-

40, 247, 288, are no less conclusory than the claim rejected in Iqbal: that certain senior government officials were the "principal architects" of a bad policy that they "knew of, condoned, and willfully and maliciously agreed to." 556 U.S. at 680—81. The "bare assertion that a policy exists, and the conclusion that [a defendant] was responsible for it," are insufficient as a matter of law to state a Bivens claim against senior Government officials. Guzman v. City of New York, No. 10 Civ. 1048 (DLC), 2011 WL 2652572, at *4 (S.D.N.Y. July 7, 2011). Similarly, assertions of Bharara and Fedarcyk's supervisory liability cannot support a Bivens claim. See Iqbal, 556 U.S. at 676 ("[V]icarious liability is inapplicable to Bivens and § 1983 suits[.]").[14]

Moreover, even if Bharara and Fedarcyk were personally involved in this case, Bharara is entitled to absolute immunity

---

[14]   Plaintiff's letters of March 16 and March 30, 2016, ECF Nos. 203, 206, focus on Ganek, in which a Fourth Amendment Bivens claim lodged against supervisors in the USAO (including Bharara) survived a motion to dismiss. See 2016 WL 929227, at *14-15. The plaintiff in Ganek alleged that a search of his office, conducted pursuant to search warrant, lacked probable cause. Having found that plaintiff adequately alleged that the finding of probable cause relied on an affidavit containing a materially false statement, id. at *6-7, Judge Pauley concluded that the plaintiff had also adequately pled the supervisors' Bivens liability for an improper search. This finding was based on plaintiff's plausible allegations that the supervisors were personally involved in the case such that they would have "entertained serious doubts as to the truth of" the false statement. Id. at *15 (internal quotation marks omitted). Specifically, plaintiff alleged: that the supervisors were regularly kept abreast of developments in the high-profile case; that the supervisors prioritized the prosecution of high-level executives such as plaintiff; and that a supervisor tipped the press about the upcoming search of plaintiff's office. Id. Because Shapiro has failed to plausibly allege Bharara and Fedarcyk's personal involvement in the investigation and prosecution of his criminal case, his reliance on Ganek is unavailing.

for any role in the decision to indict plaintiff, and both he and Fedarcyk are entitled to qualified immunity for their statements to the press made during the public announcement of the Indictment. Buckley, 509 U.S. at 278.

Finally, the notion that Bharara unilaterally changed the legal standard for seeking an indictment from "probable cause" to "reasonable suspicion" is both factually farfetched and legally irrelevant, given that the grand jury did find probable cause to indict Shapiro, who was indicted with dozens of others later found guilty beyond a reasonable doubt. We therefore conclude that the malicious prosecution claim is not well pled against Bharara or Fedarcyk.

### iv. Anspacher and Seifer

Special Agents Anspacher and Seifer are not liable for malicious prosecution because they did not initiate or continue criminal proceedings against Shapiro. "[T]here is a presumption that a prosecutor exercises independent judgment in bringing a criminal case, thereby breaking any chain of causation between a police officer's conduct and the initiation of the proceeding." Stukes v. City of New York, No. 13-CV-6166 (NGG)(VVP), 2015 WL 1246542, at *9 (E.D.N.Y. Mar. 17, 2015). However, arresting officers may be liable for malicious prosecution if they "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Mitchell v.

47

<u>Victoria Home</u>, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (internal quotation marks omitted).  In addition, an officer may be liable for malicious prosecution if he or she fabricates evidence or withholds relevant and material information from the prosecutor. <u>Id.</u>

Plaintiff claims AUSAs Goldman and McQuaid became involved "at the infancy of the investigation," and that they "directed the investigation . . . from its very inception."  Opp'n to Gov. Mem. 17, 21-22, 40; <u>see</u> SAC ¶ 142, 164, 172, 189-96.  These allegations preclude a claim that the FBI agents engaged in independent conduct sufficient to initiate the criminal proceeding and procure an indictment.  Indeed, the Complaint fails to allege any independent investigatory conduct by Anspacher and Seifer that did not also involve Goldman and McQuaid.  Moreover, once the grand jury indicted Shapiro, "control of the prosecution passed to the prosecutor[s]" and could not have been within Anspacher and Seifer's authority.  <u>Bernard v. United States</u>, 25 F.3d 98, 104 (2d Cir. 1994).  Thus, events occurring after the indictment cannot support a malicious prosecution claim against them.  For these reasons, the Complaint fails to adequately allege Anspacher and Seifer's liability for the malicious prosecution of Shapiro.

### v. Probable Cause

Additionally, Shapiro's malicious prosecution claim fails because the Complaint does not adequately allege the absence of

probable cause to prosecute.  "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). The filing of an indictment by a grand jury "creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  Id. (quoting Colon v. City of New York, 60 N.Y.2d 78, 83, 455 N.E.2d 1248 (1983)).  The burden of rebutting the presumption of probable cause rests on the plaintiff, who must "establish what occurred in the grand jury," and "further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially."  Rothstein, 373 F.3d at 284 (internal quotation marks and brackets omitted).

In an effort to rebut the presumption arising from Shapiro's indictment, the Complaint makes numerous conclusory assertions that the Indictment was procured by fraud, perjury, and other bad faith conduct.  In particular, plaintiff points to four aspects of the investigation: the Clearview Analysis, the wiretap applications, Sukhman's testimony, and the loss amount chart.  None of these supports the conclusion that the Indictment was procured by fraud, perjury, suppression of evidence, or bad faith.  While plaintiff's assertions perhaps understandably focus on him, this case must properly be viewed in a larger context.  Plaintiff was

only one of 36 defendants indicted together based on the same
presentation to the grand jury.  Of the original 36, 28 have been
convicted after trial or plea.  Even assuming arguendo that
plaintiff was improperly included in the Indictment, given the
convictions, any contention that the entire presentation to the
grand jury was so fundamentally flawed as to vitiate the
presumption of probable cause that flows from an indictment does
not survive even cursory scrutiny.  Nonetheless, we will address
each of plaintiff's specific challenges.

First, the Clearview Analysis was allegedly created by the
private defendants, not the Government defendants.  SAC ¶ 156.
Plaintiff does not plausibly allege that it was objectively
unreasonable for any of the Government defendants to have relied
on that document, or that any such reliance amounted to bad faith
conduct.  Furthermore, qualified immunity would attach to the
Government's alleged mistaken reliance on the Clearview Analysis.

Second, plaintiff makes the conclusory assertion that wiretap
applications were "designed to implicate Dr. Shapiro in an alleged
healthcare fraud."  Opp'n to Gov. Mem. 21.  As an initial matter,
the Complaint does not allege a wiretap of Shapiro, and, at oral
argument, plaintiff's counsel confirmed that no such wiretap was
disclosed in the course of the criminal case.  Tr. 6:1–13.
Instead, a wiretap of a different defendant captured a
communication between Shapiro and Zemlyansky.  SAC ¶ 185.

50

Plaintiff says the Government misinterpreted his statement and that the intercepted conversation did not in fact implicate Shapiro.  While details of the Shapiro-Zemlyansky conversation may have been included in later applications to extend the wiretap, SAC ¶ 186, there is no suggestion in the Complaint that the wiretap was expanded to include Shapiro.  Even if it were, the Complaint does not allege any further communications of Shapiro that were captured.  For these reasons, there are simply no facts alleged to support the claim that Shapiro was intentionally falsely targeted by wiretaps.

Third, the Complaint does not allege that threats made against Sukhman -- that his family could also be indicted if he failed to cooperate -- were not legitimate.  In fact, plaintiff submits a portion of Sukhman's trial testimony (in a trial of five other indicted co-defendants) in which Sukhman confirms that he, his father, and wife were engaged in criminal activity.  See Aff. of Jonathan M. Davidoff, Ex. C, at 1575-90, ECF No. 176.  Prosecutors may use legitimate threats of prosecution of individuals or third parties in the context of criminal proceedings.  United States v. Stanley, 928 F.2d 575, 579 (2d Cir. 1991).  Plaintiff's allegation that Sukhman was threatened in this way does not support his conclusion that such threats amounted to fraud or bad faith.

Fourth, the Complaint, closely read, does not actually allege that the amounts in the loss amount chart were fabricated.

Instead, the specific allegation is that the Government's rationale for calculating the loss amount was based on a mistaken theory of MRIs leading to further fraudulent treatment. SAC ¶ 208-09. Moreover, it is speculative and conclusory that: (1) this chart, relevant for sentencing, was even presented to grand jury, particularly given that the amount lost is not an element of the crimes for which plaintiff was indicted; (2) it had the effect that plaintiff assumes; or (3) there was not ample evidence to support probable cause without the chart.

### vi. Actual Malice

Finally, plaintiff fails to adequately plead that the Government defendants' prosecution of him was motivated by actual malice. The Complaint fails to supply any plausible motivation as to why the Government defendants would engage in a conspiracy with the private defendants to falsely prosecute Shapiro, except to say that the Government had been "captured" by the insurance industry. It also does not assert any specific ill will of the Government defendants towards Shapiro. Instead, the personal motivations ascribed to the Government defendants -- Bharara's "craze to indict," SAC ¶ 215, Goldman's "ego," id. ¶ 59, and McQuaid's "desire to work for the President," id. -- are complete non-sequiturs.

For all of these reasons, the malicious prosecution claim asserted in Count Three is dismissed.

### d. Fabrication of Evidence

Count Four alleges a <u>Bivens</u> claim against the Government employee defendants for denial of the constitutional right to a fair trial due to fabrication of evidence. "A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." <u>Jovanovic v. City of New York</u>, 486 F. App'x 149, 152 (2d Cir. 2012) (citing <u>Jocks v. Tavernier</u>, 316 F.3d 128, 138 (2d Cir. 2003) and <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997)).

Plaintiff fails to adequately plead his fabrication of evidence claim. First, plaintiff relies on the incorrect premise that the alleged mischaracterization in the Clearview Analysis and wiretap applications of "innocuous" evidence as inculpatory is itself a fabrication of evidence. At no point does plaintiff suggest that any underlying piece of evidence in the criminal case (such as an MRI film, medical report, or intercepted phone call) was fabricated. In fact, he asserts that had the Government only correctly evaluated this underlying evidence (as it ultimately did in late 2013), it would have proven exculpatory. SAC ¶¶ 76–77 182. An allegedly incorrect legal conclusion of analysts, case agents, and prosecutors untethered to an outright fabrication is

wholly insufficient.  Otherwise, every incorrect legal conclusion incorporated into a report or affidavit would be a fabrication of evidence.  Second, even assuming the Clearview Analysis was fabricated evidence, plaintiff fails to allege that any Government defendant was involved in the creation of that document, which was allegedly produced by the NICB.

Sukhman's allegedly false testimony also is not evidence fabricated by the Government employee defendants.  First, the Complaint offers no non-conclusory reason as to how Sukhman's testimony used against Shapiro was false.  Even presuming the testimony was false, it was falsified by Sukhman, not the Government, in response to tactics falling within the Government's prerogative.  Finally, as noted, plaintiff has failed to adequately allege that the loss amount chart (1) was false, or (2) contributed to his indictment.  For these reasons, the fabrication of evidence claim asserted in Count Four is dismissed.

### e. Inducement of False Testimony

Count Five, asserting a <u>Bivens</u> claim for inducement of false testimony, must dismissed for the reasons set forth above. Plaintiff does not plausibly plead: (1) wrongdoing with respect to the alleged coercion of Sukhman's testimony, or (2) why Sukhman's

testimony was false. In any event, absolute immunity bars the claim. <u>Bertuglia</u>, 839 F. Supp. 2d at 735.[15]

### f. Conspiracy to Violate Plaintiff's Civil Rights

Count Six alleges a conspiracy to violate plaintiff's civil rights. We have noted the elements of a conspiracy to violate civil rights in our discussion of <u>Bivens'</u> "color of law" requirement and concluded there was no such conspiracy. <u>Supra</u> 30–33. Moreover, Count Six cannot succeed because the Complaint fails to allege underlying constitutional violation. <u>Singer v. Fulton Cnty. Sheriff</u>, 63 F.3d 110, 119 (2d Cir. 1995). Therefore, Count Six is dismissed.

### g. "Stigma Plus"

Count Seven alleges a "stigma plus" claim against the Government employee defendants. The "stigma plus" doctrine provides a remedy for Government defamation under federal constitutional law.

> To prevail on a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.

---

[15]   Moreover, because there is no due process right to a freedom from false testimony or false allegations, a claim of "inducement of false testimony" is best viewed as a component of a malicious prosecution claim, not a stand-alone <u>Bivens</u> claim. <u>See</u> <u>Winn v. McQuillan</u>, 390 F. Supp. 2d 385, 392 (S.D.N.Y. 2005); <u>Morse v. Spitzer</u>, No. 07 CV 4793 (CBA)(RML), 2011 WL 4626004, at *12 (E.D.N.Y. Mar. 31, 2011) (report and recommendation), <u>adopted in relevant part</u>, 2013 WL 359326, at *9 (E.D.N.Y. Jan. 29, 2013).

Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) (internal quotation marks omitted).

We conclude that plaintiff's stigma plus claim, based on the February 29, 2012 press release and remarks by Bharara and Fedarcyk, fails to plead either element as a matter of law.[16]

First, plaintiff does not show a "stigma" in the sense of a demonstrably false statement about him.  The press release did not mention Shapiro by name, except in a chart listing him as an indicted person, which, of course, was accurate.  The press release also states that it is simply summarizing the charges in the Indictment.  See Krause Decl. Ex. B, at 2, ("The following allegations are based on the unsealed Indictment and other documents filed today in Manhattan federal court[.]"); id. at 3 ("The charges contained in the Indictment are merely accusations, and the defendants are presumed innocent unless and until proven guilty.").

Plaintiff's reliance on Bharara's press conference remarks is also insufficient.  Bharara stated that the scheme involved a "cadre of corrupt doctors," but did not mention Shapiro by name. Even assuming this oblique reference were sufficient to stigmatize Shapiro, the statement was not demonstrably false.  First, like the press release, Bharara's remarks were couched in cautionary

---

[16]    As a preliminary matter, the Complaint does not allege any public statements by Goldman, McQuaid, Anspacher, or Seifer, and therefore offers no basis whatsoever to name these defendants in this claim.

language.  In fact, Bharara began the allegedly offending sentence
with the phrase, "[a]s described in the indictment."  Krause Decl.
Ex. F. at 2; see also id. ("[t]oday's indictment charges the
defendants with").  Moreover, even without this hedging language,
the statement ultimately proved factually accurate, given that
multiple medical professionals were convicted in connection with
the charged fraud.

Second, plaintiff does not show a "plus."  Plaintiff asserts
that, as a result of these statements in particular, and his
indictment and prosecution in general, he has been unable to find
work and has suffered economically.  SAC ¶¶ 67–68, 231; see Opp'n
to Gov. Mem. 47–49.  We can appreciate plaintiff's position that
the sequence of being indicted, arrested, and prosecuted has done
serious harm to him financially, professionally, and emotionally.
However, these consequences, to whatever extent they may have been
caused by the Government's statements, are not more than the
"deleterious effects flowing directly from a sullied reputation,"
which, "standing alone, do not constitute a 'plus' under the
'stigma plus' doctrine."  Sadallah, 383 F.3d at 38 (internal
quotation marks and brackets omitted).  To adequately plead the
claim, plaintiff must allege a state-imposed deprivation of a
liberty or property interest "in addition to the alleged
defamation," such as a loss of his property or termination of his
Government employment.  Sadallah, 383 F.3d at 39 (internal

quotation marks omitted); <u>Bertuglia</u>, 839 F. Supp. 2d at 725–26. He has not done so.  Accordingly, Count Seven is dismissed.

### h. "Deliberate Indifference to Training"

Count Eight alleges a <u>Bivens</u> claim against Bharara and Fedarcyk for deliberate indifference to training.  We construe this claim as a "failure to train" claim, seeking to hold Bharara and Fedarcyk liable for the conduct of their subordinates.  Such a claim must be dismissed.

First, it is unclear if <u>Bivens</u> remedy is even available in this context.  <u>See</u> <u>Newton v. City of New York</u>, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in <u>Ashcroft v. Iqbal</u>."); <u>see also</u> <u>Arar</u>, 585 F.3d at 574 ("A <u>Bivens</u> action is sometimes analogized to an action pursuant to 42 U.S.C. § 1983, but it does not reach so far as to create the federal counterpart to an action under <u>Monell</u>[.]").

Second, even if <u>Bivens</u> were available, Shapiro has not alleged a "pattern of similar constitutional violations by untrained employees," which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 62 (2011) (internal quotation marks omitted).  This is because without notice of deficient training, policymakers cannot be said to have deliberately chosen a training policy that violates constitutional rights.  <u>Id.</u>

Finally, supervisory liability requires an underlying constitutional deprivation. Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999). We have found that no such deprivation is adequately pled in the Complaint. For these reasons, Count Eight is dismissed.

To summarize: all the Bivens claims lodged against the Government defendants in Counts One through Eight are dismissed.

**2. FTCA Claims**

The Complaint advances three claims under the FTCA. While the FTCA is a partial waiver of the United States' sovereign immunity for certain tortious conduct by United States employees acting within the scope of their employment, the FTCA's intentional tort exception provides that the statute's waiver of immunity shall not apply to "[a]ny claim arising out of . . . false arrest, malicious prosecution, [or] abuse of process[.] 28 U.S.C. § 2680(h). A proviso to this intentional tort exception allows intentional tort claims to proceed in connection with "acts or omissions of investigative or law enforcement officers of the United States Government." Id. However, Government prosecutors are not "investigative or law enforcement officers" within the meaning of the FTCA. Bernard, 25 F.3d at 104. Therefore, Shapiro's FTCA claims must be rooted in the conduct of Fedarcyk, Anspacher, Seifer, or other "investigative or law enforcement officers of the United States Government."

### a. Malicious Abuse of Process

Count Nine asserts malicious abuse of process against the United States under the FTCA. "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino, 331 F.3d at 76 (internal quotation marks omitted).

Plaintiff fails to adequately allege these elements. We have already found that the Complaint does not plausibly allege the Government defendants' malice necessary to support a malicious prosecution claim. For similar reasons, plaintiff does not make a plausible showing either of an intent to harm him or a collateral objective behind the indictment, arrest, and prosecution. He presents conclusory allegations that FBI "worked with the NICB and promoted their illegal agenda" and "facilitated an intentional abuse of Dr. Shapiro's constitutional rights by working with members of the NICB." SAC ¶ 178. These conclusions are a bridge too far: they fail to explain how the Government or its agents pursued its prosecution of Shapiro for nefarious reasons such as personal gain, blackmail, retribution, or infliction of economic harm. Simply claiming "various ulterior motives" for a prosecution does not sufficiently show that a "collateral objective . . . drove

60

defendant to pervert 'the regularly issued process . . . to the accomplishment of an improper purpose.'" Rhodes v. United States, 519 F. App'x 703, 706 (2d Cir. 2013) (quoting Dean v. Kochendorfer, 237 N.Y. 384, 390, 143 N.E. 229 (1924)).   The only specific collateral objective alleged is the NICB and insurance company defendants' desire to save money on reimbursements.   However, plaintiff has failed to establish joint action or a conspiracy between the private and government defendants, undermining his repeated assertion that the Government prosecuted him to benefit the NICB and the insurance company defendants.   These deficiencies doom the FTCA abuse of process claim, and Count Nine is dismissed accordingly.

### b. False Arrest

Count Ten asserts a claim for false arrest against the United States under the FTCA.   As noted, a false arrest claim must fail when the arrest was executed pursuant legal process.   Because an arrest warrant was issued in this case, Count Ten cannot succeed.

### c. Malicious Prosecution

Count Eleven asserts a claim for malicious prosecution against the Government employee defendants and the private defendants under the FTCA.   The United States is the only permissible defendant under the FTCA.   See 28 U.S.C. § 2679(b)(1); Hightower v. United States, 205 F. Supp. 2d 146, 153–54 (S.D.N.Y. 2002).   Even if the United States had been correctly named as the

defendant, we have already considered and rejected plaintiff's malicious prosecution theory for a variety of reasons in the context of his <u>Bivens</u> claim.

Accordingly, the FTCA claims asserted in Counts Nine, Ten, and Eleven are dismissed.

## C. Leave to Amend is Denied

Plaintiff seeks leave to file a third amended complaint to add state-law claims. Opp'n to Priv. Mem. 22 n.12. Following the filing of a first amended complaint, a party may amend its pleading only with the opposing party's consent or the court's permission. Fed. R. Civ. P. 15(a). Whether to grant leave to amend is left to the court's discretion. <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007).

We deny plaintiff's request for leave to amend, as well as any request to re-plead the instant causes of action. Plaintiff has had three chances to plead his claims, and, in the SAC, used 115 pages to do so. The Court previously warned him not only of the prolixity of his First Amended Complaint, but also that he would be unlikely to receive another chance to amend. Equally important, he was put on notice by numerous pre-motion letters from defendants which raised most of the arguments we have addressed here. Finally, the deficiencies in the SAC are substantive and substantial.

In this context, permitting plaintiff a fourth opportunity to plead his claims would "needlessly burden counsel and the Court, and unhelpfully encourage counsel in future cases to forego earlier opportunities to replead once on notice of the full arguments favoring dismissal." Lopez v. Ctpartners Exec. Search Inc., No. 15 Civ. 1476 (PAE), --- F. Supp. 3d ----, 2016 WL 1276457, at *23 (S.D.N.Y. Mar. 29, 2016).  Thus, our dismissal of the claims in the SAC is with prejudice.

### III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted.   The Clerk of the Court is directed to terminate the motions pending at Docket Numbers 151, 157, 161, 164, 169, 172, and 178 and to close this case.

Dated:     New York, New York
           August /5, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

63